# Exhibit A

Westlaw.

Not Reported in N.E.2d
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Page 1

**C**

Superior Court of Massachusetts.
Duncan M. McFARLAND, et al., Plaintiffs,
v.
Arnold C. SCHNEIDER, III, Defendant.
**No. Civ.A. 96-7097.**

Feb. 17, 1998.

Private Counsel 126320, James S Dittmar, Hutchins Wheeler & Dittmar, Boston MA, Private Counsel 557029, Karen M O'Toole, Hutchins Wheeler & Dittmar, Boston MA, for Colonial Williamsburg Foundation Active 09/05/97, Other interested party.

**FINDINGS OF FACT, CONCLUSIONS OF LAW & ORDER FOR JUDGMENT**

MCHUGH, Justice.

**I. BACKGROUND**

*1 This is an action in which four of the partners of Wellington Management Company seek on behalf of themselves and their partners injunctive relief and damages against a former partner who left the firm to start his own business. [FN1] Pursuant to Mass.R.Civ.P. 42(b), the claim for injunctive relief was severed before trial from the claim for damages. [FN2] The injunction claim then proceeded, to trial, without a jury. Without objection, direct examination generally proceeded by way of affidavits and cross examination proceeded in the customary fashion. Following completion of the courtroom phase, the parties submitted deposition transcripts [FN3] and requests for findings of fact and conclusions of law. Based on the testimony presented during the course of the trial, the exhibits there introduced, the deposition testimony admitted after the trial, and the reasonable inferences I have drawn from all of those sources, I find and conclude as follows:

FN1. The plaintiffs' standing to bring this action and to seek the relief they now seek was challenged unsuccessfully before trial. See Paper No. 35.

FN2. The severance order, entered on the record over defendant's objection, stated that any findings made by the court would not be binding on a jury empaneled to hear the damage case.

FN3. Both sides made objections to some portions of the deposition testimony offered by the other. Rulings on those objections have been made in a separate order of even date.

**II. FINDINGS OF FACT**

*A PARTIES*

Plaintiffs Duncan M. McFarland ("McFarland"), Robert W. Doran ("Doran"), John R. Ryan ("Ryan") and Paul D Kaplan ("Kaplan") are partners of Wellington Management Company, LLP ("Wellington" or the "Partnership"), a limited liability partnership registered under the laws of the Commonwealth of Massachusetts.

Messrs. McFarland, Doran and Ryan are the Managing Partners (the "Managing Partners") of Wellington. At all times relevant to this action, Mr. Kaplan was a member of Wellington's Executive Committee. When this lawsuit was filed, Wellington had 51 partners (collectively the "Partners" and individually a "Partner").

Defendant Arnold C. Schneider, III ("Mr.Schneider") is a former Partner of Wellington. He was removed from the Partnership on December 4, 1996 pursuant to the vote of the Wellington Partners the preceding day. Mr. Schneider is a citizen of the Commonwealth of Pennsylvania. He is a Chartered Financial Analyst, a former president of the Financial Analysts of Philadelphia and is currently on that group's Board of Directors. Mr. Schneider now operates his own investment management company, Schneider Capital Management, L.P. ("SCM")

*B. WELLINGTON MANAGEMENT COMPANY*

*1. General*

Founded in 1928, Wellington provides investment advisory and management services for several hundred clients located in the United States and in more than 20 foreign countries. Currently, the firm manages over $133 billion of its clients' assets. Those clients are primarily institutional investors (such as retirement plans or endowments) and mutual funds.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d                                                                                                      Page 2
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Wellington is organized as a Massachusetts limited liability partnership and currently has 54 Partners, all of whom are actively engaged in Wellington's business. In addition to the Partners, Wellington employs approximately 600 employees, consisting of about 160 investment professionals, 120 non-investment professionals and a support staff of 320. Included among the investment professionals are 24 equity portfolio managers with an average of 25 years of experience and an average of 19 years with Wellington. There are also 16 fixed income portfolio managers representing an average of 16 years of experience and 9 years with Wellington. Wellington is headquartered in Boston but also has offices in Valley Forge, Atlanta, and San Francisco. [FN4]

> FN4. An affiliate, Wellington International Management Company, Pte. is based in Singapore and has a branch in Sydney, Australia. Another affiliate, Wellington Management International has its office in London, England. Wellington Trust Company, NA, a wholly-owned subsidiary of Wellington, is a limited purpose trust company also headquartered in Boston. Other affiliates of Wellington have been created in conjunction with the offering of hedge fund limited partnerships, both offshore and domestic, and to serve various types of pooling vehicles offshore. Wellington and its affiliated companies are referred to collectively as the "Wellington Management Organization."

*2 Wellington's business has grown steadily over the years since it was formed. Most of its contracts are terminable by either side on thirty days notice to the other. Although Wellington loses, and expects to lose, some clients each year for a variety of reasons, it also gains, and expects to gain, new clients annually as well. Despite those annual ebbs and flows, Wellington's overall number of clients and the overall amount of money it manages have shown consistent increases.

When a client contracts with Wellington for investment services, a portfolio manager typically is assigned to the client's account. The portfolio manager typically is assigned to the client's account by Wellington's Chief Executive Officer ("CEO") based on recommendations from line managers. In assigning portfolio managers, the CEO attempts to match a manager's skills and style with client needs and objectives rather than to reward origination of

business. Almost invariably, however, the client is consulted about the identity of the prospective portfolio manager before a final decision is made. Moreover, the client typically has the right to reject a manager proposed by Wellington either as a consequence of an express term of the management contract between the client and Wellington or as a practical consequence of Wellington's desire to maintain good client relations. Once assigned to an account, the portfolio manager is the Wellington employee primarily charged with making investment decisions regarding the client's funds in the account for which he or she is responsible. [FN5]

> FN5. In that regard, Wellington typically is the custodian of the funds and the portfolio manager actually places buy and sell orders for execution by Wellington's trading department. Sometimes, however, custody of the securities in the account is lodged elsewhere. In those cases, individualized trading arrangements typically are made and Wellington's trading department does not execute trading orders.

Wellington charges its clients an annual fee for the services it provides. Typically, that fee is determined by a percentage of assets under Wellington's management on a specific date or dates. All of the revenues derived by Wellington from all of its activities belong to the Partners as a whole. Those revenues are divided between and among the Wellington Partners and employees pursuant to various criteria, all of which are designed to provide incentives for performance at high levels.

Wellington Partners, like Mr. Schneider, are compensated by means of a draw, participation in the firm's year-end profits and incentives tailored to the individual Partner. Wellington typically uses benchmarks to determine incentive-based distribution to those of its Partners who manage portfolios. The incentive compensation those managers receive therefore depends, in large part, on how the funds they are handling during a given period perform in relation to performance of the funds included in the benchmark. Mr. Schneider's benchmarks always were the S & P 500 or the Russell 1000 Value, indices that tracked performance of securities issued by the some of the largest companies in the United States.

Although the portfolio manager is ultimately responsible for investment decisions regarding the accounts he or she is managing, one person working

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                    Page 3
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

alone typically cannot acquire and digest all of the vast amount of information typically necessary for sound investment decisions. Wellington, therefore, provides support to all of its portfolio managers in many different ways. Three of those ways are of primary importance.    First of all, Wellington typically assigns teams of analysts to work for individual portfolio managers. Those teams often are critical to the manager's success for, over time at least, they come to know his or her investment "style," the kinds of information he or she needs in order to make sound decisions and the kinds of data he or she regards as important.    Accordingly, while an individual manager's insights, judgment and experience are critical to his or her overall success, those qualities require the support of an experienced and competent team of analysts in order to reach their full potential.

*3 Second, in addition to the team of analysts assigned to each manager, Wellington maintains a large central research group with analysts devoted to following particular industries and companies within those industries.    All portfolio managers have access to services and reports the central research group generates.

Finally, every morning, all of Wellington's investment professionals gather for a morning meeting during which investment information is discussed and analyzed.    The Valley Forge office participates in that morning meeting by conference call and is on-line with three monitors used to display investment information to all in attendance at the meeting at whatever site.    During the meeting or at some other time during the morning, Wellington distributes to all managers listings of all transactions made by all Wellington portfolio managers the previous day.

Wellington's overall management was designed in a manner the designers thought was likely to allow investment professionals to concentrate on their investment-related responsibilities with an almost single-minded intensity.    Specific Wellington employees other than the portfolio managers are responsible for such things as marketing and business development, client service, regulatory affairs, administration, finance, investment services, portfolio management and other areas.    Each of those individuals is responsible for seeing that his or her specific functions are performed throughout the organization.

In keeping with its desire to allow investment

professionals to focus on investments and investing, Wellington does not rely on its portfolio managers to originate new business and does not directly compensate them for business they do originate. Instead, Wellington has developed marketing teams dedicated to that task.    Similarly, Wellington's clients generally receive administrative services from specific service managers who are part of dedicated client service groups within the firm, not from the client's portfolio manager.

*2. The Partnership Agreement and Structure*
The Wellington Partnership was formed in 1979 when Wellington, at the time a public company with approximately 2,000 shareholders, became privately owned. Wellington's Articles of Partnership (the "Partnership Agreement") were originally adopted on August 31, 1979 and have been amended several times since then.    The most recent amendment became effective on September 30, 1996.

The Partnership Agreement provides for a Managing Partners Committee to oversee partnership matters and for an Executive Committee to oversee business matters.    The Managing Partners Committee consists of three Partners elected by vote of the all Partners. Currently, the Managing Partners Committee consists of John Ryan, Robert Doran and Duncan McFarland. Among other things, the Managing Partners Committee is responsible for determining Wellington's annual net profit or net loss and each Partner's allocable share of that net profit or loss. [FN6] The Managing Partners Committee elects the firm's Chief Executive Officer ("CEO"), currently Duncan McFarland.    The Committee also has the exclusive authority to appoint Associates (who are senior, non-Partner professional employees), to nominate persons for admission to the Partnership and to recommend removal of a Partner from the Partnership.    Actual removal of a Partner, however, requires the affirmative vote of at least 75% of the Partners. [FN7]

> FN6. The allocable share of profit and loss is compensation in addition to the incentive income discussed earlier.    See p 5, *supra* In deciding upon a Partner's allocable share, the Committe takes into account the value of the Partner's services to the firm, his or her capital account and any other factors the Committee deems relevant.

> FN7. In discharging its responsibility for oversight of business matters, the Executive Committee, among other things, appoints

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d                                                                    Page 4
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

committees to focus on particular business issues, oversees and approves the expansion of business units, oversees the investment of Wellington's assets and authorizes capital expenditures.    The Executive Committee consists of the three Managing Partners plus from two to six additional members nominated by the CEO and elected by the Partnership.  Mr. McFarland currently is the Chair of the Executive Committee.

*4 Article XV of the Partnership Agreement, the provision lying at the heart of the present controversy, is entitled "Agreement Not to Compete." [FN8]  That Article contains two separate but related undertakings by each Partner, one dealing with Wellington's clients and employees and the other dealing with competition generally.  Article XV also contains a waiver provision.  In material part, those provisions read as follows:

> FN8. Another provision of the Agreement, Article XIV, is relevant to the overall controversy between the parties.    Article XIV sets forth the financial terms on which Partners withdraw from the Partnership.  In essence, a withdrawn Partner receives payments for ten years following his or her withdrawal.    Those payments are drawn from a percentage of the firm's net available income and are based on a formula set forth in Article XIV itself.

Each Partner recognizes and acknowledges that, in connection with the performance of his or her duties as a Partner, he or she will obtain access to, and become familiar with, confidential and proprietary information of the Partnership, its affiliated companies and its customers, clients and employees, and that he or she will obtain personal knowledge of and influence over the identity and business needs of the Partnership's customers, clients and employees. Each Partner further recognizes and acknowledges that, as a result of the above, he or she has an ability to cause harm to the Partnership after he or she withdraws or is removed as a Partner, and that the terms of this Article XV are a fair and reasonable means of preventing such harm.

Each Partner also recognizes that the extent to which the activities of a withdrawn or removed Partnership may cause harm to the Partnership is a matter best determined by the facts and circumstances of each case, recognizing that there are many activities in which a withdrawn or removed Partner may engage which will not constitute harm to the Partnership.    Therefore, the Managing Partners, acting by majority vote, shall have the authority on behalf of the Partnership to fairly and reasonably determine whether the activities or proposed activities of the withdrawn or removed Partner are appropriate or constitute misappropriation or will adversely affect the Partnership's good will (including especially its relationships with its customers, clients and employees) and its confidential and proprietary business information.    In the event that the Managing Partners conclude that the activities or proposed activities of a withdrawn or removed Partner constitute such harm to the Partnership, the Managing Partners shall give due consideration to the reasons and circumstances of the Partner's withdrawal or removal in determining what actions, if any, shall be taken to remedy the violation.

Except to the extent waived by the Managing Partners, each Partner agrees that, for a period of five years following such Partner's withdrawal or removal as a Partner, he or she will (i) not business from any client of the Partnership on behalf of himself or herself or any entity engaged in competition with the Partnership, (ii) refrain from hiring, enticing or in any other manner persuading or attempting to persuade any Partner, employee, independent contractor, client or customer of the Partnership to discontinue his, her or its relationship with the Partnership, or to violate any Agreement with the Partnership, and (iii) notify the Partnership of any change in his or her address and of each employment or other business activity in which he or she engages.

*5 Except to the extent waived by the Managing Partners, each Partner further agrees that, during the time he or she is a Partner, and for the initial three year period after such Partner's withdrawal or removal, he or she will not participate in any business engaged in competition with the business of the Partnership or any of its affiliated companies, including a business engaged in providing investment advisory or investment management services.  For purposes of this paragraph, the phrase "participate in a business" shall include, but not be limited to, consulting to, being employed by, or having a direct or indirect ownership interest (other than ownership of less than 5% of a class of securities registered under the Securities Exchange Act of 1934, as amended) in, any business or entity which engages in the business or activity in question.
    ....

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                              Page 5
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Each Partner understands and agrees that any decision by the Managing Partners to waive the provisions of this Article XV in a particular case shall not be deemed a waiver of the Partnership's right to fairly and reasonably enforce the provisions of this article in any other instance. In the event that any one or more provisions of this Article XV shall for any reason be held to be invalid, illegal, or unenforceable shall not affect [*sic* ] any other provisions of these Articles. If any one or more of the provisions of this Article XV shall for any reason be held to be excessively broad as to duration, geographical scope or subject, it shall be construed by limiting and reducing it so as to be enforceable to the maximum extent compatible with applicable law as it shall then appear. [FN9]

> FN9. Article XV was added to the Partnership Agreement in a 1990 amendment to that agreement. Before that amendment, the provision regarding competition had been part of Article XIV, titled, "Removal and Withdrawal of Partners." The earlier non-competition provision was different from the current provision in two respects. First, the non-competition period was, in substance, twelve years. Second, there was no flexibility in application of the provision. That lack of flexibility effectively prevented some withdrawing Partners from engaging in activities that might technically amount to competition but posed no real harm to the Partnership. As the quoted sections of Article XV reveal, the 1990 amendment shortened the applicable time period to three years for general competition and five years with respect to clients and employees of the firm. In addition, Article XV created a waiver provisions the Managing Partners were given the power to execute.

Article XV sprang from a variety of different considerations, all of which centered on the Partners desire to give Wellington--which, like many professional corporations, resembles a holding company for boutiques each of which is able to survive and perform, although usually not as well, on its own--a substantial measure of institutional stability. In part, Article XV was designed to give employees who hoped to become Partners some assurance that the partnership they ultimately achieved would warrant their investment of years of effort. The Article also was designed to help create

and maintain an environment of professional collegiality and openness so that all Partners could collaborate on providing all Wellington clients with high quality services without fear that their efforts ultimately would enrich another Partner at their own expense. Finally, Article XV was designed to promote Wellington's stability and thus its continued ability, among other things, to produce the revenues necessary to make payments to which withdrawn Partners are, and will be, entitled under Article XIV of the Partnership Agreement.

From 1983 until 1990, only three Partners withdrew from Wellington and all three adhered voluntarily to the far more rigorous provisions of the non-competition provisions then in effect. After Article XV was created in 1990, eight Partners withdrew. [FN10] One or two of the eight simply retired completely from all work. Their departure thus provided no occasion for considering the Article's reach and impact. Others undertook activities that clearly fell outside the scope of the Partnership's business. Those activities, too, furnished no occasion for interpreting the Article's terms.

> FN10. In addition, one died.

*6 For a variety of reasons, Wellington personnel did not tell their clients about the terms of Article XV either when the clients signed their contracts with Wellington or at a later date. Wellington viewed the issue as one relating chiefly to internal governance, not to client relations. Moreover, no Wellington Partner who left Wellington in the past had done so in order to start his or her own investment management firm. Thus questions about who had precisely what rights upon a Partner's departure had remained largely academic. For the same reasons, Wellington never had an occasion to tell a client that a portfolio manager would be unavailable to manage--its funds after his departure from Wellington.

On four occasions, however, the Managing Partners were asked to grant waivers of the type that Article XV contemplates. On three of the four occasions, they granted the request [FN11] and, on the fourth, they did not. [FN12] Nevertheless, before Mr. Schneider's departure, Wellington had not faced an "unfriendly" departure from the firm and had never faced a request for a waiver from the provisions of Article XV that involved either the prospect of direct competition at a significant level [FN13] or continued provision of services by the withdrawing Partner to several of the firm's then-existing clients. Thus, when the relevant events began to unfold

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 11 Mass L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Page 6

during the summer of 1996, Wellington had neither a well-formulated approach to the problems for its own guidance nor a tested template for use by others.

FN11. John Neff, a former Managing Partner who ran Vanguard's Windsor Fund for 31 years, was permitted to continue providing *pro bono* investment advisory services to the University of Pennsylvania. George Lewis was permitted to join the investment office responsible for managing assets held in trust for his family. Gerald Mitchell, the Partner who left to attend Divinity School, was permitted to continue advising one long-term client. That client essentially requested that Mr. Mitchell meet with it quarterly to give it some general advice. The client remained a Wellington client at all times.

FN12. Mr. Neff sought a waiver to become associated with Hirtle Callaghan & Co., Inc. an investment advisor based in Wayne, Pennsylvania, that serves as an advisor to high net-worth individuals and monitors independent investment managers. The Managing Partners declined to grant Mr. Neff a waiver to allow him to join that organization.

FN13. I recognize, and will address shortly, Mr. Schneider's contention that his withdrawal and subsequent activities did not involve competition with Wellington.

*C    THE    SCHNEIDER-WELLINGTON RELATIONSHIP*

*1. The Inception*

Mr. Schneider joined Wellington upon his graduation from college in June, 1983. When he joined the firm, Mr. Schneider had no experience in the investment management business and, like many in his position, brought no clients with him. Mr. Schneider began by working as an analyst in Wellington's Valley Forge office under the direction of John Nyheim, a now-departed Partner who was responsible for managing several of Wellington's accounts. As he progressed, Mr. Schneider was given more and different responsibilities and began to assume some coordinate responsibility for the portfolios Mr. Nyheim was managing. Mr. Schneider along with others, also made presentations to prospective clients Wellington's marketing department was soliciting.

Mr. Nyheim and his team of analysts were known throughout Wellington as the Value/Yield team. [FN14] In early 1992, the Value/Yield team was managing portfolios for 18 Wellington clients with total of approximately $3 billion in assets under Wellington management. Among those clients were Frank Russell Trust Company ("FRTC") [FN15], RJR-Nabisco ("RJR"), PECO Energy, the Colonial Williamsburg Foundation ("Colonial Williamsburg") and the State of Utah Retirement System ("URS").

FN14. The "value" component of the label derives from a so-called "value" approach to investing, i.e., an approach that seeks stocks with lower than average price/earnings or price/cash flow multiples. The "yield" component comes from the strength of the security's yield. The labels, however, carry with them an aura of precision that really does not exist. In the last analysis, as Mr. Ryan put it at trial and as the history of several of the accounts presented at trial amply demonstrated, all portfolio managers had essentially the same objective: buying low and selling high.

FN15. FRTC is a subsidiary of the Frank Russell Company ("FRC"), a consultant to institutional investors and the parent for the Frank Russell Investment Management Company ("FRIMCO"), the advisor of mutual funds organized by FRC. Hereafter, "Russell" will refer to FRC, FRTC and FRIMCO as a group.

Mr. Schneider was elected a Wellington Partner in December of 1991, effective January 1, 1992. He signed the Partnership Agreement shortly thereafter. [FN16] Although no one had discussed the terms of the Partnership Agreement with him at the time he was hired or at any time before his election to Partnership, [FN17] he was given a copy of that Agreement after his election and before he was asked to sign it. In addition, Mary Ann Tynan ("Ms.Tynan"), a Wellington Partner who serves as Wellington's Director of Regulatory Affairs, discussed with Mr. Schneider the Agreement as a whole and several of its provisions, including Article XV. Ms. Tynan had that discussion with Mr. Schneider, and others who had been elected to Partnership with him, as part of her regular practice of discussing, *inter alia,* the terms of the Partnership Agreement with all newly-elected Partners. Ms. Tynan encouraged Mr. Schneider to review the terms

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

of the Partnership Agreement in detail, and in particular the non-competition provisions, and to refer any questions about the Agreement or its terms to her, to his own legal advisers or to the firm's Managing Partners.

> FN16. Mr. Schneider signed the Partnership Agreement again in 1994 and 1996, when it was amended in ways not here relevant. He signed the 1996 version of the agreement in the late summer or early fall off that year, after he announced his resignation and at a time when he was engaged in activities described in more detail below. On both occasions, he knew the Agreement contained the restrictions found in Article XV and on neither occasion did he say anything about them to any Wellington Partner or employee.

> FN17. Wellington's treatment of Mr. Schneider was not unique, for Wellington Partners and employees typically did not discuss the terms of the Agreement with employees before they were elected to Partnership.

*7 Before signing the Agreement, Mr. Schneider read it. He also reviewed its content with his attorney and with members of his family. He raised no questions about any provision of the Agreement with Ms. Tynan or any other Wellington Partner. Mr. Schneider knew when he signed the Agreement that it contained the non-competition agreements in Article XV, he understood what the agreements meant and he understood they prohibited him from doing. At the time, however, he was concerned with advancing his own career at Wellington, had no plans to leave and thus was not concerned in the slightest with the restrictions those agreements imposed. He signed the Partnership Agreement freely and willingly--indeed, enthusiastically--consumed, as he was, with anticipation about what a Wellington Partnership would mean for him.

Later in 1992, Mr. Nyheim tendered his resignation from Wellington. His resignation was accepted effective December 31, 1992. After Mr. Nyheim announced his resignation, Mr. Nyheim, Mr. Schneider, Mr. Ryan and John H. Gooch, another Wellington Partner, began a coordinated effort to retain for Wellington the clients whose accounts Mr. Nyheim had been managing. The effort ultimately included a consulting arrangement between Mr. Nyheim and Wellington that continued for

approximately one year while Wellington's retention and transition efforts progressed. Overall, the transition process lasted some twenty months and had Mr. Nyheim's full cooperation and effort. Ultimately, Wellington retained 15 of the 18 portfolios Mr. Nyheim had been managing. Mr. Schneider became the account manager for 10 of those 15. Those 10 had committed a total of $1.3 billion to Wellington's management. Mr. Ryan succeeded to management of another five clients representing aggregate managed assets of over $1.4 billion. Three other clients, with assets of approximately $190 million, left the firm and were shortly thereafter joined by a fourth.

Wellington's retention of the vast majority of the portfolios Mr. Nyheim's had been managing, and the transfer to Mr. Schneider of some of those accounts, proved quite profitable to Wellington and to Mr. Schneider. In fact, Mr. Schneider's compensation more than quintupled from 1992 to 1993, so that he received well more than $1 million in total compensation for 1993. His distributions remained at that high level for the next two and a half years. In 1995, he received distributions from Wellington in the total amount of $1,463,999.

### 2. Prelude to Disharmony

In early to mid June of 1996, Mr. Schneider telephoned Duncan McFarland, Wellington's CEO, to say that he was concerned about the impact that some of the Wellington's moratorium and allocation policies were having on his performance and that he wanted to speak to Mr. McFarland on the subject the next time the latter was in Valley Forge. Both of those policies had been in existence at Wellington for some time and both had counterparts at other large investment management firms throughout the United States. Both had caused extensive internal discussions at Wellington through the years, discussions that became more or less intense as the investment climate shifted and changed.

*8 The moratorium policy provides, in essence, that Wellington portfolio managers' combined holdings of a given security cannot exceed 14% of the issued and outstanding shares of that security. [FN18] The policy is designed to facilitate Wellington's compliance with regulatory requirements imposed on those who hold large blocks of an issuer's shares. The policy is also designed to avoid problems in liquidating shares of a security if Wellington's managers collectively decide that the shares should be sold. When the 14% moratorium limit is reached, Wellington's fund managers are not permitted to buy shares of that security until Wellington's aggregate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                Page 8
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

holdings again drop below 14%.

> FN18. At one time the Moratorium limit was 10%. That limit caused problems at Wellington because John Neff, who ran the Windsor Fund until the end of 1995, had a practice of taking large positions in companies in which he invested. That practice coupled with the size of the Windsor Fund, and thus the amount it had to invest, sometimes put pressure on moratorium limits. The resulting problem was ameliorated by Wellington's decision to increase the moratorium limit from 10% to 14%. The Windsor Fund's own investment restrictions prohibit it from holding more than 10% of the capitalization of any given company. As a result, even if the Windsor Fund purchased as much of a security as its own limits permitted, 4% of the outstanding shares of that security would remain available to other Wellington Managers.

In essence, the allocation policy is designed to distribute shares when the block Wellington possesses is insufficient to satisfy the demands of all portfolio managers. When Wellington portfolio managers place orders to buy securities for more than one client at approximately the same time and at approximately the same price, the orders are combined for purposes of execution and all clients receive the same average price for all trades executed through same broker on the same day. For many reasons, all of the orders placed and executed in that fashion may not be completely filled that day or ever. There may be insufficient shares available in the market at the desired price. In the case of an initial or secondary public offering, the underwriter may allocate fewer shares to a particular investment management firm than the firm has sought. [FN19]

> FN19. The same problem sometimes is encountered when only one Wellington account is involved. The amount of securities Wellington managers sometimes buy and sell means that it may take days or even weeks to fill their order completely. Indeed, in some cases it may be impossible to fill the order completely.

When all orders for a security cannot be filled, it is necessary for Wellington to allocate between and among client portfolios the total shares purchased at the price the several portfolio managers requested. When purchases from the secondary market are

involved, Wellington typically makes the allocation to each portfolio based upon the relative size of that portfolio's order in relation to the total orders from all portfolios. When initial public offerings or purchases that approach the moratorium limit are concerned, Wellington typically allocates on the basis of account size rather than order size. Allocation of initial public offerings, however, is also subject to other discretionary factors typically overseen and executed by one of Wellington's Partners. [FN20]

> FN20. Initial public offerings, or IPO's, often were oversubscribed within Wellington, and in the market generally. Accordingly, if a Wellington portfolio manager proposed an allocation of Wellington's allotment of shares in a manner different from an allocation based strictly on assets under management, John Gooch, a Wellington Partner with oversight responsibilities for all portfolio managers, was empowered to make discretionary judgments regarding what percentage of the available securities should be placed in what portfolio. In exercising that discretion, Mr. Gooch considered, among other things, the portfolio manager's attendance at meetings with management of the issuer, amount of research done, prior knowledge of or particular interest in the relevant industry and market capitalization of the issuer.

Application of the allocation policy sometimes can result in a phenomenon known as "crowding out." If a portfolio manager with, say, two billion dollars under management and a manager with, say, ten billion dollars under management both sought the same amount of the same security under circumstances that triggered the allocation policy, the manager with ten billion dollars under management would likely receive five shares for every share received by the manager with two billion dollars in her portfolio. The latter, therefore, would be "crowded out" of all the shares she desired because of the order placed by the manager of the bigger portfolio or portfolios. As a result of being "crowded out," some portfolio managers sometimes were unable to achieve the overall position in a security they sought to achieve and that they felt would be of greatest benefit to their portfolio.

*9 Wellington disclosed its allocation and moratorium policies to its clients both in its Form ADV [FN21] and in more detail upon request. The clients, all of whom are highly sophisticated asset

Not Reported in N.E.2d                                                                Page 9
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

custodians or managers, were aware that firms like Wellington typically had such policies even if they were not always aware of the precise terms of each policy. The clients were not generally concerned about those policies as long as they were treated in a fair and equitable manner. Both policies, after all, were the product of Wellington's size and consequent presence in the market, a size and presence that produced a number of benefits unavailable to smaller firms and their clients.

> FN21. The Form ADV is the public disclosure statement Investment Advisors must file annually with the SEC and in which they must disclose a number of the features and facets of their business operations. See 17 C.F.R. § § 275.204-1, 279.1. The SEC has no specific regulations for operation of either allocation or of moratorium policies but does require that the policies be clearly articulated, be fair to all clients over time and be appropriately disclosed to clients.

In any event, Mr. McFarland met with Mr. Schneider in June of 1996 in Valley Forge. [FN22] The two discussed the moratorium and allocation policies and Mr. Schneider's contention that their application was adversely affecting his performance. [FN23] Toward the end of the conversation, Mr. Schneider raised with Mr. McFarland the possibility of some different form of affiliation between himself and Wellington. Essentially, Mr. Schneider stated that he wanted an arrangement with Wellington under which he, or an entity with which he was affiliated, would have access to Wellington's information and facilities but unencumbered by Wellington's moratorium and allocation policies.

> FN22. This was the first in what turned out to be an extended series of meetings and conversations that ensued over the next few weeks and months. The memories of the participants regarding the content of the conversations and meetings is generally congruent but often differs in a manner reflecting the participant's interest. A given participant's account of the meeting or conversation thus often resembles a "colorized" black and white film: the essential structure is often accurate but frequently the hue is slightly, and sometimes substantially, off. My findings with respect to the content of all meetings and conversations, like all of my findings

generally, thus are necessarily the product of all of the evidence and the inferences I have drawn from that evidence.

> FN23. During the conversation and at trial, Mr. Schneider contended that the advisory account he managed for URS outperformed the other Wellington accounts he managed because the URS account was not, for reasons here irrelevant, subject to the allocation and moratorium policy. At least one account Mr. Schneider managed that was subject to both policies equaled or exceeded URS's performance in the four years during which Mr. Schneider managed both accounts. To be sure, URS's performance exceeded the average performance of Mr. Schneider's other Wellington accounts by 1.5%. Those results might be attributable to application of the allocation and moratorium policies, might be attributable to other factors and might be attributable to a combination of factors. Notwithstanding the asserted importance of the matter and the numerous spreadsheets and other analytical studies he routinely performed to measure the performance of the accounts and parts of accounts he was managing, Mr. Schneider never performed any empirical studies to determine precisely what impact allocation, moratorium or crowding out had on his accounts' performance. I am unpersuaded as a matter of fact that those policies had an adverse impact on his portfolios. I also am unpersuaded that Mr. Schneider in truth and in fact believed that they had a significantly adverse impact on his portfolios at the time he had his conversation with Mr. McFarland.

Mr. McFarland told Mr. Schneider to put his proposal in writing so that he could discuss it with Messrs. Doran and Mr. Ryan, the other Wellington Managing Partners. Immediately after his meeting with Mr. Schneider, Mr. McFarland told both men about Mr. Schneider's request. He also asked Ms. Tynan, the head of Wellington's regulatory affairs department, to consider, in principle, Mr. Schneider's proposal and to advise the Managing Partners about both the regulatory issues it raised and about the extent to which Wellington's policies and procedures would have to apply to such an affiliate.

Under the Partnership Agreement, Partners were

Not Reported in N.E.2d                                                                                    Page 10
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

required to give six months notice of resignation or withdrawal from the Partnership. June 30, therefore, was the deadline for a notice of a withdrawal that would be effective on December 31. Shortly after the meeting between Mr. McFarland and Mr. Schneider, Mr. Schneider sought from Wellington and received a two-week extension for submitting a resignation. In the wake of Mr. McFarland's conversation with Mr. Schneider, the latter's request for an extension was not a complete surprise. It did, however, give rise to concern and comment within Wellington's higher management circles.

On or about June 28, 1996, Mr. Schneider submitted to Mr. McFarland a written affiliation proposal. The proposal was essentially an outline that contained very little detail. Mr. Schneider had consulted with neither a lawyer nor a business advisor about the content of the proposal before he gave it to Mr. McFarland.

In truth and in fact, escape, not a tight or loose affiliation, was at that point uppermost in Mr. Schneider's mind. By that time, he wanted to leave Wellington to start his own firm and believed that he could carry clients with him when he left. His desire to go had entrepreneurial roots and was not borne of an adverse reaction to allocation or moratorium policies. Unbeknownst to Mr. McFarland or to anyone in Wellington's upper management, Mr. Schneider already had begun preparations for a new venture. In April, he had contacted a "head hunter" to help him find a marketing person, he had interviewed potential marketing directors, he had contacted a candidate for a back office position and he had looked at office space. He had informed Dennis Trittin ("Mr. Trittin"), his contact at Russell, Mr. Schneider's largest client, that he was seriously considering resigning from Wellington. He had said the same thing to Mr. Nyheim, the former Wellington Partner for whom he had initially worked at Wellington and with whom he maintained a friendship after Mr. Nyheim departed. Indeed, in late June, Mr. Nyheim told Mr. Schneider that the William Penn Foundation, on whose board Mr. Nyheim sat, might be in need of a new investment manager some time in 1997. Mr. Schneider and Mr. Nyheim discussed the possibility that Mr. Schneider could fill that role and arranged an August meeting at which Mr. Schneider could make a presentation to the William Penn board. [FN24] Mr. Nyheim and Mr. Schneider agreed that the William Penn opportunity was intended for Mr. Schneider personally, and not for Wellington. As a result Mr. Schneider made no mention of that opportunity to anyone at Wellington. [FN25]

FN24. Mr. Schneider made that presentation in mid-August, as scheduled. Before the meeting, Mr. Schneider asked two Wellington employees who then worked under his supervision and who now work for him at his new firm to prepare documentation for him to bring to that meeting. In particular, Mr. Schneider instructed Gary Soura to print out a list of Mr. Schneider's performance statistics and to place the name "Schneider Investment Partners, L.P." on the document. He also directed his secretary, Gina Moore, to alter a Wellington marketing document by adding a cover sheet with the name 'Schneider Investment Partners, L.P." He then distributed those documents at the meeting with the William Penn Board. Mr. Schneider did not inform the Managing Partners, or anyone at Wellington, that he had used Wellington documents in the fashion described above. Indeed, Wellington first learned of the documents when Ms. Tynan discovered them on the Wellington computer system after Mr. Schneider's departure. Mr. Schneider also used a similar list of his performance statistics to respond to a questionnaire distributed by a widely used and highly regarded investment consultant. In addition, after he left Wellington, he retained a number of documents he had accumulated over the years that showed the performance of the portfolios he was managing and he had Ms. Moore print out from the Wellington computer system and deliver to him after his departure an updated performance list. Mr. Schneider did not take from Wellington, or receive after his departure, any Wellington documents unrelated to the performance of portfolios for which he had been responsible. Nevertheless, he did not inform anyone in Wellington management that he had taken or retained the documents just described and his retention of them did not comply with the terms of a request Mr. McFarland regarding return of all Wellington documents Mr. McFarland made in a letter he sent to Mr. Schneider on October 30, 1996.

FN25. Although Mr. Nyheim left Wellington amicably, a dispute between him

Not Reported in N.E.2d                                                                Page 11
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

and Wellington had arisen during the year he served as a consultant. The dispute led to threats of a lawsuit. Although the matter was resolved before any action commenced, Mr. Nyheim remained unhappy with Wellington in general and, more particularly, with Mr. McFarland and Mr. Ryan for what he perceived as their roles in his difficulties. Mr. Nyheim's animosity toward Wellington and his friendship with Mr. Schneider led him to act as a sounding board and informal advisor as Mr. Schneider made his departure plans.

*10 Unaware of Mr. Schneider's true plans and thoughts, Mr. McFarland considered Mr. Schneider's proposal and gave copies of it to Ms. Tynan and to Mr. Gooch, Mr. Schneider's direct supervisor, for their consideration and comment. A few days later, Ms. Tynan delivered to Messrs. McFarland, Doran and Ryan a memorandum analyzing the potential regulatory consequences and issues Mr. Schneider's proposal raised. Those issues and potential consequences led the three to conclude that they did not want Wellington to participate in an affiliation of the type Mr. Schneider had proposed. [FN26]

> FN26. In addition to the problems raised in Ms. Tynan's memorandum, the three took into consideration an earlier Wellington affiliation with an entity called Marble Arch. From Wellington's perspective, that affiliation had not worked successfully and its failure colored in some measure the way they viewed Mr. Schneider's submission.

Mr. McFarland and Mr. Ryan next met with Mr. Schneider in Valley Forge on July 10, 1996. They gave Mr. Schneider a copy of Ms. Tynan's memorandum and told him that they were rejecting his affiliation request. They also told him that they were willing to explore different assignments for him within Wellington, such as organizing a hedge fund for him to manage, restricting his book of business to a smaller amount of assets and a number of other alternatives. During the July 10 meeting, Mr. Schneider's comments focused chiefly on the impact his performance had on his compensation, compensation that was dependent in part on the incentives described earlier, and that his compensation would be greater if he were not hobbled by the allocation and moratorium policies. At the conclusion of the meeting, Mr. Schneider said that he would respond to Mr. McFarland on the Wellington alternatives discussed during the

meeting's course.

### 3. The Split

On Friday, July 12, 1996, two days after the meeting in Valley Forge, Mr. Schneider handed Mr. Ryan a memorandum saying that he intended to resign as a Partner effective at year's end. In response to Mr. Ryan's questions regarding what he intended to do after his resignation, Mr. Schneider stated that he intended to explore a variety of options for staying in the investment management business including starting his own firm, joining another firm and starting a hedge fund. He also told Mr. Ryan that he was thinking, at least in a broad sense, about ways to preserve his existing client relationships. He told Mr. Ryan that many of his clients were likely to leave Wellington after his departure, and that it therefore that it made business sense both for him and for Wellington to work out some kind of revenue-sharing plan so that, if the clients joined him, Wellington would not be completely deprived of revenues they had theretofore produced. He added, however, that all of his plans and thoughts were tentative and that he had no clear and targeted focus.

In fact, by July 12, Mr Schneider was firmly committed to starting his own firm and continuing to perform the same kind of investment management services he had been performing at Wellington. Indeed, on the very next day, Mr. Schneider signed a Form ADV for an entity called "Schneider Investment Partners, L.P.," and mailed the completed form to the SEC the following Monday. Filing and approval of the Form ADV was a precondition to Mr. Schneider's ability to conduct an investment advisory business for institutional clients. The Form ADV was 21 pages long. It is an important document and Mr. Schneider clearly had begun its preparation long before July 13. [FN27]

> FN27. A month later, on August 13, 1996, Mr. Schneider registered Schneider Investment Partners, L.P., with the Commonwealth of Pennsylvania. On August 15, 1996, he filed with the Pennsylvania Department of State the papers necessary to incorporate FIP Co., which became the general partner of Schneider Investment Partners, L.P.

*11 On Monday, July 15, 1996, the first business day following announcement of his resignation, Mr Schneider telephoned Russell's Mr. Trittin. During the course of that day, he had another telephone conversation with Mr. Trittin and with Ms. Nola

Not Reported in N.E.2d                                                                                              Page 12
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Williams, another Russell investment manager. During those telephone conversations, Mr. Schneider informed Mr. Trittin and Ms. Williams that he had submitted his resignation to Wellington and would be starting his own investment management business. He also told them that he had filed his Form ADV with the SEC and was waiting to hear from the agency regarding its approval. Mr. Schneider advised Mr. Trittin and Ms. Williams that, if he were terminated from Wellington as a result of submitting his resignation, he would likely have a trader and analyst and would be otherwise ready to conduct his own business as early as September 1, 1996. During those conversations, Mr. Schneider also discussed with Mr. Trittin and Ms. Williams the non-competition Agreement he had signed. He specifically told them that he was subject to such an Agreement and that it was possible that a restraining order might enter to prohibit him from accepting business from Wellington clients such as Russell. He did not inform any Wellington Partners or employees that he had had those conversations.

### 4. Client Plans

When Mr. McFarland learned, through Mr. Ryan, that Mr. Schneider had delivered his resignation notice, Mr. McFarland's thoughts immediately turned to retention of the clients whose accounts Mr. Schneider was managing and to designation of successor managers for those accounts. Although Mr. Schneider's comments to Mr. Ryan had been somewhat vague as to the details of his future plans, Mr. Schneider's resignation, the context in which the resignation occurred, the prelude to the resignation and the content of Mr. Schneider's discussion with Mr. Ryan at the time he tendered his resignation led Mr. McFarland, and other Wellington managers to a strong belief, if not a conclusion, that Mr. Schneider intended to stay in the investment advisory business and that, notwithstanding the terms of his non-competition agreements, he might well seek to retain some of the clients he had served while at Wellington.

Based on his experience with other withdrawal and transition matters, albeit none quite like this one, Mr. McFarland, who, as Wellington's CEO, was in overall charge of handling the withdrawal and transition matters, had concluded that Wellington's efforts to retain the clients would be maximized if a Wellington followed a two-step process. First, the Managing Partners and Mr. Schneider would come to some kind of an agreement and understanding regarding Mr. Schneider's plans after he withdrew. Completion of the first step depended on determining

whether Mr. Schneider in fact had any interest in keeping the clients he had served while at Wellington and, if he did, persuading him not to try to do so.

Once an agreement and understanding between Wellington and Mr. Schneider were reached, Mr. McFarland hoped that Wellington and Mr. Schneider then would jointly inform the clients Mr. Schneider was serving--and other Partners, employees, industry consultants--of what the future held. Mr. McFarland was of the opinion that the transition process would proceed most smoothly from Wellington's standpoint if Mr. Schneider, and not Wellington, informed the clients that he would not be available to continue managing their accounts after his withdrawal.

*12 With all of those thoughts and considerations in mind, Mr. McFarland told a number of Wellington Partners, including Pamela Dippel, Eugene Record and Jonathan Payson, all of whom were involved with client services, John Gooch, who had had a longstanding relationship with many of Mr. Schneider's clients, and Nancy Lukitsh, Wellington's marketing director, that they should meet to develop a plan for informing clients and consultants that Mr. Schneider would be leaving the firm at the end of the year and for seeking to retain their business after Mr. Schneider left. The group began those plans.

Mr. Schneider was approaching things from a very different perspective. He very much wanted to stay in the investment advisory business. He believed that there was a very strong likelihood that he could take at least Russell and URS and possibly other clients with him when he left. He was a talented investment manager and he knew that the clients whom he served while at Wellington both recognized his talent and appreciated the performance of their portfolios under his tenure. Mr. Schneider had never been a "team player" and thus he had not acquainted his client representatives with others at Wellington with whom he worked and upon whose efforts he depended for at least some part of his success. He regarded the non-competition agreements in Article XV as potential obstacles to be overcome en route to his chosen objective rather than as solemn undertakings surrounded by fiduciary obligations. He believed that his keys to success were three in number: The first was to signal the clients whose money he managed that he would be available to manage their funds after his departure. The second was to remain vague regarding his specific plans during his conversations with Wellington personnel so that Wellington would not be provoked into litigation until the clients had manifested their

intention to leave Wellington. Third and finally was to do everything he could possibly do to ready himself for business so that he instantly could begin managing money in his own firm if it became necessary or possible for him to do so before the end of the year.

Those very different expectations, hopes and desires probably doomed from the outset any hope of an agreeable separation protocol. What in fact materialized was a five-month fencing match that ultimately resulted in Mr. Schneider's expulsion from the Partnership and this litigation

6. *The Summer Interactions*

Armed with their very different hopes and plans, Mr. McFarland, Mr. Ryan and Mr. Schneider met in Valley Forge on July 19. In light of Mr. Schneider's July 12 suggestion to Mr. Schneider that he wanted to preserve existing client relationships, Mr. McFarland and Mr. Ryan told Mr. Schneider of his obligations under Article XV of the Partnership Agreement, including his obligation not to solicit or accept business from Wellington clients and not to compete with Wellington without obtaining a waiver from the Managing Partners. In response, Mr. Schneider said that, in his view, non-competition agreements were invalid and thus that he did not believe Article XV could be enforced. When Mr. McFarland replied that the Managing Partners believed the clause was enforceable and intended to enforce it, Mr. Schneider said that there really was no need to discuss the issue further because he believed it would be immoral to "pick off" clients and had no intention of doing so. When he made that statement, however, he fully intended to take with him to his new firm at least Russell and URS and any others who were willing to come.

***13** Mr. Schneider then repeated his statement of July 12 to Mr. Ryan to the effect that he believed only a few of his clients would stay at Wellington and that, as a consequence, Wellington should consider a revenue-sharing arrangement that allowed clients whose accounts Mr. Schneider had been managing to go with him if they so desired. Mr. McFarland said that he would not agree to Mr. Schneider's taking clients with him even if those clients could not be persuaded to stay with Wellington after Mr. Schneider's departure. Mr. McFarland told Mr. Schneider that he strongly disagreed with Mr. Schneider's views regarding the enforceability of Article XV, that Wellington had put a great deal of thought into Article XV, that it was different from a standard non-competition agreement in many ways and that Wellington intended to hold him to its terms.

During the course of the meeting, Mr. McFarland specifically asked Mr. Schneider on several occasions about his future plans and about what steps, if any, Mr. Schneider was taking to implement those plans. Mr. Schneider, despite all of the concrete steps he had taken to set up his business and the clear vision he had regarding the direction in which he planned to go, responded by saying that his plans were uncertain and that he was still considering a number of options. The meeting ended without any resolution.

On July 24, 1996, Mr. McFarland, Mr. Ryan, Mr. Gooch and James Walters, a Wellington Partner who was a lawyer and headed Wellington's Special Projects Group, telephoned Mr. Schneider to inquire about Mr. Schneider's plans and about transitional matters. Mr. Schneider said again that he had not decided what he would do after he left the Wellington. With that statement as background, the group discussed what Mr. Schneider should say if clients asked him directly what he would be doing after his departure from Wellington. Mr. Schneider suggested that, because his plans were vague, his response to clients should be vague. Mr. McFarland agreed. He did so because, at that point he still was trying to determine precisely what Mr. Schneider proposed to do and to reach an agreement with him before Mr. Schneider disclosed to Wellington personnel or clients Mr. Schneider's specific post-Wellington plans. [FN28]

FN28. During the course of the conversation, Mr. Schneider also said that he could be more specific with clients if Mr. McFarland wanted him to be, Mr. McFarland said that he did not. The two men, however, had different ideas regarding what being more specific meant. To Mr. McFarland, greater specificity entailed discussions of a variety of potential plans on which Mr. Schneider had not yet settled. To Mr. Schneider, greater specificity meant discussing the kinds of concrete details about the plan he had formulated, that he in fact had begun to discuss and that he later would discuss with people outside Wellington.

On August 8, 1996, Mr. Ryan and Mr. McFarland met briefly with Mr. Schneider in Valley Forge. By this time Wellington had begun some transitional steps and Mr McFarland told Mr. Schneider of them.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                              Page 14
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Mr. McFarland asked Mr. Schneider once more if he had decided what he was going to do after leaving Wellington and whether he had taken any steps toward implementing his plans. Mr. Schneider responded by saying that he had done nothing and was still considering a variety of options. Mr. McFarland again brought up the non-competition and waiver issues and Mr. Schneider said that he understood his obligations in that regard. By this time, however, he was very hard at work on his new venture, so much so that in a conversation he had with Russell's Mr. Trittin one week later, he was able to state that his new firm would occupy space as of December 1, 1996 and would be open for business on January 1, 1997 and that he had notified the "brokerage community" of his plans in order to insure that his trading needs would be fully met when his operations began. [FN29]

> FN29. Mr. Schneider's interactions with Mr. Trittin are discussed in more detail later. See pp. 53-62, *infra*.

*14 On August 28, 1996, Mr. Gooch met Mr. Schneider in Valley Forge to discuss the general subject of Wellington's retention of the clients whose portfolios Mr. Schneider was managing. At that meeting, Mr. Gooch told Mr. Schneider that his objective was to retain for Wellington the client accounts Mr. Schneider had been managing. To that end, Mr. Gooch said, he wanted Mr. Schneider's thoughts regarding successor managers whom Wellington might designate. Mr. Schneider responded that he did not view it as part of his responsibility to assign or to help to assign successor managers and that Wellington should assign proposed successors on its own. Mr. Gooch then asked Mr. Schneider what he would say if a client asked him for an evaluation of successors Wellington had proposed for his accounts. Mr. Schneider replied that the clients he was serving paid him "to pick stocks, not people."

Mr. Gooch also told Mr. Schneider that he wanted to obtain his thoughts regarding where to place within Wellington the people who then were on Mr. Schneider's support staff, or team, in Valley Forge. Mr. Gooch asked Mr. Schneider if he thought that any members of that team were qualified to manage any of the accounts Mr. Schneider was managing. Mr. Schneider said that none was. Mr. Gooch and Mr. Schneider then discussed the strengths and weaknesses of the individual members of Mr. Schneider's staff and whether they should be retained as Wellington employees following Mr. Schneider's

departure. Mr. Schneider avoided stating any express opinion as to the qualifications of those individuals and declined to recommend that any be retained. Indeed, Mr. Schneider said that he would not get involved in making any recommendations regarding any members of his team and that Wellington should reach an independent judgment regarding whether they should be retained. Mr. Gooch told Mr. Schneider that he and others at Wellington would try to reach that independent conclusion. In fact, at the time he talked to Mr. Gooch, Mr. Schneider was so impressed by the quality and ability of his team members that he wanted to have them join him at new business if he could find a way to do so. [FN30]

> FN30. Indeed, on or about August 14, he had told Mr. Trittin that his lawyer had advised him not to approach those staffers at that time about joining him in his new venture and that, as a consequence and a safeguard, he was interviewing others for staff positions at the firm. See pp. 56- 57, *infra*

On at least two other occasions during the course of the summer, Mr. McFarland had talked to Mr. Schneider about the latter's plans. On one occasion, Mr. McFarland had heard from others that Mr. Schneider was talking to a trader at a company called Delaware Investments about potential employment. Mr. McFarland telephoned Mr. Schneider to ask him if this were true. Mr. Schneider said that it was not, that he did not know where rumors like that were coming from and that he had told Mr. McFarland the nature of his plans to the extent he had formed them.

On another occasion, Mr. McFarland telephoned Mr. Schneider to tell him that he had heard that Mr. Schneider had been discussing with members of his Wellington team the possibility of their joining him at a new firm after he left Wellington. Mr. Schneider said that he had not had any such discussions and again stated, falsely, that he had informed Mr. McFarland in full detail about all of his plans to the extent that he had formed them.

*15 On September 23, 1996, Mr. Doran, Mr. Ryan and Mr. McFarland again met with Mr. Schneider to discuss his withdrawal. Mr. Doran asked Mr. Schneider if he had had any contact with clients about his future plans. Mr. Schneider said that he had received telephone calls from some of his clients but had not gone beyond telling them that he would remain a Wellington Partner and would manage their

Not Reported in N.E.2d                                                                 Page 15
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

assets until the end of the year. At least with Mr. Trittin, of course, he had by then gone well beyond that and he had told representatives of URS, RJR-Nabisco and the Mentor Group at least that he intended to remain in the investment advisory management business. Mr. McFarland again asked Mr. Schneider if he had developed any plans for future and Mr. Schneider again responded that he had no definite plans. By this time, however, Mr. Schneider had in fact hired a trader and a back office manager for Schneider Investment Partners, had signed a five-year lease for office space in the name of Schneider Investment Partners and paid a $13,000 rental deposit for that space.

On October 3, 1996, Mr. Gooch met again with Mr. Schneider in Valley Forge. Mr. Gooch told Mr. Schneider that he was having difficulty finding any place at Wellington for the members of his staff and asked him if he had any thoughts on their strengths, weaknesses or qualifications in addition to the non-committal thoughts he had expressed on August 28. Mr. Schneider said that he had no such thoughts and reiterated that it was up to Wellington to decide whether to retain or discharge his staff members.

Mr. Gooch in fact tried without success to place the members of Mr. Schneider's staff at Wellington. He had done so, however, with restrained enthusiasm. Mr. Gooch thought that Mr. Schneider, as the staffers' direct supervisor, was in the best position to know their strengths, weaknesses and capabilities. Consequently, he felt that Mr. Schneider's non-committal statements masked substantial reservations Mr. Schneider had about their qualifications. After Mr. Gooch was unable to find other places for the staffers within Wellington, Wellington ultimately notified them that they would be discharged at year's end.

Wellington's notice to the staffers of their year-end dismissal, however, did not end the efforts Mr. Gooch made to place them elsewhere. On or about October 21, 1997, Binkley Shorts, another Wellington portfolio manager, talked with Mr. Gooch about adding another person to the staff working for him. Mr. Gooch told Mr. Shorts that Wellington had given notice of termination to Mr. Schneider's staff and that all of those staff members were available for Mr. Shorts to work with him if he chose to work with them and they chose to stay. Mr. Gooch told Mr. Shorts that he should talk to Mr. Schneider to see if any of those people might be compatible with Mr. Shorts' needs. Mr. Shorts telephoned Mr. Schneider for that purpose and, in response to Mr. Shorts'

questions, Mr. Schneider said, in substance and effect, "If I were you, I wouldn't hire any of these people. They wouldn't meet your standards." Indeed, Mr. Schneider told Mr. Shorts that it would not even be worthwhile to interview those employees. As to one of them, Mr. Schneider said that he "would never be more than a research assistant." He also disparaged the academic background of another member of his team, saying that he had "only attended Penn State." Because of Mr. Schneider's statements, Mr. Shorts pursue none of the members of Mr. Schneider's staff. He did, however, expand the staff working for him by hiring another person from within Wellington.

**\*16** After Wellington announced to Mr. Schneider's team members that they would not be retained beyond the end of the year, Mr. Schneider hired many, if not all of them, for his new firm. Staffing always had been an important consideration in Mr. Schneider's plans and he believed, correctly, that he would obtain a marketing advantage for his new firm if he were able to represent to clients that he had brought his team with him intact from Wellington. It was with that thought and plan in mind that Mr. Schneider had discouraged Wellington's retention of them. [FN31]

> FN31. I am unable to determine precisely when Mr. Schneider hired those staffers although I find that he and they had made some arrangement regarding post-Wellington employment at his new firm before November 11 when he gave Russell's Mr. Trittin their home telephone numbers and suggested that Mr. Trittin talk to them directly about their future plans. See p. 57, *infra*

### 7. The Dinner Invitation

In early October, Mr. Ryan received an invitation to a dinner honoring John C. Bogle, Chairman of the Vanguard Group, Wellington's largest client. Listed on the invitation as one of the dinner's sponsors was an entity called "Schneider Investment Partners," the company Mr. Schneider had formed on August 13. On October 8, Mr. Ryan sent Mr. McFarland a copy of that invitation. After Wellington employees consulted various public listings, Mr. McFarland and the others learned that Schneider Investment Partners, L.P., had been registered with the Pennsylvania Secretary of State on August 13, 1996, that Mr. Schneider was the principal in the entity and that Schneider Investment Partners had been registered with the Securities and Exchange Commission as an

# Exhibit A

Westlaw.

Not Reported in N.E.2d                                                        Page 1
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

C

Superior Court of Massachusetts.
Duncan M. McFARLAND, et al., Plaintiffs,
v.
Arnold C. SCHNEIDER, III, Defendant.
**No. Civ.A. 96-7097.**

Feb. 17, 1998.

Private Counsel 126320, James S Dittmar, Hutchins
Wheeler & Dittmar, Boston MA, Private Counsel
557029, Karen M O'Toole, Hutchins Wheeler &
Dittmar, Boston MA, for Colonial Williamsburg
Foundation Active 09/05/97, Other interested party.

**FINDINGS OF FACT, CONCLUSIONS OF
LAW & ORDER FOR JUDGMENT**

MCHUGH, Justice.

**I. BACKGROUND**
*1 This is an action in which four of the partners of
Wellington Management Company seek on behalf of
themselves and their partners injunctive relief and
damages against a former partner who left the firm to
start his own business.   [FN1]   Pursuant to
Mass.R.Civ.P. 42(b), the claim for injunctive relief
was severed before trial from the claim for damages.
[FN2] The injunction claim then proceeded, to trial,
without a jury    Without objection, direct
examination generally proceeded by way of affidavits
and cross examination proceeded in the customary
fashion    Following completion of the courtroom
phase, the parties submitted deposition transcripts
[FN3] and requests for findings of fact and
conclusions of law    Based on the testimony
presented during the course of the trial, the exhibits
there introduced, the deposition testimony admitted
after the trial, and the reasonable inferences I have
drawn from all of those sources, I find and conclude
as follows:

> FN1. The plaintiffs' standing to bring this
> action and to seek the relief they now seek
> was challenged unsuccessfully before trial.
> See Paper No. 35.

> FN2. The severance order, entered on the
> record over defendant's objection, stated that
> any findings made by the court would not be
> binding on a jury empaneled to hear the
> damage case.

> FN3. Both sides made objections to some
> portions of the deposition testimony offered
> by the other.   Rulings on those objections
> have been made in a separate order of even
> date.

**II. FINDINGS OF FACT**
*A PARTIES*

Plaintiffs Duncan M. McFarland ("McFarland"),
Robert W. Doran ("Doran"), John R. Ryan ("Ryan")
and Paul D Kaplan ("Kaplan") are partners of
Wellington     Management     Company,     LLP
("Wellington" or the "Partnership"), a limited liability
partnership registered under the laws of the
Commonwealth of Massachusetts.

Messrs. McFarland, Doran and Ryan are the
Managing Partners (the "Managing Partners") of
Wellington.   At all times relevant to this action, Mr.
Kaplan was a member of Wellington's Executive
Committee.   When this lawsuit was filed, Wellington
had 51 partners (collectively the "Partners" and
individually a "Partner").

Defendant    Arnold    C.    Schneider,    III
("Mr.Schneider") is a former Partner of Wellington.
He was removed from the Partnership on December
4, 1996 pursuant to the vote of the Wellington
Partners the preceding day.    Mr. Schneider is a
citizen of the Commonwealth of Pennsylvania.    He
is a Chartered Financial Analyst, a former president
of the Financial Analysts of Philadelphia and is
currently on that group's Board of Directors.    Mr.
Schneider now operates his own investment
management    company,    Schneider    Capital
Management, L.P. ("SCM")

*B. WELLINGTON MANAGEMENT COMPANY*

*1. General*
Founded in 1928, Wellington provides investment
advisory and management services for several
hundred clients located in the United States and in
more than 20 foreign countries.   Currently, the firm
manages over $133 billion of its clients' assets.
Those clients are primarily institutional investors
(such as retirement plans or endowments) and mutual
funds.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d                                                                                     Page 2
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

Wellington is organized as a Massachusetts limited liability partnership and currently has 54 Partners, all of whom are actively engaged in Wellington's business. In addition to the Partners, Wellington employs approximately 600 employees, consisting of about 160 investment professionals, 120 non-investment professionals and a support staff of 320. Included among the investment professionals are 24 equity portfolio managers with an average of 25 years of experience and an average of 19 years with Wellington. There are also 16 fixed income portfolio managers representing an average of 16 years of experience and 9 years with Wellington. Wellington is headquartered in Boston but also has offices in Valley Forge, Atlanta, and San Francisco. [FN4]

> FN4. An affiliate, Wellington International Management Company, Pte. is based in Singapore and has a branch in Sydney, Australia. Another affiliate, Wellington Management International has its office in London, England. Wellington Trust Company, NA, a wholly-owned subsidiary of Wellington, is a limited purpose trust company also headquartered in Boston. Other affiliates of Wellington have been created in conjunction with the offering of hedge fund limited partnerships, both offshore and domestic, and to serve various types of pooling vehicles offshore. Wellington and its affiliated companies are referred to collectively as the "Wellington Management Organization."

**\*2** Wellington's business has grown steadily over the years since it was formed. Most of its contracts are terminable by either side on thirty days notice to the other. Although Wellington loses, and expects to lose, some clients each year for a variety of reasons, it also gains, and expects to gain, new clients annually as well. Despite those annual ebbs and flows, Wellington's overall number of clients and the overall amount of money it manages have shown consistent increases.

When a client contracts with Wellington for investment services, a portfolio manager typically is assigned to the client's account. The portfolio manager typically is assigned to the client's account by Wellington's Chief Executive Officer ("CEO") based on recommendations from line managers. In assigning portfolio managers, the CEO attempts to match a manager's skills and style with client needs and objectives rather than to reward origination of

business. Almost invariably, however, the client is consulted about the identity of the prospective portfolio manager before a final decision is made. Moreover, the client typically has the right to reject a manager proposed by Wellington either as a consequence of an express term of the management contract between the client and Wellington or as a practical consequence of Wellington's desire to maintain good client relations. Once assigned to an account, the portfolio manager is the Wellington employee primarily charged with making investment decisions regarding the client's funds in the account for which he or she is responsible. [FN5]

> FN5. In that regard, Wellington typically is the custodian of the funds and the portfolio manager actually places buy and sell orders for execution by Wellington's trading department. Sometimes, however, custody of the securities in the account is lodged elsewhere. In those cases, individualized trading arrangements typically are made and Wellington's trading department does not execute trading orders.

Wellington charges its clients an annual fee for the services it provides. Typically, that fee is determined by a percentage of assets under Wellington's management on a specific date or dates. All of the revenues derived by Wellington from all of its activities belong to the Partners as a whole. Those revenues are divided between and among the Wellington Partners and employees pursuant to various criteria, all of which are designed to provide incentives for performance at high levels.

Wellington Partners, like Mr. Schneider, are compensated by means of a draw, participation in the firm's year-end profits and incentives tailored to the individual Partner. Wellington typically uses benchmarks to determine incentive-based distribution to those of its Partners who manage portfolios. The incentive compensation those managers receive therefore depends, in large part, on how the funds they are handling during a given period perform in relation to performance of the funds included in the benchmark. Mr. Schneider's benchmarks always were the S & P 500 or the Russell 1000 Value, indices that tracked performance of securities issued by the some of the largest companies in the United States.

Although the portfolio manager is ultimately responsible for investment decisions regarding the accounts he or she is managing, one person working

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                        Page 3
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

alone typically cannot acquire and digest all of the vast amount of information typically necessary for sound investment decisions. Wellington, therefore, provides support to all of its portfolio managers in many different ways. Three of those ways are of primary importance. First of all, Wellington typically assigns teams of analysts to work for individual portfolio managers. Those teams often are critical to the manager's success for, over time at least, they come to know his or her investment "style," the kinds of information he or she needs in order to make sound decisions and the kinds of data he or she regards as important. Accordingly, while an individual manager's insights, judgment and experience are critical to his or her overall success, those qualities require the support of an experienced and competent team of analysts in order to reach their full potential.

*3 Second, in addition to the team of analysts assigned to each manager, Wellington maintains a large central research group with analysts devoted to following particular industries and companies within those industries. All portfolio managers have access to services and reports the central research group generates.

Finally, every morning, all of Wellington's investment professionals gather for a morning meeting during which investment information is discussed and analyzed. The Valley Forge office participates in that morning meeting by conference call and is on-line with three monitors used to display investment information to all in attendance at the meeting at whatever site. During the meeting or at some other time during the morning, Wellington distributes to all managers listings of all transactions made by all Wellington portfolio managers the previous day.

Wellington's overall management was designed in a manner the designers thought was likely to allow investment professionals to concentrate on their investment-related responsibilities with an almost single-minded intensity. Specific Wellington employees other than the portfolio managers are responsible for such things as marketing and business development, client service, regulatory affairs, administration, finance, investment services, portfolio management and other areas. Each of those individuals is responsible for seeing that his or her specific functions are performed throughout the organization.

In keeping with its desire to allow investment

professionals to focus on investments and investing, Wellington does not rely on its portfolio managers to originate new business and does not directly compensate them for business they do originate. Instead, Wellington has developed marketing teams dedicated to that task. Similarly, Wellington's clients generally receive administrative services from specific service managers who are part of dedicated client service groups within the firm, not from the client's portfolio manager.

*2. The Partnership Agreement and Structure*
The Wellington Partnership was formed in 1979 when Wellington, at the time a public company with approximately 2,000 shareholders, became privately owned. Wellington's Articles of Partnership (the "Partnership Agreement") were originally adopted on August 31, 1979 and have been amended several times since then. The most recent amendment became effective on September 30, 1996.

The Partnership Agreement provides for a Managing Partners Committee to oversee partnership matters and for an Executive Committee to oversee business matters. The Managing Partners Committee consists of three Partners elected by vote of the all Partners. Currently, the Managing Partners Committee consists of John Ryan, Robert Doran and Duncan McFarland. Among other things, the Managing Partners Committee is responsible for determining Wellington's annual net profit or net loss and each Partner's allocable share of that net profit or loss. [FN6] The Managing Partners Committee elects the firm's Chief Executive Officer ("CEO"), currently Duncan McFarland. The Committee also has the exclusive authority to appoint Associates (who are senior, non-Partner professional employees), to nominate persons for admission to the Partnership and to recommend removal of a Partner from the Partnership. Actual removal of a Partner, however, requires the affirmative vote of at least 75% of the Partners. [FN7]

> FN6. The allocable share of profit and loss is compensation in addition to the incentive income discussed earlier. See p 5, *supra*
> In deciding upon a Partner's allocable share, the Committe takes into account the value of the Partner's services to the firm, his or her capital account and any other factors the Committee deems relevant.

> FN7. In discharging its responsibility for oversight of business matters, the Executive Committee, among other things, appoints

Not Reported in N.E.2d                                                                                                    Page 4
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

committees to focus on particular business issues, oversees and approves the expansion of business units, oversees the investment of Wellington's assets and authorizes capital expenditures. The Executive Committee consists of the three Managing Partners plus from two to six additional members nominated by the CEO and elected by the Partnership. Mr. McFarland currently is the Chair of the Executive Committee.

*4 Article XV of the Partnership Agreement, the provision lying at the heart of the present controversy, is entitled "Agreement Not to Compete." [FN8] That Article contains two separate but related undertakings by each Partner, one dealing with Wellington's clients and employees and the other dealing with competition generally. Article XV also contains a waiver provision. In material part, those provisions read as follows:

> FN8. Another provision of the Agreement, Article XIV, is relevant to the overall controversy between the parties. Article XIV sets forth the financial terms on which Partners withdraw from the Partnership. In essence, a withdrawn Partner receives payments for ten years following his or her withdrawal. Those payments are drawn from a percentage of the firm's net available income and are based on a formula set forth in Article XIV itself.

Each Partner recognizes and acknowledges that, in connection with the performance of his or her duties as a Partner, he or she will obtain access to, and become familiar with, confidential and proprietary information of the Partnership, its affiliated companies and its customers, clients and employees, and that he or she will obtain personal knowledge of and influence over the identity and business needs of the Partnership's customers, clients and employees. Each Partner further recognizes and acknowledges that, as a result of the above, he or she has an ability to cause harm to the Partnership after he or she withdraws or is removed as a Partner, and that the terms of this Article XV are a fair and reasonable means of preventing such harm.

Each Partner also recognizes that the extent to which the activities of a withdrawn or removed Partnership may cause harm to the Partnership is a matter best determined by the facts and circumstances of each case, recognizing that there are many activities in which a withdrawn or

removed Partner may engage which will not constitute harm to the Partnership. Therefore, the Managing Partners, acting by majority vote, shall have the authority on behalf of the Partnership to fairly and reasonably determine whether the activities or proposed activities of the withdrawn or removed Partner are appropriate or constitute misappropriation or will adversely affect the Partnership's good will (including especially its relationships with its customers, clients and employees) and its confidential and proprietary business information. In the event that the Managing Partners conclude that the activities or proposed activities of a withdrawn or removed Partner constitute such harm to the Partnership, the Managing Partners shall give due consideration to the reasons and circumstances of the Partner's withdrawal or removal in determining what actions, if any, shall be taken to remedy the violation.

Except to the extent waived by the Managing Partners, each Partner agrees that, for a period of five years following such Partner's withdrawal or removal as a Partner, he or she will (i) not business from any client of the Partnership on behalf of himself or herself or any entity engaged in competition with the Partnership, (ii) refrain from hiring, enticing or in any other manner persuading or attempting to persuade any Partner, employee, independent contractor, client or customer of the Partnership to discontinue his, her or its relationship with the Partnership, or to violate any Agreement with the Partnership, and (iii) notify the Partnership of any change in his or her address and of each employment or other business activity in which he or she engages.

*5 Except to the extent waived by the Managing Partners, each Partner further agrees that, during the time he or she is a Partner, and for the initial three year period after such Partner's withdrawal or removal, he or she will not participate in any business engaged in competition with the business of the Partnership or any of its affiliated companies, including a business engaged in providing investment advisory or investment management services. For purposes of this paragraph, the phrase "participate in a business" shall include, but not be limited to, consulting to, being employed by, or having a direct or indirect ownership interest (other than ownership of less than 5% of a class of securities registered under the Securities Exchange Act of 1934, as amended) in, any business or entity which engages in the business or activity in question.

....

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                          Page 5
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Each Partner understands and agrees that any decision by the Managing Partners to waive the provisions of this Article XV in a particular case shall not be deemed a waiver of the Partnership's right to fairly and reasonably enforce the provisions of this article in any other instance. In the event that any one or more provisions of this Article XV shall for any reason be held to be invalid, illegal, or unenforceable shall not affect [*sic*] any other provisions of these Articles. If any one or more of the provisions of this Article XV shall for any reason be held to be excessively broad as to duration, geographical scope or subject, it shall be construed by limiting and reducing it so as to be enforceable to the maximum extent compatible with applicable law as it shall then appear. [FN9]

> FN9. Article XV was added to the Partnership Agreement in a 1990 amendment to that agreement. Before that amendment, the provision regarding competition had been part of Article XIV, titled, "Removal and Withdrawal of Partners." The earlier non-competition provision was different from the current provision in two respects. First, the non-competition period was, in substance, twelve years. Second, there was no flexibility in application of the provision. That lack of flexibility effectively prevented some withdrawing Partners from engaging in activities that might technically amount to competition but posed no real harm to the Partnership. As the quoted sections of Article XV reveal, the 1990 amendment shortened the applicable time period to three years for general competition and five years with respect to clients and employees of the firm. In addition, Article XV created a waiver provisions the Managing Partners were given the power to execute.

Article XV sprang from a variety of different considerations, all of which centered on the Partners desire to give Wellington--which, like many professional corporations, resembles a holding company for boutiques each of which is able to survive and perform, although usually not as well, on its own--a substantial measure of institutional stability. In part, Article XV was designed to give employees who hoped to become Partners some assurance that the partnership they ultimately achieved would warrant their investment of years of effort. The Article also was designed to help create and maintain an environment of professional collegiality and openness so that all Partners could collaborate on providing all Wellington clients with high quality services without fear that their efforts ultimately would enrich another Partner at their own expense. Finally, Article XV was designed to promote Wellington's stability and thus its continued ability, among other things, to produce the revenues necessary to make payments to which withdrawn Partners are, and will be, entitled under Article XIV of the Partnership Agreement.

From 1983 until 1990, only three Partners withdrew from Wellington and all three adhered voluntarily to the far more rigorous provisions of the non-competition provisions then in effect. After Article XV was created in 1990, eight Partners withdrew. [FN10] One or two of the eight simply retired completely from all work. Their departure thus provided no occasion for considering the Article's reach and impact. Others undertook activities that clearly fell outside the scope of the Partnership's business. Those activities, too, furnished no occasion for interpreting the Article's terms.

> FN10. In addition, one died.

*6 For a variety of reasons, Wellington personnel did not tell their clients about the terms of Article XV either when the clients signed their contracts with Wellington or at a later date. Wellington viewed the issue as one relating chiefly to internal governance, not to client relations. Moreover, no Wellington Partner who left Wellington in the past had done so in order to start his or her own investment management firm. Thus questions about who had precisely what rights upon a Partner's departure had remained largely academic. For the same reasons, Wellington never had an occasion to tell a client that a portfolio manager would be unavailable to manage-its funds after his departure from Wellington.

On four occasions, however, the Managing Partners were asked to grant waivers of the type that Article XV contemplates. On three of the four occasions, they granted the request [FN11] and, on the fourth, they did not. [FN12] Nevertheless, before Mr. Schneider's departure, Wellington had not faced an "unfriendly" departure from the firm and had never faced a request for a waiver from the provisions of Article XV that involved either the prospect of direct competition at a significant level [FN13] or continued provision of services by the withdrawing Partner to several of the firm's then-existing clients. Thus, when the relevant events began to unfold

Not Reported in N.E.2d                                                                                          Page 6
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

during the summer of 1996, Wellington had neither a well-formulated approach to the problems for its own guidance nor a tested template for use by others.

> FN11. John Neff, a former Managing Partner who ran Vanguard's Windsor Fund for 31 years, was permitted to continue providing *pro bono* investment advisory services to the University of Pennsylvania. George Lewis was permitted to join the investment office responsible for managing assets held in trust for his family. Gerald Mitchell, the Partner who left to attend Divinity School, was permitted to continue advising one long-term client. That client essentially requested that Mr. Mitchell meet with it quarterly to give it some general advice. The client remained a Wellington client at all times.

> FN12. Mr. Neff sought a waiver to become associated with Hirtle Callaghan & Co., Inc. an investment advisor based in Wayne, Pennsylvania, that serves as an advisor to high net-worth individuals and monitors independent investment managers. The Managing Partners declined to grant Mr. Neff a waiver to allow him to join that organization.

> FN13. I recognize, and will address shortly, Mr. Schneider's contention that his withdrawal and subsequent activities did not involve competition with Wellington.

## C    THE    SCHNEIDER-WELLINGTON RELATIONSHIP

### 1. The Inception

Mr. Schneider joined Wellington upon his graduation from college in June, 1983. When he joined the firm, Mr. Schneider had no experience in the investment management business and, like many in his position, brought no clients with him. Mr. Schneider began by working as an analyst in Wellington's Valley Forge office under the direction of John Nyheim, a now-departed Partner who was responsible for managing several of Wellington's accounts. As he progressed, Mr. Schneider was given more and different responsibilities and began to assume some coordinate responsibility for the portfolios Mr. Nyheim was managing. Mr. Schneider along with others, also made presentations to prospective clients Wellington's marketing department was soliciting.

Mr. Nyheim and his team of analysts were known throughout Wellington as the Value/Yield team. [FN14] In early 1992, the Value/Yield team was managing portfolios for 18 Wellington clients with total of approximately $3 billion in assets under Wellington management. Among those clients were Frank Russell Trust Company ("FRTC") [FN15], RJR-Nabisco ("RJR"), PECO Energy, the Colonial Williamsburg Foundation ("Colonial Williamsburg") and the State of Utah Retirement System ("URS").

> FN14. The "value" component of the label derives from a so-called "value" approach to investing, i e., an approach that seeks stocks with lower than average price/earnings or price/cash flow multiples. The "yield" component comes from the strength of the security's yield. The labels, however, carry with them an aura of precision that really does not exist. In the last analysis, as Mr. Ryan put it at trial and as the history of several of the accounts presented at trial amply demonstrated, all portfolio managers had essentially the same objective: buying low and selling high.

> FN15. FRTC is a subsidiary of the Frank Russell Company ("FRC"), a consultant to institutional investors and the parent for the Frank Russell Investment Management Company ("FRIMCO"), the advisor of mutual funds organized by FRC. Hereafter, "Russell" will refer to FRC, FRTC and FRIMCO as a group.

Mr. Schneider was elected a Wellington Partner in December of 1991, effective January 1, 1992. He signed the Partnership Agreement shortly thereafter. [FN16] Although no one had discussed the terms of the Partnership Agreement with him at the time he was hired or at any time before his election to Partnership, [FN17] he was given a copy of that Agreement after his election and before he was asked to sign it. In addition, Mary Ann Tynan ("Ms.Tynan"), a Wellington Partner who serves as Wellington's Director of Regulatory Affairs, discussed with Mr. Schneider the Agreement as a whole and several of its provisions, including Article XV. Ms. Tynan had that discussion with Mr. Schneider, and others who had been elected to Partnership with him, as part of her regular practice of discussing, *inter alia,* the terms of the Partnership Agreement with all newly-elected Partners. Ms. Tynan encouraged Mr. Schneider to review the terms

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d                                                                           Page 7
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

of the Partnership Agreement in detail, and in particular the non-competition provisions, and to refer any questions about the Agreement or its terms to her, to his own legal advisers or to the firm's Managing Partners.

> FN16. Mr. Schneider signed the Partnership Agreement again in 1994 and 1996, when it was amended in ways not here relevant. He signed the 1996 version of the agreement in the late summer or early fall off that year, after he announced his resignation and at a time when he was engaged in activities described in more detail below. On both occasions, he knew the Agreement contained the restrictions found in Article XV and on neither occasion did he say anything about them to any Wellington Partner or employee.

> FN17. Wellington's treatment of Mr. Schneider was not unique, for Wellington Partners and employees typically did not discuss the terms of the Agreement with employees before they were elected to Partnership.

*7 Before signing the Agreement, Mr. Schneider read it. He also reviewed its content with his attorney and with members of his family. He raised no questions about any provision of the Agreement with Ms. Tynan or any other Wellington Partner. Mr. Schneider knew when he signed the Agreement that it contained the non-competition agreements in Article XV, he understood what the agreements meant and he understood they prohibited him from doing. At the time, however, he was concerned with advancing his own career at Wellington, had no plans to leave and thus was not concerned in the slightest with the restrictions those agreements imposed. He signed the Partnership Agreement freely and willingly--indeed, enthusiastically--consumed, as he was, with anticipation about what a Wellington Partnership would mean for him.

Later in 1992, Mr. Nyheim tendered his resignation from Wellington. His resignation was accepted effective December 31, 1992. After Mr. Nyheim announced his resignation, Mr. Nyheim, Mr. Schneider, Mr. Ryan and John H. Gooch, another Wellington Partner, began a coordinated effort to retain for Wellington the clients whose accounts Mr. Nyheim had been managing. The effort ultimately included a consulting arrangement between Mr. Nyheim and Wellington that continued for

approximately one year while Wellington's retention and transition efforts progressed. Overall, the transition process lasted some twenty months and had Mr. Nyheim's full cooperation and effort. Ultimately, Wellington retained 15 of the 18 portfolios Mr. Nyheim had been managing. Mr. Schneider became the account manager for 10 of those 15. Those 10 had committed a total of $1.3 billion to Wellington's management. Mr. Ryan succeeded to management of another five clients representing aggregate managed assets of over $1.4 billion. Three other clients, with assets of approximately $190 million, left the firm and were shortly thereafter joined by a fourth.

Wellington's retention of the vast majority of the portfolios Mr. Nyheim's had been managing, and the transfer to Mr. Schneider of some of those accounts, proved quite profitable to Wellington and to Mr. Schneider. In fact, Mr. Schneider's compensation more than quintupled from 1992 to 1993, so that he received well more than $1 million in total compensation for 1993. His distributions remained at that high level for the next two and a half years. In 1995, he received distributions from Wellington in the total amount of $1,463,999.

### 2. Prelude to Disharmony

In early to mid June of 1996, Mr. Schneider telephoned Duncan McFarland, Wellington's CEO, to say that he was concerned about the impact that some of the Wellington's moratorium and allocation policies were having on his performance and that he wanted to speak to Mr. McFarland on the subject the next time the latter was in Valley Forge. Both of those policies had been in existence at Wellington for some time and both had counterparts at other large investment management firms throughout the United States. Both had caused extensive internal discussions at Wellington through the years, discussions that became more or less intense as the investment climate shifted and changed.

*8 The moratorium policy provides, in essence, that Wellington portfolio managers' combined holdings of a given security cannot exceed 14% of the issued and outstanding shares of that security. [FN18] The policy is designed to facilitate Wellington's compliance with regulatory requirements imposed on those who hold large blocks of an issuer's shares. The policy is also designed to avoid problems in liquidating shares of a security if Wellington's managers collectively decide that the shares should be sold. When the 14% moratorium limit is reached, Wellington's fund managers are not permitted to buy shares of that security until Wellington's aggregate

Not Reported in N.E.2d                                                                     Page 8
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

holdings again drop below 14%.

> FN18. At one time the Moratorium limit was 10%. That limit caused problems at Wellington because John Neff, who ran the Windsor Fund until the end of 1995, had a practice of taking large positions in companies in which he invested. That practice coupled with the size of the Windsor Fund, and thus the amount it had to invest, sometimes put pressure on moratorium limits. The resulting problem was ameliorated by Wellington's decision to increase the moratorium limit from 10% to 14%. The Windsor Fund's own investment restrictions prohibit it from holding more than 10% of the capitalization of any given company. As a result, even if the Windsor Fund purchased as much of a security as its own limits permitted, 4% of the outstanding shares of that security would remain available to other Wellington Managers.

In essence, the allocation policy is designed to distribute shares when the block Wellington possesses is insufficient to satisfy the demands of all portfolio managers. When Wellington portfolio managers place orders to buy securities for more than one client at approximately the same time and at approximately the same price, the orders are combined for purposes of execution and all clients receive the same average price for all trades executed through same broker on the same day. For many reasons, all of the orders placed and executed in that fashion may not be completely filled that day or ever. There may be insufficient shares available in the market at the desired price. In the case of an initial or secondary public offering, the underwriter may allocate fewer shares to a particular investment management firm than the firm has sought. [FN19]

> FN19. The same problem sometimes is encountered when only one Wellington account is involved. The amount of securities Wellington managers sometimes buy and sell means that it may take days or even weeks to fill their order completely. Indeed, in some cases it may be impossible to fill the order completely.

When all orders for a security cannot be filled, it is necessary for Wellington to allocate between and among client portfolios the total shares purchased at the price the several portfolio managers requested. When purchases from the secondary market are involved, Wellington typically makes the allocation to each portfolio based upon the relative size of that portfolio's order in relation to the total orders from all portfolios. When initial public offerings or purchases that approach the moratorium limit are concerned, Wellington typically allocates on the basis of account size rather than order size. Allocation of initial public offerings, however, is also subject to other discretionary factors typically overseen and executed by one of Wellington's Partners. [FN20]

> FN20. Initial public offerings, or IPO's, often were oversubscribed within Wellington, and in the market generally. Accordingly, if a Wellington portfolio manager proposed an allocation of Wellington's allotment of shares in a manner different from an allocation based strictly on assets under management, John Gooch, a Wellington Partner with oversight responsibilities for all portfolio managers, was empowered to make discretionary judgments regarding what percentage of the available securities should be placed in what portfolio. In exercising that discretion, Mr. Gooch considered, among other things, the portfolio manager's attendance at meetings with management of the issuer, amount of research done, prior knowledge of or particular interest in the relevant industry and market capitalization of the issuer.

Application of the allocation policy sometimes can result in a phenomenon known as "crowding out." If a portfolio manager with, say, two billion dollars under management and a manager with, say, ten billion dollars under management both sought the same amount of the same security under circumstances that triggered the allocation policy, the manager with ten billion dollars under management would likely receive five shares for every share received by the manager with two billion dollars in her portfolio. The latter, therefore, would be "crowded out" of all the shares she desired because of the order placed by the manager of the bigger portfolio or portfolios. As a result of being "crowded out," some portfolio managers sometimes were unable to achieve the overall position in a security they sought to achieve and that they felt would be of greatest benefit to their portfolio.

**\*9** Wellington disclosed its allocation and moratorium policies to its clients both in its Form ADV [FN21] and in more detail upon request. The clients, all of whom are highly sophisticated asset

Not Reported in N.E.2d                                                                                      Page 9
Not Reported in N.E.2d, 11 Mass. L. Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

custodians or managers, were aware that firms like Wellington typically had such policies even if they were not always aware of the precise terms of each policy. The clients were not generally concerned about those policies as long as they were treated in a fair and equitable manner. Both policies, after all, were the product of Wellington's size and consequent presence in the market, a size and presence that produced a number of benefits unavailable to smaller firms and their clients.

> FN21. The Form ADV is the public disclosure statement Investment Advisors must file annually with the SEC and in which they must disclose a number of the features and facets of their business operations. See 17 C.F.R. § § 275.204-1, 279.1. The SEC has no specific regulations for operation of either allocation or of moratorium policies but does require that the policies be clearly articulated, be fair to all clients over time and be appropriately disclosed to clients.

In any event, Mr. McFarland met with Mr. Schneider in June of 1996 in Valley Forge. [FN22] The two discussed the moratorium and allocation policies and Mr. Schneider's contention that their application was adversely affecting his performance. [FN23] Toward the end of the conversation, Mr. Schneider raised with Mr. McFarland the possibility of some different form of affiliation between himself and Wellington. Essentially, Mr. Schneider stated that he wanted an arrangement with Wellington under which he, or an entity with which he was affiliated, would have access to Wellington's information and facilities but unencumbered by Wellington's moratorium and allocation policies.

> FN22. This was the first in what turned out to be an extended series of meetings and conversations that ensued over the next few weeks and months. The memories of the participants regarding the content of the conversations and meetings is generally congruent but often differs in a manner reflecting the participant's interest. A given participant's account of the meeting or conversation thus often resembles a "colorized" black and white film: the essential structure is often accurate but frequently the hue is slightly, and sometimes substantially, off. My findings with respect to the content of all meetings and conversations, like all of my findings

generally, thus are necessarily the product of all of the evidence and the inferences I have drawn from that evidence.

> FN23. During the conversation and at trial, Mr. Schneider contended that the advisory account he managed for URS outperformed the other Wellington accounts he managed because the URS account was not, for reasons here irrelevant, subject to the allocation and moratorium policy. At least one account Mr. Schneider managed that was subject to both policies equaled or exceeded URS's performance in the four years during which Mr. Schneider managed both accounts. To be sure, URS's performance exceeded the average performance of Mr. Schneider's other Wellington accounts by 1.5%. Those results might be attributable to application of the allocation and moratorium policies, might be attributable to other factors and might be attributable to a combination of factors. Notwithstanding the asserted importance of the matter and the numerous spreadsheets and other analytical studies he routinely performed to measure the performance of the accounts and parts of accounts he was managing, Mr. Schneider never performed any empirical studies to determine precisely what impact allocation, moratorium or crowding out had on his accounts' performance. I am unpersuaded as a matter of fact that those policies had an adverse impact on his portfolios. I also am unpersuaded that Mr. Schneider in truth and in fact believed that they had a significantly adverse impact on his portfolios at the time he had his conversation with Mr. McFarland.

Mr. McFarland told Mr. Schneider to put his proposal in writing so that he could discuss it with Messrs. Doran and Mr. Ryan, the other Wellington Managing Partners. Immediately after his meeting with Mr. Schneider, Mr. McFarland told both men about Mr. Schneider's request. He also asked Ms. Tynan, the head of Wellington's regulatory affairs department, to consider, in principle, Mr. Schneider's proposal and to advise the Managing Partners about both the regulatory issues it raised and about the extent to which Wellington's policies and procedures would have to apply to such an affiliate.

Under the Partnership Agreement, Partners were

Not Reported in N.E.2d                                                                    Page 10
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

required to give six months notice of resignation or withdrawal from the Partnership. June 30, therefore, was the deadline for a notice of a withdrawal that would be effective on December 31. Shortly after the meeting between Mr. McFarland and Mr. Schneider, Mr. Schneider sought from Wellington and received a two-week extension for submitting a resignation. In the wake of Mr. McFarland's conversation with Mr. Schneider, the latter's request for an extension was not a complete surprise. It did, however, give rise to concern and comment within Wellington's higher management circles.

On or about June 28, 1996, Mr. Schneider submitted to Mr. McFarland a written affiliation proposal. The proposal was essentially an outline that contained very little detail. Mr. Schneider had consulted with neither a lawyer nor a business advisor about the content of the proposal before he gave it to Mr. McFarland.

In truth and in fact, escape, not a tight or loose affiliation, was at that point uppermost in Mr. Schneider's mind. By that time, he wanted to leave Wellington to start his own firm and believed that he could carry clients with him when he left. His desire to go had entrepreneurial roots and was not borne of an adverse reaction to allocation or moratorium policies. Unbeknownst to Mr. McFarland or to anyone in Wellington's upper management, Mr. Schneider already had begun preparations to for a new venture. In April, he had contacted a "head hunter" to help him find a marketing person, he had interviewed potential marketing directors, he had contacted a candidate for a back office position and he had looked at office space. He had informed Dennis Trittin ("Mr. Trittin"), his contact at Russell, Mr. Schneider's largest client, that he was seriously considering resigning from Wellington. He had said the same thing to Mr. Nyheim, the former Wellington Partner for whom he had initially worked at Wellington and with whom he maintained a friendship after Mr. Nyheim departed. Indeed, in late June, Mr. Nyheim told Mr. Schneider that the William Penn Foundation, on whose board Mr. Nyheim sat, might be in need of a new investment manager some time in 1997. Mr. Schneider and Mr. Nyheim discussed the possibility that Mr. Schneider could fill that role and arranged an August meeting at which Mr. Schneider could make a presentation to the William Penn board. [FN24] Mr. Nyheim and Mr. Schneider agreed that the William Penn opportunity was intended for Mr. Schneider personally, and not for Wellington. As a result Mr. Schneider made no mention of that opportunity to anyone at Wellington. [FN25]

FN24. Mr. Schneider made that presentation in mid-August, as scheduled. Before the meeting, Mr. Schneider asked two Wellington employees who then worked under his supervision and who now work for him at his new firm to prepare documentation for him to bring to that meeting. In particular, Mr. Schneider instructed Gary Soura to print out a list of Mr. Schneider's performance statistics and to place the name "Schneider Investment Partners, L.P." on the document. He also directed his secretary, Gina Moore, to alter a Wellington marketing document by adding a cover sheet with the name 'Schneider Investment Partners, L.P." He then distributed those documents at the meeting with the William Penn Board. Mr. Schneider did not inform the Managing Partners, or anyone at Wellington, that he had used Wellington documents in the fashion described above. Indeed, Wellington first learned of the documents when Ms. Tynan discovered them on the Wellington computer system after Mr. Schneider's departure. Mr. Schneider also used a similar list of his performance statistics to respond to a questionnaire distributed by a widely used and highly regarded investment consultant. In addition, after he left Wellington, he retained a number of documents he had accumulated over the years that showed the performance of the portfolios he was managing and he had Ms. Moore print out from the Wellington computer system and deliver to him after his departure an updated performance list. Mr. Schneider did not take from Wellington, or receive after his departure, any Wellington documents unrelated to the performance of portfolios for which he had been responsible. Nevertheless, he did not inform anyone in Wellington management that he had taken or retained the documents just described and his retention of them did not comply with the terms of a request Mr. McFarland regarding return of all Wellington documents Mr. McFarland made in a letter he sent to Mr. Schneider on October 30, 1996.

FN25. Although Mr. Nyheim left Wellington amicably, a dispute between him

Not Reported in N.E.2d
Not Reported in N.E.2d, 11 Mass L Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

and Wellington had arisen during the year he served as a consultant. The dispute led to threats of a lawsuit. Although the matter was resolved before any action commenced, Mr. Nyheim remained unhappy with Wellington in general and, more particularly, with Mr. McFarland and Mr. Ryan for what he perceived as their roles in his difficulties. Mr. Nyheim's animosity toward Wellington and his friendship with Mr. Schneider led him to act as a sounding board and informal advisor as Mr. Schneider made his departure plans.

*10 Unaware of Mr. Schneider's true plans and thoughts, Mr. McFarland considered Mr. Schneider's proposal and gave copies of it to Ms. Tynan and to Mr. Gooch, Mr. Schneider's direct supervisor, for their consideration and comment. A few days later, Ms. Tynan delivered to Messrs. McFarland, Doran and Ryan a memorandum analyzing the potential regulatory consequences and issues Mr. Schneider's proposal raised. Those issues and potential consequences led the three to conclude that they did not want Wellington to participate in an affiliation of the type Mr. Schneider had proposed. [FN26]

> FN26. In addition to the problems raised in Ms. Tynan's memorandum, the three took into consideration an earlier Wellington affiliation with an entity called Marble Arch. From Wellington's perspective, that affiliation had not worked successfully and its failure colored in some measure the way they viewed Mr. Schneider's submission.

Mr. McFarland and Mr. Ryan next met with Mr. Schneider in Valley Forge on July 10, 1996. They gave Mr. Schneider a copy of Ms. Tynan's memorandum and told him that they were rejecting his affiliation request. They also told him that they were willing to explore different assignments for him within Wellington, such as organizing a hedge fund for him to manage, restricting his book of business to a smaller amount of assets and a number of other alternatives. During the July 10 meeting, Mr. Schneider's comments focused chiefly on the impact his performance had on his compensation, compensation that was dependent in part on the incentives described earlier, and that his compensation would be greater if he were not hobbled by the allocation and moratorium policies. At the conclusion of the meeting, Mr. Schneider said that he would respond to Mr. McFarland on the Wellington alternatives discussed during the meeting's course.

### 3. The Split

On Friday, July 12, 1996, two days after the meeting in Valley Forge, Mr. Schneider handed Mr. Ryan a memorandum saying that he intended to resign as a Partner effective at year's end. In response to Mr. Ryan's questions regarding what he intended to do after his resignation, Mr. Schneider stated that he intended to explore a variety of options for staying in the investment management business including starting his own firm, joining another firm and starting a hedge fund. He also told Mr. Ryan that he was thinking, at least in a broad sense, about ways to preserve his existing client relationships. He told Mr. Ryan that many of his clients were likely to leave Wellington after his departure, and that it therefore that it made business sense both for him and for Wellington to work out some kind of revenue-sharing plan so that, if the clients joined him, Wellington would not be completely deprived of revenues they had theretofore produced. He added, however, that all of his plans and thoughts were tentative and that he had no clear and targeted focus.

In fact, by July 12, Mr. Schneider was firmly committed to starting his own firm and continuing to perform the same kind of investment management services he had been performing at Wellington. Indeed, on the very next day, Mr. Schneider signed a Form ADV for an entity called "Schneider Investment Partners, L.P.," and mailed the completed form to the SEC the following Monday. Filing and approval of the Form ADV was a precondition to Mr. Schneider's ability to conduct an investment advisory business for institutional clients. The Form ADV was 21 pages long. It is an important document and Mr. Schneider clearly had begun its preparation long before July 13. [FN27]

> FN27. A month later, on August 13, 1996, Mr. Schneider registered Schneider Investment Partners, L.P., with the Commonwealth of Pennsylvania. On August 15, 1996, he filed with the Pennsylvania Department of State the papers necessary to incorporate FIP Co., which became the general partner of Schneider Investment Partners, L.P.

*11 On Monday, July 15, 1996, the first business day following announcement of his resignation, Mr. Schneider telephoned Russell's Mr. Trittin. During the course of that day, he had another telephone conversation with Mr. Trittin and with Ms. Nola

Not Reported in N.E.2d                                                    Page 12
Not Reported in N.E.2d, 11 Mass. L. Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Williams, another Russell investment manager. During those telephone conversations, Mr. Schneider informed Mr. Trittin and Ms. Williams that he had submitted his resignation to Wellington and would be starting his own investment management business. He also told them that he had filed his Form ADV with the SEC and was waiting to hear from the agency regarding its approval. Mr. Schneider advised Mr. Trittin and Ms. Williams that, if he were terminated from Wellington as a result of submitting his resignation, he would likely have a trader and analyst and would be otherwise ready to conduct his own business as early as September 1, 1996. During those conversations, Mr. Schneider also discussed with Mr. Trittin and Ms. Williams the non-competition Agreement he had signed. He specifically told them that he was subject to such an Agreement and that it was possible that a restraining order might enter to prohibit him from accepting business from Wellington clients such as Russell. He did not inform any Wellington Partners or employees that he had had those conversations.

4. *Client Plans*

When Mr. McFarland learned, through Mr. Ryan, that Mr. Schneider had delivered his resignation notice, Mr. McFarland's thoughts immediately turned to retention of the clients whose accounts Mr. Schneider was managing and to designation of successor managers for those accounts. Although Mr. Schneider's comments to Mr. Ryan had been somewhat vague as to the details of his future plans, Mr. Schneider's resignation, the context in which the resignation occurred, the prelude to the resignation and the content of Mr. Schneider's discussion with Mr. Ryan at the time he tendered his resignation led Mr. McFarland, and other Wellington managers to a strong belief, if not a conclusion, that Mr. Schneider intended to stay in the investment advisory business and that, notwithstanding the terms of his non-competition agreements, he might well seek to retain some of the clients he had served while at Wellington.

Based on his experience with other withdrawal and transition matters, albeit none quite like this one, Mr. McFarland, who, as Wellington's CEO, was in overall charge of handling the withdrawal and transition matters, had concluded that Wellington's efforts to retain the clients would be maximized if a Wellington followed a two-step process. First, the Managing Partners and Mr. Schneider would come to some kind of an agreement and understanding regarding Mr. Schneider's plans after he withdrew. Completion of the first step depended on determining

whether Mr. Schneider in fact had any interest in keeping the clients he had served while at Wellington and, if he did, persuading him not to try to do so.

Once an agreement and understanding between Wellington and Mr. Schneider were reached, Mr. McFarland hoped that Wellington and Mr. Schneider then would jointly inform the clients Mr. Schneider was serving--and other Partners, employees, industry consultants--of what the future held. Mr. McFarland was of the opinion that the transition process would proceed most smoothly from Wellington's standpoint if Mr. Schneider, and not Wellington, informed the clients that he would not be available to continue managing their accounts after his withdrawal.

*12 With all of those thoughts and considerations in mind, Mr. McFarland told a number of Wellington Partners, including Pamela Dippel, Eugene Record and Jonathan Payson, all of whom were involved with client services, John Gooch, who had had a longstanding relationship with many of Mr. Schneider's clients, and Nancy Lukitsh, Wellington's marketing director, that they should meet to develop a plan for informing clients and consultants that Mr. Schneider would be leaving the firm at the end of the year and for seeking to retain their business after Mr. Schneider left. The group began those plans.

Mr. Schneider was approaching things from a very different perspective. He very much wanted to stay in the investment advisory business. He believed that there was a very strong likelihood that he could take at least Russell and URS and possibly other clients with him when he left. He was a talented investment manager and he knew that the clients whom he served while at Wellington both recognized his talent and appreciated the performance of their portfolios under his tenure. Mr. Schneider had never been a "team player" and thus he had not acquainted his client representatives with others at Wellington with whom he worked and upon whose efforts he depended for at least some part of his success. He regarded the non-competition agreements in Article XV as potential obstacles to be overcome en route to his chosen objective rather than as solemn undertakings surrounded by fiduciary obligations. He believed that his keys to success were three in number: The first was to signal the clients whose money he managed that he would be available to manage their funds after his departure. The second was to remain vague regarding his specific plans during his conversations with Wellington personnel so that Wellington would not be provoked into litigation until the clients had manifested their

Not Reported in N.E.2d                                                                                      Page 13
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

intention to leave Wellington. Third and finally was to do everything he could possibly do to ready himself for business so that he instantly could begin managing money in his own firm if it became necessary or possible for him to do so before the close of the year.

Those very different expectations, hopes and desires probably doomed from the outset any hope of an agreeable separation protocol. What in fact materialized was a five-month fencing match that ultimately resulted in Mr. Schneider's expulsion from the Partnership and this litigation.

### 6. The Summer Interactions

Armed with their very different hopes and plans, Mr. McFarland, Mr. Ryan and Mr. Schneider met in Valley Forge on July 19. In light of Mr. Schneider's July 12 suggestion to Mr. Schneider that he wanted to preserve existing client relationships, Mr. McFarland and Mr. Ryan told Mr. Schneider of his obligations under Article XV of the Partnership Agreement, including his obligation not to solicit or accept business from Wellington clients and not to compete with Wellington without obtaining a waiver from the Managing Partners. In response, Mr. Schneider said that, in his view, non-competition agreements were invalid and thus that he did not believe Article XV could be enforced. When Mr. McFarland replied that the Managing Partners believed the clause was enforceable and intended to enforce it, Mr. Schneider said that there really was no need to discuss the issue further because he believed it would be immoral to "pick off" clients and had no intention of doing so. When he made that statement, however, he fully intended to take with him to his new firm at least Russell and URS and any others who were willing to come.

*13 Mr. Schneider then repeated his statement of July 12 to Mr. Ryan to the effect that he believed only a few of his clients would stay at Wellington and that, as a consequence, Wellington should consider a revenue-sharing arrangement that allowed clients whose accounts Mr. Schneider had been managing to go with him if they so desired. Mr. McFarland said that he would not agree to Mr. Schneider's taking clients with him even if those clients could not be persuaded to stay with Wellington after Mr. Schneider's departure. Mr. McFarland told Mr. Schneider that he strongly disagreed with Mr. Schneider's views regarding the enforceability of Article XV, that Wellington had put a great deal of thought into Article XV, that it was different from a standard non-competition agreement

in many ways and that Wellington intended to hold him to its terms.

During the course of the meeting, Mr. McFarland specifically asked Mr. Schneider on several occasions about his future plans and about what steps, if any, Mr. Schneider was taking to implement those plans. Mr. Schneider, despite all of the concrete steps he had taken to set up his business and the clear vision he had regarding the direction in which he planned to go, responded by saying that his plans were uncertain and that he was still considering a number of options. The meeting ended without any resolution.

On July 24, 1996, Mr. McFarland, Mr. Ryan, Mr. Gooch and James Walters, a Wellington Partner who was a lawyer and headed Wellington's Special Projects Group, telephoned Mr. Schneider to inquire about Mr. Schneider's plans and about transitional matters. Mr. Schneider said again that he had not decided what he would do after he left the Wellington. With that statement as background, the group discussed what Mr. Schneider should say if clients asked him directly what he would be doing after his departure from Wellington. Mr. Schneider suggested that, because his plans were vague, his response to clients should be vague. Mr. McFarland agreed. He did so because, at that point he still was trying to determine precisely what Mr. Schneider proposed to do and to reach an agreement with him before Mr. Schneider disclosed to Wellington personnel or clients Mr. Schneider's specific post-Wellington plans. [FN28]

> FN28. During the course of the conversation, Mr. Schneider also said that he could be more specific with clients if Mr. McFarland wanted him to be, Mr. McFarland said that he did not. The two men, however, had different ideas regarding what being more specific meant. To Mr. McFarland, greater specificity entailed discussions of a variety of potential plans on which Mr. Schneider had not yet settled. To Mr. Schneider, greater specificity meant discussing the kinds of concrete details about the plan he had formulated, that he in fact had begun to discuss and that he later would discuss with people outside Wellington.

On August 8, 1996, Mr. Ryan and Mr. McFarland met briefly with Mr. Schneider in Valley Forge. By this time Wellington had begun some transitional steps and Mr. McFarland told Mr. Schneider of them.

Not Reported in N.E.2d                                                                    Page 14
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

Mr. McFarland asked Mr. Schneider once more if he had decided what he was going to do after leaving Wellington and whether he had taken any steps toward implementing his plans. Mr. Schneider responded by saying that he had done nothing and was still considering a variety of options. Mr. McFarland again brought up the non-competition and waiver issues and Mr. Schneider said that he understood his obligations in that regard. By this time, however, he was very hard at work on his new venture, so much so that in a conversation he had with Russell's Mr. Trittin one week later, he was able to state that his new firm would occupy space as of December 1, 1996 and would be open for business on January 1, 1997 and that he had notified the "brokerage community" of his plans in order to insure that his trading needs would be fully met when his operations began. [FN29]

> FN29. Mr. Schneider's interactions with Mr. Trittin are discussed in more detail later. See pp. 53-62, *infra*.

**\*14** On August 28, 1996, Mr. Gooch met Mr. Schneider in Valley Forge to discuss the general subject of Wellington's retention of the clients whose portfolios Mr. Schneider was managing. At that meeting, Mr. Gooch told Mr. Schneider that his objective was to retain for Wellington the client accounts Mr. Schneider had been managing. To that end, Mr. Gooch said, he wanted Mr. Schneider's thoughts regarding successor managers whom Wellington might designate. Mr. Schneider responded that he did not view it as part of his responsibility to assign or to help to assign successor managers and that Wellington should assign proposed successors on its own. Mr. Gooch then asked Mr. Schneider what he would say if a client asked him for an evaluation of successors Wellington had proposed for his accounts. Mr. Schneider replied that the clients he was serving paid him "to pick stocks, not people."

Mr. Gooch also told Mr. Schneider that he wanted to obtain his thoughts regarding where to place within Wellington the people who then were on Mr. Schneider's support staff, or team, in Valley Forge. Mr. Gooch asked Mr. Schneider if he thought that any members of that team were qualified to manage any of the accounts Mr. Schneider was managing. Mr. Schneider said that none was. Mr. Gooch and Mr. Schneider then discussed the strengths and weaknesses of the individual members of Mr. Schneider's staff and whether they should be retained as Wellington employees following Mr. Schneider's

departure. Mr. Schneider avoided stating any express opinion as to the qualifications of those individuals and declined to recommend that any be retained. Indeed, Mr. Schneider said that he would not get involved in making any recommendations regarding any members of his team and that Wellington should reach an independent judgment regarding whether they should be retained. Mr. Gooch told Mr. Schneider that he and others at Wellington would try to reach that independent conclusion. In fact, at the time he talked to Mr. Gooch, Mr. Schneider was so impressed by the quality and ability of his team members that he wanted to have them join him at new business if he could find a way to do so. [FN30]

> FN30. Indeed, on or about August 14, he had told Mr. Trittin that his lawyer had advised him not to approach those staffers at that time about joining him in his new venture and that, as a consequence and a safeguard, he was interviewing others for staff positions at the firm. See pp. 56-57, *infra*.

On at least two other occasions during the course of the summer, Mr. McFarland had talked to Mr. Schneider about the latter's plans. On one occasion, Mr. McFarland had heard from others that Mr. Schneider was talking to a trader at a company called Delaware Investments about potential employment. Mr. McFarland telephoned Mr. Schneider to ask him if this were true. Mr. Schneider said that it was not, that he did not know where rumors like that were coming from and that he had told Mr. McFarland the nature of his plans to the extent he had formed them.

On another occasion, Mr. McFarland telephoned Mr. Schneider to tell him that he had heard that Mr. Schneider had been discussing with members of his Wellington team the possibility of their joining him at a new firm after he left Wellington. Mr. Schneider said that he had not had any such discussions and again stated, falsely, that he had informed Mr. McFarland in full detail about all of his plans to the extent that he had formed them.

**\*15** On September 23, 1996, Mr. Doran, Mr. Ryan and Mr. McFarland again met with Mr. Schneider to discuss his withdrawal. Mr. Doran asked Mr. Schneider if he had had any contact with clients about his future plans. Mr. Schneider said that he had received telephone calls from some of his clients but had not gone beyond telling them that he would remain a Wellington Partner and would manage their

Not Reported in N.E.2d                                                                                  Page 15
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

assets until the end of the year.   At least with Mr. Trittin, of course, he had by then gone well beyond that and he had told representatives of URS, RJR-Nabisco and the Mentor Group at least that he intended to remain in the investment advisory management business.   Mr. McFarland again asked Mr. Schneider if he had developed any plans for future and Mr. Schneider again responded that he had no definite plans.     By this time, however, Mr. Schneider had in fact hired a trader and a back office manager for Schneider Investment Partners, had signed a five-year lease for office space in the name of Schneider Investment Partners and paid a $13,000 rental deposit for that space.

On October 3, 1996, Mr. Gooch met again with Mr. Schneider in Valley Forge.   Mr. Gooch told Mr. Schneider that he was having difficulty finding any place at Wellington for the members of his staff and asked him if he had any thoughts on their strengths, weaknesses or qualifications in addition to the non-committal thoughts he had expressed on August 28. Mr. Schneider said that he had no such thoughts and reiterated that it was up to Wellington to decide whether to retain or discharge his staff members.

Mr. Gooch in fact tried without success to place the members of Mr. Schneider's staff elsewhere at Wellington.      He had done so, however, with restrained enthusiasm.   Mr. Gooch thought that Mr. Schneider, as the staffers' direct supervisor, was in the best position to know their strengths, weaknesses and capabilities.      Consequently, he felt that Mr. Schneider's non-committal statements masked substantial reservations Mr. Schneider had about their qualifications.   After Mr. Gooch was unable to find other places for the staffers within Wellington, Wellington ultimately notified them that they would be discharged at year's end.

Wellington's notice to the staffers of their year-end dismissal, however, did not end the efforts Mr. Gooch made to place them elsewhere.   On or about October 21, 1997, Binkley Shorts, another Wellington portfolio manager, talked with Mr. Gooch about adding another person to the staff working for him.   Mr. Gooch told Mr. Shorts that Wellington had given notice of termination to Mr. Schneider's staff and that all of those staff members were available for Mr. Shorts to work with him if he chose to work with them and they chose to stay. Mr. Gooch told Mr. Shorts that he should talk to Mr. Schneider to see if any of those people might be compatible with Mr. Shorts' needs.   Mr. Shorts telephoned Mr. Schneider for that purpose and, in response to Mr. Shorts'

questions, Mr. Schneider said, in substance and effect, "If I were you, I wouldn't hire any of these people.      They wouldn't meet your standards." Indeed, Mr. Schneider told Mr. Shorts that it would not even be worthwhile to interview those employees.   As to one of them, Mr. Schneider said that he "would never be more than a research assistant."      He also disparaged the academic background of another member of his team, saying that he had "only attended Penn State."   Because of Mr. Schneider's statements, Mr. Shorts pursue none of the members of Mr. Schneider's staff.   He did, however, expand the staff working for him by hiring another person from within Wellington.

*16 After Wellington announced to Mr. Schneider's team members that they would not be retained beyond the end of the year, Mr. Schneider hired many, if not all of them, for his new firm.   Staffing always had been an important consideration in Mr. Schneider's plans and he believed, correctly, that he would obtain a marketing advantage for his new firm if he were able to represent to clients that he had brought his team with him intact from Wellington.   It was with that thought and plan in mind that Mr. Schneider had discouraged Wellington's retention of them. [FN31]

> FN31. I am unable to determine precisely when Mr. Schneider hired those staffers although I find that he and they had made some arrangement regarding post-Wellington employment at his new firm before November 11 when he gave Russell's Mr. Trittin their home telephone numbers and suggested that Mr. Trittin talk to them directly about their future plans. See p. 57, *infra*

### 7. The Dinner Invitation
In early October, Mr. Ryan received an invitation to a dinner honoring John C. Bogle, Chairman of the Vanguard Group, Wellington's largest client.   Listed on the invitation as one of the dinner's sponsors was an entity called "Schneider Investment Partners," the company Mr. Schneider had formed on August 13. On October 8, Mr. Ryan sent Mr. McFarland a copy of that invitation.      After Wellington employees consulted various public listings, Mr. McFarland and the others learned that Schneider Investment Partners, L.P., had been registered with the Pennsylvania Secretary of State on August 13, 1996, that Mr. Schneider was the principal in the entity and that Schneider Investment Partners had been registered with the Securities and Exchange Commission as an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                Page 16
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

investment adviser.

As stated, Mr. McFarland and others at Wellington had had suspicions from the outset that Mr. Schneider was seriously contemplating starting his own investment-advisory business. Indeed, Mr. Schneider had stated when he tendered his resignation that his post-Wellington options included starting his own investment management business. Nevertheless, the dinner invitation was Wellington's first confirmation regarding Mr. Schneider's actual plans. [FN32]

> FN32. By then, of course, Wellington also had heard from some clients that they were considering their own options for their investments after Mr. Schneider's departure and that those options included asking Mr. Schneider to continue managing their money. After his July 19 statement that he did not intend to "pick off" clients, however, Mr. Schneider himself had said nothing to Wellington personnel about preserving client relationships.

Armed with the information from the public records and from the invitation, Mr. McFarland telephoned Mr. Schneider to ask him about the dinner invitation and the formation of Schneider Investment Partners. Mr. Schneider said that his firm's appearance as a dinner sponsor had been a mistake and that he had not authorized use of the firm's name when he made a contribution to the dinner. Mr. McFarland told Mr. Schneider that his mistake had been forming Schneider Investment Partners without informing the Wellington Managing Partners of his plans and receiving their permission and that he had violated the Partnership Agreement by doing so. Mr. Schneider replied by saying that he had not violated the Partnership Agreement because he had only taken preparatory steps towards going into business and was continuing to work full time at Wellington. He also said, falsely, that he had formed Schneider Investment Partners merely to keep his options open. The conversation ended with Mr. McFarland telling Mr. Schneider that he was extremely troubled by his actions and would let him know of Wellington's response to those actions.

Following the conversation, Mr. McFarland sent Mr. Schneider a letter dated October 10, 1996 in which he discussed Mr. Schneider's withdrawal from the Partnership, the information he then had regarding Mr. Schneider's future plans and factors the Managing Partners would take into account in

determining Mr. Schneider's merit distribution for 1996. Among other things, Mr. McFarland told Mr. Schneider that he expected him to help Wellington retain the accounts Mr. Schneider then was managing. Mr. McFarland also stated that Wellington expected Mr. Schneider to comply with the terms of Article XV of the Partnership Agreement.

*17 After sending Mr. Schneider the October 10 letter, Mr. McFarland left on a long-planned overseas business trip. On October 24, 1996, following his return to the United States, Mr. McFarland telephoned Mr. Schneider to seek more detail about Schneider Investment Partners and to discuss rumors that Mr. McFarland had by then heard that Mr. Schneider was hiring people for his new firm. Mr. Schneider denied the rumors, saying that he did not know what the source of those rumors could possibly be. He again said that he had no specific plans to do business as Schneider Investment Partners but was merely protecting his options.

Mr. McFarland, Mr. Ryan and others continued to hear rumors about Mr. Schneider's plans over the next few days and weeks. Among them were that Mr. Schneider's brother had resigned from his position with an investment advisory firm to join Mr. Schneider's new firm and that Mr. Schneider was claiming he would open his new business with $1 billion under management.

In fact, by the end of October, Mr. Schneider was in a position where, as he told Mr. Trittin on or about November 11, the only additional staff person he needed to open the doors of his new business was someone to handle marketing and client services. He had office space, analysts, a senior trader, a "back-office" manager and the necessary trading arrangements with other firms. At about that time, Mr. Ryan, Mr. Doran and Mr. McFarland began to discuss the possibility of removing Mr. Schneider from the Partnership as a consequence of what they viewed as his violations of the Partnership Agreement.

On October 30, 1996, Mr. McFarland sent another letter to Mr. Schneider. The October 30 letter was far stronger in tone than the earlier letters had been and, among other things, instructed Mr. Schneider to provide Wellington the complete details of his proposed business arrangements and his contact with Wellington clients no later than November 8. The letter also instructed him to refrain from activities that violated Article XV of the Partnership

Not Reported in N.E.2d                                                                                                        Page 17
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

Agreement.

After receiving Mr. McFarland's letter of October 30, Mr. Schneider told Mr. Ryan on November 6, 1996, that he wanted to talk to the Managing Partners about the letter's content. [FN33] A conference call was arranged for the same day. Participating in Boston were Mr. McFarland and Mr. Doran. Mr. Ryan and Mr. Schneider participated from Valley Forge. During the conference, Mr. Schneider told the Managing Partners for the first time about discussions he had had with Daniel Ludeman of the Mentor Group in early August [FN34] and about the discussions earlier described that he had had with the William Penn Foundation. He said that he had not mentioned the Mentor meeting earlier because it had not led to anything and that he had not mentioned the William Penn meeting because it was just a brief meeting focused solely on his investment style. Mr. McFarland asked Mr. Schneider about the rumor he had heard regarding Mr. Schneider's claims that he would be starting his business with $1 billion of assets under management. Mr. Schneider did not answer that question but said instead that he would address all such issues in a written document he would provide to the Managing Partners by November 8, 1996.

> FN33. By that time Mr. Schneider had somehow obtained a copy of a memorandum, marked privileged and confidential, that Mr. McFarland had faxed to Mr. Ryan. The memorandum was dated November 4, 1996 and had been prepared by Mr. Walters, the lawyer who headed Wellington's Special Projects Group. In the memorandum, which had been prepared at Mr. McFarland's request, Mr. Walter's discussed various legal options Wellington could take in response to what Wellington management understood had been Mr. Schneider's actions. Mr. McFarland distributed the memorandum to the Managing Partners in preparation for a meeting he planned to have on November 6 to discuss those options. Because he was to undergo surgery on November 6, Mr. Walters was not going to attend that meeting. The memorandum counseled against seeking injunctive relief and stated that the better course would be to remove Mr. Schneider as a Partner and possibly to sue him for damages if it turned out that he actually went forward with what Wellington managers were coming to understand were

his plans to offer investment management services through his own company, Mr. Schneider was upset by what he read in the memorandum and viewed it as a blueprint for depriving him of the compensation to which he believed he was entitled for his work in 1996. In fact, the memorandum had been drafted for the purpose of illuminating possible options and was not the embodiment of a pre-formed program for Mr. Schneider's expulsion.

> FN34. See pp. 77-78, *infra.*

*\*18* On November 7, 1996, Mr. Schneider wrote to the Managing Partners the letter he had promised during the November 6 telephone conference. The letter purported to set forth a full chronicle of Mr. Schneider's activities after he announced his resignation and his post-Wellington plans. In fact, it presented a picture of future plans that was far more undefined and fluid than in fact was the case and it presented a history of client contacts and discussions far more passive than in fact had occurred. Moreover, among other things, the letter stated that several firms had approached Mr. Schneider about "running money" for them after he left Wellington but all involved his joining their firms, that he had not solicited any Wellington clients, that he had had only brief discussions with clients about this future plans and that he was a "long way from being able to commence business." Those statements were simply false. Beyond that, the letter wholly omitted any description of the by then extensive and detailed discussions Mr. Schneider had had about his future plans with Russell's Mr. Trittin.

### 8. *The November 14 Meeting*

On November 14, 1996, Messrs. Doran, Ryan and McFarland met with Mr. Schneider to discuss his letter of November 7, 1996. Among other things, the four discussed Mr. Schneider's communications with Wellington's clients. Mr. Schneider told them, for the first time, that he had engaged in detailed conversations with employees of Russell regarding his business plans. He said that he had provided Russell with information about those plans in response to specific questions Russell employees had asked him. Mr. Schneider also said, again for the first time, that, for two principal reasons, he felt free to accept business from any Wellington clients who offered it to him if those clients were going to leave Wellington in any event. The first reason he proffered was that his acceptance of business from clients who were planning to leave in any event

Not Reported in N.E.2d                                                                                     Page 18
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

would cause Wellington no harm. Second, Wellington had by then notified all of the members of his "team" that they would not be rehired. He intended, he said, to do only "all-cap value" investing and Wellington's decision to disband his team meant that no "all-cap value" managers would remain at Wellington after he left. Accordingly, he said, he and Wellington would not be in competition with each other.

At some point, the conversation turned to a rumor Mr. McFarland had heard regarding Mr. Schneider's alleged claims that he would open his business with $1 billion of assets under management. Mr. McFarland had asked about the rumor during his November 6 telephone conversation with Mr. Schneider. Mr. McFarland said that he saw no reference to that issue in Mr. Schneider's November 7 letter. Mr. Schneider said that it was addressed in the letter through his statement that he would accept business from clients who followed him on a wholly unsolicited basis.

### 9. Attempts at a Waiver
**\*19** On November 15, 1996, the day after the meeting just described, Mr. McFarland sent Mr. Schneider a letter stating that Mr. McFarland considered his November 7 letter and his statements during the previous day's meeting to be an inadequate response to the Managing Partner's concerns about Mr. Schneider's adherence to what the Managing Partners believed were the terms of the Partnership Agreement. The letter closed with a statement that, absent a waiver of a type described in Article XV itself, Mr. Schneider was prohibited from preparing for or engaging in the investment advisory business.

Mr. Schneider responded with a letter dated November 19, 1996. In his response, Mr. Schneider disputed Mr. McFarland's statement of his obligations under the Partnership Agreement and presented his own views regarding contractual obligations, competition with the Partnership, accepting business from Partnership clients and what did and did not constitute harm to the Partnership. Although he did not explicitly seek a waiver of a type Article XV contemplated, he did say that he thought Wellington should make a good-faith determination regarding whether his acceptance of business from his existing clients, if they were to leave Wellington in any event, would cause any harm to Wellington. Finally, Mr. Schneider stated that he was prepared to come to Boston to discuss the situation further if the Managing Partners so desired.

On November 19, 1996, Mr. Schneider telephoned Mr. Doran to ask whether he could hire the members of his Wellington "team." Mr. Doran responded that that issue might be appropriate to consider in the context of working out a waiver agreement under Article XV, but that Mr. Schneider had made no such waiver request. Mr. Doran also told Mr. Schneider that any waiver request should include a precise and specific statement regarding the nature and contours of the business in which Mr. Schneider would like to engage. During the course of their conversation, Mr. Doran told Mr. Schneider that if the request included permission to manage money for his current clients, the Managing Partners would have "real difficulty with that."

In fact, Mr. Doran's statement was accurate. Neither Mr. Doran nor either of the other Managing Partners had any intention, then, earlier or later, of entering a waiver agreement that had the effect of allowing Mr. Schneider to take Wellington clients with him to his new firm. They believed in fact, and in good faith, that at least those provisions of Article XV which prohibited departed partners from providing investment advisory services to Wellington clients were of paramount importance to the firm. Although they viewed the remaining provisions of the Article as important, they had not ruled out in their own minds by this time the possibility of waiving the Article's three-year ban on all competition.

Mr. McFarland followed Mr. Doran's comments with a letter dated November 21, 1996. In his letter, Mr. McFarland said, among other things, that any waiver of the terms of Article XV Wellington was prepared to give would be based on an undertaking that Mr. Schneider would not provide solicited or unsolicited investment advisory services to any Wellington client without the Managing Partners' consent and that he would not solicit or hire Wellington employees without consent of those Partners as well. Mr. McFarland followed the letter with a telephone call to Mr. Schneider in which he asked him to come to Boston to meet with the Managing Partners. Mr. Schneider agreed.

**\*20** Five days later, on November 26, Mr. Schneider met with Mr. McFarland and Mr. Doran in Boston. Mr. Ryan, the third Managing Partner, participated in the meeting by telephone from his office in Valley Forge. Before the meeting, the three Managing Partners had prepared a list of five points they considered essential to any waiver agreement they were prepared to make. Those essential points included an agreement not to provide solicited or

Not Reported in N.E.2d                                                          Page 19
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

unsolicited investment advisory services to Wellington clients for a five-year period. That point was drawn directly from Article XV of the Partnership Agreement. The Managing Partners were, however, prepared to waive the provisions of Article XV prohibiting acceptance of investment advisory business from other clients during the first three years after Mr. Schneider's departure.

The topic the four discussed on November 26 was the proposed agreement not to accept business from Wellington clients.    Mr. Schneider said that he would not agree not to accept business from Wellington clients for five years because he did not need a waiver to accept business from clients who were going to leave Wellington in any event.    Mr. Schneider continued by saying that the clients had rights and that Wellington could not tell the clients what to do.    The meeting quickly came to loggerheads and did not progress beyond that first point.    Obviously, the two sides reached no agreement. [FN35]

> FN35. At one point Mr. Schneider proposed that Wellington ask the clients whether they would stay with Wellington if Mr. Schneider left the firm and did not stay in the investment advisory business.    If they said "no," then Mr. Schneider would be free to accept business from them. Implicit in his suggestion was that a "yes" answer would prevent him from accepting their business. Mr. McFarland declined to explore that possibility accurately believing, among other things, that a client answers to the question would be unrevealing in light of their knowledge that he in fact would be available to accept their business.

### 11. The Expulsion

The November 26 meeting between Mr. Schneider and the Managing Partners had taken place in the shadow of Wellington's preparation for a Partnership meeting at which the Managing Partners would seek, if necessary, Mr. Schneider's expulsion from the Partnership if no acceptable waiver agreement could be negotiated.    On November 23, 1996, Ms. Tynan, at Mr. McFarland's request, had notified Mr. Schneider and all other Partners that a special meeting would be held on December 3, 1996.    Later, Ms. Tynan sent to Mr. Schneider and all other Partners a package containing a chronology of events as the Managing Partners saw them, copies of all correspondence between Mr. Schneider and Mr. McFarland and a letter from Mr. Schneider to all

Partners.    In his letter, Mr. Schneider requested an opportunity to speak to all Partners and present in person his views regarding what had occurred.

Because no Agreement was reached on November 26, the special meeting of the Partnership was held in Wellington's Boston office beginning at 8:00 AM on December 3, 1996.    All Wellington Partners, including Mr. Schneider, attended the meeting, most in person and a few by telephone.    Mr. McFarland opened the proceedings with a brief statement that the meeting's purpose was to consider removing Mr. Schneider as a Partner.    He referred to the package of materials that had been sent to everyone in advance.    Mr. McFarland then told Mr. Schneider take whatever time he desired to make any statement he wished to make.    Mr. Schneider spoke for about fifteen or twenty minutes.    Mr. Schneider's comments were followed by a question and answer period during which Mr. Schneider answered questions asked of him by various Wellington Partners. After the question and answer period concluded, Mr. McFarland asked Mr. Schneider to leave the room.    A discussion among the remaining Partners ensued.    During the course of that discussion, one Partner suggested that, instead of voting to expel Mr. Schneider immediately, the firm vote to expel him unless he agreed by 10:00 AM the next day to the terms of the waiver the Managing Partners had proposed on November 26.    A vote on that issue was taken by secret ballot.    Mr. Schneider received a ballot and voted.    The vote was 47-5 in favor of expulsion unless Mr. Schneider signed the proffered waiver agreement.    The vote thus was substantially in excess of the 75% the Partnership Agreement required for removal.

*21 Following the vote, Mr. McFarland went to the nearby conference room where Mr. Schneider was waiting and informed him of the outcome. Mr. McFarland gave Mr. Schneider a letter containing the waiver terms and a space for his signature.    The substantive terms of the letter were identical to those the Managing Partners had set out on November 26. In essence, the letter sought Mr. Schneider's agreement to accept no business from existing Wellington clients for a five-year period in return for which he would be relieved from Article XV's prohibition on acceptance of business from other clients and Wellington would not challenge his right to hire the employees who were being terminated as a consequence of his withdrawal.    Mr. Schneider took the letter and left the office, saying he would call Mr. McFarland the following morning with his response The following morning, Mr. Schneider telephoned

Not Reported in N.E.2d                                                                                                      Page 20
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

Mr. McFarland and said that he could not accept the terms of the letter. His expulsion from Wellington thereafter became effective at 10:00 AM.

### D. THE CLIENTS

As stated, when Mr. Schneider submitted his notice of resignation in July 1996, he was managing accounts for eight Wellington clients: Russell, RJR-Nabisco, the State of Utah Retirement System, Colonial Williamsburg Foundation, PECO Energy, Mentor Investment Group, Bell Atlantic and Consolidated Freightways. Two of those clients, PECO Energy and Mentor Income Group, remained with Wellington. Two others, Bell Atlantic and Consolidated Freightways, left Wellington to go to unrelated management, although Bell Atlantic officials indicated to Wellington personnel that Bell Atlantic would be searching for new managers when its merger with NYNEX concluded and that Wellington would be considered along with others.

Russell moved the four accounts Mr. Schneider managed to his new firm in December 1996. Russell remained, and remains, a Wellington client on other accounts. The State of Utah Retirement System and RJR Nabisco, a long term Wellington client, left Wellington in December 1996 and transferred their assets to Mr. Schneider's firm. Colonial Williamsburg terminated its relationship with Wellington and indicated its intention to transfer its funds to Mr. Schneider at his new firm. The preliminary injunction this Court entered on December 30, 1996 prohibited Mr. Schneider from accepting those funds.

The way Mr. Schneider and Wellington dealt with all eight, and particularly the latter four, before and after Mr. Schneider announced his resignation is worthy of some detailed examination.

#### 1. Frank Russel Company

A relationship between Russell and Wellington existed for many years. In 1989, Mr. Nyheim began to manage a Russell portfolio for Wellington. In January 1990, Mr. Schneider became the assistant portfolio manager for the account. In May 1991, before he became a Wellington Partner, Mr. Schneider became the Russell portfolio manager for the Russell funds Mr. Nyheim theretofore had been managing. His succession to that role was approved by Russell. In May 1992, Russell opened a second portfolio with Wellington and specifically indicated that Mr. Schneider should manage that portfolio. In August of 1994, Russell placed two different sets of

funds with Wellington, again with the explicit requirement that Mr. Schneider manage those funds. All of the contracts under which Wellington managed money for Russell provided for immediate termination by either side at any time and without penalty.

**\*22** From the outset, Russell was an important client to Mr. Schneider, as it was to Wellington generally, not only because of the money that Russell had directly under management at Wellington--the approximately $800 million Mr. Schneider eventually managed for Russell accounted for one-third of all the funds he managed--but also because Russell was a widely-respected national firm that acted as an advisor and consultant to many trustees and other asset-holders throughout the Nation. In that capacity, Russell was in a position to advise its clients regarding their selection of asset managers. Indeed, Russell and Wellington have many joint clients. [FN36]

> FN36. The Russell-Wellington relationship thus is particularly complex because Russell serves as a consultant to some of Wellington's best clients, is itself a client and competes with Wellington for business from potential clients.

In early 1993, Russell managers observed that the Russell portfolios Mr. Schneider was managing were "migrating" from a large cap average, i.e., investments in companies that, on average, had capitalizations greater than $5 billion, to a mid-cap average, i.e., investments in companies that, on average, had capitalizations between $1 billion and $5 billion. The migration was of some concern to the Russell managers because Mr. Schneider had not discussed it with them in advance and it affected the overall mix of the Russell investments. [FN37] Russell examined what Mr. Schneider was doing, approved of his objectives and results and ultimately rebalanced the distribution of its assets among its portfolio managers to accommodate the changes Mr. Schneider had made.

> FN37. In managing assets, Russell employs something it calls "multi-style, multi-manager diversification." In essence, Russell's approach relies for overall balance on various portfolio managers who employ different approaches to investing and who specialize in investing in different kinds of securities. The blended result, in Russell's view, produces consistent returns over long

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                           Page 21
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

periods of time and reduces the likelihood that portfolio values will change dramatically over short periods if time. The Russell approach thus places a premium on overall results for all funds invested even though a particular asset class or investment style--or a particular fund investing in one asset class or using a particular style--may not achieve above-average performance at any particular time. Russell's approach is not unique and is similar to the approach used by other corporate and public funds. Because of the blended nature of Russell's investment approach, a change by one manager in her or his investment style or class necessarily triggered at least an examination by Russell of the question whether the focus and approach of other funds had to be changed in order to maintain what Russell believed was an appropriate overall investment balance.

Mr. Schneider's chief contact at Russell was Dennis J. Trittin, a senior portfolio manager. As part of his normal routine with all portfolio managers handling Russell assets, Mr. Trittin spoke to Mr. Schneider at least twice each year. During the course of those conversations, Mr. Trittin sometimes asked Mr. Schneider about how long he thought he would remain at Wellington. At one point in late 1995, Mr. Schneider said that he might leave someday because of the "crowding out" issues that existed at Wellington. [FN38] In the Spring of 1996, Mr. Trittin spoke again with Mr. Schneider and again asked him how long he intended to remain at Wellington. This time, Mr. Schneider was more definite and stated that he was thinking about leaving Wellington because of crowding out issues.

> FN38. Mr. Trittin was familiar with the "crowding out" phenomenon both generally and as a result of his conversations with Mr. Schneider. He regarded it as no more than a nuisance as long as performance remained good and he had no concerns with the performance of the funds Mr. Schneider was handling.

In light of this information, Mr. Trittin thereafter telephoned Mr. Schneider frequently for updates regarding his plans. When Mr. Trittin spoke to him in June, Mr. Schneider said that he definitely planned to leave Wellington unless he could work out a satisfactory arrangement regarding what he characterized as the "crowding out" problem. [FN39]

Mr. Trittin asked Mr. Schneider to let him know of his plans as soon as he had made a final decision.

> FN39. fact, by late June Mr. Schneider was planning to leave Wellington but not because of "crowding out." See pp. 23-24, *supra*

As stated earlier, Mr. Schneider telephoned Mr. Trittin on July 15, 1996, to tell him that he had tendered his resignation to Wellington the previous Friday, July 12. In that first conversation, Mr. Schneider told Mr. Trittin that he was going to form his own investment management firm. Later that day, Mr. Schneider spoke with Mr. Trittin and with Ms. Williams. In that subsequent conversation, Mr. Schneider said that he thought he would be capable of going into business by September 1, 1996 if it were necessary to do so. He thought, he said, that he would have a trader and back office analysts ready to go by then. He told Ms. Williams and Mr. Trittin that he had filed the form ADV with the Securities and Exchange Commission but that he was still waiting for approval.

*23 Mr. Trittin asked Mr. Schneider if there were any reason why Mr. Schneider could not take the Russell assets he was managing to his new firm with him. In reply, Mr. Schneider said that there was a non-competition agreement in his contract with Wellington and that he thought that at least a possibility that would seek an injunction to prevent him from continuing to manage Russell's assets. Mr. Trittin believed that Wellington would not seek to enforce the agreement and, at least by downplaying its importance, conveyed his impression to Mr Schneider. Mr. Schneider offered no other reason why he could not accept Russell's business after his departure. [FN40]

> FN40. Earlier, when Mr. Nyheim left Wellington, he told Mr. Trittin that there was a non-competition agreement in his contract with Wellington. Mr. Trittin, therefore, was not in fact surprised when Mr. Schneider mentioned the non-competition agreement to him.

Mr. Trittin wanted very much to keep his options open with respect to Mr. Schneider's continued management of Russell's funds. Accordingly, he and Mr. Schneider agreed that, as the months progressed, Mr. Schneider and he would talk about Mr. Schneider's plans but that Mr. Schneider would provide information only in response to questions

Not Reported in N.E.2d                                                                                          Page 22
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

Mr. Trittin asked.    The two men followed that procedure during the rest of their conversations over the ensuing weeks and months. [FN41]

> FN41. In addition, on or about August 14, Mr. Schneider and Mr. Trittin agreed that they should have their conversations about Mr. Schneider's new venture 'off hours' when Mr. Schneider was not in the Wellington offices and that they should not use Wellington telephones. They followed that procedure, too, thereafter.

During the following week, Mr. Trittin had several additional telephone conversations with Mr. Schneider during which he asked Mr. Schneider for details regarding his plans for the new venture. Mr. Schneider gave to Mr. Trittin the details he requested, details Mr. Schneider simultaneously was telling his Partners at Wellington he did not have because his plans were indefinite.

During the period between July 21 and December 4, 1996, Mr. Schneider spoke repeatedly to Mr. Trittin and other Russell employees about his plans for his new business. Mr. Schneider understood throughout this period that Russell was considering whether or not to move its assets to his new firm and that his conversations with Mr. Trittin and the others at Russell were part of Russell's due-diligence investigation.

By September 24, Mr. Schneider had told Mr. Trittin, among other things, that he had hired a trader and a back office person for the new firm, both of whom would be available to start on January 2, 1997, he had received assurances from the brokerage community that his new firm would be covered from the moment it opened its doors, he had ample financial resources to support the new firm, including the ability to sustain operations for two years without revenues, he had substantial financial backers, including Mr. Nyheim, who were willing to invest additional capital in the firm, he would be maintaining the style of investment management that he had employed at Wellington and that URS would move its account to his new firm.

During a conversation Mr. Trittin and Mr. Schneider had on August 14, 1997, Mr. Trittin asked Mr. Schneider about whether he would be bringing with him to his new firm the members of the team of analysts who had worked with him at Wellington. Mr. Schneider replied that he had been advised by his lawyer not to approach the members of his team

about joining him and that he was interviewing analysts unaffiliated with Wellington to supplement or to substitute for those individuals if they ultimately were unavailable. From Mr. Trittin's questions, and from an earlier conversation he had had with Mr. Trittin during the week of July 15, Mr. Schneider knew that Mr. Trittin valued the stability that would flow from bringing his support team to his new venture. As a consequence, Mr. Schneider formulated a strategy, execution of which was described earlier, that was designed to minimize the likelihood that Wellington would retain those staffers and kept Mr. Trittin informed of the relationship between himself, Wellington and those staffers, at least in a general way, thereafter. Indeed, on November 11, 1996, by which time Wellington had notified the staffers that they would be terminated at year's end and Mr. Schneider had made some arrangement with them regarding employment at his new firm, Mr. Schneider suggested that Mr. Trittin call them at home to discuss with them directly their future plans. For that purpose, he gave Mr. Trittin the staffers' home telephone numbers. Mr. Trittin in fact never called them.

*24 The closeness of the relationship between Mr. Schneider and Mr. Trittin and the high regard in which the latter held the former's services had not gone unnoticed by other Wellington Partners. By August 2, 1996, the Wellington personnel involved in making transition plans generally believed it was unlikely that the Russell funds Mr. Schneider was managing would remain at Wellington after Mr. Schneider left. On August 16, 1996, Mr. Trittin confirmed that belief when he told Pamela Dippel and Nancy Lukitsh, two Wellington Partners, that Russell was considering moving its portfolios to Mr. Schneider after he left Wellington although Russell was also considering other options, including keeping the funds at Wellington under management by someone who followed Mr. Schneider's style or some Wellington manager who followed another style. Later that month, Mr. Trittin told Mr. Ryan by telephone that he intended to write to Russell clients, including clients who had money under management at Wellington, to tell them of Mr. Schneider's departure from Wellington and to urge them to "consider their options" regarding future management of their funds.

Faced with what Wellington management perceived as Russell's likely desire to move assets Mr. Schneider had been managing to his new firm, Wellington decided to concentrate its efforts on persuading Mr. Schneider to make himself

Not Reported in N.E.2d                                                          Page 23
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

unavailable to Russell rather that directly telling Russell that it intended to hold Mr. Schneider to the terms of an agreement that would have the effect of making him unavailable. Accordingly, Ms. Dippel, Ms. Lukitsh and Mr. Ryan did not mention to Mr. Trittin anything about the terms of the restrictive covenant during their conversations with him.

In late September, 1996, Mr. Trittin, Ms. Williams and Mark Thurston, another Russell employee, had a telephone conversation with Ms. Lukitsh and Mr. Gooch of Wellington. During this call, Ms. Lukitsh and Mr. Gooch offered Russell two different approaches to replacing Mr. Schneider after he left Wellington. The first alternative Wellington offered was management of the funds by a man named James Morby. Mr. Morby was an analyst who had never managed a portfolio. The second alternative was management of the funds by Saul Pannell, a manager with extensive experience and a known track record. After discussing the alternatives, Mr. Trittin requested that Wellington send him a detailed written proposal regarding the two proposals. Wellington did so in early October, 1996.

Mr. Trittin was not favorably impressed by either of the alternatives Wellington proposed. Indeed, by the time he received Wellington's written proposal, he was of a mind that, unless unforseen information appeared or unforseen developments occurred between then and the time Mr. Schneider actually left Wellington, Russell's best option would be to move the Russell funds Mr. Schneider was managing at Wellington to Mr. Schneider at his new firm. Nevertheless, in November, Mr. Trittin arranged to meet with Wellington representatives on December 10, 1996 to discuss the two alternatives Wellington had proposed. Mr. Trittin also scheduled a meeting with Mr. Schneider for the same day.

**\*25** On or about December 4, 1996, Mr. Trittin received a telephone call from Mr. Schneider in which Mr. Schneider told him that Wellington had terminated him. Shortly thereafter, Mr. Trittin and another Russell representative spoke to Mr. McFarland who told them that Mr. Schneider had been terminated because of his refusal to agree to live up to a provision in the Wellington Partnership Agreement prohibiting Partners from soliciting or accepting Wellington client assets for five years after leaving Wellington. Mr. Trittin told Mr. McFarland that he was surprised that Wellington would pursue such a provision and stated that the provision restricted the ability of Wellington clients to choose the investment managers they desired. Mr.

McFarland replied by saying that Wellington had not yet decided what action, if any, it intended to take if Mr. Schneider accepted existing Wellington clients at his new business but that Wellington "wanted to take the high road and wished [Mr. Schneider] well."

Mr. Trittin's conversation with Mr. McFarland on December 4 was the first notice Mr. Trittin had from Wellington about what Wellington considered to be the scope, although not the existence, of the non-competition provisions of the Partnership Agreement and the value Wellington placed on those provisions. For the reasons stated earlier, Wellington had not discussed those provisions with him previously. Moreover, notwithstanding all of the discussions Mr. Schneider and Mr. Trittin had had about Mr. Schneider's plans during the period after July 12, Mr. Schneider never had mentioned to Mr. Trittin the statements Mr. McFarland had made to him about the value Wellington placed and intended to place on holding him to what Wellington perceived were the terms of his non-competition agreement.

On December 10, 1996, Mr. Schneider met with Mr. Trittin, Mr. Thurston, Ms. Williams and two other Russell employees. [FN42] During the meeting, Mr. Schneider told the Russell representatives that, under the Partnership Agreement, he could accept business from Wellington clients if to do so would not cause harm to the Partnership. Mr. Schneider further informed Mr. Trittin and the other Russell employees that the key question was whether the assets he had been managing would remain at Wellington after Mr. Schneider's departure even if they did not go with him to his new firm. Mr. Schneider told the group that if Russell's assets would not remain at Wellington under those circumstances, then he was free to accept Russell's business. That was not, of course, what Article XV of the Partnership Agreement said nor was it what Mr. McFarland had said was Wellington's view of what it meant.

> FN42. Although the meeting took place on December 10, it had been scheduled at least one month earlier.

Mr. Schneider also told Mr. Trittin on December 10, 1996 that there was a remote chance that Wellington would sue him and seek an injunction against his accepting client assets. He further stated that if a client were to move its assets to Mr. Schneider's new firm before any injunction entered, it was unlikely that the Court would undo that move. Mr. Trittin and other Russell employees agreed with the latter assessment and in fact acted thereafter in the belief

Not Reported in N.E.2d                                                                      Page 24
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

that their interests would be advanced if they entered management contracts with Mr. Schneider's new firm before legal proceedings began. Finally, at the December 10, 1996, meeting Mr. Schneider showed Mr. Trittin and the other Russell representatives an organizational chart that listed his three Wellington analysts, Paul Sloate, Nancy Neary and Pat O'Brien, as analysts at his new firm. In addition, Mr. Schneider generally described the strengths of his new venture including the absence of allocation problems he claimed to have had at Wellington.

**\*26** Later that day, the Russell representatives also met with Wellington representatives to discuss the proposal Wellington had made to have Mr. Morby manage the assets Russell then had at Wellington. Before December 10, Russell had rejected the option of having Mr. Pannell manage those assets and had notified Wellington of that decision. The December 10 meeting did nothing to change Mr. Trittin's initial negative feelings about having Mr. Morby manage the Russell funds and Russell rejected that option, too.

On December 13, 1996, Mr. Trittin contacted Mr. Schneider and informed him that the relevant Russell boards had met and had decided to offer him a portion of their pension plan assets to manage. Mr. Trittin also informed Mr. Schneider that Russell had decided that it would not retain Wellington if Mr. Schneider was unavailable because Wellington's products did not fit Russell's needs. On December 18, 1996, Mr. Schneider entered into three separate agreements with Russell, the effect of which was to provide him with more than $800 million of Russell's pension plan assets to manage. The agreements are terminable by Schneider Capital Management on thirty days notice.

*2. State of Utah Retirement System*
At the end of 1989, the State of Utah Retirement Systems ("URS"), a public agency in and for the State of Utah, retained Mr. Nyheim at Wellington as a portfolio manager for approximately $100 million of its pension plan assets. The management contract was signed after Mr. Nyheim and Mr. Schneider traveled to Utah and made presentations to the URS staff and Board. [FN43] When URS signed its management contract with Wellington, it specifically approved of Mr. Nyheim as the portfolio manager and of Mr. Schneider as the assistant portfolio manager. Neither, however, is mentioned in the contract. Before executing the contract, Wellington did not inform any URS representatives that the Wellington Partnership Agreement contained a

restrictive covenant. The contract provided for termination by either side on written notice to the other.

> FN43. URS was truly Mr. Nyheim's client in the sense that URS placed funds with Wellington because Mr. Nyheim would be managing those funds.

In 1992, after Mr. Nyheim announced his retirement, URS representatives decided that they wanted Mr. Schneider to succeed Mr. Nyheim in management and oversight of their funds. Wellington agreed and Mr. Schneider became manager of the portfolio. [FN44]

> FN44. URS viewed Mr. Nyheim's management of their account as adequate, no more and no less. Nevertheless, through Mr. Nyheim's efforts and those of Wellington Partners and employees, including Mr. Schneider, URS remained with Wellington after Mr. Nyheim departed.

During the next two years, URS representatives, like their counterparts at Russell, observed that, under Mr. Schneider's management, their portfolio was "migrating" downward from a large to a mid-sized "cap." The migration occurred without prior discussion and consultation between Mr. Schneider and URS and URS was concerned about it. Ultimately, however, after internal discussions, discussions with URS consultants and discussions with Mr. Schneider, URS determined that the "migration" was acceptable. Indeed, URS concluded that Mr. Schneider's chief strengths lay in his knowledge of and approach to investments in "mid-cap" stocks. [FN45]

> FN45. Unlike their counterparts at Russell, the URS representatives responsible for the assets Wellington was managing were not particularly concerned with the average capitalization of the investments they had placed with Wellington, although they recognized that smaller capitalizations typically meant slightly increased risk. Instead, the URS representatives placed a greater emphasis on whether their assets performed better than the S & P 500 regardless of the capitalization of the companies in which those assets were invested. Indeed, the performance of all URS domestic asset managers is measured by performance of that index.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                          Page 25
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

**\*27** Under Mr. Nyheim and Mr. Schneider's management, URS' initial investment of $100 million grew substantially. Accordingly, at some point after he became portfolio manager, URS provided Mr. Schneider with an additional $150 million in new pension-plan assets to manage. [FN46] URS and Wellington agreed that the new assets would be managed by Mr. Schneider and that no portfolio manager could be substituted for him without URS' consent.

> FN46. URS total assets amount to approximately $8.6 billion and include all of the retirement assets for all public employees of the State of Utah. For purposes of management, the assets are divided between approximately 20 fund managers.

Richard Cherry ("Mr. Cherry"), the Chief Investment Officer at URS, was the principal contact at URS for Wellington and for Mr. Schneider. On or about July 15, 1996, Mr. Record telephoned Mr. Cherry to tell him that Mr. Schneider had decided to withdraw from Wellington at the end of 1996. Mr. Cherry responded by saying that URS had been pleased with Mr. Schneider and would likely follow him to a new management company if that is where he went after he left Wellington. Mr. Record, in response, said that URS' could do what it wished but that Wellington would like the opportunity to present URS with some alternatives to Mr. Schneider for its consideration. Mr. Cherry agreed to receive a Wellington presentation whenever Wellington was prepared to make it, but in fact he was essentially committed from the outset to recommend to his board that URS move its assets to Mr. Schneider's new firm if Mr. Schneider were able to accept those assets there. [FN47] During their conversation, Mr. Record did not tell Mr. Cherry that a restrictive covenant in the Partnership Agreement might affect Mr. Schneider's ability to manage URS funds in 1997 after his departure from Wellington nor did he suggest to Mr. Cherry that Wellington might be unwilling to allow Mr. Schneider to continue management of URS funds after he left.

> FN47. Mr. Cherry did not have the power to determine on his own who the portfolio manager would be. Instead, he made recommendations to the trustees responsible for the URS assets and they, in turn, made the ultimate decision. I infer, and therefore find, however, that Mr. Cherry was an

experienced money manager and that the Board placed a great deal of weight on his recommendation regarding who the manager should be.

Shortly after talking to Mr. Record, Mr. Cherry telephoned Mr. Schneider to discuss his upcoming departure. Mr. Schneider did not provide Mr. Cherry with any specific details regarding his post-Wellington plans but he did say, in substance and effect, that he intended to continue managing money for others. In response, Mr. Cherry told Mr. Schneider that URS would likely ask Mr. Schneider to continue to manage the money he then was managing if he were open for business in 1997. Mr. Schneider responded affirmatively to Mr. Cherry's expression of interest. He, too, said nothing at that point about the restrictive covenant in his Partnership Agreement with Wellington.

Mr. Schneider and Mr. Cherry spoke several additional times over the course of the summer. During those conversations, Mr. Schneider told Mr. Cherry that he did in fact intend to open his own firm and to bring with him to that firm his Wellington analysts if he could do so. Mr. Schneider also told Mr. Cherry that he intended to continue at his new firm the same investment process he had used at Wellington, that he expected to receive the same level of coverage from the Wall Street brokerage houses he had been receiving while at Wellington and that he expected some Wellington clients to join him at his new firm.

**\*28** During the course of their summer conversations, Mr. Schneider told Mr. Cherry at some point that his contract with Wellington contained a non-competition Agreement. He also minimized its likely impact in his plans. He did not tell Mr. Cherry about the conversations he had by then had with Mr. McFarland in which Mr. McFarland had told him that Wellington planned to enforce the agreement nor did he tell Mr. Cherry that he and Mr. McFarland disagreed with each other regarding the Agreements's scope and validity.

On August 27, 1996, Mr. Ryan and Mr. Record met with Mr. Cherry and his staff in Utah to propose alternatives to Mr. Schneider after Mr. Schneider's departure. In essence, they proposed two options, one involving management of URS assets by Mr. Ryan and one involving management by Mr. Pannell. In preparation for the meeting, Mr. Ryan and Mr. Record discussed, among other things, whether they would tell Mr. Cherry about the restrictive covenant

Not Reported in N.E.2d                                                                                  Page 26
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

if he, or others, suggested that URS wished to have Mr. Schneider continue to manage URS's money. They ultimately decided not to inform Mr. Cherry or the others of the covenant's existence or content if the subject of continuing to work with Mr. Schneider arose. The subject, of course, did arise and they neither disclosed the covenant's existence nor suggested that Wellington might seek to restrain Mr. Schneider from managing URS's money after his departure. At the end of the meeting, Mr. Cherry told Mr. Ryan and Mr. Record that he wanted to talk to Mr. Schneider about his plans before making a decision regarding the Wellington alternatives discussed at the meeting.

After their visit, Mr. Cherry discussed with Mr. Schneider the proposals Mr. Ryan and Mr. Record had made. Mr. Schneider told Mr. Cherry that Mr. Pannell was an outstanding portfolio manager but declined to comment on Mr. Ryan's abilities. Mr. Cherry took Mr. Schneider's response as an indication that Mr. Schneider did not have a positive opinion of Mr. Ryan's abilities, as Mr. Schneider knew he would. [FN48]

> FN48. The record offers no basis for concluding that Mr. Ryan was anything other than a competent portfolio manager although it contains no basis for making a judgment regarding relative performance of securities managed by Mr. Ryan and those managed by Mr. Schneider. There was, however, a rivalry of sorts between Mr. Ryan and Mr. Schneider, both of whom, as stated, had started out as part of Mr. Nyheim's team. While it did not interfere with the manner in which they serviced Wellington clients, the rivalry did not encourage either man to take steps which might have been particularly helpful to the other. The rivalry also accounts for at least some of the personal vigor with which Mr. Ryan responded to news of Mr. Schneider's proposed departure and post-departure plans, including the ludicrous "tough love" memorandum he authored on November 11, 1996 and which others at Wellington fortunately had the good sense to ignore.

At some point in late September 1996, Mr. Cherry told Mr. Schneider that he wanted Mr. Schneider to meet with representatives of URS in Utah to talk about the future of the Utah portfolio, including whether Mr. Schneider would manage that portfolio at his new firm beginning in 1997. A few days later,

Mr. Schneider went to Utah to meet Mr. Cherry and other URS representatives. Before leaving Philadelphia for that meeting, Mr. Schneider told Mr. Gooch that he was going to Utah to meet with Mr. Cherry at Mr. Cherry's request. He did not, however, tell Mr. Gooch that part of the agenda for the meeting was a discussion of whether he would be available to manage URS assets after he left Wellington. Mr. Gooch thanked Mr. Schneider for telling him of the upcoming meeting and reiterated Wellington's desire to have Mr. Schneider maintain normal relations with clients until he actually departed. In fact, Mr. Gooch, and others at Wellington whom Mr. Gooch told of Mr. Schneider's upcoming meeting, suspected that Mr. Schneider's availability to manage URS assets after he left Wellington was at least a part of the agenda for Mr. Schneider's meeting.

*29 During Mr. Schneider's meeting with Mr. Cherry and other URS representatives, Mr. Cherry asked Mr. Schneider a series of questions about his new firm. Mr. Schneider answered all of those questions in detail and told the URS representatives that he would be able to manage their assets at his new firm if they wanted him to do so. By the time the meeting ended, Mr. Cherry had all of the information he felt he needed in order to recommend that URS retain Mr. Schneider's new firm as its investment manager and had decided to make that recommendation. At the end of their meeting, he told Mr. Schneider of his conclusions and forthcoming recommendations. Mr. Schneider responded that he very much wished to continue managing the URS account and looked forward to doing so. The non-competition provisions of Mr. Schneider's Agreement with Wellington were not discussed at any point during the course of the meeting.

Several days after the meeting between Mr. Cherry and Mr. Schneider, Mr. Cherry telephoned Mr. Record and told him that URS wanted Mr. Schneider to continue managing after his departure the URS Assets he had been managing at Wellington. Mr. Cherry reiterated that desire in a second telephone conversation he had with Mr. Record in late October 1996. On neither occasion did Mr. Record tell Mr. Cherry that the Agreement between Mr. Schneider and Wellington contained a restrictive covenant or that Wellington might seek to enforce that covenant. At the end of October, Mr. Cherry was authorized by URS to begin negotiations with Mr. Schneider to transfer to him the URS assets when he left Wellington and began business on his own.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                     Page 27
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

On December 5, 1996, Mr. Record telephoned Mr. Cherry and told him that Mr. Schneider had been expelled from the Wellington Partnership. Mr. Cherry responded by saying that URS intended to follow Mr. Schneider to his new firm. The conversation ended with Mr. Record wishing Mr. Cherry well. The same day, Mr. Cherry contacted Mr. Schneider and formally offered him a contract to manage the URS assets. URS and Schneider Capital Management entered a formal management agreement on December 9, 1996, under which URS placed with him for management at his new firm the approximately $400 million he had been managing at Wellington. That agreement is terminable by either side on thirty days notice.

### 3. RJR-Nabisco

Toward the end of 1987, RJR-Nabisco ("RJR") retained Wellington as a portfolio manager for approximately $100 million of its pension plan. Wellington, with RJR's approval, assigned Mr. Nyheim to manage the account. In 1989, Mr. Schneider became the assistant portfolio manager and Mr. Nyheim gave him broad discretion with respect to management decisions.

Mr. Schneider's principal contact at RJR was John MacMurray ("Mr.MacMurray"). Mr. MacMurray's relationship with Wellington began while Mr. MacMurray was employed at Bell Telephone of Pennsylvania and predated Mr. Schneider's employment with Wellington.

*30 The contract between Wellington and RJR was terminable by either side on thirty day's notice and required Wellington to notify RJR if there were "any substantial change in the duties" of Mr. Nyheim or Mr. Ryan. In July 1991, after discussions between Mr. MacMurray and Wellington, Mr. Schneider became the portfolio manager for the RJR assets Wellington had contracted to manage. [FN49]

> FN49. Mr. MacMurray had not been enthusiastic about Mr. Nyheim's performance as a portfolio manager and viewed the performance of the RJR account under his stewardship as marginal. Mr. MacMurray agreed to accept Mr. Schneider as the portfolio manager after an extended conversation with John Gooch and after hearing the high praise Mr. Gooch, for whose judgment in such matters Mr. MacMurray had high regard, had for Mr. Schneider.

After becoming manager of the RJR portfolio, Mr. Schneider began to make the kinds of changes in the securities the account held that he ultimately made in the Russell and URS accounts. When he assumed management of the RJR assets, the account held largely "large cap" securities. Mr. Schneider began investing in securities in companies with a smaller capitalization. Consequently, the account as a whole, like the Russell and URS accounts, began to "migrate" toward securities in the "mid-cap" range.

Before making his changes in investment strategy, Mr. Schneider did not seek specific permission from Mr. MacMurray or other RJR representatives. Instead, they, like their counterparts at Russell and URS, learned of the changes after they had occurred. Nevertheless, after analysis, RJR representatives concluded that the changes were beneficial and told Mr. Schneider to continue with his approach. [FN50]

> FN50. RJR's overall objectives for its domestic portfolio were closely tied to the performance of the Wilshire 5000 Stock Index, an index of performance widely used in the industry. Overall, RJR expected its domestic portfolio to outperform the Wilshire Index by 1% per year, after investment fees, over a three to five year period. RJR also sought to minimize the portfolio's "tracking error" or short term departures from the upward or downward trend of the Wilshire Index. To meet its objectives, RJR employed nine different portfolio managers, each with a different set of investment approaches. Mr. Nyheim's approach focused chiefly on "large cap value" stocks and the portfolio Mr. Schneider inherited from him was, in the main, composed of those securities. The performance benchmark RJR ultimately assigned to Mr. Schneider was the Russell 1000. The RJR assets Mr. Schneider was managing outperformed both the Russell 1000 and Wilshire 5000 by approximately 5 to 8 percent per year.

Wellington managed only a portion of RJR's overall pension assets. Like Russell, RJR balanced its overall portfolio through investments in a variety of different kinds of securities in the manner RJR thought most beneficial to its overall investment objectives. A change in the type of securities in the account at Wellington thus led to RJR's changes in other, non-Wellington accounts as RJR sought to "rebalance" its

Not Reported in N.E.2d                                                                            Page 28
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

investments in the wake of Mr. Schneider's altered investment strategy.

Mr. MacMurray first learned of Mr. Schneider's decision to leave Wellington in early August when Mr. Gooch and Mr. Doran telephoned him to report Mr. Schneider's decision.    Mr. MacMurray was surprised because Mr. Schneider had not previously mentioned to him any dissatisfaction with Wellington or with any Wellington policies.    During their August telephone conversation, neither Mr. Doran nor Mr. Gooch told Mr. MacMurray that the Wellington Partnership Agreement contained a restrictive covenant that might affect RJR's ability to have Mr. Schneider manage its funds in 1997 after his departure from Wellington, nor did either of them suggest that Wellington might take steps to prevent Mr. Schneider from accepting RJR funds after he left.

Shortly after his conversation with Mr. Doran and Mr. Gooch, Mr. MacMurray telephoned Mr. Schneider to ask about Mr. Schneider's plans to resign.    During the conversation, Mr. MacMurray asked Mr. Schneider about his post-Wellington plans. Mr. Schneider responded that he intended to stay in the investment management business but provided few further details.    In response, Mr. MacMurray told Mr. Schneider that he wanted Mr. Schneider to continue to manage the RJR assets he then was managing.   Mr. Schneider did not say that he would or would not do so.    In that conversation or shortly thereafter, however, Mr. Schneider told Mr. MacMurray that he had a non-competition agreement with Wellington.    He did not tell Mr. MacMurray that he had by then had several discussions with Mr. McFarland during which Mr. McFarland had expressed an intention to enforce the agreement or that he and Mr. McFarland disagreed over the Agreement's scope and validity.

**\*31** On September 3, 1996, at a regular quarterly meeting of the RJR Pension Investment Committee ("Committee"), Mr. MacMurray referred to Mr. Schneider's upcoming departure from Wellington. He suggested that RJR's best interests would be served if it moved its account to Mr. Schneider's new firm if RJR were satisfied that the new firm had been established on a sound business and financial basis, employed an appropriate staff and had in place appropriate procedures and controls.          Mr. MacMurray also told the committee that he thought Wellington and Mr. Schneider had some work to do to sort out at least some of the details of their contractual relationship and that that process might take several months.   In making those remarks, Mr.

MacMurray was fully aware that a non-competition agreement between Wellington and Mr. Schneider lay at the heart of the contractual "sorting out" he thought the two sides had to do.

On October 15, 1997, Mr. Schneider met with Mr. MacMurray and with Edward Robertiello, another RJR employee, at RJR's headquarters in New York to discuss Mr. Schneider's future plans.          Mr. MacMurray had asked Mr. Schneider to meet with him in New York specifically to discuss these plans. Before the meeting, Mr. Schneider telephoned Mr. Gooch at Wellington to tell him of the planned meeting.   Again, however, he did not tell Mr. Gooch that at least a part of the agenda for the meeting concerned Mr. Schneider's future plans.

During their October 15, meeting, Mr. Schneider told Mr. MacMurray and Mr. Robertiello that he was opening his own firm and discussed his by then detailed staffing plans.    Mr. MacMurray repeated his desire to have Mr. Schneider manage RJR's money in 1997 after he left Wellington and Mr. Schneider replied that he fully expected to be in a position to do so when he moved to his own firm.   By the close of the meeting, Mr. MacMurray believed that following Mr. Schneider to his new firm was a viable option, one Mr. MacMurray thereafter pursued to the exclusion of all others save consideration of the proposal Wellington itself later made to him.   At no time during their meeting, or at any time thereafter, did Mr. Schneider suggest that he would be unavailable to manage RJR money after moving to his new firm nor did he say anything to discourage Mr. MacMurray from considering Mr. Schneider's new firm as an investment manager for RJR.

On October 30, Mr. MacMurray met with Mr. Gooch, Mr. Doran and Mr. Wardwell, another Wellington Partner, to discuss the manner in which Wellington proposed to manage the RJR assets after Mr. Schneider's departure.          At the meeting, Wellington suggested a number of alternatives, none of which was satisfactory to Mr. MacMurray.

Shortly thereafter, Mr. MacMurray informed Mr. Gooch that, although the proposals Wellington had made were of some merit, Mr. Schneider's performance had been excellent and that, as a consequence, RJR was inclined to stay with him after he left Wellington.    On November 11, 1996, he reaffirmed that intention during the course of an in-person meeting he had with Mr. Gooch.   In response, Mr. Gooch told Mr. MacMurray that RJR's best interests were Wellington's primary concern.   He did

Not Reported in N.E.2d                                                                                      Page 29
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

not mention the restrictive covenant in the Partnership Agreement nor did he mention Wellington's attitude toward enforcement of that agreement.

**\*32** Mr. Gooch telephoned Mr. MacMurray on December 5 to tell him that Wellington had terminated Mr. Schneider and that RJR's assets were being "actively monitored" by Mr. Ryan, who, absent an emergency, would make no significant investment changes until RJR decided what to do with the portfolio as a whole. [FN51] Shortly thereafter, Mr. MacMurray spoke with Mr. Schneider and learned that Mr. Schneider had opened his new firm, had registered it with the SEC, was occupying new office space, was bringing his team of analysts from Wellington with him to the new firm and had hired some additional personnel. He also learned, through discussions with Mr. Schneider, Mr. Gooch or others, that Wellington did not wish to allow Mr. Schneider to continue managing at his new firm the assets he had been managing at Wellington.

> FN51. Management by Mr. Ryan had been one of the alternatives Wellington had proposed during its October 30 meeting with Mr. MacMurray.

Mr. Schneider met with Mr. MacMurray and Mr. Robertiello in Pennsylvania on December 16, 1996, to discuss whether Mr. Schneider would be able to manage at his new firm the assets he had been managing at Wellington. The three discussed the new firm, its staffing and resources. During this meeting, Mr. Schneider said that he would only accept RJR's business if RJR had decided not to continue with Wellington. Mr. MacMurray and Mr. Robertiello replied that Wellington's proposals did not fit RJR's plan. Both Mr. MacMurray and Mr. Robertiello were favorably impressed with Mr. Schneider's presentation and neither believed that the alternatives Wellington had proposed would meet RJR's needs as well.

On the same day he was meeting with Mr. Schneider, Mr. MacMurray received a series of telephone messages from Mr. McFarland. For some reason, he did not return Mr. McFarland's calls. [FN52] Through the messages Mr. McFarland left, however, he learned that Wellington was seeking injunctive relief to keep Mr. Schneider from managing RJR assets at his new firm.

> FN52. He attributed the reason to his travels that day. In an age where traveling simply

requires a slight shift in the medium of communication, that explanation is highly improbable. Far more likely is that, with litigation looming, Mr. MacMurray picked the side he was on and did not wish to complicate his own situation by talking with the other until he had a clearer picture of precisely what was going to happen.

On December 19, 1996, after consultation with the RJR Pension Investment Committee and internal discussion of, among other things, the injunction he knew Wellington was seeking, Mr. MacMurray telephoned Mr. Schneider and informed him that RJR had decided to offer him a contract to manage the assets he had been managing at Wellington. Mr. Schneider verbally accepted the offer. Later that day, Mr. MacMurray telephoned Mr. Gooch and told him that RJR was terminating Wellington as portfolio manager effective immediately and faxed him a letter to that effect shortly thereafter. Among other things, the contract between RJR and Schneider Capital Management contains a provision allowing either side to terminate the relationship on thirty days notice.

### 4. The Others

The relationship between Wellington, Mr. Schneider and the four other clients for whom Mr. Schneider was managing portfolios requires far less discussion.

*i. PECO Energy Company.* Representatives of PICO Energy Company ("PECO") first learned of Mr. Schneider's resignation in a July telephone conversation with Mr. Gooch. At no time did Mr. Schneider tell those representatives that he intended to open his own firm nor did they ask about his post-Wellington plans. After announcing his resignation, Mr. Schneider attended three meetings with PECO: (i) a PECO Board meeting at PECO's offices in Philadelphia in August or September 1996, (ii) a PECO staff meeting at the same time as the PECO Board meeting, and (iii) an annual meeting at Wellington's offices in Valley Forge with Hewitt Associates, PECO's consultant. During those meetings, the subject of r Schneider's future plans did not rise. Ultimately, Wellington discussed with PICO alternatives to Mr. Schneider's management after his departure. After consideration of those alternatives, PICO decided to remain with Wellington and transferred management of its portfolio to Mr. Ryan.

**\*33** *ii. The Mentor Group.* In early August, 1996, Mr. Schneider received a telephone call from Daniel

Not Reported in N.E.2d                                                                                                                                        Page 30
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

Ludeman, the chairman and chief executive of the Mentor Group ("Mentor"). Mr. Ludeman said that he had learned of Mr. Schneider's resignation and that he wanted to meet with Mr. Schneider about a potential new business relationship after Mr. Schneider departed. Mr. Schneider, without mentioning the plans he already had formed, agreed to meet with Mr. Ludeman the next time the latter was in Philadelphia.

The meeting occurred a few weeks later. Mr. Ludeman started the meeting by informing Mr. Schneider that Mentor was considering a change in the type of assets it was holding in its portfolio and that it might ask Mr. Schneider to manage the reformed portfolio after he left Wellington. Mr. Schneider responded in an equivocal fashion. Mr. Ludeman also told Mr. Schneider that Mentor was seeking an in-house value manager for their institutional and high net worth individual clients and wanted to know if he were interested in filling that position. Mr. Schneider said that he was not. Finally, Mr. Ludeman asked Mr. Schneider whether he would be interested in setting up a firm that Mr. Schneider would own, that would agree to manage up to $500 million of Mentor's assets and in which Mentor would have an equity stake. Mr. Schneider said that he was not interested in that proposal, either. Mr. Schneider did not discuss in any detail with Mr. Ludeman the plans he already had made, although he did say that he planned to remain in the investment management business is some way. Mr. Ludeman never asked Mr. Schneider to continue managing the funds he had been managing at Wellington and Mr. Schneider did not seek to do so.

After their mid-August meeting, Mr. Schneider and Mr. Ludeman had a few additional telephone conversations during which Mr. Ludeman sought to have Mr. Schneider think seriously about coming in-house at Mentor. Mr. Schneider repeatedly declined to do so. During those conversations, the two men did not discuss the possibility of Mr. Schneider's management of Mentor funds after he left Wellington.

While these discussions were occurring, Wellington was proposing to Mr. Ludeman a successor to Mr. Schneider after Mr. Schneider left Wellington. In late November 1996, Mentor selected Steven O'Brien of Wellington's Equity Income Group as the successor portfolio manager.

iii. *Consolidated Freightways*    In the summer of 1996, after he tendered his resignation, Mr. Schneider

received a telephone call from Linda Lester, the pension analyst at Consolidated Freightways ("Consolidated") who was responsible for selecting portfolio managers to manage Consolidated's assets. When the subject of Mr. Schneider's future plans arose, Mr. Schneider told her that he intended to remain in the investment management business but provided no details regarding his future venture. The two had several conversations over the remainder of the summer, but Ms. Lester did not ask for additional details regarding Mr. Schneider's business and Mr. Schneider provided none. Wellington made proposals to Consolidated regarding a successor portfolio manager within Wellington but Consolidated did not believe that the Wellington alternatives were consistent with its needs. Ultimately, Consolidated moved its assets to a portfolio manager unaffiliated with Wellington or with Mr. Schneider.

**\*34** iv. *Bell Atlantic*    In July of 1996, after Mr. Schneider tendered his resignation, he received a telephone call from Paul Dokas, an investment manager at Bell Atlantic ("Bell"). They discussed Mr. Schneider's resignation and upcoming departure. They did not, however, discuss Mr. Schneider's future plans. Mr. Dokas did not ask about the possibility of Mr. Schneider managing Bell's assets after he left Wellington.

In mid-October 1996, Mr. Schneider met with Mr. Dokas and others at Bell's Philadelphia offices for a regularly scheduled biannual meeting of portfolio managers. During this meeting, the Bell representatives asked Mr. Schneider about his post-Wellington plans. In response, he told them that he was going to remain in the investment management business and intended to open his own firm in 1997. [FN53] No Bell representative asked Mr. Schneider if he were prepared to manage Bell's assets at his new firm nor did Mr. Schneider ask for an opportunity to do so. Bell representatives did, however, ask Mr. Schneider what he thought of Mr. Pannell and Mr. Morby as portfolio managers. Mr. Schneider responded that Mr. Pannell was an excellent portfolio manager and that Mr. Morby was an excellent analyst. Ultimately, Bell decided that it did not want to keep its assets at Wellington and, in late October, announced that decision to Wellington and to Mr. Schneider. Bell never offered management of its assets to Mr. Schneider and he never asked Bell for the opportunity to manage them.

FN53. Before the meeting, Mr. Dokas and other Bell representatives had a conversation

Not Reported in N.E.2d                                                                    Page 31
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

with Mr. McFarland, Mr. Gooch and Mr. Payson, during which Mr. Dokas asked Mr. McFarland about how Wellington would view a Bell decision to retain Mr. Schneider as a portfolio manager after he left Wellington. Mr. McFarland answered equivocally but did not say that (i) Wellington would have a problem with that, (ii) Wellington had a restrictive covenant in its Partnership Agreement or (iii) Wellington would take steps to prevent or eliminate that option. Ultimately, nothing came of the matter because Bell never seriously considered placing its assets with Mr. Schneider at his new firm. The aftermath of Dokas's question, however, revealed, as did other events, that even as late as October all Wellington Partners were not of like mind regarding the appropriate Wellington response to questions about Wellington's position in the event that a client sought to place assets with Mr. Schneider at his new firm. On October 8, 1996, the day after the conversation with Mr. Dokas, Mr. Payson wrote as follows in a memorandum he addressed to Mr. Doran, Mr. Gooch and Mr. McFarland:

I think the answer to Bell Atlantic and to other clients is clear. It is your money and we recognize your right to do with it whatever is in your best interest as fiduciaries.... What we are talking about is the client's money. They can do whatever they want to do with it. We cannot let it appear by our words or actions that we believe we have any entitlement to the management of the client's money or to a revenue stream resulting from it.... The non-compete clause probably has some harassment value, but it is a no-win situation if it ends up harassing former clients (who are, in fact, some of our best prospects).

Mr. Payson concluded in his memorandum that it "would be fine" if Bell gave a portion of its assets to Mr. Schneider to manage. Mr. Doran and Mr. McFarland strongly disagreed with Mr. Payson. After receipt of his memorandum, Mr. Doran told Mr. Payson that his laissez-faire approach to the question did not reflect the direction in which Wellington management intended to go. Instead, management intended to insist on Mr. Schneider's observation of the terms of the Partnership Agreement. Before Mr. Schneider's discharge, however, no one at

Wellington communicated that position to any of the eight clients whose assets Mr. Schneider was managing.

v. *Colonial Williamsburg*. In July, 1996, after he tendered his resignation, Mr. Schneider received a telephone call from Jean Puckett, a Colonial Williamsburg Foundation ("CW") employee who had some responsibility for assets outside portfolio managers were overseeing. The two discussed Mr. Schneider's withdrawal from Wellington but there was no discussion of Mr. Schneider's future plans or of CW's interest in retaining his services after he left.

Neither Wellington nor Mr. Schneider had much contact with CW over the next few months regarding what was to happen after Mr. Schneider left. Indeed, as late as November 21, 1996, Charles Flather, a member of CW's Investment Committee, told Mr. Gooch in a telephone conversation that Mr. Flather had not talked with Mr. Schneider about his future plans and did not know what Mr. Schneider was going to do after year-end.

After Mr. Schneider's December discharge, Mr. William Roberts, another CW employee, called Mr. Schneider at home to ask him about the circumstances surrounding the discharge and about his future plans. Mr. Schneider told Mr. Roberts of his discharge, of the firm he had started and that he was available to do the same kind of work he had done while at Wellington. Mr. Roberts expressed an interest in transferring CW's funds to Mr. Schneider and Mr. Schneider expressed an interest in receiving those funds.

On December 23, 1996, Mr. Roberts called Mr. Schneider to say that CW had decided to hire Mr. Schneider to manage its funds. By then, however, the preliminary injunction had entered in this case and Mr. Schneider told Mr. Roberts that he could not accept CW's business in light of that injunction. That conversation marked the first time that anyone at CW knew of a non-competition agreement in the Partnership Agreement.

**\*35** During the period following Mr. Schneider's resignation, Wellington, had proposed to CW representatives a number of alternatives for management of the CW portfolio after Mr. Schneider's departure. CW considered those alternatives but ultimately rejected them. After learning that Mr. Schneider was unavailable to continue managing their assets because of the preliminary injunction, CW moved them to a third

Not Reported in N.E.2d                                                                                    Page 32
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

party.

*E. COMPENSATION*

As stated earlier, there were several components to
Mr. Schneider's annual compensation.    One his
allocable share of the firm's annual net profit    The
second was a draw. [FN54]  Third and finally was his
incentive     distribution     based     on     portfolio
performance. [FN55]  In 1995, Mr. Schneider's total
compensation was $1,463,999.     Of that $730,224
was his allocable profit share, $100,000 was his draw
and the balance of $633,775 was his incentive
compensation.

> FN54. Presumably the draw was against
> anticipated distributions of profit and thus
> was actually a part of the Partners' allocable
> share of the firm's profits.

> FN55. See P. 5, *supra*    Incentive
> compensation took account not only of the
> preceding year's performance but of
> performance over several prior years as
> well.

After his discharge from Wellington, the Managing
Partners determined that Mr. Schneider's allocable
share of the 1996 Wellington profits would be zero.
He was paid $474,794 in incentive compensation for
the first six months of 1996 and, at the end of
December, his estimated incentive compensation for
the last six months was $481,449.     That amount,
with or without adjustments stemming from client fee
payments, was to be paid on March 15, 1997.  It was
not.  The record does not reveal why.

In addition to compensation for services, Mr.
Schneider annually received a return on his capital
investment in Wellington.     He was paid the
appropriate amount for 1996 and, after his departure,
his capital account was returned to him.

Finally, when it expelled him from the Partnership,
Wellington concluded that Mr. Schneider was not
entitled to a ten-year series of payments discussed in
Article XIV of the Partnership Agreement. [FN56]  It
would have made those payments to him if it had not
expelled him.    Although the record is insufficient to
permit calculation of the amount of those payments,
the first would not have been less than $50,000.

> FN56. See n. 8, *supra*

*F. COMPETITION*

After Mr. Schneider left Wellington, no one at
Wellington managed assets in the particular style and
manner that Mr. Schneider had used.   That, however,
was not surprising for few portfolio managers use
exactly the same approach to management of the
assets for which they are responsible.

To be sure, the investment management industry
often uses labels such as "value," "growth," "all-cap"
and "mid-cap" to describe particular funds or
portfolios and the manner in which they are managed.
Use of those terms is not limited to the industry and
many of them are routinely found on the stock and
mutual-fund tables of daily newspapers.  While those
terms have value and utility when used to describe
the composition of a given fund at a given moment
[FN57] or to describe the investment style typically
used by an investment manager who has established a
track record over a period of years, they do not
separate stocks, funds or managers with either the
precision or the rigidity that, for example, separates a
bus from a car or a surgeon from a pipefitter.

> FN57. Even there, there is some play in the
> joints.  "Growth" stocks, for example, are
> those believed to have a high potential for
> earnings growth and "value" stocks are those
> believed to have inexpensive values in
> relation to their real worth    Nevertheless,
> many stocks are viewed as having both
> "growth" and "value" characteristics.    Of
> the 1000 stocks covered by the Russell 1000
> index, approximately 200 to 250 appear in
> both the Russell 1000 Value Index and the
> Russell 1000 Growth Index.   The same is
> true of distinctions based on capitalization.
> Large-cap funds generally invest in stocks
> with a with a weighted average market
> capitalization in excess of $5 billion, mid-
> cap funds in stocks with a weighted average
> market capitalization of $1-5 billion, small-
> cap funds in stocks with a weighted average
> market capitalization of less than $1 billion
> and so on.    The dividing line however, is
> not a bright one.

*36 In a similar vein, use of the term "product" in
the present context suggests a degree of rigidity that
often does not truly exist.   An established investment
fund like the Magellan Fund or the Windsor Fund, to
take but two of many possible examples, are properly
thought of as "products" because of defined
characteristics they have established over time.    A
person who states that he or she is a "value manager"

Not Reported in N.E.2d                                                                    Page 33
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

or a "mid-cap growth manager," however, is not in any realistic sense stating that he or she is offering to the public a clearly-defined product. Instead, by adopting one of those labels, he or she is identifying, in a broad, general but nevertheless sometimes helpful way, his or her investment management style. Moreover, although it is difficult to change the characteristics of a true "product," it is relatively easy to change a management style. [FN58] Indeed, many talented portfolio managers change their style from time to time and many manage money successfully using different styles simultaneously. Mr. Schneider himself began as a "large cap manager" and changed his focus, and the portfolios he was managing, to securities issued by companies with smaller capitalization. He nevertheless described himself as a large-cap manager in the Form ADV he prepared and filed with the SEC to register Schneider Investment Partners, L.P., the investment guidelines for Schneider's Capital Management's contracts with FRTC and FRIMCO, Schneider's Capital Management's contract with RJR and a questionnaire response Schneider's Capital Management submitted to Cambridge Associates, an industry consulting group. [FN59]

> FN58. For that reason alone, I reject Mr. Schneider's suggestion that, as an "all-cap value manager," he does not compete with Wellington because Wellington has no "all-cap value managers." Putting to one side the large question whether it is accurate to say that no one at Wellington was using that management style when Mr. Schneider departed or uses that style today, the management style one uses at one given moment does not necessarily dictate the style one will use in the immediate future if doing so is necessary to serve the needs of an existing or potential client.

> FN59. I reject Mr. Schneider's contention that some or all of these characterizations were the product of oversights flowing from his harried preparations for a new venture. At the time he filed the form ADV there surely was no reason to rush and, in fact, there was nothing harried about his preparation of the form. That step, like most that followed, was carefully calculated and planned. Moreover, his "large-cap" approach appears in those documents in too many different contexts and forms to have been the product of some unknown gremlin. Instead, I find that his self-described "all cap

value approach" is one he has picked primarily for purposes of this litigation.

With all of that in mind, and wholly independent of the definition of "competition" Article XV of the Partnership Agreement itself contains, [FN60] I find that Schneider Capital Management and Wellington are in competition with each other. Both are registered investment advisers. Both manage pension funds for institutional clients. Both seek to draw on the same client base. Both are prepared to expand to accommodate new business. Both are prepared to offer an array of services to meet client needs. Both work with or plan to work with industry consultants to obtain new clients. While each has characteristics that distinguish it from the other, chief among which surely is Wellington's size and diversity, their pursuit of the same clients following Mr. Schneider's announcement of his resignation, demonstrates, almost in and of itself, their competitive relationship.

> FN60. In part, Article XV says as follows: each Partner further agrees that, during the time he or she is a Partner, and for the initial three year period after such Partner's withdrawal or removal, he or she will not participate in any business engaged in competition with the business of the Partnership or any of its affiliated companies, *including a business engaged in providing investment advisory or investment management services.*
> (Emphasis added.) The italicized language amounts to the parties' own non-exclusive definition of what they meant by use of the term "competition."

*G. SUMMARY AND ULTIMATE FINDINGS*

The foregoing discussion is extended because the basic facts are important and have been thoroughly explored by the parties in the oral and written materials they presented to the court. In essence, Mr. Schneider was hired by Wellington in 1983 at a time when he was young, inexperienced and wholly without a client base. His learning and his exposure to Wellington clients began while he worked as an analyst for Mr. Nyheim and continued over the ensuing years. Mr. Schneider was, and is, a talented and dedicated portfolio manager who brought energy and insight to the analytical tasks he was given and those he undertook for himself. When Mr. Nyheim left Wellington, Mr. Schneider was a natural successor for several of the portfolios on which he

Not Reported in N.E.2d                                                                                    Page 34
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

had worked as an analyst. He therefore succeeded to management of those portfolios with the endorsement--in many cases the enthusiastic endorsement--of the clients.

*37 At about the time Mr. Schneider began to manage portfolios, he was offered a Wellington Partnership. Before he accepted that Partnership, he thoroughly explored the financial consequences of admission to the Partnership and the terms of the Partnership Agreement. He read and understood those terms, including the terms governing competition found in Article XV. Overall, he knew that a Wellington Partnership would be financially rewarding to him and he enthusiastically accepted Wellington's offer to join. In the years following his admission to Partnership, Mr. Schneider continued to provide excellent services for the clients whose assets he managed. As a consequence, he earned substantial fees for Wellington and substantial compensation for himself.

Although Mr. Schneider's relationship with Wellington provided both with substantial benefits, Mr. Schneider became less enchanted with it as time progressed. He had never worked in Wellington's Boston office and felt no real connection to most of those who did. He was, by his own account, not very good at keeping those in Boston informed of what he was doing or, I find, at helping his clients maintain a relationship to Wellington Partners and employees other than himself. His relations with Mr. Ryan, his contemporary and one of the few other Wellington Partners in Wellington's much smaller Philadelphia office, were not warm and never had been. Although the two had worked together as analysts for Mr. Nyheim, their relationship always had been colored more by competition than by collegiality. As a consequence, Mr. Schneider and his team of analysts worked largely in isolation as they provided high-quality portfolio management services to the Wellington clients for whose funds Mr. Schneider was responsible.

At first gradually and then with growing conviction, Mr. Schneider became convinced that he could provide the same quality service to clients, could achieve the same quality of results and could make more money if he were working on his own with the kind and quality of analytical support he was receiving from Wellington. Moreover, he believed that at least some of his Wellington clients would come with him if he opened his own firm. By the early spring of 1996, that conviction dominated his outlook. In the late spring, and perhaps earlier, he

began to make concrete plans to leave Wellington and to start his own investment management firm. To that end he sought the advice of Mr. Nyheim and of others, including lawyers, on whose judgment he relied. He also began to raise the subject with Russell's Mr. Trittin, who, at the very least, leant him a sympathetic ear and at least implicit encouragement.

As his departure plans hardened, Mr. Schneider was fully aware of the terms Article XV of the Wellington Partnership Agreement. He had doubts, however, about whether Wellington would seek to enforce it, and thought instead that he would be able to work out some transitional profit-sharing arrangement with respect to any Wellington clients who came with him to his new firm. When that possibility seemed dashed by Mr. McFarland's response to his economic overtures in July, Mr. Schneider, believing that his chances of success in an enforcement action would be enhanced if he were able to demonstrated the absence of any solicitation, decided to do everything he could to structure his relationship with his existing clients and staff in a manner that would encourage them to come with them to his new firm and yet allow him to say that he had not solicited them to do so.

*38 Wellington had not informed the clients whose portfolios Mr. Schneider was managing about the non-competition provisions of the Partnership Agreement when those clients signed their initial contract with Wellington. Likewise, Mr. Schneider had not done so at any point during his relationship with them prior to July of 1996. During the course of their "due diligence" investigations before signing contracts with Wellington, however, none of the clients considered the matter important to inquire about.

As Wellington employees went about their efforts to persuade clients to remain with Wellington after Mr. Schneider departed, Wellington employees made no mention of the non-competition agreement. On the contrary, Wellington managers assured those clients that they could do what they wished with their assets after Mr. Schneider left Wellington even though they had no intention of surrendering what they believed was Wellington's right under the Partnership Agreement to prevent Mr. Schneider from continuing to manage those assets after he left. Mr. Schneider did mention the non-competition agreement in conversations with some of his existing clients but downplayed its importance even after conversations in which Mr. McFarland told him that Wellington

Not Reported in N.E.2d                                                                    Page 35
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

believed in its validity and intended to enforce it.

Although Mr. Schneider did not solicit business from PECO Energy, Mentor Investment Group, Bell Atlantic, Consolidated Freightways or Colonial Williamsburg Foundation, he clearly did solicit business from Russell, the URS and, to a lesser degree and later, RJR. That fact that the solicitations occurred--in Russell's case, by express agreement--in the form of responses to questions the clients raised does not make Mr. Schneider's ostensibly reactive overtures any less solicitous. Mr. Schneider very much wanted the Russell account both for its own sake and for its potential as a gateway to other accounts. He knew that the possibility of landing the Russell account, high from the outset, would be enhanced if he had other accounts. He had established an excellent relationship with URS's Mr. Cherry. He believed, accurately, that he could bring the URS account with him to his new firm and that he could use a URS decision to come with him as a part of his assurance to Russell that he was starting on a sound footing.

Mr. Schneider's dealings with Wellington before and after he tendered his resignation were simply deceitful. Yes, he said early on that he was thinking about remaining in the investment business after he left. And yes, Wellington correctly divined that his ultimate intention was to remain in the same kind of investment business and possibly to manage the very same assets he was managing at Wellington. But at a time when Mr. Schneider was providing to Russell, the URS and RJR a detailed outline of the plans he was making and his expectations regarding when he would be in a position to start managing money, he was providing Wellington, in response to questions surely no less direct than those his clients were posing, with only the vaguest of generalities about a series of alleged options he was considering. At a time when he told Wellington he thought it would be "immoral" to "pick off clients," he was planning to do just that. At a time when he was telling Wellington employees either that he had no opinion about the qualifications of his staff or that his staffers were not very qualified, he knew their value, knew that their presence in his new firm would provide the kind of stabilizing support that would be helpful in soliciting new business and was planning to hire them for his new firm if he possibly could. And at a time when he was deeply and heavily engaged in discussing with clients his ability and hope to serve them at his new firm when he left Wellington, he signed again the Partnership Agreement containing an unequivocal undertaking that he would not do so.

**\*39** I am not persuaded that Russell, URS and RJR would have left Wellington if Mr. Schneider had announced to them that he was unavailable to manage their money following his departure. In my view, the evidence in that regard is evenly balanced. [FN61] On the one hand, it is clearly true that, upon hearing of Mr. Schneider's resignation, decision-makers at each of the three entities immediately thought it would be beneficial to have Mr. Schneider continue management of their assets. It is also true that all three subsequently rejected Wellington proposals for successor managers and stated, in one way or another, that they would not have remained with Wellington even if Mr. Schneider had been unavailable to manage their assets at his new firm. On the other hand, the succession process that attended Mr. Nyheim's departure several years earlier took twenty months, had Mr. Nyheim's full cooperation and was successful in moving most of his clients, including these three, to Mr. Schneider and Mr. Ryan. Moreover, when the three rejected Wellington's succession proposals and when they said that they would leave Wellington no matter what Mr. Schneider's availability, they knew that he in fact was available and knew that they had to make up their minds regarding what to do, not in twenty months, but in six. Under those circumstances, I simply am unable to determine what more probably than not would have occurred if Mr. Schneider had said from the outset that he could not manage their assets after he left Wellington.

> FN61. On this issue, it is appropriate to place the burden on Mr. Schneider, See *Meehan v. Shaughnessy*, 404 Mass. 419, 441, 535 N.E.2d 1255 (1989).

If Mr. Schneider is enjoined from engaging in any competition with Wellington his ability to earn at the levels he was earning while at Wellington will likely be severely compromised. That compromise will be ameliorated, although not substantially, if Mr. Schneider receives from Wellington the ten years of payments Article XIV of the Partnership Agreement describes.

If Mr. Schneider is enjoined from managing the funds he currently manages for Russell, the URS and RJR, all three will suffer economic harm flowing from the costs and expenses of hiring a new portfolio manager and from the fees and expenses attending portfolio reorganizations the new managers may deem desirable. While not insignificant, those costs and expenses are no different from those to which all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d                                                                                      Page 36
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

three exposed themselves when they signed contracts with Wellington and with Schneider Capital Management containing provisions under which both managers had the right to end the contract on short notice. Moreover, to the extent Mr. Schneider's management of their assets during the period since this action commenced has deepened their reliance on Mr. Schneider, that deepening occurred at a time when each clearly knew of the terms of the agreement he had with Wellington, of this litigation and of at least the possibility that the outcome would not be in Mr. Schneider's favor. Whatever their state of knowledge before the action commenced, therefore, they surely could have been in doubt about nothing thereafter.

*40 The effects on Wellington of not enjoining Mr. Schneider from managing portfolios for the clients whom he served while at Wellington are more subtle. Surely Wellington will survive his departure and the loss of the three clients he took with him, clients I cannot on this record say would or would not have remained with Wellington Mr. Schneider he had been unavailable to manage their assets after he left. One cannot, of course, determine if Wellington will lose other opportunities because it no longer manages the funds for which Mr. Schneider had been responsible. Beyond that, there is always the possibility that Mr. Schneider's unhindered departure will cause other clients to reappraise their ties to Wellington and to move on as well. On this record, however, both considerations, are too speculative to rise to the level of tangible harm.

The more likely impact on Wellington of a decision not to issue an injunction is internal. Wellington is built on a foundation designed to maximize the incentives for interdependence and team-work between Partners, between Partners and future Partners and between Partners and staff. Those incentives are designed to achieve, and depend for their existence on, a perception among Partners and employees that clients typically are gained through collective effort and lost despite it. That perception would rapidly disappear if individuals were permitted with impunity to pluck for themselves the fruits of collaboration. Disappearance of that perception, in turn, would have an extremely deleterious impact on Wellington's institutional stability and on the quality of services talented Wellington collaborators have historically provided.

## CONCLUSIONS OF LAW

Against the backdrop of those factual findings, findings perhaps more detailed than necessary to capture the essentials but nonetheless appropriate should any appellate review be sought, the appropriate framework for analysis of the parties' legal arguments emerges in essentially straightforward fashion.

### A. ANALYTICAL FRAMEWORK

Under established Massachusetts law,

[a] covenant not to compete contained in a contract for personal services will be enforced if it is reasonable, based on all the circumstances.... In determining whether a covenant will be enforced, in whole or in part, the reasonable needs of the former employer for protection against harmful conduct of the former employee must be weighed against both the reasonableness of the restraint imposed on the former employee and the public interest.... If the covenant is too broad in time, in space or in any other respect, it will be enforced only to the extent that is reasonable and to the extent that it is severable for the purposes of enforcement.

*All Stainless, Inc. v. Colby,* 364 Mass. 773, 778, 308 N.E.2d 481 (1974). See also *Pettingell v. Morrison, Mahoney & Miller,* 426 Mass. 253, 256, 687 N.E.2d 1237 (1997). Put another way,

any covenant restricting competition is to be enforced only to the extent that it is reasonable in time and space, necessary to protect legitimate interests, and not an obstruction of the public interest.

*41 *Alexander & Alexander, Inc. v. Danahy,* 21 Mass.App.Ct. 488, 498, 488 N.E.2d 22 (1986). [FN62] See generally, *Marine Contractors Co., Inc. v. Hurley,* 365 Mass. 280, 287, 310 N.E.2d 915 (1974). The party seeking the covenant's enforcement has the burden of proving the existence of the requisite facts and circumstances. See *New England Canteen Services, Inc. v. Ashley,* 372 Mass. 671, 675, 363 N.E.2d 526 (1977).

> FN62. *All Stainless* dealt with an agreement arising out of the relationship between employer and employee and *Alexander & Alexander* dealt with the sale of a business containing an employment arrangement. There is a suggestion in decided cases that different analytical frameworks apply to non-competition agreements found in employment agreements and those found in agreements for the sale of a business. See *Alexander & Alexander, supra,* 21 Mass.App.Ct. at 496, 488 N.E.2d 22. The distinction is rooted, among other things, in a generalized view regarding the relative

Not Reported in N.E.2d                                                                          Page 37
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

bargaining power as well as the interests deserving protection. *Id.*, *Restatement (Second) of Contracts § 188, comment g* In the former situation, there is some suggestion that an agreement will be enforced if it is reasonable in time and space and not contrary to the public interest, whether or not it is necessary to protect the enforcer's legitimate interests. See *Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102- 03, 390 N.E.2d 243 (1979); Thomas v. Paker, 327 Mass. 339, 341, 98 N.E.2d 640 (1951); Wells v. Wells, 9 Mass.App.Ct. 321, 325, 400 N.E.2d 1317 (1980)* Consideration of the enforcer's legitimate interests, the suggestion goes, is only relevant when the agreement arises out of the employer-employee relationship. *Id* As *Alexander & Alexander* itself demonstrates, however, the dichotomy is not a rigid one. See also, e.g., *Sherman v. Pfefferkorn, 241 Mass. 468, 474-75, 135 N.E. 568 (1922);* Bowne of Boston, Inc. v *Levine,* Middlesex Superior Court 97-5789, *1997 WL 781444 (1997)* (Burnes, J.). Instead, the real difference in the courts' approach, at least in the modern cases, appears to lie in the intensity with which the enforcer's asserted interests are scrutinized. Both Wellington and Mr. Schneider entered the Partnership Agreement freely and voluntarily. Both did so because they believed that admission of Mr Schneider to the Wellington Partnership would be mutually beneficial. Neither forced the other to agree. Both were sophisticated and both had access to counsel. Over the approximately four years of the Agreement's existence, both profited handsomely from its operation The Agreement provided Mr. Schneider, like all other departing Partners, with a ten-year stream of income, albeit relatively modest, see p 83, *supra,* in the event of his or her departure. The Agreement was renewed without comment or discussion several times during the parties relationship including once when Mr Schneider's resignation was squarely before both sides. And, perhaps most important, the Agreement dealt with the relations between partners, people who owed to each other not simply the good-faith workaday accommodation required of those engaged in commercial transactions but instead "the punctilio of an honor the most sensitive."

*Meinhard v. Salmon,* 249 N.Y. 458, 463-64, 164 N.E. 545 (1928). See generally, *Chelsea Indus., Inc. v. Gaffney,* 389 Mass. 1, 11-12, 449 N.E.2d 320 (1983). Under those circumstances, there is no reason to give this non-competition agreement any more restrictive scope and operation, or any greater scrutiny, than is customarily given commercial agreements generally. See generally, e.g., *Shea v. Bay State Gas Co.,* 383 Mass. 218, 222-25, 418 N.E.2d 597 (1981).

*B. APPLICATION OF THE FACTORS*

*1. Reasonable in time and space*

A valid non-competition agreement must first of all be reasonable under the circumstances attending its enforcement including time and space. *All Stainless, supra, 364 Mass. at 778, 308 N.E.2d 481; New England Tree Expert Co., Inc. v. Russell, 306 Mass. 504, 510, 28 N.E.2d 997 (1940).* Determining reasonableness of the agreement requires an inquiry into all of the facts *Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 717, 175 N.E.2d 374 (1961); Sherman v. Pfefferkorn, 241 Mass. 468, 474, 135 N.E. 568 (1922).* If a covenant is too broad in space, time or any other respect, it will be enforced only to the extent that it is reasonable and then only to the extent that the reasonable component is severable from the remainder. *All Stainless, supra, 364 Mass. at 778, 308 N.E.2d 481; Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 718, 175 N.E.2d 374 (1961) Cedric G. Chase Photographic Labs., Inc. v. Hennessey, 327 Mass. 137, 139, 97 N.E.2d 397 (1951).*

The restrictions here at issue have both temporal and geographic components. In deciding the reasonableness of such restrictions, the court should consider (1) the nature of the plaintiff's business, (2) the type of employment involved, (3) the situation of the parties, (4) the employer's legitimate business interests, and (5) the right to work and earn a livelihood. *All Stainless,* supra, 364 Mass. at 778, 308 N.E.2d 481.

Article XV, as stated, contains a five year ban on "(i) solicit[ing] or accept [ing] business from any client of [Wellington and] (ii) ... hir[ing] ... any .. employee ... of" Wellington and a three-year ban on "participat[ing] in any business engaged in competition with the business of the [Wellington], including a business engaged in providing investment advisory or investment management services."

Not Reported in N.E.2d                                                                                        Page 38
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

When one considers the fact that Mr. Schneider came to Wellington as a trainee without experience or clients, that he received all, of his training and honed all of his investment management skills as, and as a result of being, a Wellington employee, that Wellington during those years put him in a position where he was able to meet and perform work for the clients whose accounts he ultimately managed, that Wellington, while profiting handsomely from his labors, compensated him handsomely as well, that Wellington provided all of the support and administrative assistance that were essential to his performance of services at the high level he performed them and in the process to crate the reputation he came to enjoy, and when one considers the Wellington interests the Agreement protects, interests detailed in the next section, I am of the opinion that a five-year ban on providing services to Wellington clients is reasonable.  See generally _Marine Contractors Co., Inc. v. Hurley,_ 365 Mass. at 287, 310 N.E.2d 915 (1974); _Walker Coal & Ice Co. v. Westerman,_ 263 Mass. 235, 239, 160 N.E. 801 (1928); _Alexander & Alexander, Inc., supra,_ 21 Mass.App.Ct. at 498, 488 N.E.2d 22. [FN63]

> FN63. Although at trial it used Mr. Schneider's interactions with Wellington employees for evidentiary purposes, Wellington's post-trial papers do not appear to take the position that Mr. Schneider should now be enjoined from continuing to employ any former Wellington employees. Although many of the considerations discussed in the next section apply with equal force to hiring employees, a series of other considerations, general and particular, apply to that issue as well.  If Wellington truly seeks an injunction prohibiting Mr. Schneider's employment of the former employees, it may seek through an appropriate filing a modification of the order with which this opinion ends.

**\*42** The three year ban on all competition stands on a different footing.  In some cases, three-year prohibitions on competition, see, e.g., _Blackwell v. Helides,_ 368 Mass. 225, 229, 331 N.E.2d 54 (1975); _Loranger Construction Co. v. C. Franklin Corp.,_ 355 Mass. 727, 730, 247 N.E.2d 391 (1969); _Novelty Bias Binding Co. v. Shevrin,_ 342 Mass. 714, 718, 175 N.E.2d 374 (1961);  _New England Tree Expert Co., Inc. v. Russell,_ 306 Mass. 504, 508, 28 N.E.2d 997 (1940), and prohibitions of national scope, [FN64] see, e.g., _Marcam Corp. v. Orchard,_ 885 F.Supp. 294, 299 (D.Mass.1995);  _Marshall Engine Co. v._

_New Marshall Engine Co., 203 Mass. 410, 422, 89 N.E. 548 (1909),_ have been upheld.

> FN64. Indeed, Wellington's business is international.  There is no suggestion however that Mr. Schneider has international aspirations or that the international component of the Article XV has any practical impact on this case.

Here, however, enforcement of the prohibition would have a significant impact on Mr. Schneider's ability to earn a living. [FN65]  Moreover, the law will enforce a ban on competition only to the extent necessary to preserve an important interest other than simple freedom from competition.  E.g., _Whitinsville Plaza, Inc., v. Kotseas,_ supra, 378 Mass. at 102, 390 N.E.2d 243;  _Marine Contractors Co. ., Inc. v. Hurley, supra,_ 365 Mass. at 287-88, 310 N.E.2d 915 (1974);  _Richmond Bros. v. Westinghouse Broadcasting,_ 357 Mass. 106, 111, 256 N.E.2d 304 (1970);  _Club Aluminum Co. v. Young,_ 263 Mass. 223, 226-27, 160 N.E. 804 (1928);  _Knowles Broadcasting Co. v. Oreto,_ 3 Mass.App.Ct. 707, 708, 322 N.E.2d 791 (1975).  Although a three-year ban on all competition is not unrelated to protection of Wellington's legitimate interests, a ban of that breadth is not essential or even highly necessary to do so.  Given a strong public policy favoring competition and the adverse consequences to Mr. Schneider flowing from enforcement of the total ban, I am of the opinion that it should not be enforced, at least through the medium of an injunction. [FN66]

> FN65. See p. 83, _supra._

> FN66. This phase of the case concerns only injunctive relief.  The impossibility of severance, see n. 80, _infra,_ eliminates use of another enforcement approach often used elsewhere, See, e.g., _Struck v. Plymouth Mortgage Co.,_ 414 Mass. 118, 121-22, 605 N.E.2d 296 (1993).  I venture no opinion on whether a damage remedy nevertheless remains.

### 2. Protection Legitimate Interests

A valid non-competition agreement also must be reasonably necessary to protect an employer's legitimate business interests.  Although several different interests are often asserted in support of such covenants, goodwill is the interest Wellington asserts here.  From decided cases, there is no doubt that goodwill is an interest deserving of protection in virtually all contexts. _New England Canteen Service,_

Not Reported in N.E.2d                                                                                         Page 39
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

_Inc. v. Ashley_, 372 Mass. 671, 674, 363 N.E.2d 526 (1977); _New England Tree Expert Co. v. Russell_, 306 Mass. 504, 28 N.E.2d 997 (1940); _Kroeger v. Stop & Shop Cos., Inc._, 13 Mass.App.Ct. 310, 316, 432 N.E.2d 566 (1982), _review denied_, 386 Mass. 1102, 440 N.E.2d 1175 (1982).

Goodwill is a broad term and encompasses a variety of intangible business attributes such as the " 'name, location and reputation, which tends to enable' the business 'to retain [its] patronage.' " _Slate Co. v. Bikash_, 343 Mass. 172, 175-76, 177 N.E.2d 780 (1961), _quoting Murray v. Bateman_, 315 Mass. 113, 115, 51 N.E.2d 954 (1943). Wellington points to two components of its goodwill the non-competition agreement protects. One of those is external and the other is internal.

The external component has to do with Wellington's relationship with clients, actual and potential. An employer's positive reputation or position in the eyes of its clients or potential clients is an element of goodwill that often manifests itself through repeat business with existing clients and through referrals to potential clients. _Marine Contractors Co., Inc. v. Hurley, supra_, 365 Mass. at 287-289, 310 N.E.2d 915 (1974). In the investment brokerage industry, as in many others where clients typically interact with one, or a handful, of a firm's employees who provide, and direct the provision of, non-standard services individually tailored to the client's particular needs, the employer's goodwill is the product of the employee's skill, knowledge of customer needs, "[p]rompt service, integrity, and loyalty." _Alexander & Alexander, Inc. v. Danahy_, 21 Mass.App.Ct. 488, 497, 488 N.E.2d 22 (1986). As a consequence, the employer's goodwill is burdened with a particular vulnerability, for
*43 the former employee's close association with the employer's customers may cause those customers to associate the former employee, and not the employer, with products of the type sold to the customer through the efforts of the former employee.
_All Stainless, Inc. v. Colby_, 364 Mass. 773, 780, 308 N.E.2d 481 (1974). [FN67] That association in the client's mind tends to overlook, among other things, the institutional training, support and synergy that enable the employee to provide services of the quality the client values so highly.

> FN67. Mr. Schneider uses that principle to argue that the goodwill resulting from the employee's interaction with the client is the employee's, not the employer's, and thus that

the employee is free to take it with her when she leaves. For that proposition, he cites _Sentry Ins. v. Firnstein_, 14 Mass.App.Ct. 706, 708, 442 N.E.2d 46 (1982). _Firnstein_, never cited again in any Massachusetts appellate decision, turns on its own facts. Carried as far as Mr. Schneider would carry it, _Firnstein_ would lead one to conclude that organizations engaged in providing non-standard, professional services would never possesses, and could never preserve, institutional goodwill. That simply is not the law.

At least insofar as it pertains to relations with the firm's clients, a non-competition clause of the type the agreement between Mr. Schneider and Wellington contains thus is a particularly appropriate method for protecting employer goodwill. Indeed, it is a kind of centripetal glue that helps to retard the centrifugal tendencies inherent in the very nature of a business engaged in providing professional services.

The internal element of goodwill, expressly recognized in Article XV, [FN68] is equally important. Wellington, like many other organizations offering professional services to sophisticated clients through highly skilled service providers, is, buy its very nature, an association of individuals who have the capacity to provide comparable services on their own. Moreover, successful execution of Wellington's day-to-day functions depends, at least in part, on formation of relationships of trust and confidence between individual employees and Wellington clients. Ultimately, therefore, Wellington's continued growth and viability depend on nurturing close relationships between its own employees and its clients and on maintaining its own relationship with employees whom it has placed in a position to form client relationships and necessarily supported while those relationships formed and grew.

> FN68. As stated in the findings, the Agreement says in part that
> the Managing Partners, acting by majority vote, shall have the authority on behalf of the Partnership to fairly and reasonably determine whether the activities or proposed activities of the withdrawn or removed Partner are appropriate or constitute misappropriation or will adversely affect the Partnership's good will (including especially its relationships with its customers, clients and employees) and its confidential and

Not Reported in N.E.2d                                                                         Page 40
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

proprietary business information.

Institutionally, maintaining that internal goodwill produces an enterprise stable and vibrant enough to provide current and prospective employees with a vision of future returns handsome enough to warrant their current investments of energy and insight. Maintaining that internal goodwill promotes a willingness to share information and strategies because it tends to create an atmosphere in which employees believe that rewards flow from their common enterprise and not from amassing institutional information for use in entrepreneurial adventures. [FN69] And maintaining that internal goodwill helps to prevent the kind of unseemly machinations for acquisition of clients and employees the record in this case demonstrates, machinations that, whatever their success or lack of success, can only have a deleterious--perhaps extremely deleterious--impact on common esprit or morale. [FN70]

> FN69. As the facts found earlier reveal, almost 60% of Mr. Schneider's annual compensation in the year before he left came from *firm* profits, not from his own individual performance. See p. 82, *supra*.

> FN70. Mr. Schneider's alalysis of his activity's "harm" to the Partnership solely in terms of avoidable lost income thus is, to say the least, unduly crabbed.

Mr. Schneider's contention that, whatever the Agreement's validity generally, it cannot possibly have preserved any internal or external goodwill here because all three of the clients who joined him at his new firm said that they would have left Wellington in any event. I am unpersuaded by that contention chiefly for three reasons. First, the findings establish that a certain percentage of Wellington clients depart every year and that a certain percentage sign on for the first time. Unlike these departures, those accustomed and expected ebbs and flows in the client base create what are, and necessarily are viewed as, common losses and common gains. They do not create the perception or the fear that one's colleagues may be privateers waiting for an opportune moment to set sail with clients, if not in tow, at least following close behind.

*44 Second, the findings in this case show how the difference between solicitation and non-solicitation and the difference between unconditional and conditional departure from Wellington can be just as

metaphysical in fact as the Appeals Court has opined that they may be in theory. *Alexander & Alexander, Inc. v. Danahy, supra,* 21 Mass.App.Ct. at 499, 488 N.E.2d 22. All three clients who joined Mr. Schneider at his new firm knew he was available to take their business before they said that they were leaving Wellington. And Mr. Schneider's conventions and understandings about disclosing future plans only in response to specific questions do not transform his clear solicitations into some kind of a benign serendipity.

Third, even if solicitation were stripped away, the findings made here demonstrate precisely why an agreement like this one may be particularly necessary for a business like Wellington. Wellington hired Mr. Schneider when he was inexperienced. Wellington trained Mr. Schneider and provided a forum for his considerable talent and skills to flourish. Wellington exposed him to clients and encouraged him and them to form a tightly knit relationships. While they did so, Wellington provided the support that was essential for those relationships to flourish. Wellington did all of that because that is how its business, and all successful businesses like it, work. And when Mr. Schneider reached a point where he thought that the relationship between himself and the clients he was serving was strong enough that at least some of them would go with him when he left, that is precisely what he did. Surely an employer's effort to prevent that result, if otherwise reasonable, is entirely legitimate.

### 3. *Public policy*

Finally, decided cases customarily state that a covenant not to compete is enforceable to the extent it is consonant with the public interest. E.g., *Alexander & Alexander, Inc. v. Danahy,* 21 Mass.App.Ct. 488, 501, 488 N.E.2d 22 (1986). [FN71] I am persuaded that public policy would not be ill-served by enforcing this agreement to the extent that it prohibits Mr. Schneider from providing investment advisory services to Wellington clients. Insofar as the parties are concerned, the agreement is, as I have now repeatedly stated, part of the relationship between two sophisticates. There was no coercion here, no overreaching and no preying on the economic needs of the powerless or ill-informed.

> FN71. Decisions typically have considered the "public interest" when determining whether and to what extent to enforce non-competition agreements and I shall do so as well. One may well wonder, however, whether the "public interest," often difficult

Not Reported in N.E.2d                                                                                    Page 41
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

for a single individual to identify and apply, ought to have a significant role in judicial analysis of these kinds of agreements, cf., e.g., _Bank of New England, N.A. v. Mortgage Corporation of New England_, 30 Mass.App.Ct. 238, 567 N.E.2d 961 (1991), or whether the Legislature is instead in the best position to determine where that interest lies and to create a mechanism for its enforcement. Cf., e.g., G.L. c. 112, § 12X.

Mr. Schneider claims that clients have a right to insist on the portfolio manager of their choice, a right that would be adversely affected by enforcement of agreements such as this one. Moreover, he contends, that right should be given particular support when the clients are themselves fiduciaries for large funds that hold and manage pension and other funds for numerous individuals. To the extent that Mr. Schneider has standing to make it, however, that claim is undercut, if not eviscerated, by the fact that Wellington's contracts with the three, like the vast majority of Wellington's contracts with all of its clients, provided for termination by either side on 30-days notice. Had Wellington exercised that power and had Mr. Schneider elected to stay at Wellington following Wellington's exercise of that power, none of the clients would have had any right whatsoever to insist on the portfolio manager of their choice. [FN72] Mr. Schneider's current contracts with all three contain similar provisions. He, too, thus is free to tell them that they have thirty days to leave and, if he does so, they have no right to say "no."

> FN72. The same can be said of the argument Mr. Schneider makes on the basis of Wellington's fiduciary obligation to its clients, again assuming his standing to raise that argument. The fiduciary relationship between Wellington surely existed while the contract between Wellington and each client was in effect. The fiduciary relationship, however, contemplated termination on 30-days notice. Once terminated, some fiduciary traces no doubt remained but no case Mr. Schneider has cited or of which I am aware suggests that those traces were strong enough to pull apart an otherwise valid agreement between Wellington and Mr. Schneider. My conclusions in this regard are designed solely to deal with and decide Mr. Schneider's claim that the agreement should not be enforced, here or generally, because of the fiduciary nature of the relationship between Wellington and its

clients. Questions whether any Wellington client suffered harm because Wellington did not tell the client about the non-competition provisions in the Partnership Agreement and, if so, whether the client has any recourse are simply not before me.

**\*45** More broadly, there is no suggestion in the record or in argument that there is a limited national pool of talented, energetic and able portfolio managers who are capable of producing high yields in a manner that blends with a client's overall investment objectives. [FN73] Moreover, the relationship between a fund manager and investment advisor, although necessarily a relationship requiring trust and confidence, does not typically produce or require the kind of intimacy that typically attending the doctor-patient and lawyer-client relationships and even, perhaps, the relationship an investment advisor and an individual.

> FN73. Indeed, this record shows that, if the results are favorable enough, clients are prepared to change their overall investment mix, if not their investment approach, to accommodate those results and the manner in which they are achieved.

More difficult is Mr. Schneider's contention that Wellington should not now be able to enforce the non-competition agreement in a manner that prohibits his provision of investment advisory services to Russell, URS or RJR because Wellington misled all three with respect to its intentions after his departure. Again assuming his standing, the argument is difficult because, before Mr. Schneider was discharged, Wellington clearly did not tell any of the three about the non-competition agreement's existence. Indeed, it consciously structured its approach to all three in a manner designed to assure them that they could do as they chose with their funds after Mr. Schneider departed. Wellington did so because it hoped to reach an understanding with Mr. Schneider that would allow it to keep mail covered with velvet. Wellington did so, however, at a time when it knew the clients were indeed thinking about where to go after Mr. Schneider's departure.

Russell, of course, entered its contracts with an eye toward doing so before an injunction could issue and RJR knew when it entered its contract that Wellington was planning to seek injunctive relief. More important, though, are two other impediments to Mr. Schneider's successful use of the argument he has made about Wellington's conduct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d                                                          Page 42
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

First of all, there can be no doubt that Mr. Schneider knew from the outset about Wellington's view's regarding Article XV. Indeed, his understanding of Wellington's seriousness was a motivating force in the clandestine manner in which he went about his preparations for the new venture and in the vague responses he gave to Wellington about his future plans. Knowing Wellington's purpose and approach to the Agreement's terms at a time when he was informing all three clients of his ability to accept their business, he elected not to tell them of Wellington's clearly-expressed position. Insofar as protection of the client's interests is concerned, then, Mr. Schneider and Wellington are in the same position.

Secondly, if one assumes that Wellington's early disclosure of its intention to hold Mr. Schneider to the terms of the Partnership Agreement would have dissuaded each of them from transferring their business to Mr. Schneider's new firm, [FN74] then the harm to them was their involvement in a new relationship from which they could be involuntarily terminated on thirty days notice. An injunction that takes account of that termination period thus will deal with any harm caused by a Wellington's lack of candor for which money is no adequate remedy. [FN75]

> FN74. That assumption is necessary for Mr. Schneider's argument to have any force but it is an assumption nonetheless because, on this record, I am not persuaded one way or the other about its truth.

> FN75. I recognize that someone could argue that the consequences of issuing an injunction now would be the disruptive impact of a second move where, if one assumes that a full disclosure by Wellington would have led the clients to go to someone other than Mr. Schneider initially, only one move would have been necessary. I make no judgment on that argument's validity or on whether some claim for damages for the monetary cost of the additional disruption is viable.

## C. OTHER CONSIDERATIONS

### 1. Preparatory Efforts

*46 Citing *Meehan v. Shaughnessy,* 404 Mass. 419, 435, 535 N.E.2d 1255 (1989), *Augat, Inc. v. Aegis, Inc.,* 409 Mass. 165, 172, 565 N.E.2d 415 (1991) and *Chelsea Indus., Inc. v. Gaffney,* 389 Mass. 1, 10, 449

N.E.2d 320 (1983), Mr. Schneider argues that he was perfectly free to make preparatory efforts to leave Wellington without disclosing to his partners what those efforts were and without violating his fiduciary duty to them in the process. He is correct. [FN76] This is not a record, however, that reflects benign preparation and nothing more. Moreover, "[a] partner has an obligation to 'render on demand true and full information of all things affecting the partnership to any partner." ' *Meehan v. Shaughnessy, supra,* 404 Mass. at 436, 535 N.E.2d 1255. Mr. Schneider surely did not do that. Most important, however, none of the cited cases, nor any other of which this court is aware, places an imprimatur on secret preparations to violate an agreement to which one is bound both by contractual and fiduciary ties. That, too, however, is exactly what happened here.

> FN76. It is, however, somewhat ironic, that, in an era where a broad duty of good faith and fair dealing exists between contractual adversaries, see, e.g., *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471-473, 583 N.E.2d 806 (1991); G.L. c. 93A, § 11, we view clandestine preparations for departure as fully consistent with the fiduciary ties that exist between those bound together in ostensibly common cause. Among other things, such preparations are never fully secret and inevitably produce, if not the manipulative excesses this record demonstrates, at least some disruptions of a type that usually spring from the shadowy places where secrecy and intrigue are breeding.

### 2. Wellington Payments

Mr. Schneider next argues that no injunction should issue because Wellington failed to pay him the merit compensation he was entitled to receive for 1996 and failed to pay him the incentive compensation to which he was entitled for the last six months of 1996. [FN77] The amount of the merit payment, however, was left by the Partnership Agreement to the discretion of the Managing Partners. As with all discretionary judgments, the Managing Partners were required to use good faith and to be reasonable. I am of the opinion that their conclusion to award zero merit compensation to one who clearly breached a material provision of an Agreement to which he was bound by fiduciary ties and deceitful about his doings was neither unreasonable nor an exercise in bad faith. [FN78]

Not Reported in N.E.2d                                                                                              Page 43
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
**(Cite as: 1998 WL 136133 (Mass.Super.))**

FN77. As to the latter, the record was clear that Mr. Schneider had not, by the time of trial, received any payment of incentive compensation for the last six months of 1996. Unlike the Wellington judgment regarding a merit payment, however, the record does not suggest that Wellington had made a final decision that it would make no incentive payment and the record is silent regarding what, if anything in that regard, occurred after the trial concluded.

FN78. For the same reasons, I reject Mr. Schneider's contention that his expulsion from the partnership was an exercise in bad faith. Procedurally, the process was fair and Mr. Schneider had a full opportunity to have his say. Even if one puts to one side the assumed votes of the Managing Partners--and there is no reason to do so--there is not a scintilla of evidence that the 44 other partners (out of 52) who thereafter voted for his expulsion did so for any reason other that their judgment about the severity of his malefactions.

The matter of incentive compensation raises different issues. I have found that that compensation was determined by matching Mr. Schneider's performance against the S & P 500 or the Russell 1000 index in a fashion that, while not fully disclosed by the record, was essentially mechanical. Moreover, his incentive compensation took account of performance over the preceding year as well as some prior years.

"A material breach of contract by one party excuses the other party from performance as matter of law." *Hastings Associates, Inc. v. Local 369 Building Fund, Inc.,* 42 Mass.App.Ct. 162, 171, 675 N.E.2d 403 (1997). That principle follows from the principle that a material breach entitles the non-breaching party to treat the contract as having ended. Clearly, Mr. Schneider committed a material breach of his contract with Wellington by accepting business the contract prohibited him from accepting. His breach occurred before the incentive payment from Wellington was due. Wellington therefore was not in breach of the contract by failing to make that payment to him.

When one seeks specific performance of a contract, however, one seeks to treat the contract not as terminated but as a living document that governs the relationship between the parties to it. As a general

rule, therefore, one who seeks specific performance of an agreement must perform his or her obligations under the same agreement. Some cases appear to say that the party seeking specific performance must have performed fully by the time he or she seeks specific performance. See, e.g., *A.B.C. Auto Parts, Inc. v. Moran,* 359 Mass. 327 331, 268 N.E.2d 844 (1971). On closer examination, however, actual performance is not required, see, e.g., *Rigs v. Sokol,* 318 Mass. 337, 344, 61 N.E.2d 538 (1945), and a more complete statement of the rule is that the court may refuse specific performance

*47 if a substantial part of the agreed exchange for the performance to be compelled is as yet unperformed and its concurrent or future performance is not well secured to the satisfaction of the court.

*Morad v. Silva,* 331 Mass. 94, 99, 117 N.E.2d 290 (1954) quoting *Restatement of Contracts § 373.* [FN79]

FN79. The same concept appears, in somewhat greater detail, in *Restatement (Second) of Contracts § 363.*

Here I am of the opinion that equity will be served if injunctive relief is conditioned on Wellington's payment to Mr. Schneider of the incentive compensation to which the contract entitled him for the last six months of 1996 together with interest at the judgment rate for the period after the time the payment should have been made until the time it is made.

Mr. Schneider also argues that Wellington has failed to pay to him the withdrawal amounts provided by Article XIV of the Partnership agreement and that failure, too, precludes injunctive relief. Clearly, the withdrawal payments are closely tied to the non-competition agreement and Mr. Schneider is therefore not entitled to any payment for the period during which he has been providing investment advisory services to Wellington's former clients. As to future payments, however, the analysis just concluded is equally applicable and injunctive relief will be conditioned on Wellington's payment of the amounts Article XIV requires commencing with the date on which the injunction becomes effective. [FN80]

FN80. Arguably, the payments specified in Article XIV were designed as compensation for observance of all of the non-competition provisions of Article XV. Similarly, Wellington's obligation to pay incentive

Not Reported in N.E.2d                                                                          Page 44
Not Reported in N.E.2d, 11 Mass.L.Rptr. 704, 1998 WL 136133 (Mass.Super.)
(Cite as: 1998 WL 136133 (Mass.Super.))

compensation is dependent on Mr. Schneider's performance, or tender of performance, of all of his contractual obligations. For the reasons stated earlier, there will be no specific enforcement of the provisions of the Agreement prohibiting all competition for three years. I have no reason to believe that Mr. Schneider will voluntarily comply with those provisions in the future. Neither the payment provisions found in Article XIV nor the incentive component of Mr. Schneider's compensation can be severed or segregated in any realistic fashion and thus the full amount will be required as a condition of providing injunctive relief.

### 3. Good Faith Negotiations

Mr. Schneider argues that injunctive relief should be denied because the Managing Partners failed to negotiate in good faith a waiver of the provisions of Article XV. [FN81] As the findings, demonstrate, however, the negotiations never progressed beyond the question of whether Mr. Schneider could provide services at his new firm to clients he had had at Wellington. Without any negotiation at all, Wellington was prepared to separate general competition from continued service to Wellington clients. Mr. Schneider, though, was unwilling to consider any arrangement that prohibited him from continuing to deal with his Wellington clients. Surely, good faith negotiation did not require Wellington to capitulate on its most important point. [FN82]

FN81. Subsumed in that argument is his contention that they failed to reach a good-faith determination that his competitive efforts would result in harm to Wellington. As stated earlier, his view of "harm" is unduly narrow. See n. 70, supra. His contention that they made no good faith determination regarding harm to Wellington, perhaps proceeding from an unduly narrow premise, overlooks a principal consideration on which Article XV was founded.

FN82. In that regard, Mr. Schneider appears to argue that the words "fair and reasonable" found at two points in Article XV take some of the starch from the unconditional prohibitions that Article contains and consequently permit some of the activities the Article states that it bans. That is not the formula the Article contains. Under

Article XV's plain terms, the prohibited activities are prohibited unless the Managing Partners make a good faith determination that they will do no harm and thus should not be. I have found and concluded that the Managing Partners acted in good faith and, so acting, concluded that Mr. Schneider's activities collided with Wellington's fundamental interests.

### 4. Balancing Interests

Finally, both sides have discussed the concept of balancing harms and of whether irreparable harm would or would not flow from issuance of an injunction. I have made findings on that score. In the last analysis, however, the relief Wellington seeks amounts to specific performance of a contractual undertaking.

Specific performance is not a matter of absolute right. It ought not to be granted if it will result in imposing an undue hardship upon one party to an agreement or permit the other party to obtain an inequitable advantage. On the other hand, agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.

*Freedman v. Walsh,* 331 Mass. 401, 406, 119 N.E.2d 419 (1954). Accord *Greenfield Country Estates Tenants Ass'n, Inc. v. Deep,* 423 Mass. 81, 90, 666 N.E.2d 988 (Mass.1996).

**\*48** There is no such inequity here. "[T]he task of quantifying the consequences of violating a noncompetition clause is a particularly difficult and elusive one." *Kroeger v. The Stop & Shop Companies, Inc., supra,* 13 Mass.App.Ct. at 322, 432 N.E.2d 566. Accord, *Wells v. Wells, supra,* 9 Mass.App.Ct. at 328, 400 N.E.2d 1317. The Agreement was clear and freely entered. The Agreement protects and preserves important interests. Wellington made its position regarding enforcement clear to Mr. Schneider from the outset. An injunction, in my view, should enter.

### ORDER

In light of the foregoing, it is hereby **ORDERED** that judgment enter

1. Prohibiting defendant Arnold C. Schneider, III, from directly or indirectly providing investment advisory services, in form or in substance, to any person or entity, including, but not limited to, The Utah State Retirement Board, The Frank Russell Trust Company, The Frank Russell Investment

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BILLIE JO JOY,                    )
                                  )
        Plaintiff,                )
                                  )
    v.                            )        Civil Action No. 05 11580 NMG
                                  )
HILARY ILLICK and                 )
JENNIFER KRIER,                   )
                                  )
        Defendants.               )

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Defendants Hilary Illick ("Illick") and Jennifer Krier

("Krier") (collectively, "Defendants") respectfully submit this Memorandum in support of their

Motion for Summary Judgment in their favor on all counts.

**INTRODUCTION**

Plaintiff Billie Jo Joy ("Plaintiff" or "Joy") claims that she co-authored with Illick and

Krier a play about Defendants' and their husbands' personal lives. It is axiomatic under

copyright law that co-authorship of a play must be intended by all who contributed to its writing.

Based on the undisputed facts, especially the parties' written agreement that Illick and Krier

alone authored the play, no reasonable jury could find that Joy was a co-author or that Illick and

Krier viewed Joy as their co-author. Summary judgment, therefore, is appropriate on Joy's

claims, all of which depend on the issue of co-authorship.

The following facts are undisputed. Illick and Krier initiated the concept for the play in

2001 and began to write the scenes for the play before they involved Joy. After approximately

seven months of writing the play on their own, they hired Joy and thereafter paid her on an hourly basis to act as their director, acting coach and theatre consultant. Illick and Krier received no compensation for their work on the play, other than some *de minimis* royalties they earned after Joy's involvement in the play ended in December 2002.

Most significantly to the issue of authorship, Joy executed a written contract and issued promotional materials while she was still involved with the play, which clearly and unambiguously acknowledged Illick and Krier as the sole writers of the play. While she was still involved with the play, Illick and Krier also notified her of their exclusive copyright claim to the play, to which she did not object at the time. Illick and Krier at all times maintained control of the script on their computer hard drive.

Joy's involvement with the play ended after seven performances of the play in Cambridge, Massachusetts in November and December 2002. Illick and Krier, however, continued to work on the play. They re-wrote and re-named the play from "Venus de Minivan: Mothers in the Breakdown Lane" to "Eve-olution." Through their own pluck, hard work and professional contacts, they successfully arranged for the re-written and re-named play to be optioned by a producer and then performed off-Broadway. They also succeeded in publishing the re-written and re-named play with a reputable publishing house for theatrical works.

Notwithstanding this artistic success, the play has not been a commercial success. Illick and Krier and their families (including their parents and siblings) lost the substantial money they invested in the play. Unlike Joy who was compensated on an hourly basis for all of her time working on the play, Illick and Krier invested thousands of unpaid hours working on the play.

The above facts, which cannot be disputed, firmly and unequivocally establish that Illick and Krier – and previously Joy – understood that Defendants were the sole authors of the play

with exclusive right to control the work. Accordingly, this Court should enter summary

judgment in favor of Illick and Krier on all of Joy's claims. The Court should also award Illick

and Krier their reasonable attorney's fees to defend against Joy's ill-advised and utterly frivolous

lawsuit, which is a meritless attempt to leverage ownership of a play that Joy, as a matter of law,

did not author and does not own. See 17 U.S.C. § 505; M.G.L. c.231, § 6F.

## SUMMARY OF UNDISPUTED FACTS

Both Illick and Krier are published authors. Illick Aff. at ¶ 2; Krier Aff. at ¶ 2. Plaintiff

co-founded a performance studio, Art & Soul, which is located in Cambridge, Massachusetts.

Illick Aff. at ¶ 3. On information and belief, Plaintiff is not a published author. Id.

During the fall of 2001, Illick and Krier, who are very close friends, began to write a play

together about the challenges and joys of their lives as young wives and mothers and the

sometimes painful transition from full-time careers, Illick as a writer and Krier as an

anthropologist, to being full-time mothers. Illick Aff. at ¶ 4, Krier Aff. at ¶ 3. During the fall

and winter, they wrote their play, which consisted of a chronological series of significant scenes

from their own lives. They wrote separately and in collaboration. Id.

In the spring of 2002, they decided that they wanted to stage their play, which at

that time they called "Mamalogues." Illick Aff. at ¶ 5. They approached Joy, who Krier knew as

a dance class teacher at Krier's daughter's pre-school. They asked Joy if she could help them

choreograph certain scenes of their play. Joy informed them that in addition to being a dancer,

she taught improvisational acting workshops, and had recently started directing. They discussed

whether she could also direct their play. Id.; Krier Aff. at ¶ 4. At a subsequent meeting,

approximately a week later, they reached an agreement that Illick and Krier would hire Joy as a

director and choreographer at the rate Joy requested, which was $60 per hour. Joy also offered

3

to rent them space at Art & Soul—the yoga studio and arts center Joy co-founded—for rehearsals and, ultimately, performances. Krier and Illick accepted the offer, and agreed to pay the rental fee she requested, which was $7 per hour. Krier Aff. at ¶ 4; Illick Aff. at ¶ 6.

While Joy received $60 per hour, Illick and Krier were working (and continued to work) without pay in order to achieve their goal of writing and performing their play. Illick Aff. at ¶ 6.

Illick and Krier met with Joy one or two times a week, for approximately two hours each time during a two month period from April through early June 2002. Illick Aff. at ¶ 7. Joy assisted them as a director, acting coach and with staging the play. Id. As director, Joy also offered editorial comments relating to the script, which mostly concerned striking extraneous language from the script, staging, and sequencing of scenes. Id.

Illick and Krier were the writers of the play and at all times controlled the script. Illick Aff. at ¶ 8, Krier Aff. at ¶ 5. They wrote and maintained the play on their computers at home. Id. While Joy offered editorial feedback to the script, Illick and Krier ultimately decided whether to incorporate any of Joy's editorial suggestions into the script, and they made any such changes on their computer copy of the script. Id. Joy never asked for and was never provided with a disk copy of the script. Id.

In early June 2002, Illick and Krier performed a staged reading of the play at Art & Soul. Illick Aff. at ¶ 9. Illick and Krier read the script to the audience of family and friends and they incorporated the staging they had developed with Joy. Id.

During the summer, Illick and Krier saw each other frequently, often daily, for the purpose of discussing and brainstorming the script and the future of the play. During that period, they only saw Joy once, for a breakfast meeting at her house. At that meeting, they discussed and agreed upon certain dates to perform the play at Art & Soul in November and December

4

2002. Joy also requested that Illick and Krier consider giving her a percentage of any future profits; Illick and Krier told her that they would not pay her a percentage as long as they were paying her an hourly fee. Illick Aff. at ¶ 10. At the end of the summer, in August of 2002, Illick and Krier mailed themselves a copy of the play to establish a "poor man's copyright" as authors of the play. Id.

In September, Illick and Krier began to meet again with Joy for the purpose of preparing to perform the play at Art & Soul in November and December 2002. During September, they met approximately two times per week for two hours each time. In total, they met with Joy approximately eight times in September, during which period the play was retitled "Venus de Minivan, Mothers in the Breakdown Lane." Illick Aff. at ¶ 11.

Joy then left the country for approximately six weeks. She was in France from the beginning of October until November 12 – only 10 days before the first performance of the play. During this critical period leading up to the performance of the play, Illick and Krier made further revisions to the script. There was little, if any, input on any aspect of the play from Joy during this period as they had minimal contact while Joy was overseas. Illick Aff. at ¶ 12, Krier Aff. at ¶ 7.

Once they finalized the script in approximately October 2002, Illick and Krier added another "poor man's" copyright to the tangible copies of the work as notice to the rest of the world that they were the sole owners and writers of the work. Illick Aff. at ¶ 13. Upon her return, Joy received notice of their copyright. (See Complaint, ¶ 32.) Joy did not object or insist that the copyright include her as an author. Illick Aff. at ¶ 13; Krier Aff. at ¶ 8.

Although Joy had returned to the United States only days before the first full performance, once Illick and Krier had independently managed to sell out most of the

5

performances, she refused to meet with Illick and Krier for final rehearsals of the play until the parties had discussed and signed a written agreement that described their roles in connection with the play, the credits each would receive, and the payment terms for Joy's continued work on the play through the performances in November and December. After multiple meetings and discussions, they reached a written agreement ("Agreement"). Illick Aff. at ¶ 14. (A copy of the Agreement is attached to the Illick Affidavit at Exhibit B.)

In clear and unambiguous terms, the Agreement states that Illick and Krier are the sole authors of the play. They agreed that the credits for the play should read:

"**Written by Hilary Illick and Jennifer Krier**, developed with and directed by Billie Jo Joy." (emphasis added)

Illick Aff. at ¶ 15. The credit is unambiguous as to who the writers are. Joy was not included with Illick and Krier as a writer. Indeed, given the personal nature of the play and the fact that that Illick and Krier wrote it over the course of one year, Illick and Krier would never have agreed to credit Joy as a co-author. Illick Aff. at ¶ 15, Krier Aff. at ¶ 12. In fact, before they signed the Agreement, Joy asked that the credits say the work was "adapted for stage by" Joy. Illick Aff. at ¶ 15; Krier Aff. at ¶ 8. Illick and Krier rejected that proposal because Illick and Krier's work was always written for and intended to be performed on stage, and because Illick and Krier actually wrote the play. Joy did not adapt it. Joy acquiesced in the credit. Illick Aff. at ¶ 15, Krier Aff. at ¶ 8.

Joy also acquiesced in the copyright. After she received notice of the copyright, she did not challenge the copyright in the Agreement, or request that the copyright be discussed in the future. Illick Aff. at ¶ 16, Krier Aff. at ¶ 8. In the Agreement, Joy also insisted that she continue to be paid $60 per hour for her continued work as a director. This hourly payment was in addition to the rent paid by Illick and Krier for use of Art & Soul as a performance location.

6

Illick Aff. at ¶ 16. Subsequent to the Agreement, Joy requested additional monies for work on sound and lighting, which Krier and Illick agreed to pay her—as they did all her requests for payment during the entire period of time she provided her services to them. Illick Aff. at ¶ 17.

The parties discussed, but did not reach an agreement, as to whether Joy should receive future royalties, if any, from the play. Illick and Krier did not believe Joy was entitled to any royalties since she was a paid consultant and had not written or invested financially in the production of the play. Illick Aff. at ¶ 17, Krier Aff. at 8. If she gave up the payments she had received, Illick and Krier were considering whether to give her a small royalty percentage (12.5%). The parties did not reach an agreement as to royalties since Joy insisted on full hourly pay plus royalties. Illick Aff. at ¶ 17.

In addition to the private agreement, the parties held the play out to the public as a work authored by Illick and Krier. The promotional materials for the performance of the play in November and December were prepared with Joy's participation. Illick Aff. at ¶ 18. (A copy of the e-mail confirming Joy's involvement in creating the promotional matters is attached to the Krier Aff. as Exhibit A.) Those promotional materials advertised that the play was: "<u>Written by Hilary Illick and Jennifer Krier</u>, Developed with and Directed by Billie Jo Joy." Illick Aff. at ¶ 18 (emphasis added); Krier Aff. at ¶ 9; Ex. C to Illick Aff.

The play was performed seven times in November and December, 2002. As of the final curtain call in December 2002, Illick and Krier had invested thousands of dollars to produce and perform the play at Art & Soul. (Copies of cancelled checks paid by Illick and Krier to Joy for her services and for renting the theatre space at Art & Soul, as well as an invoice from Joy for her services, are attached to the Illick Aff. as Exhibit D.) The ticket sales were insufficient to cover Illick's and Krier's costs. Thus, while Joy was paid at all times for her time and profited

7

financially from the play, Illick and Krier were not paid for any of their time and lost significant money as a result of the play. Illick Aff. at ¶19.

Joy had no involvement with the play after the final performance at Art & Soul in Cambridge, except again to request a share of any future royalties since she knew that Illick and Krier intended to try to publish the play. Nor did she seek to participate in promoting the work in other venues. Illick Aff. at ¶ 20.

By contrast, Illick and Krier continued actively to work on the play. They formally registered their copyright to the play on April 11, 2003. (A copy of their registration with the United States Copyright Office is attached to the Illick Affidavit as Exhibit A.) They hired an agent. Through Illick's contacts in New York, they found producers who were interested in staging the play. They continued to re-write the play. They entered into a contract with a New York producer giving the producer the exclusive right to produce the play for a period of eighteen months, and raised $100,000 from their own family and friends to contribute to the production costs of the New York performance run. Illick Aff. ¶ 21. (A copy of the agreement with the New York producer is attached to the Illick Aff. as Exhibit E.) In this contract, Illick and Krier listed only themselves as the authors of the play, which was consistent with their understanding and intent as to authorship. See id.; Illick Aff. at ¶¶ 8, 13, 15; Krier Aff. at ¶¶ 5, 12. They titled the re-written version of the play, "Eve-olution," and it was performed at the Cherry Lane Theatre by professional actresses in October 2004. Illick Aff. at ¶ 21. Illick and Krier were unpaid for any of their time re-writing and promoting the play in New York. Illick Aff. at ¶ 21.

The play was not successful financially in New York. The producers lost money, as did Illick, Krier and their family and friends who invested in the New York production. Both Illick's

8

and Krier's mothers, for example, invested $10,000 each, and (like every other investor in the project) lost that money. Illick Aff. at ¶ 22.

They succeeded in publishing "Eve-olution" through the Dramatists' Play Service, Inc., a publishing company that specializes in theatrical works. Illick Aff. at ¶ 23. In their contract with the Dramatists' Play Service, they described themselves as the sole authors of the play. (A copy of the publishing contract is attached to the Illick Aff. as Exhibit F.) In addition, Illick and Krier listed themselves as the authors on the title page and in the credit pages of the published play, and dedicated the play to their husbands and children. Krier Aff. at ¶ 11. (Copies of these pages of Eve-olution are attached to the Krier Aff. at Exhibit C.) Illick and Krier listed the credit Joy had requested and they had agreed to in their Agreement on page 4 of the script, which is the customary location in the industry for such an attribution. Krier Aff. at ¶ 11.

Illick and Krier have received a total of approximately $3,300 each in royalties from the staging of the play in New York and from its publication. Illick Aff. at ¶ 23; Krier Aff., at ¶ 11 (attaching accounting agent's accounting statement as Exhibit B). Those modest royalties consisted largely of agreed-upon advance payments, and it appears that the play may not yield any additional royalties to them. Illick Aff. at ¶ 23; Krier Aff. at ¶ 11. At this stage, they have suffered substantial net losses in terms of their financial return on the play since they began work on it in 2001. Illick Aff. at ¶ 23.

Joy never asked to invest or to cover any of the losses for the New York production, but she does (unsurprisingly) request a share of all royalties and additional money for alleged harm to her career. Illick Aff. at 24, Krier Aff. at ¶ 10.

### SUMMARY JUDGMENT STANDARD

"A party against whom a claim ... or a declaratory judgment is sought may, at any time,

move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). "Summary judgment is authorized 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the nonmoving party to present evidence showing the existence of a trial worthy issue." Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39 (1st Cir. 2004) (also noting that "bare allegations in a party's unsworn pleadings or in a lawyer's brief do not carry weight in the summary judgment calculus") (citations omitted).

"[W]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Proc. 56(e).

## ARGUMENT

Joy's claims, which are all based on her allegation that she co-authored the play, must be rejected as a matter of law in light of the undisputed and irrefutable facts which show that the parties viewed Illick and Krier as the sole authors of the play and Joy as a paid director and theatre consultant. The intent of the parties as to authorship is clear from the written Agreement, which Joy asked Illick and Krier to sign and in which Joy acknowledges that Illick and Krier were the sole authors of the work. Their intent as to authorship is further confirmed by the promotional materials they prepared

10

and used in connection with the performances of the play in Cambridge, Massachusetts, which stated

that the play was written by Illick and Krier, not Joy. There is substantial additional evidence

discussed below that further shows that Illick and Krier (rightfully) viewed themselves as the authors

and owners of the play. Based on this incontrovertible evidence that Illick and Krier -- and previously

Joy -- viewed Defendants as the sole authors of the play, summary judgment should enter on their

behalf.

> **A.    The Written Agreement Unambiguously Provides That Illick And Krier
> Were The Sole Authors And, Accordingly, Joy's Contract Claim Should Be
> Rejected As A Matter Of Law.**

The written Agreement alone establishes as a matter of law that Illick and Krier were the

authors of the play and are entitled to protection of their rights as the authors. Given the express terms

of the contract, the Court should not allow Joy's frivolous claim that she co-authored the play to

proceed further.[1]

Interpretation of a contract ordinarily is a question of law for the court. See Commercial

Union Ins. Co. v. Swiss Reinsurance America Corp., 413 F.3d 121, 125 (1st Cir. 2005);

---

[1] In various "pre-suit" communications, Plaintiff has argued that the written Agreement in its entirety is
unenforceable because it contains some terms that are not definite or resolved. For example, the parties did not
reach an agreement with respect to the royalty percentage that Joy should receive, if any, from the publication of the
play. The parties, instead, agreed to reach an agreement at a later date. Such "agreements to agree" are not
enforceable contract terms. See Rosenfield v. U.S. Trust Co., 219 Mass. 210, 217 (1935); Schwanbeck v. Federal-
Mogul Corp., 412 Mass. 703, 706 (1992). However, merely because the parties were unable to reach agreement as
to certain terms does not mean that the entire agreement is unenforceable. On the contrary, Massachusetts
courts will construe contracts in such a manner as to be valid and enforceable whenever possible. Lafayette Place
Associates v. Boston Redevelopment Authority, 427 Mass. 509, 517 (1998), cert. denied, 525 U.S. 1177 (1999) ("a
contract should be interpreted 'so as to make it a valid and enforceable undertaking rather than one of no force and
effect.'"). This includes severing contract provisions that are unenforceable, if necessary to enforce the remainder
of the agreement. See, e.g. McFarland v. Schneider, 11 Mass. L. Rptr. 704, 1998 WL Mass.Super.136133, * 40
(Mass. Super. - Feb 17, 1998), attached to this Memorandum as Exhibit A ("'[i]f the covenant [not to compete] is
too broad in time, in space or in any other respect, it will be enforced only to the extent that is reasonable and to the
extent that it is severable for the purposes of enforcement'") (citation omitted); see also U.S. v. Data Translation,
Inc., 984 F.2d 1256, 1259 (1st Cir. 1992) ("When a single portion of a lengthy contract is unintelligible, but yet
severable from the remainder, a court may strike that portion itself without affecting the enforceability of the
remainder."). Accordingly, even though the parties did not reach an agreement with respect to royalties and future
exploitation of the work, they reached a very definite and important agreement as to credits and payment terms for
Joy. These terms should be given effect pursuant to the parties' intent.

Diamond Crystal Brands, Inc. v. Backleaf, LLC, 60 Mass. App. Ct. 502, 504-05 (2004). Courts construing a contract "adhere to the bedrock principle that, in the absence of linguistic ambiguity, the text of a contract dictates its meaning." Okmyansky v. Herbalife Int'l of America, Inc., 415 F.3d 154, 159 (1st Cir, 2005). In applying that principle, "words that are plain and free from ambiguity must be construed in their usual and ordinary sense." Id. (citing and quoting Ober v. Nat'l Cas. Co., 318 Mass. 27 (1945)).

The written Agreement is clear and unambiguous as to the parties' agreed-upon roles with respect to the play.[2] Joy was a paid director who helped to develop the play as a paid theatre consultant; she was expressly <u>not</u> one of the authors. As the language of the Agreement makes perfectly clear, Illick and Krier were the sole authors. Accordingly, Plaintiff agreed that on publications of the play, the credit should read: "Written by Hilary Illick and Jennifer Krier." This should end Plaintiff's contract claim as a matter of law.[3]

---

[2] Based on Joy's allegations that Illick and Krier allegedly "agreed through oral and written communications that Joy was a co-author" of the play (Complaint, par. 74), one can anticipate that Joy intends to seek to introduce extrinsic (or parol) evidence of that alleged oral agreement. The Court should reject that effort because the parties entered into an unambiguous written agreement that expressly addressed the issue of authorship, and it is well-established in Massachusetts that: "[a]s a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous." Langone v. USCO Distribution Services, Inc., 389 F.Supp.2d 91, 98 (D. Mass. 2005).

[3] Even if her contract specifically requested that Joy "ghost write," "adapt" or otherwise author the play, which it obviously does not, Joy's claims would fail due to her status as a specially-commissioned work-for-hire. See, e.g. Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc., 119 F.3d 55, 63 (1st Cir. 1997) (rejecting claim of authorship due to alleged contributions to work because done in course of employment); National Center for Jewish Film, Inc. v. Goldman, 943 F.Supp. 113, 117-118 (D. Mass. 1996) (where movie producer hired three individuals to compose music for films, their claims to ownership of copyright rejected outright because "[a]bsent [the producer's] urging as the 'motivating factor' behind the production of the movies ... there would have been no Songs.")

12

**B.    The Written Agreement, The Billing For The Play And Other Evidence Unequivocally Establish That Illick And Krier Never Viewed Joy As Co-Author Or Intended That She Would Have Rights As Co-Author And Accordingly Joy's Copyright Claim Should Be Rejected As A Matter Of Law.**

Plaintiff's copyright claim must fail because she cannot meet her burden to establish that Illick and Krier viewed her as a co-author and intended her to receive equal ownership rights to the play. <u>See Childress v. Taylor</u>, 945 F.2d 500, 508-509 (2nd Cir. 1991); <u>Thomson v. Larson</u>, 147 F.3d 195, 201-202 & n.20 (2d Cir. 1998). The written Agreement and billing for "Venus de Minivan," the play as it was performed in Cambridge, Massachusetts, unequivocally establish that the parties mutually agreed and understood Joy was not a co-author of the play. Those written documents expressly provide that Illick and Krier alone were the writers of the play. Illick and Krier added a poor man's copyright to the script prior to the Cambridge production; Joy did not object in the Agreement that the parties subsequently entered. There is significant additional evidence based on Illick's and Krier's exploitation of the play in New York after 2002 that confirms their understanding that they were the exclusive authors of the play. All of this important and unrebuttable evidence of Illick's and Krier's intent as to authorship should dispose of Joy's copyright claim on summary judgment. <u>See Childress</u>, 945 F.2d at 500 (federal appeals court affirmed summary judgment on copyright claim where there was insufficient evidence from which a jury could infer that principal author had "the state of mind required for joint authorship").

1. **Under Copyright Law, Joy Has Burden To Prove That Illick and Krier Intended That She Would Be A Co-Author And Enjoy Equal Rights To Exploit The Work.**

Joy has brought a declaratory judgment claim against Illick and Krier alleging that she is a co-author of the play pursuant to the Copyright Act, 17 U.S.C. Sec. 101 *et seq.* The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. Sec. 101. "Joint authorship entitles the co-authors to equal undivided interests in the whole work – in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made." Thomson, 147 F.3d at 199 (citing 17 U.S.C. Sec. 201(a)). The burden of proof is on the person claiming co-authorship to establish that "each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." Thomson, 147 F.3d at 200. Joy cannot meet that burden.[4]

2. **Joy Cannot Establish Sufficient Evidence That Illick And Krier Intended That She Would Be Co-Author and Enjoy Equal Right to Exploit The Work And, Therefore, Summary Judgment Is Appropriate.**

In cases involving copyright claims relating to the development of theatrical works, courts have clearly established that whether a play is a "joint work" - - i.e., whether one who contributes to the production of a play is entitled to copyright as a co-author - - depends on the mutual intent of the persons who contributed to the writing of the play. Childress, 945 F.2d at 508. The central test on intent is "how the putative joint authors regarded themselves in relation to the work." Id; see also Thomson, 147

---

[4] While Joy contributed to the play as director and theatre consultant, she cannot establish that she made independently copyrightable contributions to the work. Illick and Krier do not focus especially on this requirement as they firmly believe that Joy's co-authorship claim fails as a matter of law at summary judgment on the second requirement of her co-authorship claim, namely, Joy cannot establish sufficient evidence that Illick and Krier intended she would be a co-author with them. In addition, the issue of whether Joy made independently copyrightable contributions to the play might raise fact questions that would require costly and full-blown discovery and then trial, which for reasons of expense Illick and Krier, as stay-at-home mothers and artists, wish to avoid

F.3d at 201. "[E]ach putative co-author must intend to be a co-author in order to give rise to a co-author relationship." Thomson, 147 F.3d at 202 n.20 (emphasis added). The importance of the mutual intent test is especially significant where, as here, the person seeking rights as a co-author was not the "principal" or "dominant" author of the play. Childress, 945 F.2d at 508. Where the co-author claimant has insufficient evidence of such mutual intent, summary judgment is appropriate. Id.

In the two leading cases concerning co-authorship of a play, Childress v. Taylor and Thomson v. Larson, the Second Circuit discussed the principal factors to be considered in determining the question of intent.[5] The most important, and decisive, factor is whether the parties entered a written agreement on authorship. In Childress, the Second Circuit indicated that "contractual agreements concerning listed authorship" should be dispositive as to whether each participant in the creation of a play intended that all would be identified as co-authors.[6] Cf. 945 F.2d at 508. Given the existence of just such an agreement between the parties in which Joy agreed that Illick and Krier were to be listed as the sole authors of the play, Joy's claim should fail as a matter of law.

Even if the written Agreement was insufficient to determine whether Illick and Krier viewed themselves as the sole authors of the play, which Defendants strongly believe is not the case, there are additional factors by which intent can be determined as a matter of law. Judging the evidence here against these criteria, it is clear that Illick and Krier -- and previously Joy -- viewed Defendants as the sole authors of the play.

For example, an agreement as to billing for the play is *prima facie* proof on the issue of intent. Thomson, 147 F.3d at 203. Here, it is undisputed that the billing for the play during the Cambridge

---

[5] These Second Circuit cases are widely cited by courts and copyright text books nationwide and should be strongly persuasive, if not controlling, precedent here since the First Circuit and this Court have not written on the issue of determining intent in a co-authorship claim involving a theatrical work.

[6] In the absence of such a contractual agreement, the Court went on to discuss useful tests to determine the question of intent and co-authorship. Id

15

performances was prepared with Joy's knowledge, assistance and acquiescence, and the billing publicly stated that the play was written by Illick and Krier, not Joy.

Registration of a copyright also informs the question of intent. See Childress, 945 F.2d at 509. Where the principal author registers the copyright in her own name, it tends to establish that her intent was not to share co-authorship. Id. Here, Illick and Krier established a "poor man's" copyright on the script of "Venus de Minivan" twice before it was performed in Cambridge. Joy received a copy of the script and was on notice of Illick's and Krier's claim of exclusive ownership, yet she did not object or address the copyright issue in the written Agreement that the parties subsequently signed. Illick and Krier also formally registered their copyright with the United States Copyright Office in April 2003, registering the copyright exclusively in their own names.

Control of the script is also a factor that illuminates the issue of intent. The Second Circuit found that "a contributor's decision-making authority over what changes are made and what is included in a work" can be persuasive on the issue of intent. Thomson, 147 F.3d at 202-203.[7] Illick and Krier retained control of the script on their computers. If anyone, including Joy, made a suggestion for a change to the script during a rehearsal, Illick and Krier ultimately decided if it would be incorporated into the final script and made the change in their own discretion. It is undisputed that Joy never had the script on her computer, nor was she ever provided a floppy disk with the script. The lack of the mechanical ability to control the changes

---

[7]  Similarly, in Erickson v. Trinity Theatre, Inc., 13 F.3d 1061 (7th Cir. 1994), a defendant failed in its argument that certain of its actor members were co-authors of plays to which the plaintiff playwright claimed sole copyright ownership. In Erickson, the plays were developed in rehearsals, and the actors were actively involved. The editing of one of the plays "was accomplished largely by consensus;" Erickson admitted that the actors provided ideas for the dialogue in another. Id. at 1064. The Seventh Circuit held that, because the playwright "made the final decisions ... [and] controlled what eventually was put in the script," the actors who contributed suggestions for dialogue were not entitled to a copyright in the work as co-authors. Id.

16

to the script, while not definitive, is additional evidence that the parties did not view Joy as a co-author.

Evidence that the "principal" or "dominant" author of the play treated the play as her own by entering into agreements with third parties as the exclusive author of the play also bears on the question of intent. Thomson, 147 F.3d at 202-203. The Second Circuit noted: "[t]he fact that [Larson, the principal author] felt free to enter into the November 1995 contract on his own, without the consent of and without any reference to Ms. Thomson [the dramaturg] quite apart from whatever the terms of the agreements are, indicates that his intention was to be the sole author." Id. at 203. Similarly, Illick and Krier repeatedly acted as the sole authors of the play in dealings with the public. They registered the copyright for the play and listed themselves as the authors. They entered into a contract with a New York producer to stage their play there and described themselves as the sole authors in that contract. They also entered into the script publication contract and again listed themselves as the sole authors. The published play lists them as the authors.

All of these factors firmly establish that Illick and Krier understood that they were the sole authors of the play, and that they never intended that Joy would be a co-author and enjoy the equal right to control the future exploitation of the play. This makes sense for the additional reason that the play is intensely personal about their own and their husbands' private lives. They do not want, and never would have wanted, anyone else -- including Joy -- to have the right to use or exploit this material without their control and express consent. In light of this overwhelming and undisputed evidence, Joy cannot prevail on her co-authorship claim, and summary judgment should enter in favor of Illick and Krier.

### 3. <u>Childress</u> Establishes That Summary Judgment Should Be Awarded To Illick and Krier.

In <u>Childress</u>, the seminal and lead case on the issue of determining claims to authorship of dramatic plays, the Second Circuit affirmed summary judgment in favor of the principal author on facts less compelling than here. <u>Childress</u> establishes that summary judgment should be awarded to Illick and Krier.

<u>Childress</u> involved a claim of co-authorship by an actress, Clarice Taylor, who conceived the idea of a stage play based on the comedienne "Moms" Mabley; she sought out the plaintiff, Alice Childress, to write it; provided extensive research materials to Childress for the task; spoke with Childress regularly about the play's progress while Childress was at work on it; and suggested details based on her research. <u>Id.</u> at 508.

Notwithstanding Taylor's contributions to the play, the trial court rejected her claim of co-authorship on a motion for summary judgment, which was affirmed by the Second Circuit because the parties understood that Childress was the author as reflected in the agreed-upon billing for the play. <u>Id.</u> at 507-508. In reaching its determination, the Court noted that:

> an inquiry so limited [to the state of mind of the purported co-author] would extend joint author status to many persons who are not likely to have been within the contemplation of Congress. For example, a writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work. Similarly, research assistants may on occasion contribute to an author some protectable expression or merely a sufficiently original selection of factual material as would be entitled to a copyright, yet not be entitled to be regarded as a joint author of the work in which the contributed material appears. What distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors.

18

Id. at 507. Thus, under copyright law, editors who make some contribution to the script are not deemed joint authors, because the author and editor do not intend to be joint authors, even though the editor will frequently make useful revisions, some of which will be original expression. See id.[8]

Joy's contributions to the script, if any, were as a director and theatre consultant and akin to Taylor and the hypothetical editor whom the Childress court stated are without claims to co-authorship. Illick and Krier never intended that by hiring Joy as a paid director/consultant, she would be a co-author. In fact, they emphatically rejected her attempt to claim authorship before the play's performance in November 2002 when they dismissed her request for an "adapted by" credit and stated in the written Agreement that they alone would receive the credit as the writers of the play.

The Second Circuit in Childress affirmed a summary judgment ruling in favor of the principal author on the copyright claim. The evidence in this case in favor of Illick and Krier is even stronger. After all, Illick and Krier signed a written Agreement with Joy that they alone were the sole authors of the play; there was no such unambiguous expression of the parties' intent in Childress. Based on the precedent of Childress, summary judgment should be granted in favor of Illick and Krier on Joy's copyright claim.

## C. Because Plaintiff's Other Claims Derive From Her Wrongful Co-Authorship Claim, They Too Must Fail.

All of Plaintiff's other claims in this suit arise from and necessarily depend upon her meritless claim of co-authorship. For the reasons, set forth above, Plaintiff's co-authorship claim is defective as a matter of law. Accordingly, the Court should enter summary judgment in

---

[8] Similarly, in Thomson, the trial court found that Thomson (the petitioner for co-authorship) had "made at least some non-*de minimis* copyrightable contribution" to the play, but the trial court and Second Circuit found that even a contribution of significant language is not sufficient to confer co-author status on the contributor. Id. at 202. "A specific finding of mutual intent remains necessary." Id.

favor of Illick and Krier on the remainder of Plaintiff's claims.  See Complaint, ¶ 60 (Count II,

seeking an accounting);  ¶ 65-66 (Count III, false advertising);  ¶ 69 (Count IV, breach of oral

contract);  ¶ 74 (Count V, breach of contract implied in fact);  ¶ 79 (Count VI, estoppel).

## CONCLUSION

For these reasons, Defendants Hilary Illick and Jennifer Krier respectfully request that the

Court allow their motion for summary judgment on all of Plaintiff's claims.  In addition, Illick and

Krier request that the Court order Plaintiff to pay their reasonable attorneys' fees to defend against this

meritless and frivolous action, pursuant to 17 U.S.C. Sec. 505 and M.G.L. c.231, Sec. 6F.

Respectfully submitted,

HILARY ILLICK and
JENNIFER KRIER,
By their attorneys,


/s/ Nicholas B. Carter
Nicholas B. Carter, Esq. (BBO# 561147)
Raymond P. Ausrotas (BBO# 640315)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626
ncarter@toddweld.com

Dated: April 10, 2006

### CERTIFICATE OF SERVICE

I, Nicholas B. Carter, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: April 10, 2006                        /s/ Nicholas B. Carter