UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BILLIE JO JOY, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05 11580 NMG |
| ) | |
| HILARY ILLICK and ) | |
| JENNIFER KRIER, ) | |
| ) | |
|     Defendants. ) | |

**AFFIDAVIT OF HILARY ILLICK IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

I, Hilary Illick, depose and state as follows:

1.    I am over the age of 18, and make this Affidavit voluntarily and of sound mind, based upon personal knowledge of the matters described.

2.    I have a bachelor's degree in Philosophy from Stanford University, and I have an MFA (Masters in Fine Arts) in Creative Writing from SFSU. In addition to the plays that are involved in this case, I have published numerous writings, ranging from fictional short stories, to personal parenting essays, to journalistic articles. I am married to Pierre Valette. We have four children and live in Belmont, Massachusetts.

3.    To the best of my knowledge, Billie Jo Joy co-founded a performance studio, Art & Soul, which is located in Cambridge, Massachusetts; as far as I know, Ms. Joy is not a published author.

4.    During the fall of 2001, Jennifer Krier and I -- who are very close friends -- began to write a play together about the challenges and joys of our lives as young wives and mothers, and the sometimes painful transition from our prior full-time careers (mine as a writer and Jennifer's as an anthropologist) to being full-time mothers. During the fall and winter, we wrote the play, which consisted of a chronological series of significant scenes from our lives. We wrote separately and in collaboration.

5.    In the spring of 2002, we decided that we wanted to stage our play, which at that time we called "Mamalogues." We approached Ms. Joy, and asked her if she could help us choreograph certain scenes in our play (which originally had dance sequences in it). Ms. Joy informed us that in addition to being a dancer, she taught improvisational acting workshops, and had recently started directing. We discussed with Ms. Joy the possibility of her directing our play.

6.    At a meeting about a week after we met, Ms. Joy agreed to work with us helping with directing and choreography, provided that we agreed to pay her a wage of $60 per hour for her work, and a rental fee of $7 per hour for the Art & Soul studio space. This was Ms. Joy's standard fee. By contrast, Jennifer and I worked without pay during the entire period that we wrote and staged the play.

7.    Jennifer and I met with Ms. Joy 1-2 times per week for approximately 2 hours each session, during a two month period from April through early June. Ms. Joy assisted us as a director, acting coach and with staging the play. As a director, Ms. Joy also offered editorial comments relating to the script, which mostly concerned striking extraneous language from the script, and the staging and sequencing of scenes.

8.    Jennifer and I were the writers of the play and at all times controlled the script. We wrote and maintained the play on our computers at home. While Ms. Joy offered editorial feedback on the script, we ultimately decided whether to incorporate any of Ms. Joy's editorial suggestions into the script, and made any such changes on our computer copy of the script. Ms. Joy never asked for and was never provided with a disk with a copy of the script. (In other words, to the best of my knowledge she never had a copy of the script on her computer.) All final decisions to the script were made in collaboration by Jennifer and myself, who for the entire duration of the project viewed ourselves as 50-50 partners: co-writers and co-owners of the script.

9.    In early June, 2002, we performed a staged reading of the play at Art & Soul. Jennifer and I read the script to the audience of family and friends and we incorporated the staging we had developed with Ms. Joy.

10.    During the summer, Jennifer and I saw each other frequently, often daily, to brainstorm and discuss the script and the future of the play. During the entire summer, we saw Ms. Joy only once, for a breakfast meeting at her house. At that meeting, we discussed and agreed upon dates to perform our play at Art & Soul in November and December of 2002. Ms. Joy requested a percentage of any future profits of the play, but we told her that we would not pay her a percentage as long as we were paying her an hourly fee. At the end of the summer, in August of 2002, we mailed a copy of the script to ourselves to establish a "poor man's copyright" over the work establishing ourselves as authors.

11.     In September, Jennifer and I began to meet again with Ms. Joy for the purpose of preparing to perform the play at Art & Soul later in November and December. During September, we met approximately two times per week for two hours each time. In total, we met with Ms. Joy approximately eight times in September, at which time we re-titled the play, "Venus de Minivan, Mothers in the Breakdown Lane."

12.     Ms. Joy then left the country for approximately six weeks. She was in France from the beginning of October until November 12 -- only 10 days before the first performance of the play. During this critical period leading up to the performance of the play, Jennifer and I made further revisions to the script. There was little, if any, input on any aspect of the play from Ms. Joy during this entire nearly two-month period as we had minimal contact with her overseas.

13.     Once we finalized the script in approximately October 2002, Jennifer and I added another "poor man's" copyright to the tangible copies of the work and mailed it to ourselves, again, as notice to the rest of the world that we were the sole owners and writers of the work. Upon her return, Ms. Joy received a copy of the play which included a notice of our copyright on its cover page with the symbol "©." Ms. Joy did not object or insist that the copyright include her as an author at that time. (We later formally registered this play in April of 2003 with the Copyright Office, a true copy of which is attached to this Affidavit as Exhibit A.)

14.     However, before meeting with us for final rehearsals of the play and other preparations for the first performance on November 22 (which Jennifer and I had managed to mostly sell out, along with the other performances, in Ms. Joy's absence), Ms. Joy insisted on discussing and drafting a legal agreement that described each of our respective roles in connection with the play and the payment terms for Ms. Joy's continued work on the play through the performances in November and December. After multiple meetings and discussions, we reached a written agreement, a copy of which is attached hereto as Exhibit B (the "Agreement").

15.     The Agreement states that Jennifer and I were the sole writers of the play. The agreed-upon credits for the play were:

> "**Written by Hilary Illick and Jennifer Krier**, developed with and directed by Billie Jo Joy." (emphasis added)

Due to the above background, and the circumstances surrounding the creation of the play, I would never have agreed to credit this play as being "written by" or authored by Ms. Joy—and, notably, I do not believe Ms. Joy would have even requested such inaccurate attribution at the time. Indeed, before signing the agreement, the most credit Ms. Joy requested was when she had asked that the credits say that the work was "adapted for stage by" Ms. Joy. Jennifer and I rejected this proposal because our work was always written for and intended to be performed on stage, and because we actually wrote the play. Ms. Joy did not "adapt" it. Ms. Joy acquiesced in the credit as appears in her signed agreement.

3

16.    At this time Ms. Joy did not ask for any terms concerning the copyright to be included in the Agreement, or request that the copyright be discussed in the future. Ms. Joy insisted that she continue to be paid $60 per hour for her continued work as a director. This hourly payment was in addition to the rent paid by Jennifer and Hilary for use of Art & Soul as a performance location.

17.    After the agreement was signed, Ms. Joy requested additional money to be paid for work on sound and lighting, which we paid. We paid all of Ms. Joy's requests for payment for her services during the time she worked with us. Jennifer and I discussed with Ms. Joy, but did not reach an agreement, as to whether Ms. Joy should receive future royalties, if any, from the play. We did not believe Ms. Joy was entitled to any royalties since she was a paid consultant and had not written or invested financially in the production of the play. If Ms. Joy was willing to give up the payments she had received from me and Jennifer, we were willing to consider giving her a small percentage of royalties (12.5 %), but since Ms. Joy insisted upon full hourly pay we never reached agreement on this point.

18.    The promotional materials for the performance of the play in November and December were prepared with Ms. Joy's participation, and those materials advertised that the play was: "Written by Hilary Illick and Jennifer Krier, Developed with and Directed by Billie Jo Joy." A true and accurate copy of a sample promotional postcard and bulletin is attached hereto at <u>Exhibit C</u>.

19.    "Venus de Minivan" was performed seven times in November and December, 2002. Jennifer and I invested thousands of dollars to produce and perform the play at Art & Soul. (Copies of cancelled checks we paid to Ms. Joy for her services and space rental, and an invoice, are attached as <u>Exhibit D</u>.) Our ticket sales were insufficient to cover our costs. Thus, while Ms. Joy was paid at all times for her time and profited financially from the play, Jennifer and I were not paid for any of our time and lost significant money as a result of the play.

20.    Ms. Joy had no involvement with the play after the final performance at Art & Soul in Cambridge, except again to request a share of any future royalties since she knew that we intended to try to publish the play. Ms. Joy did not actively seek to participate in promoting the work in other venues.

21.    Jennifer and I continued actively to work on the play: we hired an agent, and through my contacts in New York, found producers who were interested in staging the play there. We continued to re-write the play, and raised more than $100,000 from family and friends to stage the play in New York. Jennifer and I entered into a separate contract with a New York producer granting the producer the exclusive right to produce the play for a period of eighteen months, which listed only us as authors, a true copy of which is attached as <u>Exhibit E</u>. We titled the re-written version of the play, "Eve-olution," and it was performed at the Cherry Lane Theatre by professional actresses in October 2004. Jennifer and I were unpaid for our time re-writing and promoting the play in New York.

22.    The play was not successful financially in New York. We lost the money we invested in the New York production. The producers lost money, as did all of our family and friends who invested. Both Jennifer's mother and my mother, for example, invested $10,000 each, and (like every other investor) lost that money.

23.    We succeeded in publishing "Eve-olution" through the Dramatists' Play Service, Inc., a publishing company that specializes in theatrical works. A copy of that publishing contract is attached as Exhibit F. We have received a total of approximately $3300 each in royalties from its publication. Those modest royalties consisted largely of agreed-upon advance payments, and it appears that the play may not yield any additional royalties to us. At this stage, we have suffered substantial net losses in terms of our financial return on the play since we began work on it in 2001.

24.    Ms. Joy never asked to invest or to cover any of the losses for the New York production.

25.    We gave Ms. Joy the credit she requested we give her on published copies of the script -- as per our Agreement -- in writing on page 4, which is the industry standard for such attribution. There, we specified that "EVE-OLUTION was originally performed by the authors as *Venus de Minivan*, developed with and directed by Billie Jo Joy at Art & Soul in Cambridge, MA, in 2002."

Signed under the pains and penalties of perjury this __10th__ day of April, 2006.

Hilary Illick
165 Common Street
Belmont, MA  02478

/s/ Hilary Illick

5

# Exhibit A

FEE CHANGES
Fees are effective through June 30, 2002. After that date, check the Copyright Office Website at www.loc.gov/copyright or call (202) 707-3000 for current fee information.

133112856

**FORM PA**
For a Work of the Performing Arts
UNITED STATES COPYRIGHT OFFICE
R

PAu 2 – 761 – 790

EFFECTIVE DATE OF REGISTRATION

| Month | Day | Year |
|---|---|---|
| 4 | 11 | 03 |

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**
TITLE OF THIS WORK ▼
Venus de Minivan: Mothers in Overdrive

PREVIOUS OR ALTERNATIVE TITLES ▼
Venus de Minivan: Mothers in the Breakdown Lane

NATURE OF THIS WORK ▼ See instructions

Drama

---

**2**
**a** NAME OF AUTHOR ▼
Jennifer Krier

DATES OF BIRTH AND DEATH
Year Born ▼ 11-7-1963    Year Died ▼

Was this contribution to the work a "work made for hire"?
[ ] Yes
[X] No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?  [ ] Yes [X] No
Pseudonymous? [ ] Yes [X] No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Coauthor of words, scenes, characters* story, and dramatization

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b** NAME OF AUTHOR ▼
Hilary Illick

DATES OF BIRTH AND DEATH
Year Born ▼ 9-15-1964    Year Died ▼

Was this contribution to the work a "work made for hire"?
[ ] Yes
[X] No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶ USA
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?  [ ] Yes [X] No
Pseudonymous? [ ] Yes [X] No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Coauthor of words, scenes, characters*, story, and dramatization

**c** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
[ ] Yes
[ ] No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?  [ ] Yes [ ] No
Pseudonymous? [ ] Yes [ ] No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

**3**
**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
2003

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK Complete this information ONLY if this work has been published.
Month ▶    Day ▶    Year ▶    ◀ Nation

---

**4**
COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
Jennifer Krier, 20 Stone Rd, Belmont, MA 02478
Hilary Illick, 165 Common St, Belmont, MA 02478

See instructions before completing this space.

APPLICATION RECEIVED
APR 11 2003
ONE DEPOSIT RECEIVED
APR 11 2003
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

---

MORE ON BACK ▶
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.    • Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of 2 pages

*Character(s) as such not registrable;
registration based on deposited
authorship describing, depicting, or
embodying the character(s).Compendium II
of C.O. Practices 202.02(1).

| EXAMINED BY | | FORM PA |
| CHECKED BY | | |
| CORRESPONDENCE ☐ Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box.) ▼ If your answer is "no," go to space 7.
a. ☐ This is the first published edition of a work previously registered in unpublished form.
b. ☐ This is the first application submitted by this author as copyright claimant.
c. ☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: **Previous Registration Number** ▼          **Year of Registration** ▼

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation.
**Preexisting Material** Identify any preexisting work or works that this work is based on or incorporates. ▼

**Material Added to This Work** Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
**Name** ▼          **Account Number** ▼

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent.   Name/Address/Apt/City/State/ZIP ▼

Jennifer Krier/20 Stone Rd/Belmont/MA /02478

Area code and daytime telephone number ▶ (617) 484-8552      Fax number ▶ (     )
Email ▶ jenkrier@earthlink.net

**CERTIFICATION*** I, the undersigned, hereby certify that I am the
Check only one ▶ ☒ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**Typed or printed name and date** ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date.
Jennifer Krier /. Hilary Illick          Date ▶ 3/25/03

Handwritten signature (X) ▼
Jennifer M. Krier          Hilary S Illy

Certificate will be mailed in window envelope to this address:

**Name** ▼ Jennifer Krier
**Number/Street/Apt** ▼ 20 Stone Road
**City/State/ZIP** ▼ Belmont, MA    02478

**YOU MUST:**
• Complete all necessary spaces
• Sign your application in space 8

**SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:**
1. Application form
2. Nonrefundable filing fee in check or money order payable to Register of Copyrights
3. Deposit material

**MAIL TO:**
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

*fee effective July 1, 1999, the filing fee for Form PA is $30

*17 U.S.C. § 505(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.
August 2000—200,000    ♻ PRINTED ON RECYCLED PAPER    ☆U.S. GOVERNMENT PRINTING OFFICE: 2000-461-113/20,002
WEB REV: June 1999

# Exhibit B

Agreement between Artists Jennifer Krier, Billie Jo Joy, and Hilary Illick
For production of *Venus De MiniVan*
November/December 2002
Art and Soul, Cambridge, MA

- We three women, Billie Jo Joy, Jennifer Krier, and Hilary Illick all want to create the space where we're all three empowered.

- On published versions of the script *Venus de Mini Van*, *Mothers in the Breakdown Lane* the credits will read: Written by Hilary Illick and Jennifer Krier, Original Production developed with and directed by Billie Jo Joy.

- Through December 2002 Jennifer Krier and Hilary Illick are hiring Billie Jo Joy at the rate of $60/hour to direct the play *Venus de Minivan*, guide Krier and Illick in authentic movement, stage the scenes, lead voice work, and teach acting. During her paid hours, Billie Jo Joy offered script input. Hilary Illick and Jennifer Krier agree to pay for 32 hours between November 13th and December 14th. If the need arises for additional hours, they will need to be negotiated between Jennifer Krier, Hilary Illick and Billie Jo Joy.

- Proceeds from the five scheduled performances will go to Hilary Illick and Jennifer Krier (Venus De Mini Van Collaborative for Creative Expression) to offset production expenses.

- Jennifer and Hilary intend to send the script to an agent in New York to have it published. Jennifer Krier, Hilary Illick and Billie Jo Joy agree to meet in the month of January to create a contract to determine the percentage profits from the published script. It is the intention of Hilary Illick, Jennifer Krier, and Billie Jo Joy to recognize, in terms of percentages, the valuable creative contributions that have brought this work into being. As of November 14, 2002 we are discussing a percentage range of 12.5% - 25% of profits for Billie Jo Joy for her work as director and assistance with Hilary and Jennifer in developing the script—the former figure proposed by Hilary Illick and Jennifer Krier, and the latter proposed by Billie Jo Joy. We need to seek advice on such a contract and understand the terms and definitions of net and gross profit for this endeavor. We will continue this conversation and reach agreement in the month of January 2003.

- If the play goes into further production Hilary, Jennifer, and Billie Jo will need to come up with another letter of agreement for such a project.

Billie Jo Joy

Hilary Illick

Jennifer Krier

# Exhibit C



VENUS de Mini Van

--- Mothers in the Breakdown Lane ---



**Performances:** Nov. 22, 23; Dec. 7, 13, 14
**Time:** 8:00pm
**Ticket Price:** $12
**Venue:** Art & Soul, 91 Hampshire St.,
Cambridge, MA
**Reservations:** Call 617-661-7376, box 2



Art and Soul is the orange/yellow
triangular building located on the
corner of Hampshire and Windsor
Streets. It's across from the B-Side
Lounge and within walking
distance of Inman, Central and
Kendall Squares.

Venus de Mini Van is an inspirational play, a love
poem and a confession about being a woman, a
mother, a wife and a human being, right here,
right now. The play is written by Hilary Illick and
Jennifer Krier and is directed by Billie Jo Joy.



Around Soul presents

VENUS de Mini Van

November 22 & 23, 2002
December 7, 12, 13 & 14, 2002

Mothers in the Breakdown Lane

Written and performed by
Hilary Illick &
Jennifer Krier

Developed with
...
Directed by
Billie Jo Joy



# VENUS
# de Mini Van

— — — Mothers in the Breakdown Lane — — — —

## ACT I

### MOTHERING ON THIS SIDE

## ACT II

### INNER VENUS

SCENE 1    INNER VENUS
SCENE 2    PAXIL & SESAME OIL
SCENE 3    AND ALONG COMES THE PLUMBER
SCENE 4    STORMING UP TO THE THIRD FLOOR
SCENE 5    ETERNAL ONION

## ACT III

### 911

This play is dedicated to Rob and Pierre.

We would like to thank all of our family, friends & everyone who has helped us make this play possible.

---

JENNIFER KRIER has a Ph.D. in anthropology from Harvard University, is a published scholar, and is currently writing a memoir about her field research in Indonesia. She currently lives in Belmont with her husband and three children, ages 8, 5 and 2. Jennifer can be contacted at jenkrier@earthlink.net

HILARY ILLICK graduated from Stanford University, has her MFA in Creative Writing, and has published a collection of short stories as well as numerous articles and essays. She currently lives in Belmont with her husband and four children, ages 10, 8, 4 and 4. Hilary can be contacted at hsillick@aol.com.

---

BILLIE JO JOY has been performing and directing in the Boston area since 1989 notably as a dancer in Paula Josalones Performance Works and for her solo performance Small/White Woman Impersonating Martin Luther King, Jr. Recent directing credits include the highly acclaimed production of The Vagina Monologues at Harvard (2000), Homeward Bound (2002), and Venus de Mini Van (2002). She is a current recipient of a V-Day artist grant and graduate of Harvard University. Her daughter, Claire, is 20 years old and will graduate from college next May. Billie Jo can be contacted at joy@yoga.com.

We would like to continue sharing our work. If you would like to help make this possible, Venus de Mini Van is accepting contributions in the basket near the door.

---

| | |
|---|---|
| Executive Producers | Hilary Illick & Jennifer Krier |
| Producers | Hilary Illick, Billie Jo Joy, & Jennifer Krier |
| Production Assistant | Kat Mitchell |
| Graphic Designers | Rachel Strutt & Anna M Alfredson |
| | Patrick Downie |
| Sound Design | Billie Jo Joy |
| Sound Supervisor | Billie Jo Joy, Hilary Illick & Jennifer Krier |
| Costumes | Designed by Liza Hunscher |
| Pregnancy Costume | Conceived by Billie Jo Joy |
| Lighting Design & Technician | Billie Jo Joy |

Music: Unstrung Heroes Soundtrack, tracks 9, 13,17, composed by Thomas Newman. Song to Mother You by Sinead O'Connor on Mantra Mix.

# Exhibit D

*Sheet given*
*from Joy to Illick; Kner*
*December 2002*

## Venus de Mini Van

## Record of Billie's Hours and Art and Soul rent

### Directing hours ($ 60/hr)

| date | projected | actual | amount | A & S rent |
|------|-----------|--------|--------|-----------|
| Thursday, Nov. 14 | 4.0 | 3.0* | 180.00 | 4.0 hours |
| Friday, Nov. 15 | 3.0 | 3.0 | 180.00 | 3.0 |
| Sat. Nov. 16 | 2.5 | 2.5 | 150.00 | 2.5 |
| | | **8.5 hours** | **$ 510.00 pd. 11/16** | pd. by Hti |
| Sun. Nov. 17 | 1.0 (half rate) | .5 | 30.00 | 1.0 |
| Mon. Nov. 18 | 2.5 | 2.5 | 150.00 | 2.5 |
| Tues. Nov. 19 | 3.5 | 3.5 | 210.00 | 3.5 |
| Wed. Nov. 20 | 2.5 | 2.5 | 150.00 | 2.5 |
| Wed. Nov. 20 | 2.0 | 2.5 | 150.00 | 2.5 |
| Thurs. Nov. 21 | 4.5 | 4.0 | 240.00 | 4.5 |
| Friday. Nov. 22 | 2.5 | 2.5 | 150.00 | 2.5 |
| | | **18 hours** | **$ 1080.00 pd. 12/2** | 28.5 x 7 = $199.50 |
| Nov. 22 show | | | 369.50 | 5 x $15 +10= $85 |
| Nov. 23 show | | | | 5 x $15 +10= $85 |
| | | | *Paid by HSI* | **Total Nov. rent $369.50 pd. 12/2** |

| Mon. Dec. 2 | 1.5 | 1.5 | Meeting N/C | |
| Thurs. Dec. 5 | 3.5 | 3,5 | 210.00 | 3.5 hours |
| Tuesday, Dec. 10 | 1.0 | 1.0 | 60.00 | 1.0 |
| Wed. Dec. 11 | 2.0 | 2.0 | 120.00 | 2.0 |
| | | **6.5** | **$390.00 pd. 12/11** | 6 x 7=$42 (time in France) |
| | | | | |
| | | | | |

### Lighting tech and production hours ($ 30/hr)          RENT

*Cash categories*

| | | | | |
|------|-----------|--------|--------|-----------|
| Nov. 22 (L)(P) | 2.5 → 75 | 5.0 | 150.00 | 5.0 |
| Nov. 23 (L) (P) | 2.5 | 5.0 | 150.00 | 5.0 |
| Nov. 25 (P) ? | 2.5 | 2.5 | 75.00 | |
| Nov. 26 (P) ? | 1.0 | 1.0 | 30.00 | |
| Nov. 30 (P) ? | .5 | .5 | 15.00 | |
| Dec. 1 (P) ? | 1.5 | 1.5 | 45.00 | |
| Dec. 2 (P) ? | 1.5 | 1.5 | 45.00 | |
| Dec. 3 (P) ? | 1.5 | 1.5 | 45.00 | |
| Dec. 4 (P) ? | 1.5 | 1.5 | 45.00 | |
| Dec. 6 (P) ? | 2.0 | 2.0 | 60.00 | |
| Dec. 7 (L) (P) | 5.0 | 5.0 | 150.00 | |
| Dec. 8 (L) (P) | 5.0 | 5.0 | 150.00 | |
| Dec. 9 (P) | 2.0 | 2.0 | 60.00 | |
| Dec. 10 (P) | 2.5 | 2.5 | 75.00 | 2.5 |
| | | **36.50 hours** | **$1095.00 pd.** | |

*House manage 4 x 150,—*

*House lights 7 x 75.—*

*Misc. prod. hrs*

*see BJ's notes*

*this part of Check# 3887 JMK*

| | | | | |
|---|---|---|---|---|
| | | | | |
| Dec. 12 (L) (P) | 2.5 | 5.0 | | 5 |
| Dec. 13 (L) (P) | 2.5 | 5.0 | | |
| Dec. 14 (L) (P) | 2.5 | 5.0 | | |
| | | | | |
| | | | | |

**Expenses**
(note to self: $20 borrowed during rehearsal) pd. 12/2
Programs $ 13.10 pd. 12/2
Programs $ 10.95 pd. 12/2
Electrical equipment.
　　　Spotlight Bulbs $25
　　　Dimmer switch $25.84 (Jennifer paid for this – even exchange for other light
　　　expenses above)

Anna Alfredson – programs $80.00 pd. 12/2

Faxes $14.00
Water and cups $18
Programs $61.11

Total of payments on 12/11/02
Expenses= $ 93.11
Directing= $ 390.00
Production/lighting/tech=$1095
**Total amount of check on 12/11= $1578.11**

ROBERT COSINUKE
JENNIFER KRIER
20 STONE RD.
BELMONT. MA  02478-3521

5-13/110
0071231697

№ 3622

Date 4/24/02

Pay to the order of  Billie Jo Joy     $ 165.—

One hundred sixty five + no/100s

Fleet

www.fleet.com
Porter Square Office
Cambridge, Massachusetts 02140

B263B

Memo _____     Jennifer M. Krier

⑈011000138⑈ 00712 31697⑈ 3622    ⑈0000016500⑈

FLEET

2990 012  3 08 05012902

3600866048

0000100310
0904

CAMBRIDGE SAVINGS BANK
CAMBRIDGE, MA. 02138
)211371120(

04/30/02

567756398

567756398

'000000000'

FLEET

3110 012 RJ C2 05092002

3000771308

LOW SPEED
0072191729 3110
05/09/2002

CAMBRIDGE SAVINGS BANK
CAMBRIDGE, MA  02138
>211371120<

0072191729 POSITION 08 3 3

---

**ROBERT COSINUKE**
**JENNIFER KRIER**
20 STONE RD.
BELMONT, MA  02478-3521

5-13/110
0071231697

№  **3499**

Date 4/30/02

Pay to the order of  Billie & Joey                    $ 90 —

Ninety and no/100's                                        DOLLARS

Fleet
www.fleet.com
82638  Porter Square Office
Cambridge, Massachusetts 02140

Jennifer M. Krier

⑈011000138⑈ 00712 31697⑈ 3499 ⑈000000 9000⑈

⑈011000138⑈    0071231697⑈3499 ⑈0000009000⑈



```
CPILOT                    MAIL           C
                       ATTENTION
                       CHARGE         C2
RETAIL BRANCH WORK POINT                      REELAY ID    05907-13MAR03
                       ACCOUNT        71231697
30771304   09-MAY-02  TYPE  01
ENCLOSED IS THE PHOTOCOPY OF THE DOCUMENT THAT YOU RECENTLY REQUESTED.
SHOULD YOU REQUIRE FURTHER ASSISTANCE, PLEASE CONTACT FLEET TELEPHONE
BANKING. THANK YOU FOR BANKING WITH FLEET.
                                  TRACE ID    1425613MAR03
       Robert Cosinuke
       Jennifer Krier
       20 Stone Rd
       Belmont Ma 02478-3521
```



```
CPILOT                    MAIL          C
                     ATTENTION
                     CHARGE          C2
RETAIL BRANCH WORK POINT                REELAY ID    05918~13MAR03
                     ACCOUNT          71231697
36617448   24-MAY-02   TYPE   01
ENCLOSED IS THE PHOTOCOPY OF THE DOCUMENT THAT YOU RECENTLY REQUESTED.
SHOULD YOU REQUIRE FURTHER ASSISTANCE, PLEASE CONTACT FLEET TELEPHONE
BANKING. THANK YOU FOR BANKING WITH FLEET.
                              TRACE ID    1430913MAR03

     Robert Cosinuke
     Jennifer Krier
     20 Stone Rd
     Belmont Ma 02478-3521
```



RESEARCH DEPT.

```
CPILOT                        MAIL          C
                    ATTENTION
                    CHARGE        C2
RETAIL BRANCH WORK POINT                    REELAY ID     05992-13MAR03
                    ACCOUNT       71231697
34173715    11-JUN-02   TYPE   01
ENCLOSED IS THE PHOTOCOPY OF THE DOCUMENT THAT YOU RECENTLY REQUESTED.
SHOULD YOU REQUIRE FURTHER ASSISTANCE, PLEASE CONTACT FLEET TELEPHONE
BANKING. THANK YOU FOR BANKING WITH FLEET.
                               TRACE ID   1453513MAR03

    Robert Cosinuke
    Jennifer Krier
    20 Stone Rd
    Belmont Ma 02478-3521
```



```
CPILOT                        MAIL         C
                        ATTENTION
                        CHARGE        C2
RETAIL BRANCH WORK POINT              REELAY ID    05940-13MAR03
                  ACCOUNT       71231697
36848562   20-JUN-02  TYPE  01
ENCLOSED IS THE PHOTOCOPY OF THE DOCUMENT THAT YOU RECENTLY REQUESTED.
SHOULD YOU REQUIRE FURTHER ASSISTANCE, PLEASE CONTACT FLEET TELEPHONE
BANKING. THANK YOU FOR BANKING WITH FLEET.
                        TRACE ID    1436113MAR03

     Robert Cosinuke
     Jennifer Krier
     20 Stone Rd
     Belmont Ma 02478-3521
```



```
CPILOT                    MAIL         C
                      ATTENTION
                      CHARGE        C2
RETAIL BRANCH WORK POINT                    REELAY ID    06020-13MAR03
                      ACCOUNT      71231697
34166511   17-SEP-02  TYPE   01
ENCLOSED IS THE PHOTOCOPY OF THE DOCUMENT THAT YOU RECENTLY REQUESTED.
SHOULD YOU REQUIRE FURTHER ASSISTANCE, PLEASE CONTACT FLEET TELEPHONE
BANKING. THANK YOU FOR BANKING WITH FLEET.
                              TRACE ID    1464313MAR03

     Robert Cosinuke
     Jennifer Krier
     20 Stone Rd
     Belmont Ma 02478-3521
```



```
CPILOT                    MAIL            C
                    ATTENTION
                    CHARGE         C2
RETAIL BRANCH WORK POINT                  REELAY ID    06035-13MAR03
                    ACCOUNT     71231697
36555458   25-SEP-02  TYPE  01
ENCLOSED IS THE PHOTOCOPY OF THE DOCUMENT THAT YOU RECENTLY REQUESTED.
SHOULD YOU REQUIRE FURTHER ASSISTANCE, PLEASE CONTACT FLEET TELEPHONE
BANKING. THANK YOU FOR BANKING WITH FLEET.
                              TRACE  ID   1470313MAR03

     Robert Cosinuke
     Jennifer Krier
     20 Stone Rd
     Belmont Ma 02478-3521
```



```
CPILOT                    MAIL          C
                    ATTENTION
                    CHARGE        C2
RETAIL BRANCH WORK POINT                 REELAY ID   00832-14MAR03
                    ACCOUNT      71231697
32594719   03-OCT-02  TYPE   01
ENCLOSED IS THE PHOTOCOPY OF THE DOCUMENT THAT YOU RECENTLY REQUESTED.
SHOULD YOU REQUIRE FURTHER ASSISTANCE, PLEASE CONTACT FLEET TELEPHONE
BANKING. THANK YOU FOR BANKING WITH FLEET.
                              TRACE ID   1803-14MAR03

     Robert Cosinuke
     Jennifer Krier
     20 Stone Rd
     Belmont Ma 02478-3521
```





CASE: 200303120560  DATE: 20020501  CARTRIDGE: 0004  SEQUENCE: 000016061227
COPIES:   1  AMOUNT:           $165.00  RESEARCHER: MCDOUGAL,R





CASE: 200303120567  DATE: 20020517  CARTRIDGE: 0012  SEQUENCE: 000020665189
COPIES:    1  AMOUNT:          $268.00  RESEARCHER: MCDOUGAL,R

REDACTED

REDACTED



REF. NO.: 1003003202594720    AMOUNT: $390.00

REDACTED

REDACTED

HILARY S. ILUCK
143 COMMON ST.
BELMONT, MA 02478

1016

DATE Dec 7, 2002

PAY TO THE
ORDER OF   Billie du Joy                                    $1,493.55

one thousand four hundred ninety-
                                              nine, fifty-five                    DOLLARS

Sovereign Bank

REDACTED

REDACTED

REDACTED

HILARY S. ILLICK
145 COMMON ST.
BELMONT, MA 02478
1025

Dec. 14, 2002

PAY TO THE ORDER OF Billie Jo Joy                    $ 130

One hundred thirty                                   DOLLARS

Sovereign Bank
sovereignbank.com

Hilary S

⑈⑆11025150⑆ 9850066 2459⑈ 1025 ⑈00

HILARY S. ILLICK
145 COMMON ST.
BELMONT, MA 02478
1050

Nov 16 2002

PAY TO THE ORDER OF Billie Jo Joy                    $ 510

Five hundred ten                                     DOLLARS

Sovereign Bank
sovereignbank.com

Hilary Seldon Ill

⑈⑆11075150⑆ 9850066 2459⑈ 1050 ⑈000005 1000⑈

REDACTED          REDACTED



HILARY S. ILLICK
145 COMMON ST.
BELMONT, MA 02478
1056

Dec 12 2002

PAY TO THE ORDER OF Billie Jo Joy                    $ 589

Five hundred eighty nine                             DOLLARS

Sovereign Bank
sovereignbank.com

Hilary S Ill

⑈⑆11075150⑆ 9850066 2459⑈ 1056 ⑈00000 58900⑈

REDACTED

# Exhibit E

# THEATRICAL PRODUCTION AGREEMENT

Agreement dated as of ~~January~~ *April* 23, 2003, by and between Natachi Productions, Inc., a New York corporation with an address at Suite 1F, 680 West End Ave., New York, New York 10025 ("Producer"), on the one hand and Hilary Illick and Jennifer Krier (together, the "Author"), each with an address c/o Rosenstone/Wender 38 East 29th Street, New York, New York 10016, Attention: Mr. Ron Gwiazda, in connection with the dramatic stage play by Author, currently entitled "Venus de Mini Van" (the "Play").

In consideration of the premises, the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  <u>Representations</u>. Author hereby represents, warrants, and agrees, that:

1.1.    The Author is the sole author and sole owner and proprietor of the Play and all rights therein and thereto, and the Play (except to the extent that it contains material which is in the public domain) is wholly original with the Author and has not been copied in whole or in part from any other work; the Play is and will continue for the maximum periods permitted by law to be protected by copyright in the United States of America, the European Union, the Dominion of Canada, and anywhere in the world where copyright protection is available for the Play; the Play does not, and the uses of the Play as herein contemplated will not, violate, conflict with or infringe upon any rights whatsoever of any person, firm or corporation, including without limitation any claim of Billy Jo Joy. The parties acknowledge that the Play is autobiographical and contains depictions of the lives of third parties. Author agrees to obtain depiction releases in the form annexed hereto as Exhibit A from such third parties reasonably designated by Producer (including without limitation, from Pierre Vallet and Robert Krier). To the best of Author's knowledge, after due consideration, there have been no claims or litigations with respect to the Play, each component of the Play or the title of the Play, and Author has not and Author will not do anything which will impair the title of the Play or interfere with Producer's rights herein granted to use the title of the Play.

1.2.    Author has not granted, assigned, encumbered or otherwise disposed of any right, title or interest in or to the Play except as set forth in this Agreement; there is not any outstanding right, title, interest, claim, contract or commitment in or in connection with the Play similar or adverse to or inconsistent with the rights granted to Producer or by which any of such rights may be invalidated, impaired, diminished or affected; and Author will make no agreement which will impair, invalidate, diminish or interfere with in any way the rights granted to Producer hereunder.

1.3.    Author has the sole and exclusive right to enter into this Agreement and the full warrant and authority to grant the rights granted hereby.

1.4.    The Author will indemnify, defend and hold harmless the Producer, its affiliates, permitted assigns and any officer, director, employee, member, manager or partner, from and against any and all claims, liability, losses, costs, expense (including reasonable outside attorneys' fees), damages or recoveries (including payments made in settlement but only if the Author consents thereto in writing) which may be made against or suffered or incurred by Producer, caused by or arising out of any breach or non-performance of the representations, warranties or undertakings herein made.

1.5.    Producer will indemnify, defend and hold harmless Author, its representatives, successors and permitted assigns, from and against any and all third-party claims, liability, losses, costs, expenses (including reasonable outside attorneys' fees, but only if Producer elects not to designate counsel to defend the claim) damages or recoveries which may be made against or suffered or incurred by Author by reason of any claim arising in connection with Producer's exploitation of the rights granted by Author hereunder (provided, however, that Author shall not settle any such claim without Producer's prior written consent), except any claim based on allegations which, if proved, would be covered by Author's indemnity above.

2.    <u>Grant of Rights</u>.    Author hereby grants to the Producer, and its successors, representatives, licensees and assigns, subject to the terms and conditions hereof, the exclusive right to produce and present the Play on the professional living stage as set forth in this Agreement, in First Class and non-First Class productions (each a "Commercial Production") throughout the United States, Canada and the British Isles (the "Territory"), including in New York, New York as an Off-Broadway production (which may be pursuant to an Equity Mini-Contract), in the Foreign Territories as discussed hereinbelow, and as one or more developmental productions, in Producer's discretion. As used herein, "produce" and "present" and their derivatives are used interchangeably.

3.    <u>Production Date</u>.    Although nothing herein contained shall be construed to obligate the Producer to produce the Play, the rights granted to the Producer hereunder will terminate unless the Producer produces and presents the Play on the professional living stage in a commercial production as set forth in Paragraph 2 above in a First Class or non-First Class production before a paying audience (a "Commercial Production") on or before the "Production Date", which shall be a date not later than eighteen (18) months after the date of full execution hereof, extendable for an additional one (1) year. Notwithstanding anything to the contrary contained herein, the Production Date shall be extended for a period equal to the duration of rehearsals and performances, plus thirty (30) days, in connection with each developmental production hereunder and for a period equal to the duration of rehearsals for the first Commercial Production of the Play.

4.    <u>Advances</u>.    In consideration for the rights granted to Producer herein, Producer agrees to pay to Author a non-returnable fee of one thousand ($1,000) dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. Should Producer in its sole discretion extend the Production Date for an additional period of one (1) year, Producer agrees to pay to the Author an additional non-

returnable advance recoupable against all royalties, sums and proceeds pursuant to Paragraph 5 of one thousand ($1,000) dollars, payable on or before the date on which the initial option period of eighteen (18) months (as such may be extended as permitted herein) expires.

5.    **Royalties, Remittance of Payments.** Subject to the terms of Paragraph 4 hereof and in full consideration for all rights and privileges granted to Producer and for the representations, warranties and obligations of Producer, and if Author is not in default of any of the material terms and conditions contained herein, Producer shall pay or cause to be paid to Author, and Author agrees to accept, the following amounts:

5.1.    For each week of paid public performances of the Play hereunder (except as otherwise specified elsewhere in this Agreement) the Producer shall pay to Author a royalty of six (6%) percent, escalating to seven (7%) percent upon 125% of recoupment, escalating further to eight (8%) percent upon 200% recoupment of production costs, of the gross weekly box office receipts for each week that the Play is presented.

5.2    All straight royalties shall be paid within seven (7) days after the end of the calendar week in which such performances are presented except fourteen (14) days in the continental United States, outside New York City and thirty (30) days outside the continental United States, and will be accompanied by copies of box office statements, signed by the Producer or its duly authorized representative. In computing gross weekly box office receipts, the Producer may deduct: all applicable Federal and other admission taxes and similar taxes which may be now or hereafter imposed upon admissions; any fees or commissions paid in connection with theater parties, group sales, or benefits, credit card organizations such as American Express, telephone sales, and automated ticket distribution or remote box offices; any amounts equivalent to the former five (5%) percent New York City Amusement Tax, the net proceeds of which are actually paid over to pension or welfare funds of the various theatrical unions; rent and occupancy tax; amounts received for Actor's Fund benefit performances which are actually paid over to the Actors' Fund; theatre restoration fees; up to 3% of the gross weekly box office receipts for donations to charities supporting mothers in need of support, such charities to be subject to the mutual, reasonable approval of Producer and Author; and in any Foreign Territory, also Value Added Tax, entertainment taxes, and library discounts, if any, and any other deductions permitted by the Dramatists' Guild of America, Inc.

5.3    Notwithstanding anything to the contrary contained in this Agreement, with respect to any performances in connection with which the Producer is compensated on the basis of a form of guarantees or guarantees plus a percentage, including any bus and truck or non-First Class company or productions in Atlantic City, Las Vegas, Lake Tahoe and Reno, then "gross box office receipts" shall mean the gross receipts derived by the Producer from said company (which shall include the share, royalty or fee payable to the Producer and to any star(s) or other person, firm or entity which payments ordinarily would be the responsibility of the Producer) for such performances after the deduction therefrom of (i) deductions permitted under Paragraph 5.2 and (ii) of any booking fees charged by and actually paid to any tour booking agents, provided, however, that the

3

royalty computation in this Paragraph 5.3 shall be applicable only if the royalties of all other persons whose compensation is computed as a percentage of gross box office receipts (including Producer, but excluding the theatre/local presenter and stars) are calculated on the same basis.

5.4     Notwithstanding anything to the contrary contained in this Agreement, in lieu of percentage royalties as set forth herein above, in connection with each Commercial Production, Producer, in its sole discretion, may opt to establish a pool of operating profits (a "Royalty Pool") in which each person, firm or corporation entitled to receive a percentage royalty (each a "Royalty Participant" and collectively the "Royalty Participants") (including Producer, but excluding theatre share and stars) shall share pro-rata, as his "Points" bears to the aggregate of all Points payable, Author being entitled to 6 points in the Royalty Pool.  The Royalty Pool shall consist of the following:

5.4.1.  each Royalty Participant shall receive a minimum weekly guarantee equal to the minimums of such called for in the agreement between the League of Off-Broadway Theatres and Producers and the Society of Stage Directors and Choreographers (the "SSDC Agreement") (unless such Commercial Production is a First Class Commercial Production in which case each Royalty Participant shall be entitled to receive a minimum weekly guarantee of $500 per royalty Point), as an advance against such Participant's share of the Royalty Pool (pro rata in accordance with their "Points");

5.4.2.  the Royalty Pool will consist of thirty-five (35%) percent of the operating profits (which may be calculated and averaged on four-week cycles and may be implemented, in Producer's sole discretion, for up to twelve week periods) increasing to forty (40%) percent after the production has recouped 125% of its capitalization;

5.4.3.  the Royalty Pool payments payable to Author shall not exceed 110% of the amounts which would have been paid as full contractual percentage royalties;

5.4.4.  minimum weekly guarantees shall be paid within one week following the week in which they accrue and royalty pool shares (less the guarantees advanced) shall be paid within two weeks of the relevant accounting cycle.

5.5     Operating profits mean the excess of gross weekly box office receipts (calculated as set forth in sub-paragraph 5.2 or 5.3, as applicable) over operating expenses for the same period.  Operating expenses for purposes of this Agreement shall consist of the following:   compensation paid to the cast, stage manager, general and company managers, booking agents (for tours), press agents, casting directors, production supervisors, miscellaneous stage personnel, music rights payments, transportation charges, weekly cash office charges, advertising, press and publicity costs, legal and accounting expenses, insurance costs, pension & health contributions, costs of exhibiting television commercials, theatre rent and expenses, rents, miscellaneous supplies, and all other customary running expenses of whatsoever kind or nature actually incurred by any producing entity in presenting the Play hereunder.  For purposes of calculating operating profits, operating expenses shall also include the sum equal to one (1%) percent of the

relevant company's total production capitalization, capped at $10,000, per week towards amortization of production costs, until the capitalization of the production shall have been recouped.

5.6    Notwithstanding the foregoing, if all other Royalty Participants agree to waive sums due to them pursuant to this paragraph 5, in losing weeks, Author agrees to so waive such sums due to Author.

6.    <u>Payment to Author.</u>  Each of the payments to be made by the Producer pursuant to this Agreement to the Author shall be paid 100% to Rosenstone/Wender, and remitted to 38 East 29th Street, New York, New York 10016. Producer's faithful payment in accordance with the foregoing shall be deemed full discharge of Producer's obligations to Author in connection with the sums so remitted. Rosenstone/Wender shall be entitled to give receipts related to such payments and Producer's shall be entitled to conclusively rely on the same in connection with each such payment.

7.    <u>Duration of Rights.</u>  Subject to Paragraph 3 and 4, the Producer's exclusive production rights in the Territory shall continue so long as the Producer shall produce and present the Play as a Commercial Production, without a hiatus of sixteen (16) months or more. Producer shall notify Author of touring or "sit-down" Commercial Productions no later than 30 days prior to the first day of rehearsals for each of such. Producer shall notify Author of touring or "sit-down" productions within one hundred twenty (120) days following the close of the last production in the Territory. If more than one hundred twenty days have elapsed during the hiatus period, then no later than 30 days prior to the first day of rehearsal of any such production, Author shall be entitled to receive an additional advance against royalties of Two Thousand Five Hundred Dollars ($2,500) for each touring or "sit-down" production of the Play.

8.    <u>Foreign Territories.</u>

8.1.    Provided that the Producer has presented the Play as a Commercial Production hereunder for not less than twenty-one (21) paid public performances, including no more than eight (8) previews and an official press opening in New York City, then at any time prior to the later of eighteen (18) months after the official opening of the first Commercial Production or six (6) months following the last paid public performance of the last Commercial Production hereunder, the Producer shall have the exclusive rights to present the Play, alone or in association with or under lease or license to another producer, in any or all of the following territories or territory groups (each group referred to as a "Foreign Territory"):

8.1.1.    Australia/New Zealand
8.1.2.    Japan
8.1.3.    Austria/Germany/Switzerland
8.1.4.    South Africa
8.1.5.    the Pacific Rim, including without limitation China, Korea and India

8.1.6. the European countries outside the British Isles and Austria/Germany/Switzerland
8.1.7. Latin America

8.2.    In the event Producer fails to produce and present the Play in any of the Foreign Territories within the time permitted in paragraph 8.1. (the "Foreign Production Period"), Producer shall have the right to extend the time to so produce in all of the Foreign Territories, for a period of one (1) additional year from the conclusion of the Foreign Production Period, by giving Author notice and a payment of Two Thousand Five Hundred (U.S.$2,500) United States Dollars each for the balance of the Foreign Territories, at any time prior to conclusion of the Foreign Production Period.

8.3.    In the event the Producer produces and presents the Play alone or in association with or under lease or license to another producer in at least one Foreign Territory hereunder, then all remaining Foreign Territories shall be held exclusively for Producer during the period ending six (6) months from the close of the last production of the Play hereunder in any of the Foreign Territories. Should Producer fail to produce and present another production of the Play in any of the Foreign Territories within such time, then the rights to such granted hereunder shall revert to Author.

8.4.    Royalties payable in connection with performances in the Foreign Territories shall be governed as set forth in Paragraph 5 hereof, except that Author agrees to negotiate in good faith at Producer's request a modification of the royalty pool or pools to accommodate specific needs in any or all of the Foreign Territories.

8.5.    All payments to Author hereunder shall be subject to applicable currency exchange control, taxation and other laws, regulations and orders. If any sums in which Author shares shall be "blocked," "frozen" or otherwise held by governmental authority in any country, Author's share may be deposited upon notice to Author in Author's name(s) in a bank or other depository in the country at Author's risk and subject to applicable foreign law, and such deposit shall be deemed payment to Author. Author's share of any funds converted from a foreign currency shall be computed at the same conversion rate as Producer is paid by the local company or licensee.

9.    Force Majeure.  If the Producer shall be prevented from exercising any option hereunder, or if any production hereunder shall be postponed or interrupted, due to epidemic, fire, action of the elements, strikes, labor disputes or disturbances, governmental order, court order, act of God, public enemy, wars (whether or not declared), riots, civil commotion, illness of stars or director, or any other cause beyond the Producer's control, whether of a similar or dissimilar nature, such prevention or interruption shall not be deemed as a breach of this Agreement or a cause for forfeiture of the Producer's rights hereunder, and all time periods hereunder shall be extended for the duration of the force majeure.

10.    Control of Rights; Reservation of Rights; Restriction Thereon.

6

10.1.   Author shall control the uses and dispositions of rights in the Play except as otherwise provided hereunder.  Author hereby agrees that Author will exercise Author's best efforts in exploitation of the Play and all rights therein.

10.2.   All rights in and to the Play not expressly granted to the Producer hereunder are hereby reserved to the Author for Author's use and disposition.  Except as otherwise specifically set forth in this Agreement, Author represents and warrants that Author has not disposed of or otherwise exercised any rights in the Play or authorized their exercise by any person, firm or corporation; nor will Author make any grant to any third party in contravention of, or otherwise inconsistent with, the grant of rights and the holdbacks hereunder, until the lapse or termination of the Producer's rights hereunder.  If motion picture and/or television rights and/or any other audio-visual rights in and to the Play have not been disposed of previously, Author agrees that it shall not, without Producer's prior written consent make any disposition thereof during the period Producer holds rights hereunder.

11.     **Author's Billing.**  The Producer agrees that the Author will receive billing as author of the Play in all houseboards, programs, in the initial three-sheets and posters, if any, and in all print advertising and publicity under its control, including display ads, throwaways, and announcements of the Play, but excluding so-called "ABC" ads  except those on Fridays and Sundays in which any other person, other than stars above the title, receive credit; ads where only the title of the Play, the name of the theatre, and or the names of stars appear; ads smaller than 1/8 of a New York Times standard broadsheet page; transportation display ads (if no persons other than stars and theatre appear thereon), and ads consisting primarily of critics' reviews of the Play or congratulatory/awards ads.  Such billing shall read substantially as follows: "by Hilary Illick and Jennifer Krier".  The name of the Author will be in size at least 50% of the size of the type used for the title of the Play wherever credit is accorded in a so-called 'billing box," provided all persons other than stars billed above the title are so billed in such billing box.  Producer shall be entitled to accord so-called "movie credit" (i.e., run-on billing with all credits of equal size) billing in lieu of a billing box, provided all persons other than stars are so billed in such movie credits. No names other than the title of the Play, the name of the theatre and stars may be larger or more prominent than Author's name; no names other than the title of the Play, stars and directors may be as large or prominent as Author's name; and no names other than the title of the Play, stars and the producers receiving presentation credit, may precede Author's name.  Each party constituting Author shall be entitled to receive biographies in all programs of the Play hereunder. Each of the parties constituting Author shall, upon Producer's request, supply Producer with biographies of reasonable length, which shall be subject to reasonable editing. No casual or inadvertent failure to comply with the provisions of this paragraph shall be deemed a breach of this Agreement. Upon Author's written notice to Producer of any such failure, Producer shall exert good faith efforts to rectify such failure prospectively, to the extent practicable.

12.     **Author's Approvals/Services.**  No changes in the Play shall be made without the approval of the Author, and such changes, if permitted, shall become the property of the

Author. No changes to the Play shall be made subsequent to the official press opening of the first Commercial Production of the Play without the mutual approval of Author and Producer. Author has delivered, or shall deliver immediately upon completion of the Play, a full and complete copy thereof to Producer. At Producer's request, Author shall perform such services as may be reasonably necessary in the production of the Play, including without limitation, making revisions thereto; shall assist in the selection of the cast (and replacements thereof) and consult with, assist and advise the director, scenic designers, lighting designers and costume designers; and shall attend rehearsals of the Play prior to presentation of the first Commercial Production. Author shall have the right, not to be unreasonably withheld or delayed, to approve the director, cast and replacements thereof. Author shall approve or disapprove of Producer's choice within seventy-two hours following receipt of Producer's written notice of the same. Failure to approve or disapprove shall be deemed approval. Approvals, once given, shall be final and binding and shall be deemed approvals for any production of the Play produced and presented hereunder.

13.    Radio and Television Exploitation. The Producer shall have the right to authorize one or more radio and/or television presentations of excerpts from the Play (each such presentation not to exceed fifteen (15) minutes in total) for the sole purpose of exploiting and publicizing the production of the Play; provided, however, that the Producer shall receive no compensation or profit (other than reimbursement for out-of-pocket expenses), directly or indirectly, for authorizing any such radio or television presentations.

14.    Subsidiary Rights.

14.1.    The Author shall own and control the Play with respect to all rights subject to the rights expressly granted to Producer in this Agreement. The Producer, however, shall receive from the Author the percentage of the net proceeds (regardless of when paid) to the Author specified herein below from any disposition made before ten (10) years after the final performance of the last Commercial Production of the Play pursuant to this Agreement of any of the following rights in the Play: worldwide audio-visual rights (i.e., motion picture, television, video cassette, video disk, CD-ROM, DVD, CDI and other "interactive" media, and all other kinds of visual and audio-visual productions in connection with the Play, whether now existing or developed in the future, and regardless of the method or mode of reproduction, projection, transmission, exhibition or delivery used, and including any original cast albums or soundtrack records and all other rights which may be included as allied rights in any transactions of the Author relating directly or indirectly to disposition of audio-visual rights); prequel/sequel rights; foreign language performances; condensed and tabloid versions; stock, amateur and regional theatre performances, and all stage performances of any nature (except those produced by or under license from the Producer); commercial use products/merchandise rights (except those exploited by or under license from the Producer); publication rights in all media; radio rights; and audio and audio-visual recordings of any nature. Net proceeds shall mean gross proceeds less Representative's actual commission, if any, not exceeding ten (10%) percent, except twenty (20%) percent with respect to amateur rights.

14.2.    The percentage referred to in Paragraph 14.1 shall be as follows: 10% if there are at least 21 paid performances as a Commercial Production in New York City (including no more than eight previews and an official press opening); 20% if there are at least 28 such performances; 30% if there are at least 36 such performances; 40% if there are at least 48 such performances.

14.3.    So long as Producer's production rights continue hereunder, Producer shall have the exclusive universal right to exploit the merchandising rights in the Play, including but not limited to wearing apparel; toys; games; figures; dolls; novelties; books; souvenir programs; posters; mugs; etc., and any other physical property representing a character in the Play or using the name, character or title of the Play ("Commercial Use Products"). Producer shall pay to Author 10% of its adjusted gross proceeds (i.e., the gross amount to Producer, less theatre and seller's shares and taxes) from the sale of Commercial Use Products in theatres in which the Play is produced and presented by or under lease or license of Producer, except where Author is separately compensated, not to exceed 50% of the license fee paid to Author. With respect to Commercial Use Products sold outside of theatres in which the Play is produced and presented by or under lease or license of Producer, except where Author is separately compensated, Producer shall pay to Author 50% of its net receipts therefrom. Producer agrees to account to Author on a regular basis and to provide Author with customary statements. If on the last day of Producer's production rights in the Play a contract exists with a third party for the creation, manufacture or sale of Commercial Use Products, then such contract shall continue in full force and effect until the expiration of its terms, but no more than five years from the date of such contract (or the last extension thereof).

14.4.    Author shall furnish to Producer copies of all contracts relating to any of the foregoing rights in which Producer is entitled to share (inadvertent failure to do so, however, shall not constitute a breach hereof if Author promptly furnishes such contracts after Producer's request for such), in which contracts Author shall use best efforts to provide for direct payment to Producer of its appropriate share, to be sent to Producer at the same time payments are made to Author. In no event shall Author transmit Producer's share later than thirty (30) days following receipt by Author. All payments to Producer shall be accompanied by copies of all statements furnished to Author. Author agrees to keep and maintain true and accurate books and records of account in connection with the licensing, disposition, or other exploitation of rights in the Play and to retain all such records for a period of not less than two (2) years from the date Producer receives payment and related statements. Producer or its designee shall have the right at any time during regular business hours upon seven (7) days prior notice to examine, inspect and audit such books and records and other material pertaining to the exploitation of the Play by the Author and the payments to the Producer hereunder, and to make copies and extracts thereof at Producer's expense. Producer shall share in the proceeds from dispositions of subsidiary rights which may have been made or be made after the date hereof but prior to the time Producer has presented the qualifying performances as set out in Paragraph 14.2, so long as Producer thereafter becomes entitled to share in said proceeds. Producer's maximum share shall be held in escrow or in trust until it is finally determined the Producer is or is not entitled to it.

14.5.   If Author renders writing or acting services with respect to any audio visual production based on the Play, Producer's right to share shall not apply to the Author's compensation for such services, provided that such compensation is not unreasonable in relation to the amount paid for the rights to the Play in which Producer is entitled to share.   Without limiting the generality of the foregoing, the amount paid for such of Author's services shall never exceed the amounts paid for the rights to the Play.

14.6.   In the event that the first Commercial Production of the Play hereunder shall be a first class production, then paragraphs 14.1. and 14.2. hereinabove shall be deemed amended to the corresponding provisions contained in Article XI of the then effective Dramatists Guild of America, Inc. Approved Production Contract.

15.   House Seats.   During the New York run of the first Commercial Production of the Play (other than if on a Mini-Contract), the Author shall be entitled to purchase at regular box office prices two (2) pair of house seats in the third through eighth rows of the center section of the orchestra (or equivalent if there is no center section) for each regular evening and matinee performance of the Play (other than benefit, theatre party performances, critics performances and Tony-voter performances, when only one ( ) pair shall be available).   Such tickets shall be set aside by the Producer and be made available for purchase by the Author or Author's designee until 50 hours prior to each scheduled performance of the Play unless Author guarantees payment.   If there is an "official opening" performance of the Play in New York City, Author shall be entitled to five (5) additional pair of tickets (a total of five (5) pair of such tickets shall be complimentary and one of such pair of tickets shall be for use by Rosenstone/Wender), in good orchestra locations for such performance, if used, and shall be entitled to receive complimentary passes to any opening night party given by Producer, the number of which passes shall be the same as the number of Author's opening night tickets actually used.   Producer shall make all reasonable best efforts to accommodate Author's house seat requests for other companies.   Author agrees to keep books and records as are necessary for Producer to comply with the rules and regulations of the Attorney General of the State of New York.

16.   Translations.   In connection with any proposed production of the Play hereunder in a non-English speaking country, Producer shall be entitled engage a translator to translate the text of the Play; provided, however Author shall be entitled to approve the translator and, if Author is proficient in the language into which the Play will be translated, the translation, such approvals not to be unreasonably withheld or delayed. Approval once given shall be deemed final and binding.   Should Producer seek Author's approval over a translator and should Author fail to approve or disapprove the Producer's choice after seventy-two (72) hours, such failure shall be deemed an approval.

17.   Right of First Negotiation/Last Refusal

17.1   Producer shall have the right of first negotiation and the right of last refusal with respect to all motion picture, television and ancillary rights, as follows:

17.1.1 If at any time, Producer desires to option and/or purchase, or Author desires to dispose of, a particular reserved right herein relating to motion picture, television and/or ancillary rights exploitations of the Play (a "Reserved Right"), whether directly or indirectly, then the party so desiring shall notify the other in writing and the parties shall thereupon immediately negotiate exclusively (and with respect to Author, first) regarding such Reserved Right. If after the expiration of thirty (30) days from the date of commencement of negotiations, the parties have failed to agree to material terms for Producer's option and/or purchase of such Reserved Right, then Author may terminate such negotiations or commence to negotiate with third parties, as the case may be, regarding such Reserved Right, subject to Producer's right of last refusal set forth herein below. Notwithstanding the foregoing, failure of agreement with respect to option and/or purchase of such Reserved Right shall not occur or be declared if Producer has timely offered Author the following minimum compensation:

      i.      One year option price – five thousand ($5,000) dollars, applicable against the purchase price; and

      ii.      One year option extension – five thousand ($5,000) dollars non-applicable against the purchase price; and

      iii.      Purchase price – two (2%) percent of the final shooting budget, excluding deferments, with a minimum payment of twenty-five thousand ($25,000) dollars and a maximum payment of three hundred thousand ($300,000) dollars if a theatrical motion picture is exploited or the applicable WGA minimum (plus 10%) for a television exploitation if a television motion picture is exploited, payable on or before the commencement of principal photography. Payments based on a final shooting budget shall be made at the time of purchase based on the most recent budget and shall be adjusted upon commencement of principal photography; and

      iv.      Back end – two and one-half (2 _ %) percent of net profits, defined, calculated, accounted for and paid on a most favored nations basis with Producer.

Producer's right of first negotiation shall inure to the benefit of Producer, its successors and assigns and shall bind Author and Author's heirs, successors and permitted assigns and shall survive termination of this Agreement.

17.1.2 If Producer and Author fail to reach agreement on material terms for a particular Reserved Right pursuant to Producer's right of first negotiation and if Author makes and/or receives a bona fide offer to license, lease, purchase or otherwise dispose of the particular Reserved Right or any interest therein (a "Third Party Offer"), Author shall notify Producer by registered mail or notice as may be provided for herein, should Author propose to accept such Third Party Offer, of the name of the third party offeror, the proposed purchase price, and other terms of such Third Party Offer. During a period of twenty (20) days after Producer's receipt of such notice, Producer shall have the exclusive right to license, lease, purchase and or otherwise be the recipient of such disposal by Author, as the case may be, on the same financial terms as set forth in such notice. If Producer elects to exercise such right, Purchaser shall notify Author of such exercise by registered mail or notice as may be provided herein, within such twenty (20) day period, failing which Author shall be free to accept such Third Party Offer; provided that if any such proposed license, lease, sale or other disposition is not consummated with

11

the third party offeror within thirty (30) days following the expiration of the aforesaid twenty (20) day period for Producer to exercise its rights, Producer's right of last refusal shall revive and shall apply to each and every further offer or offers at any time received by Author relating to the particular Reserved Right, or any interest therein; provided, further, that Producer's option shall continue in full force and effect, upon all of the terms and conditions of this paragraph so long as Author retains any right, title or interest in or to the particular Reserved Right. Producer's right of last refusal shall inure to the benefit of Producer, its successors and assigns and shall bind Author and Author's heirs, successors and permitted assigns and shall survive termination of this Agreement.

18.    <u>Miscellaneous.</u>

18.1.    The Producer shall have no obligation to produce or present the Play hereunder.

18.2.    Provided that twenty-one (21) paid public performances (including up to eight previews and an official press opening in New York City) of the Play are presented by the Producer hereunder, the Producer shall have the option to receive clear and prominent credit on the title page of any and all playbills or programs and publications of the Play and whenever and wherever full credits (i.e., including credits to the set, costume, and lighting designers) are given; and on any recorded versions (including but not limited to single card, main credit sequence credit in motion picture and television versions) of the Play authorized by Author, in a form to be determined by Producer.

18.3.    Producer shall be free to assign or license this Agreement, the rights hereunder, or any part of the rights granted hereunder, but shall remain secondarily liable for performance of the terms hereof, unless assignee or licensee assumes Producer's obligations hereunder in writing.

18.4.    If Producer shall require the presence of Author more than seventy-five (75) miles from their place of residence (the parties acknowledging that both parties constituting Author reside in Belmont, Massachusetts), Author shall be entitled to be reimbursed for their reasonable expenses incurred in connection therewith for travel and accommodations, as the parties shall mutually agree on a case-by-case basis.

18.5.    All notices to any party hereunder shall be in writing and shall be deemed given and received when personally delivered, or two business days after being mailed by registered or certified mail, return receipt requested, or upon delivery by an overnight delivery service. Notices shall be addressed to such party's address as given above or to such other address as the party may hereafter specify by notice duly given. Courtesy copies of all notices to Producer shall be sent by facsimile, confirmed by regular mail, toCowan, DeBaets, Abrahams & Sheppard, LLP, 41 Madison Avenue, 34th Floor, New York, NY 10010, Attention: Frederick P. Bimbler, Esq., facsimile number 212-974-3474.

18.6.    Any controversy or claim arising out of, or relating to this Agreement, or any alleged breach thereof, shall be settled by arbitration before a single arbitrator with ten years' experience in the New York commercial theatre industry, in New York, New

York, in accordance with the rules then obtaining of the American Arbitration Association. The arbitrator is instructed to award reasonable outside attorney's fees and costs to the prevailing party and is instructed to refrain from granting an award or rendering a decision that is contrary to the express provisions hereof, including without limitation rendering an award that would terminate Producer's rights hereunder or the Agreement, unless Producer has failed to make payments pursuant to paragraph 4 herein above or unless termination is expressly provided for herein in the circumstances. The arbitrator's decision and award shall be final, binding and non-appealable. Judgment upon such decision and award rendered by the arbitrator may be entered in the highest court of the forum, state or federal, having jurisdiction thereof. Each of the parties hereby consents and submits to the jurisdiction of the State and Federal courts located in the County of New York and consents to the venue thereof, and consents to service of process by registered or certified mail at the address to which notices are to be given and agrees that such service shall be deemed effective as if personal service had been made within New York State, New York County.

18.7.    The Author hereby appoints Rosenstone/ Wender, 38 East 29th Street, New York, New York 10016 ("Author's Agent") as Author's sole and exclusive agent with respect to this Agreement and all rights in the Play and does hereby authorize and direct that any and all monies due and to be paid hereunder by the Producer to the Author shall be paid and delivered to the Author's Agent who is authorized to give good and sufficient receipts therefor as full evidence and satisfaction of each payment.

In consideration of the services rendered by the Author's Agent which culminated in this Agreement and of the customary services of a play agent rendered and to be rendered by the Author's Agent in connection with the Play (which the Author's Agent hereby agrees to perform), the Author hereby agrees that the Author's Agent shall be entitled to deduct and receive a fee of 10% of any and all sums of money due to the Author under this Agreement.

The Author's Agent shall also be entitled to receive and deduct a fee of 10% of any and all sums of money which may be collected or received on behalf of the Author as the Author's share of the Author's proceeds under any and all other agreements for the production, presentation or exploitation of the Play, or any rights therein, in any form, whether the subsidiary rights such as stock, amateur, motion picture, radio and television and publishing rights (other than book publishing) and stage performing rights outside of the United States, Canada and the British Isles, except that in case of the sale or lease of amateur rights, the Author's Agent shall be entitled to deduct and receive a fee of 20%.

18.8.    This Agreement shall not constitute the parties as partners or create a joint venture or fiduciary relationship between them, and neither party shall be deemed to be the representative or agent of the other. This Agreement is made in the State of New York, and shall be governed by, and construed in accordance with, the law of that State applicable to contracts made and entirely performed therein, without giving effect to New York's principles of conflicts of law and in accordance with the law of the United States of America, to the extent such pre-empts the law of the State of New York. This

13

Agreement supersedes all prior or contemporaneous agreements, understandings, warranties, representations and negotiations between the parties with respect to the subject matter hereof, constitutes the entire agreement between the parties, and shall not be changed or terminated except in a written instrument signed by the parties. No waiver shall be deemed a continuing waiver. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, heirs, executors, administrators, successors and permitted assigns. No party shall be deemed to have breached any of the provisions hereof, unless and until the other party has sent written notice to said party specifying said party's failure, and such failure is not corrected or rectified within thirty (30) days after receipt of notice from the other party. Paragraph headings are used herein for convenience only and shall not be referred to in the interpretation of this Agreement. Use of any gender herein shall be deemed to refer to any other where appropriate from the context. Should any provision hereof be adjudged to be void or unenforceable, the offending provision shall be deemed amended, but only to the extent necessary to correct the offending provision and make such enforceable. If the offending provision is incapable of being amended and made enforceable, such shall be deemed stricken from the Agreement. The balance of the Agreement as amended shall remain in full and effect.

18.9. This Agreement may be executed in duplicate counter-parts, by facsimile or otherwise, each of which shall be deemed an original, and all of which, when taken together, shall be deemed one and the same instrument.

**IN WITNESS WHEREOF,** the parties hereto, intending to be bound have hereunder set their hands as of the date first above written and thereby constitute this the binding agreement between them with respect to the subject matter hereof.

**Nakachi Productions, Inc.** ("Producer")

By Mari Nakachi, President of
Nakachi Productions

Hilary Illick ("Author")

Jennifer Krier ("Author")

14

# Exhibit F



# EVE-OLUTION

BY HILARY ILLICK
AND JENNIFER KRIER

DRAMATISTS
PLAY SERVICE
INC.

# EVE-OLUTION

### BY HILARY ILLICK
### AND JENNIFER KRIER

DRAMATISTS
PLAY SERVICE
INC.

---

**DPS**

DRAMATISTS PLAY SERVICE, INC.

ESTABLISHED BY MEMBERS OF THE
DRAMATISTS GUILD
OF THE AUTHORS LEAGUE OF AMERICA
*for the*
HANDLING OF THE ACTING RIGHTS OF MEMBERS' PLAYS
*and*
THE ENCOURAGEMENT OF THE AMERICAN THEATRE

440 Park Avenue South, New York, NY 10016
www.dramatists.com

EVE-OLUTION

Copyright © 2005, Hilary Illick and Jennifer Krier

All Rights Reserved

CAUTION: Professionals and amateurs are hereby warned that performance of EVE-OLUTION is subject to payment of a royalty. It is fully protected under the copyright laws of the United States of America, and of all countries covered by the International Copyright Union (including the Dominion of Canada and the rest of the British Commonwealth), and of all countries covered by the Pan-American Copyright Convention, the Universal Copyright Convention, the Berne Convention, and of all countries with which the United States has reciprocal copyright relations. All rights, including professional/amateur stage rights, motion picture, recitation, lecturing, public reading, radio broadcasting, television, video or sound recording, all other forms of mechanical or electronic reproduction, such as CD-ROM, CD-I, DVD, information storage and retrieval systems and photocopying, and the rights of translation into foreign languages, are strictly reserved. Particular emphasis is placed upon the matter of readings, permission for which must be secured from the Authors' agent in writing.

The English language stock and amateur stage performance rights in the United States, its territories, possessions and Canada for EVE-OLUTION are controlled exclusively by DRAMATISTS PLAY SERVICE, INC., 440 Park Avenue South, New York, NY 10016. No professional or nonprofessional performance of the Play may be given without obtaining in advance the written permission of DRAMATISTS PLAY SERVICE, INC., and paying the requisite fee.

Inquiries concerning all other rights should be addressed to Rosenstone/ Wender, 38 East 29th Street, 10th Floor, New York, NY 10016, Attn: Ron Gwiazda.

**SPECIAL NOTE**

Anyone receiving permission to produce EVE-OLUTION is required to give credit to the Authors as sole and exclusive Authors of the Play on the title page of all programs distributed in connection with performances of the Play and in all instances in which the title of the Play appears for purposes of advertising, publicizing or otherwise exploiting the Play and/or a production thereof. The names of the Authors must appear on a separate line, in which no other names appear, immediately beneath the title and in size of type equal to 50% of the size of the largest, most prominent letter used for the title of the Play. No person, firm or entity may receive credit larger or more prominent than that accorded the Authors. The following acknowledgment must appear on the title page in all programs distributed in connection with performances of the Play:

EVE-OLUTION was originally produced Off-Broadway at the Cherry Lane Theater in November 2004 by Mari Nakachi, Lucy Anda and Meg Staunton.

*Dedicated to our husbands and children*

2

EVE-OLUTION was originally performed by the authors as *Venus de Minxaun*, developed with and directed by Billie Jo Joy at Art & Soul in Cambridge, Massachusetts, in 2002.

EVE-OLUTION was first presented by Mari Nakachi, Lucy Anda and Meg Staunton at the Cherry Lane Theater, opening on October 20, 2004. It was directed by Carolyn Cantor; the set design was by David Korins; the costume design was by Jenny Mannis; the lighting design was by Matt Richards; and the sound design was by Eric Shim. The cast was as follows:

ALISON ......................................... Carolyn McCormick
LIZA ............................................ Sabrina le Beauf

4

## CHARACTERS

ALISON: An anthropology professor in her 30s. Alison is competitive, yet feminine and vulnerable beneath the surface. On the one hand she is concerned with appearances, on the other, she is willing to expose her narcissistic and out-of-control moments. Alison is married to Leo, an ambitious businessman with an affectionate nature and boyish charm — whose temper, at times, can get volatile. They have three children, two girls and a boy: Lucy, Ruby, and Jamie.

LIZA: A creative writer in her 30s, Liza is bohemian in dress and appearance, yet a perfectionist with high expectations of herself. Liza is a free spirit who doesn't realize how tense and despairing she can get. She is married to Philippe, a French-American documentary filmmaker who's fun, adventurous and a big help at home — yet whose financial anxiety distracts him at times, and can cause him to act dismissively towards Liza. They have four children, two girls and a set of boy/girl twins: Chloe, Charlotte, Lucas and Monique.

## SETTING

The play opens with Liza in San Francisco and Alison in Ithaca, New York, with later scenes for both women taking place in an anonymous East Coast town. The overall setting of the play is open to directorial input — it can be set anywhere where two upper-middle-class women would confess their inner doubts and erratic behavior as wives and mothers. The scenes themselves, as they unfold, tend to depict specific locations.

The time span of the play covers about seven years of Alison's life, and roughly nine years of Liza's.

5