UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BILLIE JO JOY,<br><br>    Plaintiff,<br><br>v.<br><br>HILARY ILLICK and<br>JENNIFER KRIER,<br><br>    Defendants. | Civil Action No. 05 11580 NMG |

**DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO DISPUTE**

Pursuant to Rule 56.1 of LR, D. Mass., Defendants Hilary Illick ("Illick") and Jennifer Krier ("Krier") (collectively, "Defendants") respectfully submit this Concise Statement of Material Facts in support of their Motion for Summary Judgment, and incorporate herein the accompanying Affidavits of Hilary Illick ("Illick Aff.") and Jennifer Krier ("Krier Aff."):

1. Both Illick and Krier are published authors. Illick Aff. at ¶ 2; Krier Aff. at ¶ 2.

2. Plaintiff co-founded a performance studio, Art & Soul, which is located in Cambridge, Massachusetts. Illick Aff. at ¶ 3. On information and belief, Plaintiff is not a published author. Id.

3. During the fall of 2001, Illick and Krier, who are very close friends, began to write a play together about the challenges and joys of their lives as young wives and mothers and the sometimes painful transition from full-time careers, Illick as a writer and Krier as an anthropologist, to being full-time mothers. Illick Aff. at ¶ 4, Krier Aff. at ¶ 3.

4. During the fall and winter, they wrote their play, which consisted of a chronological series of significant scenes from their own lives. They wrote separately and in collaboration. Id.

5. In the spring of 2002, Illick and Krier decided that they wanted to stage their play, which at that time they called "Mamalogues." Illick Aff. at ¶ 5. They approached Joy, who Krier knew as a dance class teacher at Krier's daughter's pre-school. They asked Joy if she could help them choreograph certain scenes of their play. Joy informed them that in addition to being a dancer, she taught improvisational acting workshops, and had recently started directing. They discussed whether she could also direct their play. Id.; Krier Aff. at ¶ 4.

6. At a subsequent meeting, approximately a week later, they reached an agreement that Illick and Krier would hire Joy as a director and choreographer at the rate Joy requested, which was $60 per hour. Joy also offered to rent them space at Art & Soul -- the yoga studio and arts center Joy co-founded -- for rehearsals and, ultimately, performances. Krier and Illick accepted the offer, and agreed to pay the rental fee she requested, which was $7 per hour. Krier Aff. at ¶ 4; Illick Aff. at ¶ 6.

7. While Joy received $60 per hour, Illick and Krier were working (and continued to work) without pay in order to achieve their goal of writing and performing their play. Illick Aff. at ¶ 6.

8. Illick and Krier met with Joy one or two times a week, for approximately two hours each time during a two month period from April through early June 2002. Illick Aff. at ¶ 7. Joy assisted them as a director, acting coach and with staging the play. Id. As director, Joy also offered editorial comments relating to the script, which mostly concerned striking extraneous language from the script, staging, and sequencing of scenes. Id.

9. Illick and Krier were the writers of the play and at all times controlled the script. Illick Aff. at ¶ 8, Krier Aff. at ¶ 5. They wrote and maintained the play on their computers at home. Id. While Joy offered editorial feedback to the script, Illick and Krier ultimately decided whether to incorporate any of Joy's editorial suggestions into the script, and they made any such changes on their computer copy of the script. Id. Joy never asked for and was never provided with a disk copy of the script. Id.

2

10. In early June 2002, Illick and Krier performed a staged reading of the play at Art & Soul. Illick Aff. at ¶ 9. Illick and Krier read the script to the audience of family and friends and they incorporated the staging they had developed with Joy. Id.

11. During the summer, Illick and Krier saw each other frequently, often daily, for the purpose of discussing and brainstorming the script and the future of play. During that period, they only saw Joy once, for a breakfast meeting at her house. At that meeting, they discussed and agreed upon certain dates to perform the play at Art & Soul in November and December 2002. Joy also requested that Illick and Krier consider giving her a percentage of any future profits; Illick and Krier told her that they would not pay her a percentage as long as they were paying her an hourly fee. Illick Aff. at ¶ 10. In August 2002, Illick and Krier mailed themselves a copy of the play to establish a "poor man's copyright" as authors of the play. Id.

12. In September, Illick and Krier began to meet again with Joy for the purpose of preparing to perform the play at Art & Soul in November and December 2002. During September, they met approximately two times per week for two hours each time. In total, they met with Joy approximately eight times in September, during which period the play was retitled "Venus de Minivan, Mothers in the Breakdown Lane." Illick Aff. at ¶ 11.

13. Joy then left the country for approximately six weeks. She was in France from the beginning of October until November 12 -- only 10 days before the first performance of the play. During this period leading up to the performance of the play, Illick and Krier made further revisions to the script. There was little, if any, input on any aspect of the play from Joy during this period as they had minimal contact while Joy was overseas. Illick Aff. at ¶ 12, Krier Aff. at ¶ 7.

14. Once they finalized the script in approximately October 2002, Illick and Krier added another "poor man's" copyright to the tangible copies of the work as notice to the rest of the world that they were the sole owners and writers of the work. Illick Aff. at ¶ 13. Upon her return, Joy received notice of their copyright. (See Complaint, ¶ 32.) Joy did not object or insist that the copyright include her as an author. Illick Aff. at ¶ 13; Krier Aff. at ¶ 8.

3

15. Although Joy had returned to the United States only days before the first full performance, she refused to meet with Illick and Krier for final rehearsals of the play until the parties had discussed and signed a written agreement that described their roles in connection with the play, the credits each would receive, and the payment terms for Joy's continued work on the play through the performances in November and December. After multiple meetings and discussions, they reached a written agreement ("Agreement"). Illick Aff. at ¶ 14.

16. In clear and unambiguous terms, the Agreement states that Illick and Krier are the sole authors of the play. They agreed that the credits for the play should read:

> "**Written by Hilary Illick and Jennifer Krier**, developed with and directed by Billie Jo Joy." (emphasis added)

Illick Aff. at ¶ 15.

17. Joy was not included with Illick and Krier as a writer. Given the personal nature of the play and the fact that that Illick and Krier wrote it over the course of one year, Illick and Krier would never have agreed to credit Joy as a co-author. Illick Aff. at ¶ 15, Krier Aff. at ¶ 12.

18. Before they signed the Agreement, Joy asked that the credits say the work was "adapted for stage by" Joy. Illick Aff. at ¶ 15; Krier Aff. at ¶ 8. Illick and Krier rejected that proposal because Illick and Krier's work was always written for and intended to be performed on stage, and because Illick and Krier actually wrote the play. Joy did not "adapt" it. Joy acquiesced in the credit. Illick Aff. at ¶ 15, Krier Aff. at ¶ 8.

19. After she received notice of the copyright, Joy did not challenge the copyright in the Agreement, or request that the copyright be discussed in the future. Illick Aff. at ¶ 16, Krier Aff. at ¶ 8. In the Agreement, Joy also insisted that she continue to be paid $60 per hour for her continued work as a director. This hourly payment was in addition to the rent paid by Illick and Krier for use of Art & Soul as a performance location. Illick Aff. at ¶ 16. Subsequent to the Agreement, Joy requested additional monies for work on sound and lighting, which Krier and Illick agreed to pay her—as they did all her requests for payment during the entire period of time she provided her services to them. Illick Aff. at ¶ 17.

20. The parties discussed, but did not reach an agreement, as to whether Joy should receive future royalties, if any, from the play. Illick and Krier did not believe Joy was entitled to any royalties since she was a paid consultant and had not written or invested financially in the production of the play. Illick Aff. at ¶ 17, Krier Aff. at 8. If she gave up the payments she had received, Illick and Krier were considering whether to give her a small royalty percentage (12.5%). The parties did not reach an agreement as to royalties since Joy insisted on full hourly pay plus royalties. Illick Aff. at ¶ 17.

21. In addition to the private agreement, the parties held the play out to the public as a work authored by Illick and Krier. The promotional materials for the performance of the play in November and December were prepared with Joy's participation. Illick Aff. at ¶ 18. (A copy of the e-mail confirming Joy's involvement in creating the promotional matters is attached to the Krier Aff. as Exhibit A.)

22. Those promotional materials advertised that the play was: "<u>Written by Hilary Illick and Jennifer Krier</u>, Developed with and Directed by Billie Jo Joy." Illick Aff. at ¶ 18 (emphasis added); Krier Aff. at ¶ 9.

23. The play was performed seven times in November and December, 2002. As of the final curtain call in December 2002, Illick and Krier had invested thousands of dollars to produce and perform the play at Art & Soul. (Copies of cancelled checks paid by Illick and Krier to Joy for her services and for renting the theatre space at Art & Soul, as well as an invoice from Joy for her services, are attached to the Illick Aff. as Exhibit D.) The ticket sales were insufficient to cover Illick's and Krier's costs. While Joy was paid at all times for her time and profited financially from the play, Illick and Krier were not paid for any of their time and lost significant money as a result of the play. Illick Aff. at ¶19.

24. Joy had no involvement with the play after the final performance at Art & Soul in Cambridge, except again to request a share of any future royalties since she knew that Illick and Krier intended to try to publish the play. Nor did she seek to participate in promoting the work in other venues. Illick Aff. at ¶ 20.

5

25. Illick and Krier continued actively to work on the play. They formally registered their copyright to the play on April 11, 2003. (A copy of their registration with the United States Copyright Office is attached to the Illick Aff. as Exhibit A.) They hired an agent. Through Illick's contacts in New York, they found producers who were interested in staging the play. They continued to re-write the play. They entered into a contract with a New York producer giving the producer the exclusive right to produce the play for a period of eighteen months, and raised $100,000 from their own family and friends to contribute to the production costs of the New York performance run. Illick Aff. ¶ 21. (A copy of the agreement with the New York producer is attached to the Illick Aff. as Exhibit E.)

26. In this contract, Illick and Krier listed only themselves as the authors of the play, which was consistent with their understanding and intent as to authorship. See id.; Illick Aff. at ¶¶ 8, 13, 15; Krier Aff. at ¶¶ 5, 12.

27. They titled the re-written version of the play, "Eve-olution," and it was performed at the Cherry Lane Theatre by professional actresses in October 2004. Illick Aff. at ¶ 21. Illick and Krier were unpaid for any of their time re-writing and promoting the play in New York. Illick Aff. at ¶ 21.

28. The play was not successful financially in New York. The producers lost money, as did Illick, Krier and their family and friends who invested in the New York production. Both Illick's and Krier's mothers invested $10,000 each, and (like every other investor in the project) did not receive any return on that their investments. Illick Aff. at ¶ 22.

29. Illick and Krier succeeded in publishing "Eve-olution" through the Dramatists' Play Service, Inc., a publishing company that specializes in theatrical works. Illick Aff. at ¶ 23. In their contract with the Dramatists' Play Service, they described themselves as the sole authors of the play. (A copy of the publishing contract is attached to the Illick Aff. as Exhibit F.)

30. In addition, Illick and Krier listed themselves as the authors on the title page and in the credit pages of the published play, and dedicated the play to their husbands and children. Krier Aff. at ¶ 11. (Copies of these pages of Eve-olution are attached to the Krier Aff. at Exhibit C.) Illick and Krier listed the credit Joy had requested and they had agreed to in their Agreement on page 4 of the script, which is the customary location in the industry for such an attribution. Krier Aff. at ¶ 11.

31. Illick and Krier have received a total of approximately $3,300 each in royalties from the staging of the play in New York and from its publication. Illick Aff. at ¶ 23; Krier Aff., at ¶ 11 (attaching accounting agent's accounting statement as Exhibit B). Those royalties consisted largely of agreed-upon advance payments, and it appears that the play may not yield any additional royalties to them. Illick Aff. at ¶ 23; Krier Aff. at ¶ 11.

32. At this stage, Illick and Krier have suffered substantial net losses in terms of their financial return on the play since they began work on it in 2001. Illick Aff. at ¶ 23.

33. Joy never asked to invest or to cover any of the losses for the New York production. Illick Aff. at 24, Krier Aff. at ¶ 10.

> Respectfully submitted,
>
> Defendants,
>
> HILARY ILLICK and
> JENNIFER KRIER,
> By their attorneys,
>
> /s/ Nicholas B. Carter
> Nicholas B. Carter, Esq. (BBO# 561147)
> Raymond P. Ausrotas (BBO# 640315)
> Todd & Weld LLP
> 28 State Street, 31st Floor
> Boston, MA 02109
> (617) 720-2626
> ncarter@toddweld.com

Dated: April 10, 2006

### CERTIFICATE OF SERVICE

I, Nicholas B. Carter, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: April 10, 2006            /s/ Nicholas B. Carter