UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BILLIE JO JOY,<br><br>Plaintiff,<br><br>v.<br><br>HILARY ILLICK and<br>JENNIFER KRIER,<br><br>Defendants. | Civil Action No. 05 11580 NMG |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Defendants Hilary Illick ("Illick") and Jennifer Krier ("Krier") (collectively, "Defendants") respectfully submit this Memorandum in support of their Motion for Summary Judgment in their favor on all counts.

**INTRODUCTION**

Plaintiff Billie Jo Joy ("Plaintiff" or "Joy") claims that she co-authored with Illick and Krier a play about Defendants' and their husbands' personal lives. It is axiomatic under copyright law that co-authorship of a play must be intended by all who contributed to its writing. Based on the undisputed facts, especially the parties' written agreement that Illick and Krier alone authored the play, no reasonable jury could find that Joy was a co-author or that Illick and Krier viewed Joy as their co-author. Summary judgment, therefore, is appropriate on Joy's claims, all of which depend on the issue of co-authorship.

The following facts are undisputed. Illick and Krier initiated the concept for the play in 2001 and began to write the scenes for the play before they involved Joy. After approximately

seven months of writing the play on their own, they hired Joy and thereafter paid her on an hourly basis to act as their director, acting coach and theatre consultant. Illick and Krier received no compensation for their work on the play, other than some *de minimis* royalties they earned after Joy's involvement in the play ended in December 2002.

Most significantly to the issue of authorship, Joy executed a written contract and issued promotional materials while she was still involved with the play, which clearly and unambiguously acknowledged Illick and Krier as the sole writers of the play. While she was still involved with the play, Illick and Krier also notified her of their exclusive copyright claim to the play, to which she did not object at the time. Illick and Krier at all times maintained control of the script on their computer hard drive.

Joy's involvement with the play ended after seven performances of the play in Cambridge, Massachusetts in November and December 2002. Illick and Krier, however, continued to work on the play. They re-wrote and re-named the play from "Venus de Minivan: Mothers in the Breakdown Lane" to "Eve-olution." Through their own pluck, hard work and professional contacts, they successfully arranged for the re-written and re-named play to be optioned by a producer and then performed off-Broadway. They also succeeded in publishing the re-written and re-named play with a reputable publishing house for theatrical works.

Notwithstanding this artistic success, the play has not been a commercial success. Illick and Krier and their families (including their parents and siblings) lost the substantial money they invested in the play. Unlike Joy who was compensated on an hourly basis for all of her time working on the play, Illick and Krier invested thousands of unpaid hours working on the play.

The above facts, which cannot be disputed, firmly and unequivocally establish that Illick and Krier – and previously Joy – understood that Defendants were the sole authors of the play

with exclusive right to control the work. Accordingly, this Court should enter summary judgment in favor of Illick and Krier on all of Joy's claims. The Court should also award Illick and Krier their reasonable attorney's fees to defend against Joy's ill-advised and utterly frivolous lawsuit, which is a meritless attempt to leverage ownership of a play that Joy, as a matter of law, did not author and does not own. See 17 U.S.C. § 505; M.G.L. c.231, § 6F.

## SUMMARY OF UNDISPUTED FACTS

Both Illick and Krier are published authors. Illick Aff. at ¶ 2; Krier Aff. at ¶ 2. Plaintiff co-founded a performance studio, Art & Soul, which is located in Cambridge, Massachusetts. Illick Aff. at ¶ 3. On information and belief, Plaintiff is not a published author. Id.

During the fall of 2001, Illick and Krier, who are very close friends, began to write a play together about the challenges and joys of their lives as young wives and mothers and the sometimes painful transition from full-time careers, Illick as a writer and Krier as an anthropologist, to being full-time mothers. Illick Aff. at ¶ 4, Krier Aff. at ¶ 3. During the fall and winter, they wrote their play, which consisted of a chronological series of significant scenes from their own lives. They wrote separately and in collaboration. Id.

In the spring of 2002, they decided that they wanted to stage their play, which at that time they called "Mamalogues." Illick Aff. at ¶ 5. They approached Joy, who Krier knew as a dance class teacher at Krier's daughter's pre-school. They asked Joy if she could help them choreograph certain scenes of their play. Joy informed them that in addition to being a dancer, she taught improvisational acting workshops, and had recently started directing. They discussed whether she could also direct their play. Id.; Krier Aff. at ¶ 4. At a subsequent meeting, approximately a week later, they reached an agreement that Illick and Krier would hire Joy as a director and choreographer at the rate Joy requested, which was $60 per hour. Joy also offered

to rent them space at Art & Soul—the yoga studio and arts center Joy co-founded—for rehearsals and, ultimately, performances. Krier and Illick accepted the offer, and agreed to pay the rental fee she requested, which was $7 per hour. Krier Aff. at ¶ 4; Illick Aff. at ¶ 6.

While Joy received $60 per hour, Illick and Krier were working (and continued to work) without pay in order to achieve their goal of writing and performing their play. Illick Aff. at ¶ 6.

Illick and Krier met with Joy one or two times a week, for approximately two hours each time during a two month period from April through early June 2002. Illick Aff. at ¶ 7. Joy assisted them as a director, acting coach and with staging the play. Id. As director, Joy also offered editorial comments relating to the script, which mostly concerned striking extraneous language from the script, staging, and sequencing of scenes. Id.

Illick and Krier were the writers of the play and at all times controlled the script. Illick Aff. at ¶ 8, Krier Aff. at ¶ 5. They wrote and maintained the play on their computers at home. Id. While Joy offered editorial feedback to the script, Illick and Krier ultimately decided whether to incorporate any of Joy's editorial suggestions into the script, and they made any such changes on their computer copy of the script. Id. Joy never asked for and was never provided with a disk copy of the script. Id.

In early June 2002, Illick and Krier performed a staged reading of the play at Art & Soul. Illick Aff. at ¶ 9. Illick and Krier read the script to the audience of family and friends and they incorporated the staging they had developed with Joy. Id.

During the summer, Illick and Krier saw each other frequently, often daily, for the purpose of discussing and brainstorming the script and the future of the play. During that period, they only saw Joy once, for a breakfast meeting at her house. At that meeting, they discussed and agreed upon certain dates to perform the play at Art & Soul in November and December

4

2002. Joy also requested that Illick and Krier consider giving her a percentage of any future profits; Illick and Krier told her that they would not pay her a percentage as long as they were paying her an hourly fee. Illick Aff. at ¶ 10. At the end of the summer, in August of 2002, Illick and Krier mailed themselves a copy of the play to establish a "poor man's copyright" as authors of the play. Id.

In September, Illick and Krier began to meet again with Joy for the purpose of preparing to perform the play at Art & Soul in November and December 2002. During September, they met approximately two times per week for two hours each time. In total, they met with Joy approximately eight times in September, during which period the play was retitled "Venus de Minivan, Mothers in the Breakdown Lane." Illick Aff. at ¶ 11.

Joy then left the country for approximately six weeks. She was in France from the beginning of October until November 12 – only 10 days before the first performance of the play. During this critical period leading up to the performance of the play, Illick and Krier made further revisions to the script. There was little, if any, input on any aspect of the play from Joy during this period as they had minimal contact while Joy was overseas. Illick Aff. at ¶ 12, Krier Aff. at ¶ 7.

Once they finalized the script in approximately October 2002, Illick and Krier added another "poor man's" copyright to the tangible copies of the work as notice to the rest of the world that they were the sole owners and writers of the work. Illick Aff. at ¶ 13. Upon her return, Joy received notice of their copyright. (See Complaint, ¶ 32.) Joy did not object or insist that the copyright include her as an author. Illick Aff. at ¶ 13; Krier Aff. at ¶ 8.

Although Joy had returned to the United States only days before the first full performance, once Illick and Krier had independently managed to sell out most of the

5

performances, she refused to meet with Illick and Krier for final rehearsals of the play until the parties had discussed and signed a written agreement that described their roles in connection with the play, the credits each would receive, and the payment terms for Joy's continued work on the play through the performances in November and December. After multiple meetings and discussions, they reached a written agreement ("Agreement"). Illick Aff. at ¶ 14. (A copy of the Agreement is attached to the Illick Affidavit at Exhibit B.)

In clear and unambiguous terms, the Agreement states that Illick and Krier are the sole authors of the play. They agreed that the credits for the play should read:

> "**Written by Hilary Illick and Jennifer Krier**, developed with and directed by Billie Jo Joy." (emphasis added)

Illick Aff. at ¶ 15. The credit is unambiguous as to who the writers are. Joy was not included with Illick and Krier as a writer. Indeed, given the personal nature of the play and the fact that that Illick and Krier wrote it over the course of one year, Illick and Krier would never have agreed to credit Joy as a co-author. Illick Aff. at ¶ 15, Krier Aff. at ¶ 12. In fact, before they signed the Agreement, Joy asked that the credits say the work was "adapted for stage by" Joy. Illick Aff. at ¶ 15; Krier Aff. at ¶ 8. Illick and Krier rejected that proposal because Illick and Krier's work was always written for and intended to be performed on stage, and because Illick and Krier actually wrote the play. Joy did not adapt it. Joy acquiesced in the credit. Illick Aff. at ¶ 15, Krier Aff. at ¶ 8.

Joy also acquiesced in the copyright. After she received notice of the copyright, she did not challenge the copyright in the Agreement, or request that the copyright be discussed in the future. Illick Aff. at ¶ 16, Krier Aff. at ¶ 8. In the Agreement, Joy also insisted that she continue to be paid $60 per hour for her continued work as a director. This hourly payment was in addition to the rent paid by Illick and Krier for use of Art & Soul as a performance location.

6

Illick Aff. at ¶ 16. Subsequent to the Agreement, Joy requested additional monies for work on sound and lighting, which Krier and Illick agreed to pay her—as they did all her requests for payment during the entire period of time she provided her services to them. Illick Aff. at ¶ 17.

The parties discussed, but did not reach an agreement, as to whether Joy should receive future royalties, if any, from the play. Illick and Krier did not believe Joy was entitled to any royalties since she was a paid consultant and had not written or invested financially in the production of the play. Illick Aff. at ¶ 17, Krier Aff. at 8. If she gave up the payments she had received, Illick and Krier were considering whether to give her a small royalty percentage (12.5%). The parties did not reach an agreement as to royalties since Joy insisted on full hourly pay plus royalties. Illick Aff. at ¶ 17.

In addition to the private agreement, the parties held the play out to the public as a work authored by Illick and Krier. The promotional materials for the performance of the play in November and December were prepared with Joy's participation. Illick Aff. at ¶ 18. (A copy of the e-mail confirming Joy's involvement in creating the promotional matters is attached to the Krier Aff. as Exhibit A.) Those promotional materials advertised that the play was: "<u>Written by Hilary Illick and Jennifer Krier</u>, Developed with and Directed by Billie Jo Joy." Illick Aff. at ¶ 18 (emphasis added); Krier Aff. at ¶ 9; Ex. C to Illick Aff.

The play was performed seven times in November and December, 2002. As of the final curtain call in December 2002, Illick and Krier had invested thousands of dollars to produce and perform the play at Art & Soul. (Copies of cancelled checks paid by Illick and Krier to Joy for her services and for renting the theatre space at Art & Soul, as well as an invoice from Joy for her services, are attached to the Illick Aff. as Exhibit D.) The ticket sales were insufficient to cover Illick's and Krier's costs. Thus, while Joy was paid at all times for her time and profited

7

financially from the play, Illick and Krier were not paid for any of their time and lost significant money as a result of the play. Illick Aff. at ¶19.

Joy had no involvement with the play after the final performance at Art & Soul in Cambridge, except again to request a share of any future royalties since she knew that Illick and Krier intended to try to publish the play. Nor did she seek to participate in promoting the work in other venues. Illick Aff. at ¶ 20.

By contrast, Illick and Krier continued actively to work on the play. They formally registered their copyright to the play on April 11, 2003. (A copy of their registration with the United States Copyright Office is attached to the Illick Affidavit as Exhibit A.) They hired an agent. Through Illick's contacts in New York, they found producers who were interested in staging the play. They continued to re-write the play. They entered into a contract with a New York producer giving the producer the exclusive right to produce the play for a period of eighteen months, and raised $100,000 from their own family and friends to contribute to the production costs of the New York performance run. Illick Aff. ¶ 21. (A copy of the agreement with the New York producer is attached to the Illick Aff. as Exhibit E.) In this contract, Illick and Krier listed only themselves as the authors of the play, which was consistent with their understanding and intent as to authorship. See id.; Illick Aff. at ¶¶ 8, 13, 15; Krier Aff. at ¶¶ 5, 12. They titled the re-written version of the play, "Eve-olution," and it was performed at the Cherry Lane Theatre by professional actresses in October 2004. Illick Aff. at ¶ 21. Illick and Krier were unpaid for any of their time re-writing and promoting the play in New York. Illick Aff. at ¶ 21.

The play was not successful financially in New York. The producers lost money, as did Illick, Krier and their family and friends who invested in the New York production. Both Illick's

8

and Krier's mothers, for example, invested $10,000 each, and (like every other investor in the project) lost that money. Illick Aff. at ¶ 22.

They succeeded in publishing "Eve-olution" through the Dramatists' Play Service, Inc., a publishing company that specializes in theatrical works. Illick Aff. at ¶ 23. In their contract with the Dramatists' Play Service, they described themselves as the sole authors of the play. (A copy of the publishing contract is attached to the Illick Aff. as Exhibit F.) In addition, Illick and Krier listed themselves as the authors on the title page and in the credit pages of the published play, and dedicated the play to their husbands and children. Krier Aff. at ¶ 11. (Copies of these pages of Eve-olution are attached to the Krier Aff. at Exhibit C.) Illick and Krier listed the credit Joy had requested and they had agreed to in their Agreement on page 4 of the script, which is the customary location in the industry for such an attribution. Krier Aff. at ¶ 11.

Illick and Krier have received a total of approximately $3,300 each in royalties from the staging of the play in New York and from its publication. Illick Aff. at ¶ 23; Krier Aff., at ¶ 11 (attaching accounting agent's accounting statement as Exhibit B). Those modest royalties consisted largely of agreed-upon advance payments, and it appears that the play may not yield any additional royalties to them. Illick Aff. at ¶ 23; Krier Aff. at ¶ 11. At this stage, they have suffered substantial net losses in terms of their financial return on the play since they began work on it in 2001. Illick Aff. at ¶ 23.

Joy never asked to invest or to cover any of the losses for the New York production, but she does (unsurprisingly) request a share of all royalties and additional money for alleged harm to her career. Illick Aff. at 24, Krier Aff. at ¶ 10.

### SUMMARY JUDGMENT STANDARD

"A party against whom a claim … or a declaratory judgment is sought may, at any time,

move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). "Summary judgment is authorized 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Once the movant has served a properly supported motion asserting entitlement to summary judgment, the burden is on the nonmoving party to present evidence showing the existence of a trial worthy issue." Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 39 (1st Cir. 2004) (also noting that "bare allegations in a party's unsworn pleadings or in a lawyer's brief do not carry weight in the summary judgment calculus") (citations omitted).

"[W]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Proc. 56(e).

## ARGUMENT

Joy's claims, which are all based on her allegation that she co-authored the play, must be rejected as a matter of law in light of the undisputed and irrefutable facts which show that the parties viewed Illick and Krier as the sole authors of the play and Joy as a paid director and theatre consultant. The intent of the parties as to authorship is clear from the written Agreement, which Joy asked Illick and Krier to sign and in which Joy acknowledges that Illick and Krier were the sole authors of the work. Their intent as to authorship is further confirmed by the promotional materials they prepared

and used in connection with the performances of the play in Cambridge, Massachusetts, which stated that the play was written by Illick and Krier, not Joy. There is substantial additional evidence discussed below that further shows that Illick and Krier (rightfully) viewed themselves as the authors and owners of the play. Based on this incontrovertible evidence that Illick and Krier -- and previously Joy -- viewed Defendants as the sole authors of the play, summary judgment should enter on their behalf.

### A. The Written Agreement Unambiguously Provides That Illick And Krier Were The Sole Authors And, Accordingly, Joy's Contract Claim Should Be Rejected As A Matter Of Law.

The written Agreement alone establishes as a matter of law that Illick and Krier were the authors of the play and are entitled to protection of their rights as the authors. Given the express terms of the contract, the Court should not allow Joy's frivolous claim that she co-authored the play to proceed further.[1]

Interpretation of a contract ordinarily is a question of law for the court. See Commercial Union Ins. Co. v. Swiss Reinsurance America Corp., 413 F.3d 121, 125 (1st Cir. 2005);

---

[1] In various "pre-suit" communications, Plaintiff has argued that the written Agreement in its entirety is unenforceable because it contains some terms that are not definite or resolved. For example, the parties did not reach an agreement with respect to the royalty percentage that Joy should receive, if any, from the publication of the play. The parties, instead, agreed to reach an agreement at a later date. Such "agreements to agree" are not enforceable contract terms. See Rosenfield v. U.S. Trust Co., 219 Mass. 210, 217 (1935); Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). However, merely because the parties were unable to reach agreement as to certain terms does not mean that the entire agreement is unenforceable. On the contrary, Massachusetts courts will construe contracts in such a manner as to be valid and enforceable whenever possible. Lafayette Place Associates v. Boston Redevelopment Authority, 427 Mass. 509, 517 (1998), cert. denied, 525 U.S. 1177 (1999) ("a contract should be interpreted 'so as to make it a valid and enforceable undertaking rather than one of no force and effect.'"). This includes severing contract provisions that are unenforceable, if necessary to enforce the remainder of the agreement. See, e.g. McFarland v. Schneider, 11 Mass. L. Rptr. 704, 1998 WL Mass.Super.136133, * 40 (Mass. Super. - Feb 17, 1998), attached to this Memorandum as Exhibit A ("'[i]f the covenant [not to compete] is too broad in time, in space or in any other respect, it will be enforced only to the extent that is reasonable and to the extent that it is severable for the purposes of enforcement'") (citation omitted); see also U.S. v. Data Translation, Inc., 984 F.2d 1256, 1259 (1st Cir. 1992) ("When a single portion of a lengthy contract is unintelligible, but yet severable from the remainder, a court may strike that portion itself without affecting the enforceability of the remainder."). Accordingly, even though the parties did not reach an agreement with respect to royalties and future exploitation of the work, they reached a very definite and important agreement as to credits and payment terms for Joy. These terms should be given effect pursuant to the parties' intent.

11

Diamond Crystal Brands, Inc. v. Backleaf, LLC, 60 Mass. App. Ct. 502, 504-05 (2004). Courts construing a contract "adhere to the bedrock principle that, in the absence of linguistic ambiguity, the text of a contract dictates its meaning." Okmyansky v. Herbalife Int'l of America, Inc., 415 F.3d 154, 159 (1st Cir, 2005). In applying that principle, "words that are plain and free from ambiguity must be construed in their usual and ordinary sense." Id. (citing and quoting Ober v. Nat'l Cas. Co., 318 Mass. 27 (1945)).

The written Agreement is clear and unambiguous as to the parties' agreed-upon roles with respect to the play.[2] Joy was a paid director who helped to develop the play as a paid theatre consultant; she was expressly not one of the authors. As the language of the Agreement makes perfectly clear, Illick and Krier were the sole authors. Accordingly, Plaintiff agreed that on publications of the play, the credit should read: "Written by Hilary Illick and Jennifer Krier." This should end Plaintiff's contract claim as a matter of law.[3]

---

[2] Based on Joy's allegations that Illick and Krier allegedly "agreed through oral and written communications that Joy was a co-author" of the play (Complaint, par. 74), one can anticipate that Joy intends to seek to introduce extrinsic (or parol) evidence of that alleged oral agreement. The Court should reject that effort because the parties entered into an unambiguous written agreement that expressly addressed the issue of authorship, and it is well-established in Massachusetts that: "[a]s a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous." Langone v. USCO Distribution Services, Inc., 389 F.Supp.2d 91, 98 (D. Mass. 2005).

[3] Even if her contract specifically requested that Joy "ghost write," "adapt" or otherwise author the play, which it obviously does not, Joy's claims would fail due to her status as a specially-commissioned work-for-hire. See, e.g. Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc., 119 F.3d 55, 63 (1st Cir. 1997) (rejecting claim of authorship due to alleged contributions to work because done in course of employment); National Center for Jewish Film, Inc. v. Goldman, 943 F.Supp. 113, 117-118 (D. Mass. 1996) (where movie producer hired three individuals to compose music for films, their claims to ownership of copyright rejected outright because "[a]bsent [the producer's] urging as the 'motivating factor' behind the production of the movies ... there would have been no Songs.").

12

> **B.** **The Written Agreement, The Billing For The Play And Other Evidence Unequivocally Establish That Illick And Krier Never Viewed Joy As Co-Author Or Intended That She Would Have Rights As Co-Author And Accordingly Joy's Copyright Claim Should Be Rejected As A Matter Of Law.**

Plaintiff's copyright claim must fail because she cannot meet her burden to establish that Illick and Krier viewed her as a co-author and intended her to receive equal ownership rights to the play. See Childress v. Taylor, 945 F.2d 500, 508-509 (2nd Cir. 1991); Thomson v. Larson, 147 F.3d 195, 201-202 & n.20 (2d Cir. 1998). The written Agreement and billing for "Venus de Minivan," the play as it was performed in Cambridge, Massachusetts, unequivocally establish that the parties mutually agreed and understood Joy was not a co-author of the play. Those written documents expressly provide that Illick and Krier alone were the writers of the play. Illick and Krier added a poor man's copyright to the script prior to the Cambridge production; Joy did not object in the Agreement that the parties subsequently entered. There is significant additional evidence based on Illick's and Krier's exploitation of the play in New York after 2002 that confirms their understanding that they were the exclusive authors of the play. All of this important and unrebuttable evidence of Illick's and Krier's intent as to authorship should dispose of Joy's copyright claim on summary judgment. See Childress, 945 F.2d at 500 (federal appeals court affirmed summary judgment on copyright claim where there was insufficient evidence from which a jury could infer that principal author had "the state of mind required for joint authorship").

13

### 1. Under Copyright Law, Joy Has Burden To Prove That Illick and Krier Intended That She Would Be A Co-Author And Enjoy Equal Rights To Exploit The Work.

Joy has brought a declaratory judgment claim against Illick and Krier alleging that she is a co-author of the play pursuant to the Copyright Act, 17 U.S.C. Sec. 101 *et seq*. The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. Sec. 101. "Joint authorship entitles the co-authors to equal undivided interests in the whole work – in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made." Thomson, 147 F.3d at 199 (citing 17 U.S.C. Sec. 201(a)). The burden of proof is on the person claiming co-authorship to establish that "each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." Thomson, 147 F.3d at 200. Joy cannot meet that burden.[4]

### 2. Joy Cannot Establish Sufficient Evidence That Illick And Krier Intended That She Would Be Co-Author and Enjoy Equal Right to Exploit The Work And, Therefore, Summary Judgment Is Appropriate.

In cases involving copyright claims relating to the development of theatrical works, courts have clearly established that whether a play is a "joint work" - - i.e., whether one who contributes to the production of a play is entitled to copyright as a co-author - - depends on the mutual intent of the persons who contributed to the writing of the play. Childress, 945 F.2d at 508. The central test on intent is "how the putative joint authors regarded themselves in relation to the work." Id; see also Thomson, 147

---

[4] While Joy contributed to the play as director and theatre consultant, she cannot establish that she made independently copyrightable contributions to the work. Illick and Krier do not focus especially on this requirement as they firmly believe that Joy's co-authorship claim fails as a matter of law at summary judgment on the second requirement of her co-authorship claim, namely, Joy cannot establish sufficient evidence that Illick and Krier intended she would be a co-author with them. In addition, the issue of whether Joy made independently copyrightable contributions to the play might raise fact questions that would require costly and full-blown discovery and then trial, which for reasons of expense Illick and Krier, as stay-at-home mothers and artists, wish to avoid

14

F.3d at 201. "[E]ach putative co-author must intend to be a co-author in order to give rise to a co-author relationship." Thomson, 147 F.3d at 202 n.20 (emphasis added). The importance of the mutual intent test is especially significant where, as here, the person seeking rights as a co-author was not the "principal" or "dominant" author of the play. Childress, 945 F.2d at 508. Where the co-author claimant has insufficient evidence of such mutual intent, summary judgment is appropriate. Id.

In the two leading cases concerning co-authorship of a play, Childress v. Taylor and Thomson v. Larson, the Second Circuit discussed the principal factors to be considered in determining the question of intent.[5] The most important, and decisive, factor is whether the parties entered a written agreement on authorship. In Childress, the Second Circuit indicated that "contractual agreements concerning listed authorship" should be dispositive as to whether each participant in the creation of a play intended that all would be identified as co-authors.[6] Cf. 945 F.2d at 508. Given the existence of just such an agreement between the parties in which Joy agreed that Illick and Krier were to be listed as the sole authors of the play, Joy's claim should fail as a matter of law.

Even if the written Agreement was insufficient to determine whether Illick and Krier viewed themselves as the sole authors of the play, which Defendants strongly believe is not the case, there are additional factors by which intent can be determined as a matter of law. Judging the evidence here against these criteria, it is clear that Illick and Krier -- and previously Joy -- viewed Defendants as the sole authors of the play.

For example, an agreement as to billing for the play is *prima facie* proof on the issue of intent. Thomson, 147 F.3d at 203. Here, it is undisputed that the billing for the play during the Cambridge

---

[5] These Second Circuit cases are widely cited by courts and copyright text books nationwide and should be strongly persuasive, if not controlling, precedent here since the First Circuit and this Court have not written on the issue of determining intent in a co-authorship claim involving a theatrical work.

[6] In the absence of such a contractual agreement, the Court went on to discuss useful tests to determine the question of intent and co-authorship. Id.

15

performances was prepared with Joy's knowledge, assistance and acquiescence, and the billing publicly stated that the play was written by Illick and Krier, not Joy.

Registration of a copyright also informs the question of intent. See Childress, 945 F.2d at 509. Where the principal author registers the copyright in her own name, it tends to establish that her intent was not to share co-authorship. Id. Here, Illick and Krier established a "poor man's" copyright on the script of "Venus de Minivan" twice before it was performed in Cambridge. Joy received a copy of the script and was on notice of Illick's and Krier's claim of exclusive ownership, yet she did not object or address the copyright issue in the written Agreement that the parties subsequently signed. Illick and Krier also formally registered their copyright with the United States Copyright Office in April 2003, registering the copyright exclusively in their own names.

Control of the script is also a factor that illuminates the issue of intent. The Second Circuit found that "a contributor's decision-making authority over what changes are made and what is included in a work" can be persuasive on the issue of intent. Thomson, 147 F.3d at 202-203.[7] Illick and Krier retained control of the script on their computers. If anyone, including Joy, made a suggestion for a change to the script during a rehearsal, Illick and Krier ultimately decided if it would be incorporated into the final script and made the change in their own discretion. It is undisputed that Joy never had the script on her computer, nor was she ever provided a floppy disk with the script. The lack of the mechanical ability to control the changes

---

[7] Similarly, in Erickson v. Trinity Theatre, Inc., 13 F.3d 1061 (7th Cir. 1994), a defendant failed in its argument that certain of its actor members were co-authors of plays to which the plaintiff playwright claimed sole copyright ownership. In Erickson, the plays were developed in rehearsals, and the actors were actively involved. The editing of one of the plays "was accomplished largely by consensus;" Erickson admitted that the actors provided ideas for the dialogue in another. Id. at 1064. The Seventh Circuit held that, because the playwright "made the final decisions ... [and] controlled what eventually was put in the script," the actors who contributed suggestions for dialogue were not entitled to a copyright in the work as co-authors. Id.

16

to the script, while not definitive, is additional evidence that the parties did not view Joy as a co-author.

Evidence that the "principal" or "dominant" author of the play treated the play as her own by entering into agreements with third parties as the exclusive author of the play also bears on the question of intent. Thomson, 147 F.3d at 202-203. The Second Circuit noted: "[t]he fact that [Larson, the principal author] felt free to enter into the November 1995 contract on his own, without the consent of and without any reference to Ms. Thomson [the dramaturg] quite apart from whatever the terms of the agreements are, indicates that his intention was to be the sole author." Id. at 203. Similarly, Illick and Krier repeatedly acted as the sole authors of the play in dealings with the public. They registered the copyright for the play and listed themselves as the authors. They entered into a contract with a New York producer to stage their play there and described themselves as the sole authors in that contract. They also entered into the script publication contract and again listed themselves as the sole authors. The published play lists them as the authors.

All of these factors firmly establish that Illick and Krier understood that they were the sole authors of the play, and that they never intended that Joy would be a co-author and enjoy the equal right to control the future exploitation of the play. This makes sense for the additional reason that the play is intensely personal about their own and their husbands' private lives. They do not want, and never would have wanted, anyone else -- including Joy -- to have the right to use or exploit this material without their control and express consent. In light of this overwhelming and undisputed evidence, Joy cannot prevail on her co-authorship claim, and summary judgment should enter in favor of Illick and Krier.

### 3. <u>Childress</u> Establishes That Summary Judgment Should Be Awarded To Illick and Krier.

In <u>Childress</u>, the seminal and lead case on the issue of determining claims to authorship of dramatic plays, the Second Circuit affirmed summary judgment in favor of the principal author on facts less compelling than here. <u>Childress</u> establishes that summary judgment should be awarded to Illick and Krier.

<u>Childress</u> involved a claim of co-authorship by an actress, Clarice Taylor, who conceived the idea of a stage play based on the comedienne "Moms" Mabley; she sought out the plaintiff, Alice Childress, to write it; provided extensive research materials to Childress for the task; spoke with Childress regularly about the play's progress while Childress was at work on it; and suggested details based on her research. <u>Id.</u> at 508.

Notwithstanding Taylor's contributions to the play, the trial court rejected her claim of co-authorship on a motion for summary judgment, which was affirmed by the Second Circuit because the parties understood that Childress was the author as reflected in the agreed-upon billing for the play. <u>Id.</u> at 507-508. In reaching its determination, the Court noted that:

> an inquiry so limited [to the state of mind of the purported co-author] would extend joint author status to many persons who are not likely to have been within the contemplation of Congress. For example, a writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work. Similarly, research assistants may on occasion contribute to an author some protectable expression or merely a sufficiently original selection of factual material as would be entitled to a copyright, yet not be entitled to be regarded as a joint author of the work in which the contributed material appears. What distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors.

Id. at 507. Thus, under copyright law, editors who make some contribution to the script are not deemed joint authors, because the author and editor do not intend to be joint authors, even though the editor will frequently make useful revisions, some of which will be original expression. See id.[8]

Joy's contributions to the script, if any, were as a director and theatre consultant and akin to Taylor and the hypothetical editor whom the Childress court stated are without claims to co-authorship. Illick and Krier never intended that by hiring Joy as a paid director/consultant, she would be a co-author. In fact, they emphatically rejected her attempt to claim authorship before the play's performance in November 2002 when they dismissed her request for an "adapted by" credit and stated in the written Agreement that they alone would receive the credit as the writers of the play.

The Second Circuit in Childress affirmed a summary judgment ruling in favor of the principal author on the copyright claim. The evidence in this case in favor of Illick and Krier is even stronger. After all, Illick and Krier signed a written Agreement with Joy that they alone were the sole authors of the play; there was no such unambiguous expression of the parties' intent in Childress. Based on the precedent of Childress, summary judgment should be granted in favor of Illick and Krier on Joy's copyright claim.

### C.  Because Plaintiff's Other Claims Derive From Her Wrongful Co-Authorship Claim, They Too Must Fail.

All of Plaintiff's other claims in this suit arise from and necessarily depend upon her meritless claim of co-authorship. For the reasons, set forth above, Plaintiff's co-authorship claim is defective as a matter of law. Accordingly, the Court should enter summary judgment in

---

[8] Similarly, in Thomson, the trial court found that Thomson (the petitioner for co-authorship) had "made at least some non-*de minimis* copyrightable contribution" to the play, but the trial court and Second Circuit found that even a contribution of significant language is not sufficient to confer co-author status on the contributor. Id. at 202. "A specific finding of mutual intent remains necessary." Id.

19

favor of Illick and Krier on the remainder of Plaintiff's claims. See Complaint, ¶ 60 (Count II, seeking an accounting); ¶ 65-66 (Count III, false advertising); ¶ 69 (Count IV, breach of oral contract); ¶ 74 (Count V, breach of contract implied in fact); ¶ 79 (Count VI, estoppel).

## CONCLUSION

For these reasons, Defendants Hilary Illick and Jennifer Krier respectfully request that the Court allow their motion for summary judgment on all of Plaintiff's claims. In addition, Illick and Krier request that the Court order Plaintiff to pay their reasonable attorneys' fees to defend against this meritless and frivolous action, pursuant to 17 U.S.C. Sec. 505 and M.G.L. c.231, Sec. 6F.

Respectfully submitted,

HILARY ILLICK and
JENNIFER KRIER,
By their attorneys,


/s/ Nicholas B. Carter
Nicholas B. Carter, Esq. (BBO# 561147)
Raymond P. Ausrotas (BBO# 640315)
Todd & Weld LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626
ncarter@toddweld.com

Dated: April 10, 2006

### CERTIFICATE OF SERVICE

I, Nicholas B. Carter, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date: April 10, 2006                           /s/ Nicholas B. Carter