UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BILLIE JO JOY,

        Plaintiff,

v.

HILARY ILLICK AND JENNIFER KRIER,

        Defendants.

Docket No. 05-11580

**PLAINTIFF BILLIE JO JOY'S OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This case presents a stark factual dispute over its essential issue: whether defendants Hilary Illick and Jennifer Krier (collectively, "Defendants") intended to jointly author a play with plaintiff Billie Jo Joy ("Joy"). This genuine dispute of material fact must be resolved by a jury, not by the Defendants' Motion for Summary Judgment.

**STATEMENT OF THE CASE**

Joy and the Defendants co-authored a play entitled *Venus de Mini Van, Mothers in the Breakdown Lane* (the "Script") during numerous collaborative sessions at Joy's Cambridge studio in the spring and fall of 2002. Joy wrote much of the Script and exercised decision-making authority over it. Throughout the creative process, the Defendants repeatedly told Joy that she was a co-author of the Script and that she would receive a share of royalties from its use. Suddenly, after successful performance of the Script in December of 2002, the Defendants disavowed Joy as a joint author and boldly refused to speak with her. Without Joy's involvement, the Defendants licensed the Script to be performed "off Broadway" and later published a version of the Script. In both the "off Broadway" and published versions of the Script, the Defendants unjustly denied Joy her rights as a joint author.

Joy initiated this action on July 8, 2005, seeking in Count I a declaration that she was a joint author of the Script under the Copyright Act. Joy also advances claims for an accounting of defendants' profits (Count II), for false advertising (Count III), for breach of an oral contract (Count IV), for breach of a contract implied in fact (Count V), and for estoppel (Count VI). Prior to an initial scheduling conference, the exchange of automatic disclosures, or the taking of any discovery whatsoever, the Defendants moved for summary judgment on all counts. The Defendants' motion ignores the striking issues of fact concerning the intent of the Defendants – at the time of Joy's contributions – to be joint authors with Joy. These disputed facts preclude summary judgment.

In short, Joy and the Defendants tell vastly different stories about how the Defendants manifested their joint authorship intent while writing the Script with Joy. For instance, Joy submits evidence that the Defendants had not even written the Script prior to meeting with her in the spring of 2002, whereas the Defendants claim the Script was already written at that time. The Defendants also refuse to recognize that Joy wrote large portions of the Script, including an entire scene, and that Joy exercised decision-making authority over the Script. Nor do the Defendants admit that they repeatedly told Joy that all three women were writing the Script "together" and that Joy would receive "a piece of the pie." The Defendants even deny agreeing to pay Joy substantial author royalties for her contributions to the Script.

This evidence, all of which is presented in Joy's attached affidavit, creates a vivid factual dispute which can only be resolved by a trier of fact. This case cannot be disposed of at summary judgment. The Defendants' motion must be denied.

## RELEVANT FACTS

Prior to meeting Joy, the Defendants had never written, directed, produced or acted in a dramatic performance of any kind. Joy Aff. at ¶ 4. Joy, on the other hand, is an accomplished dramatic

2

artist with over 30 years of experience. *Id.* at ¶ 2. Aware of Joy's reputation and work, the Defendants approached her in or about January 2002 and asked that she direct their "idea" for a play about their experiences as women and stay-at-home mothers. *Id.* at ¶ 4.

Joy and the Defendants held an initial meeting to discuss the project on or about March 19, 2002, at Art & Soul, a Cambridge performance arts studio which Joy co-founded and uses for her artistic and theatrical projects. *Id.* at ¶ 3, 6. The Defendants told Joy that they knew essentially nothing about dramatic art and that they needed her help. *Id.* Joy and the Defendants discussed meeting at Art & Soul once or twice a week throughout the spring. *Id.* Joy offered the Defendants a favorable rate of $60 per hour for her directing and a reduced rate of $7 per hour for use of space at Art & Soul. *Id.* At that time, Joy expected to direct a play using a completed script. *Id.* at ¶ 4-7.

### The Defendants admit not having a script

An initial rehearsal was scheduled for April 9, 2002. *Id.* at ¶ 7. As that date approached, however, it became increasing clear that the Defendants had not written a script. *Id.* at ¶ 7-9. Joy repeatedly asked for a copy of the Defendants' script, but the Defendants failed to deliver one. *Id.* Finally, the Defendants conceded that they had written only a few pages of journal entries. *Id.* at ¶ 8. Joy asked the Defendants to deliver those pages to her prior to their scheduled rehearsal. *Id.* On April 8, 2002, the Defendants delivered to Joy's studio approximately ten pages of journal entries and a crude outline listing three acts and some preliminary scene titles. *Id.* at ¶ 9. The journal entries were called "Mamalogues." *Id.* at ¶ 8.

The journal entries the Defendants wrote prior to meeting with Joy on April 9, 2002, in no way resembled the completed Script. *Id.* at ¶ 9. They were not arranged or structured in the form of a play and were written without regard to theatrical concerns such as setting, dialogue, staging or lighting. *Id.* at ¶ 6. At the April 9, 2002 meeting, Joy and the Defendants agreed that these journal entries were

3

insufficient to serve as a script.  *Id.* at ¶ 10.

### Joy and the Defendants write the Script together

What were initially planned as a rehearsals instead became collaborative sessions aimed at writing the Script.  *Id.* at ¶ 11.  Starting with this very first collaborative session, Joy and the Defendants began to write the Script together by using Joy's creative techniques.  *Id.*  Throughout April, May and early June 2002, Joy and the Defendants met at Art & Soul for what became approximately three-hour collaborative writing sessions.  *Id.* at ¶ 12.

During this time, Joy wrote substantial portions of the Script by hand.  *Id.* at ¶ 13.  She wrote an entire scene and portions of scenes.  *Id.*  Notably, Joy also exercised decision-making authority over what would and would not be included in the Script.  *Id.*  Given the Defendants' complete lack of experience in theatre, they continually deferred to Joy and encouraged her to write text for inclusion in the Script.  *Id.*  In fact, Joy cannot recall a single instance in which she contributed content that did not end up in the Script.  *Id.*  After each collaborative session, the Defendants would input the newly generated text into an electronic version of the Script on their home computers.  *Id.* at ¶ 14.  The Defendants would then bring printouts of the evolving Script to the next collaborative session, where Joy and the Defendants would change, edit and revise the Script together.  *Id.*

During this time, Joy told the Defendants, on more than one occasion, that she was no longer just directing a play, but that she was also writing the Script together with them.  *Id.* at ¶ 16.  In response, the Defendants repeatedly reassured Joy that she was indeed writing the Script "together" with them.  *Id.* at ¶ 16-18.  The Defendants also agreed, in spring of 2002, that Joy would receive royalties from future uses of the Script.  *Id.* at ¶ 17.

On one occasion, Illick mentioned that she might send the Script to an agent in New York.  *Id.* at ¶ 18.  When Joy expressed hesitation because the parties had not previously discussed publication,

Illick responded that "we are definitely cutting you into this deal. You get a piece of the pie. When you are an old lady, you're getting royalty checks from this. You are part of this deal." *Id.*

On or about June 14, 2002, Joy and the Defendants put on a staged reading of the Script at Art & Soul. *Id.* at ¶ 19. After that performance, Joy met with the Defendants at her home to discuss the future of the project. *Id.* at ¶ 20. At this meeting, the Defendants again agreed to give Joy a percentage of any profits derived from future use of the Script. *Id.* While Joy was willing to accept less than a one third share – in recognition that the Script concerned the personal lives of the Defendants – Joy made clear that the royalty was for her work as a joint author, not as a director. *Id.* at ¶ 21. Joy stated, and the Defendants agreed, that all three women had written the Script together. *Id.* at ¶ 20.

Although they did not work on the Script together for the remainder of the summer of 2002, Joy and the Defendants resumed their collaborative sessions at Art & Soul in or about September 2002. *Id.* at ¶ 22. During this time, Joy and the Defendants, working together, refined and revised the Script, giving it a new title, *Venus de Mini Van, Mothers in the Breakdown Lane*. *Id.* Joy and the Defendants planned a run of performances for late November and early December 2002. *Id.* at ¶ 23.

**The first signs of trouble and the letter of intent**

While Joy was abroad during October 2002, the Defendants sent her a copy of a press release for the November and December performances. *Id.* at ¶ 23. Joy's name was nowhere on the press release. *Id.* Joy objected immediately. *Id.* Then, upon her return to Cambridge, Joy reviewed a draft of the Script which, for the first time, included a copyright page stating that the Script was copyrighted by the Defendants. *Id.* at ¶ 24. Again, Joy objected immediately, pointing out to the Defendants that they had agreed many times that Joy wrote the Script with them. *Id.* The Defendants dismissed the page, stating that it should not be taken seriously and that they included it only for their own enjoyment. *Id.*

5

Nonetheless, Joy sought to reduce to writing some basic understanding about the parties' working relationship. *Id.* at ¶ 25. With the November and December shows pressing upon them, Joy and the Defendants did not have time to meet with a lawyer prior to drafting what was a preliminary document with only rough terms (the "Letter of Intent") (Exhibit 4 to Joy Aff.). *Id.* at ¶ 25. The parties intended this document to serve as a placeholder while they were busy with the performance run. *Id.*

During discussion of the Letter of Intent, the Defendants recognized Joy's substantial contributions to the Script, and that she was a "creator" of it. *Id.* at 27. In fact, the very first line of the Letter of Intent embodies a contemporaneous discussion between Joy and the Defendants where it was agreed that all three women were equals in the creative process and that the parties would operate by consensus regarding future use of the Script. *Id.* at ¶ 26. It reads, "We three women Billie Jo Joy, Jennifer Krier, and Hilary Illick all want to create a space where we're all three empowered." *Id.*; Exhibit 4 to Joy Aff.

Joy and the Defendants also agreed on billing credit for the November and December 2002 performances. *Id.* at ¶¶ 27-28. The Letter of Intent states, in paragraph two, that "… the credits will read: Written by Hilary Illick and Jennifer Krier, Original Production developed with and directed by Billie Jo Joy." *Id.* at ¶ 28; Exhibit 4 to Joy Aff. This language was not intended to assign authorship rights exclusively to the Defendants. *Id.* The parties did not even consider using the term authorship. *Id.* Indeed, the "developed with" language was intended to recognize Joy's substantial contributions to the Script and to include her as a joint author. *Id.* at ¶ 27.

In paragraph three of the Letter of Intent, the Defendants explicitly recognize that "Billie Jo Joy contributed script input." *Id.* at ¶ 30; Exhibit 4 to Joy Aff. Notably, the Defendants initially presented Joy with a draft of the Letter of Intent stating that Joy "offered script input." *Id.* Joy pointed out, and the Defendants agreed, that "offered" did not accurately state Joy's role because she did not merely

6

suggest script content to the Defendants, she directly contributed substantial portions of text to the Script. *Id.* Recognizing the error, Illick quickly changed "offered" to "contributed" by hand. *Id.*

The Letter of Intent also memorializes, in paragraph five, the Defendants' repeated agreement to pay Joy substantial author royalties. *Id.* at ¶¶ 31-32. Although the precise percentage was yet undetermined, Joy and the Defendants discussed royalties of between 12.5% and 25% for Joy's contributions in "developing the script." *Id.* at ¶ 31; Exhibit 4 to Joy Aff.

Despite the understanding reflected in the Letter of Intent, the parties explicitly recognized the need for legal advice before reaching a final agreement, one which would bind the parties past the November and December 2002 performances. *Id.* at ¶ 25. In recognition of the agreement's preliminary nature, the Letter of Intent provides that the parties would "continue this conversation and reach an agreement in the month of January 2003" and that "[i]f the play goes into further production, [the parties] will need to come up with another letter of agreement." *Id.* at ¶ 32; Exhibit 4 to Joy Aff. A meeting was scheduled with an attorney for January 10, 2003, so that the parties could reach a final agreement with the advice of counsel. *Id.* at ¶ 25.

### The Defendants disavow Joy's joint authorship

The November and December 2002 performances at Art & Soul were a rousing success. *Id.* at ¶ 33. Afterwards, however, when Joy contacted the Defendants about their scheduled meeting with an attorney, the Defendants suddenly refused to attend. *Id.* Instead, the Defendants sent Joy a letter, dated January 13, 2003, informing her, for the first time, that they did not consider her to be a joint author of the Script. *Id.* In that letter, the Defendants brazenly refused to honor their agreement to pay Joy royalties. *Id.* The Defendants also vowed to stop speaking with Joy. *Id.*

Joy did not work on the Script with the Defendants after January 13, 2003. *Id.* at ¶ 34. Joy did eventually read in a newspaper article, however, that the Defendants, without Joy's involvement, had

7

licensed the Script to be performed "off Broadway" under the name *Eve-olution* and did not include her as a joint author. *Id.* She later discovered that the Defendants had likewise published the Script without recognizing her a joint author. *Id.* at ¶ 35. Joy did not receive any money, publicity or credit as a joint author of the "off Broadway" production or the published version of the Script. *Id.* at ¶¶ 35, 37. She has also been denied the future artistic opportunities that come with the authorship credit she deserves. *Id.*

## SUMMARY JUDGMENT STANDARD WHERE INTENT IS AT ISSUE

Summary judgment is appropriate only where "there is no genuine issue of material fact and … the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making such a determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

"[W]hen a case turns on the intent of one party, a 'trial court must be cautious about granting summary judgment.'" *Maurizio* v. *Goldsmith*, 84 F.Supp.2d 455, 458 (S.D.N.Y. 2000)(quoting *Gallo* v. *Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)); *see also Lipsett* v. *University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988)(summary judgment "test remains particularly rigorous when the disputed issue turns on a question of motive or intent"); *Poller* v. *Columbia Broadcasting System, Inc.* 368 U.S. 464, 473 (1962)("summary judgment procedures should be used sparingly ... where motive and intent play leading roles").

**ARGUMENT**

I. **A DISPUTE OF FACT EXISTS AS TO THE INTENT OF THE PUTATIVE JOINT AUTHORS**

The Defendants' motion rests upon the proposition that there is no evidence of the Defendants' intent to be joint authors with Joy. This argument is misplaced. There is indeed evidence, as set forth in Joy's affidavit, that would entitle a reasonable jury to find in Joy's favor.

The Copyright Act defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or independent parts of a unitary whole." 17 U.S.C. § 101. "The touchstone of the statutory definition 'is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit.'" *Thomson* v. *Larson*, 147 F.3d 195, 199 (2d Cir. 1998)(quoting H.R.Rep. No. 1476, 94th Cong. 120, 121 (1976), reprinted in 1976 U.S.Code Cong. & Admin. News 5659, 5735). "This does not mean, however, that the several authors must necessarily work in physical propinquity, or in concert, nor that the respective contributions be equal in quantity or quality. Neither is an express collaboration agreement necessary to create a joint author relationship." 1 NIMMER ON COPYRIGHT § 6.03 (2006).

It is well-settled among the circuits, including the First Circuit, that joint authorship exists where "each of the putative co-authors (1) made independently copyrightable contributions to the work[1]; and (2) fully intended to be co-authors." *Thomson*, 147 F.3d at 200; *see also Childress* v. *Taylor*, 945 F.2d 500, 507 (2d. Cir. 1991); *Cabrera* v. *Teatro Del Sesenta*, Inc., 914 F.Supp. 743, 767 (1st Cir. 1995)(citing *Childress*). The intent of each putative joint author at the time of her contribution is "the crucial aspect of joint authorship." *Childress*, 945 F.2d at 507. Mutual intent means that the

---

[1] While the Defendants technically dispute that Joy made independently copyrightable contributions, they also concede that this "… might raise fact questions that would require … discovery and then trial." Defendants' Memorandum in Support of Motion for Summary Judgment ("Defendants' Memorandum") at p. 14 n. 4. Indeed, Joy presents evidence that she contributed an entire scene, and portions of scenes. Joy Aff. at ¶¶ 13, 15. Joy has attached to her affidavit one concise example of how her extensive contributions became part of the Script. *See Id.* at ¶ 15. As the Defendants suggest, this evidence creates an issue of fact which can only be determined by a jury. *See* 1 NIMMER ON COPYRIGHT § 6.07[C] ("An issue of fact arises in addressing whether a person has made sufficient contribution to a work so as to claim to be its joint author").

9

parties must "entertain in their minds the concept of joint authorship, whether or not they understood precisely the legal consequences of that relationship." *Childress*, 945 F.2d at 508; *see also Thompson*, 147 F.3d at 201.

Courts have not explicitly defined the precise intent required to create joint authorship. *See Caffey*, 409 F.Supp.2d 484, * 40 (noting that the Second Circuit has not explicitly defined intent). While *Thompson* identified several factors which often bear on the intent of the parties, "the test of co-authorship intent will vary depending on the specific factual circumstances." *Thomson*, 147 F.3d at 202 n.16. See also *Aalmuhammed* v. *Lee*, 202 F.3d 1227, 1235 (9th Cir. 2000)(intent factors "cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much").

Nevertheless, courts adjudicating joint authorship claims have looked to evidence of (1) objective statements made by putative joint authors, *Thomson*, 147 F.3d at 205; (2) "decision-making authority over what changes are made and what is included in a work," *Id.* at 202-203; (3) the amount of each putative author's contribution, *Id.* at 202 n. 19; *see also Robinson* v. *Buy-Rite Costume Jewelry, Inc.*, 2004 WL 1878781 at *3 (S.D.N.Y. 2004); (4) billing credit, *Thomson,* 147 F.3d at 203; (5) written agreements between the putative joint authors, *Id.* at 204; (6) written agreements with third parties, *Id.*; and (7) the payment of author royalties. *Caffey*, 409 F.Supp.2d 484, * 40.

Joy presents sufficient evidence for a reasonable jury to find that the Defendants intended to be joint authors with Joy in that the Defendants repeatedly told Joy that all three women were writing the Script "together" and that Joy had "a piece of the pie" (Joy Aff. at ¶¶ 16, 18); Joy exercised final decision-making authority over the Script (*Id.* at ¶ 13); Joy wrote significant portions of the Script, including an entire scene (*Id.* at ¶¶ 11-15); the Defendants acknowledged, in writing, that the Script was "developed with" Joy and that Joy "contributed script input" (*Id.* at ¶¶ 27, 30); and the Defendants agreed to pay Joy substantial author royalties for her contributions to the Script (*Id.* at ¶¶ 18, 20-21,

31). From this evidence, a reasonable jury could certainly find in Joy's favor. Accordingly, summary judgment is inappropriate, and the Defendants' Motion must be denied.

### A. The Defendants' statements that Joy was a joint author and that Joy would receive royalties constitute sufficient evidence of their joint authorship intent.

Statements made between putative joint authors are evidence of their intent. *See Thomson*, 147 F.3d at 205; *Maurizio*, 84 F.Supp.2d at 466; *Robinson*, 2004 WL 1878781 at *3. During the period in which the Defendants and Joy wrote the Script, the Defendants repeatedly told Joy that she was a joint author and that she would receive substantial author royalties. Joy Aff. at ¶¶ 15-18, 20-21. Specifically, the Defendants told Joy that they were writing the Script "together" and that she would receive a "piece of the pie." *Id.* at ¶¶ 16, 18. They further promised that Joy would be "getting royalty checks" when she was "an old lady." *Id.* at ¶ 18. These statements are alone sufficient evidence for a reasonable jury to find in Joy's favor. Given this telling evidence of the Defendants' intent to be joint authors with Joy, summary judgment must be denied.

In a case strikingly similar to this one, *Maurizio*, a court in Southern District of New York found that plaintiff Cynthia Maurizio presented sufficient evidence, in the form of oral statements, that defendant Olivia Goldsmith intended to jointly author the novel *The First Wives Club* with Maurizio.[2] 84 F.Supp.2d at 465. In that case, Goldsmith started to write preliminary drafts of the *The First Wives Club* before approaching Maurizio, a more experienced hand who Goldsmith hoped would assist with plot structure and mechanics. *Id.* at 458. After working together for some time, Goldsmith asked Maurizio to co-author the novel and reiterated an earlier statement that both women would "make a lot of money." *Id.* at 458. Then, as in this case, after much of the work was written, Goldsmith suddenly refused to acknowledge Maurizio as a joint author. *Id.* at 460. Despite the fact that all drafts were credited as "by [Goldsmith]," the court found that Goldsmith's statements to Maurizio were sufficient

---

[2] Although Maurizio's joint authorship claim was barred on statute of limitations grounds, the court nevertheless found that the joint authorship claim would survive summary judgment.

11

evidence of her intent to be a joint author. *Id.* at 459-460, 465.[3]

The statements made by the Defendants to Joy are even stronger evidence of the Defendants' intent than those in *Maurizio*. After working with the Defendants for a brief time in the spring of 2002, Joy informed the Defendants that she was doing more than directing, that she was writing the Script with them. Joy Aff. at ¶ 16. The Defendants agreed that Joy was a joint author and stated that all three women were writing the Script "together." *Id.* During this time, the Defendants told Joy that she had a "piece of the pie" and that, if the play became a commercial success, she would be "getting royalty checks" when she was an "old lady." *Id.* at ¶ 18. The Defendants also told Joy that she was "part of this deal." *Id.* These statements alone constitute sufficient evidence for a reasonable jury to find that the Defendants intended Joy to be a joint author at the time the Script was written.

### B. Joy's decision-making authority is sufficient evidence that the Defendants intended her to be a joint author.

"An important indicator of authorship is a contributor's decision-making authority over what changes are made and what is included in a work." *Thomson*, 147 F.3d at 202-203. Joy exercised decision-making authority over the Script. Joy Aff. at ¶ 13. If there was a dispute between Joy and the Defendants over whether to include or exclude any content, or how text or scenes should be written, Joy made the ultimate decision. *Id.* Moreover, when Joy contributed ideas, text, staging or theatrical design, those contributions were universally accepted by the Defendants. *Id.* In fact, Joy does not recall a single instance in which her contributions were rejected by the Defendants. *Id.* This decision-

---

[3] The Defendants rely on *Childress* as dispositive of Joy's joint authorship claim. Defendants' Memorandum at pp. 18-19. This reliance is misplaced. While *Childress* indeed establishes the appropriate test for joint authorship, its facts are wholly different than the instant case. In *Childress*, Clarice Taylor asked playwright Alice Childress to write a play about comedienne Jackie "Moms" Mabley, who Taylor had been researching. Taylor provided Childress only with research and some "incidental suggestions" regarding the script. 945 F2d at 509. Never did Childress, who wrote the play by herself, say or do anything to suggest that Taylor was a joint author. *Id.* The court granted summary judgment because Taylor introduced "*no evidence* from which a trier could infer that Childress had the state of mind required for joint authorship." *Id.* (emphasis added). Here, on the other hand, Joy introduces abundant evidence of the Defendants' intent that she be a joint author. Joy wrote significant portions of the Script, exercised decision-making authority over it, was told she was a joint author, and was promised a substantial royalty for her contributions. None of these facts were present in *Childress*, making summary judgment inappropriate.

making authority reflects the Defendants' intent to work with Joy as a joint author. As such, summary judgment should be denied.

        **C.**       **The amount of Joy's contribution to the Script is sufficient evidence that the Defendants intended Joy to be a joint author.**

The amount of a putative joint authors' contribution can also be evidence that she was an intended joint author. *Thomson*, 147 F.3d at 202 n. 19. In *Thomson*, the Court expressly rejected prior case law holding that the amount of an author's contribution was not relevant to the intent consideration, commenting that the extent of an author's contribution could by itself create an issue of fact regarding intent. *Id.*

In this case, summary judgment should be denied because Joy's contribution constitutes sufficient evidence that the Defendants intended her to be a joint author. Joy made extensive contributions to the Script, including the creation of an entire scene and portions of scenes. Joy Aff. at ¶¶ 13-15. The Defendants' encouraging of extensive writing and contributions by Joy is consistent with, and evidence of, the Defendants' intent to be joint authors with Joy. That the Script was written through a truly collaborative process involving all three women is further evidence of the Defendants' intent. *Id.* at ¶¶ 11-15.

        **D.**       **The Letter of Intent is additional evidence of the parties' intent to be joint authors because it recognizes Joy's contributions and reflects the agreement to pay Joy substantial author royalties.**

Joy and the Defendants never made a formal, definitive agreement concerning authorship or copyright ownership. While the parties had intended to reduce their relationship to writing, the Defendants abruptly stopped speaking with Joy before the parties could meet with a lawyer, as they had planned, to draft the appropriate documentation. Joy Aff. at ¶ 33. The parties did, however, memorialize some basic discussions in a document entitled "Agreement between Artists Jennifer Krier, Billie Jo Joy, and Hilary Illick For Production of *Venus de MiniVan* November/December 2002." This

13

document (Exhibit 4 to Joy Aff.), drafted by Joy and the Defendants, was intended to be a placeholder only while the parties were busy with the November and December, 2002 performances. Joy Aff. at ¶¶ 25, 32. Although certainly not a model of legal clarity, this document is further support for the proposition that the Defendants' intended joint authorship with Joy.

### 1. The Letter of Intent recognizes Joy's contributions to the Script.

The very first sentence of the Letter of Intent sets forth the concept that Joy and the Defendants were on equal footing, both in the creative process and in determining future use of the Script. It states "We three women, Billie Jo Joy, Jennifer Krier, and Hilary Illick all want to create the space where we're all three empowered." Joy Aff. at ¶ 26; Exhibit 4 to Joy Aff. This text embodies a contemporaneous discussion between the Defendants and Joy. Joy Aff. at ¶ 26. In this discussion, the parties agreed that each co-author had to feel comfortable with future uses of the Script, and that Joy and the Defendants would operate by consensus. *Id.* This provision, and the conversation which led to its inclusion, are evidence that the parties intended to work as joint authors during the time the Script was written.

Further evidence of the intended joint authorship is found in the language of the Letter of Intent's third paragraph. There, the Defendants agreed to the statement "Billie Jo Joy contributed script input." While the statement itself represents sufficient evidence for a reasonable jury to find that Joy was a joint author, it is only more compelling when viewed in light of the process of its inclusion. Specifically, the Defendants presented Joy with a draft of the Letter of Intent providing that Joy "offered" script input. *Id.* at ¶ 30. When Joy pointed out that she did more than offer suggestions, that she actually wrote substantial portions and determined what would be included in the Script, the Defendants readily changed "offered" to "contributed" (in Illick's handwriting) before signing the agreement. *Id.* This evidence strongly suggests an intent on the part of the Defendants that Joy be a joint author of the Script.

> **2.    The agreement to pay substantial authorship royalties to Joy is sufficient evidence of the Defendants' intent to be joint authors.**

The Defendants promised to pay Joy substantial author royalties. In addition to repeated oral promises to pay royalties, paragraph five of the Letter of Intent states:

> Jennifer Krier, Hilary Illick and Billie Jo Joy agree to meet in the month of January to create a contract to determine the percentage of profits from the published script. It is the intention of Hilary Illick, Jennifer Krier and Billie Jo Joy to recognize, in terms of percentages, the valuable creative contributions that have brought this work into being. As of November 14, 2002, we are discussing a percentage range of 12.5% - 25% of profits for her work as director and assistance with Hilary and Jennifer in developing the script…

These royalties were intended to compensate Joy for her work as a joint author, separate and distinct from the hourly fee Joy received for her work as a director, as outlined in paragraph three of the Letter of Intent. Joy Aff. at ¶ 29, 31.

The promise of royalties is not only evidence of the Defendants' intent; in fact, it is also evidence of authorship. *Cf. Caffey*, 409 F.Supp.2d 484, * 44. In *Caffey*, three singers alleged that they did not infringe upon Caffey's copyright in a musical show because they were joint authors of it. When the singers performed the show, however, they paid Caffey author royalties without objection. *Id.* at * 44. The Southern District of New York found the receipt of royalties to be "highly probative" of a party's authorship. *Id.*

During their discussions, the Defendants repeatedly promised to pay Joy royalties for her work as a joint author. During their collaborative sessions in the spring of 2002, the Defendants told Joy that she would get "a piece of the pie" and that she would be "getting royalty checks" when she was an "old lady." Joy Aff. at ¶ 18. The parties again discussed royalties at a summer 2002 meeting at Joy's house. *Id.* at ¶¶ 20-21. Then, just prior to signing the Letter of Intent, the parties again discussed paying Joy royalties for her authorship. *Id.* at ¶ 31. These discussions are embodied in the text of the Letter of Intent.

It is also significant that the Defendants agreed to more than just a *de minimis* percentage of royalties. Although Joy agreed to less than a third because the story concerned the personal lives of the Defendants, she insisted upon, and the Defendants promised, a royalty between 12.5% and 25%. Joy Aff. at ¶¶ 31-32; Exhibit 4 to Joy Aff. The promise of substantial author royalties is strong evidence of the Defendants' intent and must be considered by a jury.

### E. The Defendants later efforts to deny Joy authorship credit do not negate their intent, during the writing process, to jointly author the Script with Joy.

The Defendants point to their later actions and agreements as evidence that Joy was not an intended joint author. Joy does not dispute that, after the Script was essentially written, the Defendants stopped speaking with her and disavowed her authorship. But the essential time for evaluating joint authorship intent is during the writing process, not after it. *Thomson*, 147 F.3d at 199. *see also Baker* v. *Robert I. Lappin Charitable Found.*, 415 F.Supp.2d 473, 487 (S.D.N.Y. 2006)("The key is the intent of the parties at the time the work is done"). Consequently, the Defendants' actions after the Script was written are evidence only that the Defendants connived to exclude Joy from the joint authorship rights she had already acquired. This evidence does nothing to negate the validity or sufficiency of the evidence presented by Joy on the issue of the Defendants' intent at the time of Joy's contribution.

Nor would it matter if the Defendants secretly harbored intentions to exclude Joy from joint authorship. The joint authorship test considers a putative author's objective intent, not her subjective intent. As the Ninth Circuit explained, "… were the mutual intent to be determined by subjective intent, it could become an instrument of fraud, were one coauthor to hide from the other an intention to take sole credit for the work." *Aalmuhammed*, 202 F.3d at 1234. The Defendants objectively expressed their intent to be joint authors until just after the Script was performed successfully. By then, the Defendants had already manifested sufficient objective evidence for a reasonable jury to find in Joy's favor on the question of joint authorship.

16

## II.   THE LETTER OF INTENT DOES NOT DISPOSE OF JOY'S CLAIMS

The Defendants premise their summary judgment argument on the Letter of Intent. They argue that it is a "clear and unambiguous" agreement, and that paragraph two, the provision for billing credit, disposes of the authorship issue. *See* Defendants' Memorandum at p. 11-12. This is only wishful thinking. Paragraph two does not address authorship; nor is it clear, unambiguous, or enforceable by its terms.

The Letter of Intent provides a useful window into the intent of the parties. It was not intended as a final or complete writing for the reasons set forth in paragraphs 25 and 32 of Joy's affidavit.[4] However, even if it were a complete and final agreement, the Defendants' motion on the issue of authorship fails because the proposition the Defendants rest upon relates to credit for *billing* purposes and not the different issue of *authorship*, which is the subject matter of this suit. Additionally, paragraph two of the Letter of Intent, drafted by laymen, is ambiguous and susceptible of differing interpretations. Its terms can only be properly understood by consideration of parol evidence, including evidence of the circumstances surrounding the document's execution and evidence of what the parties intended its terms to mean.

### A.   The Letter of Intent's billing credit provision is not dispositive because it does not address authorship.

Assuming, *arguendo*, that the Letter of Intent is a final, complete, and integrated agreement, a proposition that Joy denies, it is not dispositive of the authorship issue because the billing credit provision does not address that issue. It addresses only the issue of credit, which is not the same as

---

[4] For a contract to be enforceable, it must express a present intent to be bound. *Rosenfield* v. *U.S. Trust Co.*, 219 Mass. 210, 217 (1935). Here, to the contrary, the Letter of Intent is no more than an unenforceable "agreement to agree." *See Id.* In fact, the Letter of Intent expressly provides that the parties would "continue this conversation and reach an agreement in the month of January 2003." Further, in communications prior to the execution of the Letter of Intent, the parties explicitly agreed that each party needed legal advice before committing to a final agreement. Joy Aff at ¶ 25. It would be improper to make dispositive such a preliminary document where the parties explicitly stated that they intended to seek future legal assistance in reducing their understanding to writing.

authorship or copyright ownership.[5] While there is little doubt that agreements between the parties on billing credit may be a factor taken into account for the purpose of determining intent, it is not dispositive of authorship.[6] *See Thomson*, 147 F.3d at 203; *see also Caffey*, 409 F.Supp.2d 484 (looking to other evidence of intent even where parties had an agreement with advice of counsel stating that Caffey was author of the work).

Consequently, in *Maurizio*, even where every draft of the work at issue was unambiguously credited as "by" the primary author only, the putative joint author would have been able to defeat summary judgment by offering other evidence of the primary author's joint authorship intent, but for the statute of limitations that barred the claim. *Maurizio*, 84 F.Supp.2d at 459-460, 465. Joy has submitted evidence of the Defendants' joint authorship intent and, as such, summary judgment cannot be granted as to her joint authorship based claims in Counts I-II. In addition, by reason of the distinction between credit and authorship, summary judgment cannot be granted on Joy contract based claims, all of which concern authorship and copyright ownership.

### B. The Letter of Intent's billing credit is not dispositive because it is ambiguous.

The Defendants' argument for summary judgment rests upon paragraph two of the Letter of Intent being clear and unambiguous by its terms. Not only, of course, does this provision not address authorship, it is not by its language or terms susceptible of a single reading, as the Defendants urge. That provision provides:

---

[5] Moreover, the Letter of Intent pertains only to the November and December 2002 performances. In fact, its final paragraph states that "[i]f the play goes into further production, [the parties] will need to come up with another letter of agreement for such a project." Exhibit 4 to Joy Aff. Thus, in addition to only addressing credit, not authorship, the Letter of Intent singularly addresses credit for the November and December performances. Joy's claim, however, relates to subsequent use of the Script.

[6] Defendants point out that billing and credit can be *prima facie* evidence of a lack of intent to be joint authors. Defendants' Memorandum at p. 15. The concept of *prima facie* evidence, however, is of no consequence here. Joy does not argue that the Defendants have no evidence, rather that she presents sufficient evidence to demonstrate the presence of a genuine issue of material fact for trial.

18

> On published versions of the script *Venus de Mini Van, Mothers in the Breakdown Lane*, the credits will read: Written by Hilary Illick and Jennifer Krier, Original Production ***developed with and directed by Billie Jo Joy***. (emphasis added).

The Defendants read the first half of the provision only, arguing that the "written by" language dictates that the Defendants are the sole authors of the Script. The Defendants conveniently ignore not only that credit is not authorship, but also the statement that the Script was "developed with" Joy. In her affidavit, Joy states that, given the Defendants' acknowledgement of her contributions to the writing of the Script and the inclusion of the term "developed with," this paragraph was intended to recognizes her contributions as a joint author. Joy Aff. at ¶ 27. The credit language is not inconsistent with joint authorship because, as the discussions between the parties reflected, Joy's development of the Script was part of its authorship.

Indeed, Joy's reading of the billing credit to include herself as joint author is the better one because it harmonizes with the other provisions of the Letter of Intent, specifically paragraph five. That paragraph provides for substantial author royalties for Joy's contributions to the Script. Taken together, these provisions make sense, recognizing authorship in Joy and royalty payment for that contribution. The Defendants' reading cannot harmonize the royalty payments of paragraph five with the lack of authorship they suggest is provided in paragraph two. This makes no sense. The Defendants' solution is to invite this Court to strike paragraph five as unenforceable.[7] Clearly, the Defendants and Joy, when drafting paragraphs two and five, expected them to have some meaning in the definition of their relationship. The Defendants' strained solution to the incompatibility of royalty payments with non-authorship is not the intended reading, since it does not harmonize the provisions of the Letter of Intent.

---

[7] Defendants cite *U.S.* v. *Data Translation, Inc.*, 984 F.2d 1256 (1st Cir. 1992) in arguing that an "unintelligible" provision can be stricken from a "lengthy contract" if "severable from the remainder." Defendants' Memorandum at p. 11. Paragraph five of the Letter of Intent, however, is not severable because it informs the remainder of the agreement and must be read together with it. Moreover, paragraph five is not "unintelligible" in any way; nor is the Letter of Intent "lengthy." The Defendants' reliance on *McFarland* v. *Schneider*, 1998 WL Mass.Super. 136133, *40 (Mass.Super. Feb. 17, 1998), is likewise misplaced. That case concerns the reformation of a non-compete agreement due to public policy grounds. Here, there are no such public policy concerns.

In any event, the meaning of paragraph two, and its relationship to paragraph five, is to be established through parol evidence regarding the circumstances of the document's execution and the intent of its terms. Summary judgment is therefore inappropriate.

## CONCLUSION

Throughout Joy's time working with the Defendants, she wrote substantial portions of the Script and exercised decision-making authority. The Defendants repeatedly, and accurately, told Joy that she was writing the Script together with them and promised her substantial author royalties. This evidence is sufficient to create an issue of fact regarding the intent of the Defendants to jointly author the Script with Joy. The ambiguous language of the Letter of Intent does nothing to undermine any of Joy's claims. For these reasons, summary judgment must be denied with respect to each count of the Complaint.

Respectfully submitted,

/s/ Mark R. Vernazza
Mark R. Vernazza (BBO #661295)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
617.239.0100

Dated: August 25, 2006

### Certificate of Service
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 25, 2006.

_/s/ Mark R. Vernazza_