UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BILLIE JO JOY,

              Plaintiff,

    v.

HILARY ILLICK AND JENNIFER KRIER,

              Defendants.

Docket No.  05-11580

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS' STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff Billie Jo Joy ("Joy") submits this response to the

correspondingly numbered paragraphs of Defendants' Concise Statement of Material Facts by

defendants Hilary Illick ("Illick") and Jennifer Kreir ("Krier") (collectively, "Defendants").[1]

    1.      Undisputed for purposes of Local Rule 56.1.

    2.      Disputed.  Joy co-authored the script for the play *Venus de Mini Van, Mothers in the Breakdown Lane* (the "Script"), a copy or derivative work of which was published under the title "Eve-olution."  Joy Aff. at ¶¶ 11-18, 37.  Joy did co-found the performance studio Art & Soul, which is in Cambridge, Massachusetts.  Joy Aff. at ¶ 3.

    3.      Disputed.  Prior to collaborating with Joy in the spring of 2002, the Defendants had not completed any part of a play.  Instead, the Defendants had written several informal journal entries and a rough outline contemplating three acts and some scene titles.  The Defendants' journal entries spanned no more than ten pages and were written without respect to theatrical concerns.  Joy Aff. at ¶¶ 7-9.

    4.      Disputed.  Prior to collaborating with Joy in the spring of 2002, the Defendants had not completed any part of a play.  Instead, the Defendants had written several informal journal entries and a rough outline contemplating three acts and some scene titles.  The Defendants' journal entries spanned no more than ten pages and were written without respect to theatrical concerns.  Joy Aff. at ¶¶ 7-9.

---

[1] The evidentiary material Joy relies upon in disputing the Defendants' statements is drawn from her affidavit, which is filed herewith.

5.      Disputed.  The Defendants approached Joy and informed her that they had an idea for a play.  The Defendants asked Joy to direct the play.  The Defendants did not ask Joy to choreograph their play.  Joy Aff. at ¶ 4.

6.      Disputed.  The Defendants agreed to pay Joy a favorable rate of $60 per hour for her work as a director only.  The Defendants and Joy did not discuss choreography at all.  Joy Aff. at ¶ 6.

7.      Undisputed for purposes of Local Rule 56.1.

8.      Disputed.  During this period, Joy wrote the Script with the Defendants.  Joy Aff. at ¶¶ 11-15.  Joy contributed ideas and original text to the Script.  Joy Aff. at ¶¶ 13-15.  Joy also made final decisions regarding what would be included and excluded from the Script.  Joy Aff. at ¶ 13.

9.      Disputed.  The Defendants and Joy wrote large portions of the Script together during their collaborative sessions at Art & Soul.  Joy Aff. at ¶¶ 11-15.  Joy and the Defendants shared control of the Script during this time, although it was Joy who exercised final editorial judgment over the Script.  *Id.*  Joy cannot recall a single instance in which she contributed text or form for inclusion in the Script which was rejected by the Defendants.  Joy Aff. at ¶ 13.  Most of the text of the Script was written by hand at the Art & Soul collaborative sessions and entered into an electronic version of the Script on the home computers of the Defendants.  Joy Aff. at ¶¶ 13-15

10.     Undisputed for purposes of Local Rule 56.1.  However, in addition, Joy co-authored the Script and directed the performance, among other things.  Joy Aff. at ¶¶ 11-16, 19.

11.     Disputed.  Joy did not then request a share of future profits at this meeting because she and the Defendants had already discussed Joy's earning a share.  Instead, that discussion continued at this meeting.  Joy Aff. at ¶¶ 20-21.  Joy and the Defendants discussed that the share of future profits would compensate her for contributions as a co-author.  *Id.*  The $60 hourly fee, on the other hand, compensated Joy only for her work as a director.  *Id.*  The Defendants did not object to paying Joy an hourly fee in addition to a percentage share of future profits.  *Id.*  Also, upon information and belief, no work was done on the Script in the summer of 2002 after the staged reading.  Joy Aff. at ¶ 22.

12.     Disputed.  The meetings at Art & Soul lasted between three and five hours.  Joy Aff. at ¶ 22.  In addition, Joy and the Defendants made significant changes to the Script during these collaborative sessions.  *Id.*

13.     Disputed.  The Script did not change during this time because the Defendants were memorizing lines.  Joy Aff. at ¶ 23.

14.    Disputed. Joy did not receive notice of the Defendants' mailing a "poor man's" copyright. Joy Aff. at ¶ 24. Upon her return, Joy reviewed a version of the Script wherein the Defendants included a copyright page which did not mention Joy's name. *Id.* Joy immediately voiced her objection to the Defendants. *Id.* The Defendants told Joy that the copyright page should not be taken seriously. *Id.*

15.    Disputed. After Joy noticed the copyright page excluding her as an author (which the Defendants told her it was not intended seriously), she again desired to come to some temporary agreement as to the roles of the respective parties. Joy Aff. at ¶¶ 24-25. At the same meeting where Joy expressed a desire to make a some sort of agreement, the parties began drafting the temporary letter of intent that Joy and the Defendants ultimately signed ("Letter of Intent"). Joy Aff. at ¶ 25.

16.    Disputed. The Letter of Intent is ambiguous and does not contain a final or complete agreement of the parties. Joy Aff. at ¶¶ 25-32. The Agreement does not explicitly address the issue of authorship. Joy Aff. at ¶ 28.

       The first paragraph of the Letter of Intent reads "We three women, Billie Jo Joy, Jennifer Krier, and Hilary Illick all want to create a space where we're all three empowered." Joy Aff. at ¶ 26; Exhibit 4 to Joy Aff. In light of the Joy's contributions as an author of the Script, Joy Aff. at ¶¶ 11-18, and the Defendants' prior statements that they regarded her as an author and creator of the Script, Joy Aff. at ¶¶ 16-18, 26-28, 30, Joy understood this language to mean that all three women were authors of the Script. Joy Aff. at ¶ 26.

       The second paragraph of the Letter of Intent concerns credits for the November and December performances, stating "… the credits will read: Written by Hilary Illick and Jennifer Krier, Original Production developed with and directed by Billie Jo Joy." Given Joy's contributions as an author of the Script, Joy Aff. at ¶¶ 11-18, and the Defendants' prior statements that they regarded her as a co-author of the Script, Joy Aff. at ¶¶ 16-18, 26-28, Joy understood the "developed with" language to recognize her contributions in writing the Script and, consequently, her joint authorship. Joy Aff. at ¶¶ 27-28.

17.    Disputed. The Defendants told Joy on multiple occasions that she was writing the Script together with them. Joy Aff. at ¶¶ 16-18, 26-27, 30. It is further evidence of the Defendants' intent to be joint authors that Joy exercised decision-making authority over the Script, Joy Aff. at ¶ 13, and that she wrote substantial portions of the Script, Joy Aff. at ¶¶ 11-15.

18.    Disputed. Illick, Krier and Joy actually wrote the Script together. Joy Aff. at ¶¶ 11-18.

19.    Disputed. After Joy returned from abroad and noticed a copyright page in the Script (which the Defendants told her it was not intended seriously), Joy executed

the Letter of Intent, which recognizes her as an author of the Script. Joy also wished to continue discussion of her share of royalties, which recognized her contributions as a joint author. The Letter of Intent explicitly states that the parties would continue to discuss the division of future profits.

20.    Disputed. The Defendants orally agreed that Joy should receive a share of future profits. Joy Aff. at ¶¶ 17-18, 20-21, 31-32. The Defendants also so agreed in writing. Joy Aff. at ¶¶ 31-32. Moreover, Joy did was not a paid theatre consultant. She was, among other things, a joint author. Joy Aff. at ¶¶ 11-18. The Defendants did not, in fact, object to paying Joy an hourly fee at the same time as a royalty. Joy Aff. at ¶¶ 21, 29, 31.

21.    Disputed. By crediting the play as "written by" the Defendants and "developed with" Joy, the publicity for the play recognized Joy as a joint author. Joy Aff. at ¶¶ 26-28.

22.    Undisputed for purposes of Local Rule 56.1.

23.    Disputed. While Joy was compensated for her time as a director, Joy Aff. at ¶¶ 21, 29, she was not compensated for her contributions as a joint author. Joy Aff. at ¶¶ 35, 37.

24.    Disputed. Joy invited two producers to the November and December shows to scout the work for future production. Joy Aff. at ¶ 33. Then, after the November and December, 2002 performances, the Defendants sent Joy a letter dated January 13, 2003, stating, for the first time, that they did not consider Joy to be a joint author. In that letter, the Defendants reneged on their agreement to provide Joy royalties from future use of the Script. The Defendants also stated that they would no longer speak with Joy. Joy Aff. at ¶ 33.

25.    Disputed. The copyright does not belong to the Defendant alone. It belongs to Joy as well because she jointly authored the Script with the Defendants. Joy Aff. at ¶¶ 11-18. Also, the Defendants did not re-write the Script; they made only relatively minor changes to it. Joy Aff. at ¶ 34.

26.    Disputed. Although the Defendants listed only themselves as authors in this contract, they expressed an intent to be joint authors throughout their time writing the Script with Joy. Specifically, the Defendants told Joy on multiple occasions that she was writing the Script together with them. Joy Aff. at ¶¶ 16-18, 26-27, 30. It is further evidence of the Defendants' intent to be joint authors that Joy exercised decision-making authority over the Script, Joy Aff. at ¶ 13, and that she wrote substantial portions of the Script, Joy Aff. at ¶¶ 11-15. The Letter of Intent, and its provision giving Joy substantial author royalties, is also evidence of the Defendants' intent to be joint authors. Joy Aff. at ¶¶ 25-32.

4

27.     Disputed.  The Defendants did not re-write the Script; they made relatively minor changes to it.  Joy Aff. at ¶ 34.

28.     Undisputed for purposes of Local Rule 56.1.  However, as no discovery has been taken in this action, Joy reserves the right to take discovery on these issues and to dispute these facts in later proceedings.[2]

29.      Undisputed for purposes of Local Rule 56.1.

30.     Disputed.  The Letter of Intent addresses crediting for publication of *Venus de Mini Van, Mothers in the Breakdown Lane* only.  The Agreement is silent as to credits for publications of the Script under different titles.  Exhibit 4 to Joy Aff.

31.     Undisputed for purposes of Local Rule 56.1.  However, as no discovery has been taken in this action, Joy reserves the right to take discovery on these issues and to dispute these facts in later proceedings.

32.     Undisputed for purposes of Local Rule 56.1.  However, as no discovery has been taken in this action, Joy reserves the right to take discovery on these issues and to dispute these facts in later proceedings.

33.     Undisputed for purposes of Local Rule 56.1.  Joy automatically should have received a share of profits for her role as a joint author of the Script.


Respectfully submitted,

BILLIE JO JOY,
By her attorney,


/s/ Mark R. Vernazza
Mark R. Vernazza (BBO #661295)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199-7613
617.239.0100

Dated: August 25, 2006

---

[2] By responding to factual allegations regarding, without limitation, the Defendants' income, royalties or profits, Joy does not concede the relevance of those facts to the instant motion.  Indeed, the amount of money made or lost by the Defendants does not bear on the issue of joint authorship.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BILLIE JO JOY,

Plaintiff,

v.

Docket No. 05-11580

HILARY ILLICK AND JENNIFER KRIER,

Defendants.

## AFFIDAVIT OF BILLIE JO JOY IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Billie Jo Joy, depose and state as follows:

1.    I am over the age of 18, and make this Affidavit voluntarily and of sound mind, based upon personal knowledge of the matters described.

2.    I am an accomplished dramatic artist residing in Cambridge, Massachusetts. I have either written, directed, or acted in numerous dramatic productions over the course of more than 30 years. For example, I recently directed Harvard University's production of *The Vagina Monologues*, a project which involved students, faculty and community members. At the time, this was the most successful college theatrical production in the country. As a result, I was awarded a grant to continue my artistic vision. In 2004, I directed a group of prominent Bostonians in a production of *The Vagina Monologues*, which became Boston's first ever participation in the worldwide V-Day campaign to end violence against women.

3.    In 2000, I co-founded a performance arts studio in Cambridge named Art & Soul, which I currently co-manage. In addition to teaching weekly improvisation and yoga classes at Art & Soul, I use the studio for my own artistic and theatrical projects.

4.    I met Hilary Illick ("Hilary") and Jennifer Krier ("Jennifer") (collectively, the "Defendants") in or about January of 2002, when they approached me about helping with their "idea" for a play about their experiences as stay-at-home mothers. The Defendants told me they were aware of my reputation and work, particularly with *The Vagina Monologues*, and that they wanted me to direct their work. They did not ask about choreography. The Defendants told me that they had absolutely no prior experience with theatrical performances of any kind prior to contacting me. I agreed to meet with the Defendants.

5.    In or about March of 2002, the Defendants contacted me to set up a meeting regarding the play. We decided to meet at Art & Soul in the next few days. I assumed that a script had been written.

6.      When I met with the Defendants at Art & Soul for the first time on or about March 19, 2002, the Defendants did not bring any script. We then had a conversation in which the Defendants told me their goals were to (1) write a script, (2) perform it, and (3) have it reviewed by a newspaper of standing. The Defendants also conceded that they knew virtually nothing about dramatic arts. They did not ask about choreography at this meeting. At the Defendants request, I agreed to be compensated for my directing with a fee on the low end of my fee schedule ($60 per hour). I also charged the Defendants a reduced fee for using space at Art & Soul ($7 per hour). We discussed meeting to rehearse once or twice a week.

7.      After our initial meeting, but prior to our initial rehearsal, I repeatedly asked the Defendant's to provide me with a copy of their script. Two days before our first planned rehearsal, which was scheduled for on or about April 9, 2002, the Defendants had not provided me with anything. I again requested a copy of the script. At this time, the Defendants admitted that they had not yet written a script.

8.      The Defendants conceded that they had written only a few pages of script. I asked to see those pages prior to our rehearsal. On or about April 8, 2002, the Defendants delivered to my studio ten pages of journal entries, which were not arranged in the form of a play. They were referred to as "Mamalogues."

9.      These "Mamalogues" were written without respect to theatrical setting, dialogue, staging, lighting, or other dramatic concerns. In addition to these journal entries, the Defendants had produced only a crude outline listing three acts and some preliminary scene titles. This initial material did not resemble the play that was ultimately performed.

10.     On or about April 9, 2002, the Defendants and I met and agreed that the delivered text was insufficient to serve as a script.

11.     On or about April 9, 2002, the Defendants and I began drafting a script using creative techniques that I suggested. Under one creative technique, one of the Defendants would engage in spontaneous speaking about being a woman and a mother while I recorded and interpreted what was said. Under another creative technique, I encouraged one defendant to engage in spontaneous movement while thinking about being a woman and a mother while I would write down thoughts based on that movement. Using these and other creative techniques, we began writing, in a collaborative fashion involving each of us, what would eventually be performed as *Venus de Mini Van, Mothers in the Breakdown Lane* (the "Script").

12.     Until approximately early June of 2002, I met with the Defendants at Art & Soul twice a week for what became about three-hour collaborative writing sessions. Our efforts during this time were devoted predominantly to authoring the Script.

13.     During our collaborative sessions, I wrote large portions of the Script by hand. I wrote an entire scene, portions of scenes, and created the basic dramatic structure of the Script. During these collaborative sessions, I exercised decision-making authority as to what would be included or excluded from the Script. I dictated how text and scenes would be written and arranged. Given the Defendants' complete lack of theatre experience, they would continually defer to my judgment. I cannot recall a single instance in which I contributed content or form that was

2

rejected by the Defendants.

14.     At the end of each collaborative session, the Defendants would input the text we generated by hand at that session into a word processor on their home computers. The Defendants would then bring printouts of the evolving Script to our next collaborative session, where we would collaborate to change, edit and revise the Script together.

15.     As an example of this process, and as proof of my substantial contributions, I have attached versions of the Script in various stages (Exhibits 1, 2, and 3). Exhibit 1 is a page of draft text, written in my handwriting, as it was generated at a collaborative session. Exhibit 2 is a portion of the *Venus de Mini Van, Mothers in the Breakdown Lane* script and shows how text generated at the collaborative sessions was part of the Script. Exhibit 3 is an except from what the Defendants eventually called *Eve-olution*. It likewise shows my script contributions. Among the materials I have retained, these exhibits provide a concise and convenient example of my contributions, but they by no means depict my only contributions. I contributed an entire scene and portions of scenes during our collaborative sessions.

16.     The Defendants and I repeatedly discussed our joint authorship of the Script during our collaborative sessions in the spring of 2002. On multiple occasions before or during our collaborative sessions, I explicitly told the Defendants that I was no longer working solely as a director, but that I was writing the Script with them as well. In each instance, the Defendants said or acknowledged that we were writing the Script "together."

17.     Also during the spring of 2002, the Defendants and I discussed, on more than one occasion, that we would each take a percentage of any profits derived from the play. We did not discuss specific percentages at this time, although it was understood that we would each receive a share for our contributions to the Script.

18.     On one occasion during the spring of 2002, Hilary mentioned that she might show the script to an agent in New York. I informed the Defendants that we had not previously discussed publication, and that we needed to discuss what that would mean. Hilary replied, "We are definitely cutting you into the deal. You get a piece of the pie. When you are an old lady, you're getting royalty checks from this. You are part of this deal."

19.     On or about June 14, 2002, the Defendants and I put on a preliminary staged reading of the Script at Art & Soul.

20.     After the staged reading, during the summer of 2002, I met with the Defendants at my house to talk about future use of the Script. We again discussed sharing any profits from future use of the Script. I told the Defendants that I thought we were all authors of the Script, but that I would accept 25% royalties because the Defendants' lives were the subject of the play. The Defendants agreed with my statements that we were all authors.

21.     We discussed that I would receive royalties for my contributions as a joint author, not for my work as a director. My hourly fee, which the Defendants agreed to continue paying me, was only for my work as a director. I expressed a desire to reduce some agreement to writing and the

Defendants strongly agreed. Despite our intentions, neither the Defendants nor I reduced our agreement to writing at this time.

22.     We did not work on the Script for the remainder of the summer of 2002. The Defendants and I resumed our collaborative sessions in September of 2002, when we met approximately twice a week at Art & Soul for approximately three to five hour sessions. We continued to revise and refine the Script during this period. I continued to contribute original text to the Script. During these sessions, the Script was given the title *Venus de Mini Van, Mothers in the Breakdown Lane.*

23.     The Defendants and I planned performances of the Script at Art & Soul during November and December of 2002. While I was abroad in October of 2002, the Script was not changed because the Defendants were memorizing lines. Also during this time, the Defendants sent me a copy of a press release they had prepared to announce the performances. I was shocked to find out that the Defendants had not included my name anywhere within the press release and I objected to this.

24.     When I returned to Cambridge in November of 2002, I reviewed a copy of the Script which, for the first time, included a copyright page stating "Copyright 2002 [sic] by Jennifer Krier and Hilary Illick All rights reserved." This was the first time the Defendants referenced exclusive copyright ownership. I immediately questioned the Defendants about this page and my exclusion from it, pointing out that we had agreed many times that we were all joint authors. The Defendants told me that the copyright page should not be taken seriously and that they only inserted the page for their own enjoyment. The Defendants removed the page from the Script.

25.     Following this, in or about late November and early December of 2002, the Defendants and I discussed billing credits for the play. We eventually arrived at a letter of intent ("Letter of Intent") (Exhibit 4). The Letter of Intent was explicitly intended to serve as a placeholder until we completed the November and December performances. We agreed that none of us understood the legal significance of the document. We explicitly agreed that we would meet with an attorney following the performances to arrive at a binding contract with more specific terms. We set up a January 10, 2003 appointment with an attorney to discuss a formal contract.

26.     The first line of the Letter of Intent reads, "We three women, Billie Jo Joy, Jennifer Krier, and Hilary Illick all want to create a space where we're all three empowered." The language is the direct result of a conversation I had with the Defendants wherein we confirmed that the Defendants and I were equals in the creative process and that we would make decisions on future use of the Script by consensus. I understood this language to be consistent with my role as a joint author.

27.     The next line of the Letter of Intent states that "… the credits will read: Written by Hilary Illick and Jennifer Krier, Original Production developed with and directed by Billie Jo Joy." We discussed that the "developed with and directed by" language was intended to recognize (1) my contributions to the Script, and (2) my direction of the staged version to be performed in November and December of 2002. During discussions of this language, we all acknowledged that the Defendants and I were all "creators" of the Script.

4

28.     We did not use the term "written by" to be synonymous with or exclusive to authorship. The Defendants and I did not use the word "authored" in the agreement at all, nor did we discuss it. At no time during discussions about the Letter of Intent did the Defendants express that they did not consider me a joint author of the Script.

29.     The Letter of Intent also memorialized the payment of an hourly fee for me to "direct the play *Venus de Minivan*, guide Krier and Illick in authentic movement, stage the scenes, lead voice work, and teach acting." My hourly fee compensated me for this work alone, not for my authorship.

30.     The Letter of Intent separately acknowledges that "Billie Jo Joy contributed script input." While a draft of the Letter of Intent initially read that I "offered script input," I informed the Defendants that this was inaccurate, and that I had actually made substantial contributions to the Script. The Defendants agreed and Hilary changed "offered" to "contributed" in her handwriting.

31.     As the Letter of Intent reflects, the Defendants and I again agreed that I would receive a substantial author royalty for my contributions as a joint author. The Letter of Intent states that my share of profits was compensation for my work with Hilary and Jennifer in "developing the script." This use of "developing" recognized me as an author.

32.     Since we had not yet agreed on the precise percentage of future profits each author would receive, we left the Letter of Intent indefinite as to that percentage and included language stating that it was our intention to receive advice on a formal agreement. The Letter of Intent reflects our intention to continue discussion of its terms at least until January 2003. We also recognized, in the last sentence of the Letter of Intent, that if the Script were to be used beyond the November and December performances, that we would need to come up with an agreement with respect to that use. We planned to discuss this at the January 10, 2003 meeting with an attorney.

33.     The performances in November and December were quite successful. At my request, two producers attended the show to scout for future production. The Defendants encouraged me to contact these producers. After performances of the Script concluded in early December of 2002, I contacted the Defendants about our scheduled meeting with an attorney. The Defendants did not want to attend this meeting. On or about January 13, 2003, the Defendants wrote me a letter telling me, for the first time, that they did not regard me as a joint author of the Script, and that they did not think I was entitled to any profits from future use of the Script. The Defendants expressed that they did not want to speak with me further.

34.     I did not work with the Defendants on the Script after January 13, 2003. In October of 2004, I learned, for the first time, from a newspaper article that a theatrical performance of the Script was being performed in an off-Broadway production under a different name, *Eve-olution*, at the Cherry Lane Theatre in New York City. I believe that the Defendants licensed the Script to the Cherry Lane Theatre.

35.    I was not included as an author in any advertising, promotional materials, or newspaper articles concerning the production of *Eve-olution*. I have not received any money, publicity, or opportunities from the licensing of the Script or performance of *Evo-lution*.

36.    In or about March of 2005, I learned, for the first time, that the Defendants had registered a copyright for the play *Venus de Minivan: Mothers in Overdrive*. The copyright registration provides that this work is a "previous or alternative title" of *Venus de Mini Van: Mothers in the Breakdown Lane.*

37.    In or about May of 2005, I also learned that the Defendants published a script entitled *Eve-olution*. This publication contains substantial text I contributed to the Script, but I was not listed as an author. I have not received any monies, publicity, or opportunities in connection with its publication.

Signed under the pains and penalties of perjury this 24th day of August, 2006.

Billie Jo Joy

EXHIBIT 1

⑩ 17

## Next move (o nun)

Staxato f clenching, animal
crowding, coping thirst
no, no, no! no! no! no! covering face
against wall
trying to get away
backed into corner
help me! help! help! dropping
okay, okay, alright, covering, smothering

talks
to kids  Hi, how was school today?
How was Christine at picking you up?  Ⓔ
I'm so much getting better, I think.

(back to wall)

Dr. Levy, I'm sorry to call you at home  Ⓔ
my whole body is falling apart
I'm so afraid. My whole body hurts
I'm falling apart. I need your help. I need
your help. Remember when you said
awful disease maybe it's stress, do you
think it's stress? you said it's not nervous gratification.
I want you to be
right so badly. Just the idea of it  that
makes me relaxed. That I can  we could call it stress
take medication that I'll feel better
I want you to be right. That there's hope. That' I'll feel
laying down. I'm going to try it, take those  better
pills
Ⓖ
Hi you guys, how was school. You know what
can you guys in I just it's so
blankets  cozy in here. you can stay in
I'm right in the This room read T.V. you can stay in
middle of a really great snooze.  What? it erupted.. ×2  mead

Dr. Levy, I love you. Not a stalker.
remembering you when I write you.
The kids in their pajamas.
going to school.

Hil — sniffles
weepy
meeping
allergic

EXHIBIT 2

I'm having new kinds of ideas.

I'm nervous about what's beginning to occur to me.

    [Unsure, unsteady voice, maybe a whisper]

I might be finding out
that I don't want to go back to academia.

*Jenny clears yellow chair*


**Fade out**

**Jenny moves stools SR, strikes books, exits**

*★ blue blankets*

**Hilary:**


*Very dim wash + spot*

    **Enters in darkness in white nightie, headband;
In "bed" against wall SL, 2 navy blankets**

    [Shaky, weak but agitated]

~~I'm lying in bed, and all my joints ache.~~
I've been here for weeks now, coming up on a month.

~~I can't swallow without gagging.~~
I'm losing weight.

I feel exhausted,

    [Stand up, weak, against wall]

*bring wash up here*

but I can't sleep.
~~Nights pass.~~

    [Agitated bird, flitting from stool to chair, finding nowhere to alight]

with me going from bed to bed, to couch,
trying to find somewhere,
anywhere,
to fall asleep.

    [Physicalize hands--stare at the trembling, unbendable joints. Fear builds.]

Venus De Minivan, p. 19

It's getting worse.

**[FEEL the panic, looking at trembling hands, trapped-animal panic on lines]**

I can't move my hands!
I can't sleep!
My  body's  not  working!

**[Palms up on floor, hands trembling, propel self on knees and wrists around stage delivering lines in panic]**

No!
       No!
              No!
This can't be happening to me!

I can't fulfill a thing I'm supposed to do.
I can't take the kids to school, I can't take them...
anywhere.
I can't make deadlines
       of articles I'm supposed to be writing,
I can't–

**[Crawl under blanket on line]**

I don't want anyone to see me like this.

**[Stay under blanket]**

All I can do wait by the phone.

I'm waiting for the doctor to call.

I've had so many blood-tests,
for all these diseases I don't want:
Leukemia.
Rheumatoid arthritis.
Lupus.

I'm t–
I'm t–
I'm terrified.

**[One hand reaching up from blanket, lifeline to God]**

Venus De Minivan, p. 20

*Keep voice projecting*

Help.

[Come out from under blanket, self-soothing, smoothing, getting ready for kids]

Okay, okay.

The kids are home now.
I hear them
running up the stairs.

[Smooth face, hair wipe eyes.
Look SR for kids coming into room, talk to them with eyes closed]

Hi. Hi, you guys.
How was your day–how was Kristina picking you up?
I'm so–

[Voice breaking up, "Oh my God, I can't do this"/GUILT]

–happy you're home.
I love you so much.

[A little panicky, like: they've got to get out of here]

Okay, so.
Why don't you go downstairs and play with Kristina okay?
She'll give you snacks,
and then Daddy will be home.
And I'll be here the whole time, okay?
Okay? So,

[Shooing hand gesture]

see you later.
Close the door please.
The door.
Thanks.

[Without missing a beat, lie down behind stools, looking out from under one of
them, on phone–"phone" under cheek]

Hello, Dr. Levine?
I'm sorry to call you at home, I know it's your day off--it's Hilary--

*don't block mouth*

Venus De Minivan, p. 21

I got your number from information because--

     **[Inhale, speak in rushed exhale]**
Dr. Levine, I'm falling apart.
Remember you said maybe it's stress?
Do you think this really could   all   just be stress?
I want you to be right so badly.
Then I can take medication.
I want to try it.  I want to.  Take those pills.

     **[Start relaxing, hands unfurl, move in slow arc towards SL during "list"]**

Paxil..Serzone...Trazadone...Xanax...Clonapin...
Zoloft...Selexa...Prozac...Luvox...Paxil...

     **[Snuggle down IN LINE WITH THE BACK WALL.  Sleep in peace;**
     **Groggily greet "kids", through squinting eyes.]**

Oh, hi.  Hi you guys.  I'm so glad you're home...
I'm right in the middle of a really great snoozer.
I love you...I love you?...did you?...did you thank Kristina for driving you home?...
Stay here,...stay in my bed....do your...homework here...
or even...want to watch t.v?...right here, stay right here...snacks...
snacks in my bed...are...okay, too...I love you....I love you...
I'm just going to keep snoozing...

     **[Snuggle in a little more to dreamy delirium,**
     **slurring a little, sort of going in and out]**

Dear Dr. Levine,
I love you..
I don't want you to think I'm a stalker...or anything...
it's just that you saved my life...
     you gave me my life back...
I'm sleeping...and sleeping...sleeping the sleep of the gods...
and that babysitter I hired is still doing pick-up time...so I get to stay in bed...
Our whole family is living out of my bed...
I don't want this phase to end yet...
     I know it can't last forever...
          but I want it to keep going a little longer...
             just a little...

     **[Stay asleep on stage during Jenny's next Mamalog]**



# EXHIBIT 3

but I haven't had much time for research lately.
I nurse Jamie whenever he wants.
I rub oils and lotions all over his little body.
He has made my pace so…languid.

People say your body never recovers from pregnancy
especially after thirty-five.
But I feel more sensual now than ever.

With my first two babies, I was so busy, I went numb.
But in the state I'm in now
I just feel so open
I feel so connected.
It's like I'm finally in my body,
and the only research I want to do now is about my body.
I read about what to eat, how to breath, move, stretch.

*(Vulnerable, confessional.)*

I'm learning how to feel.

## LIZA:

*(TIME: About two years after the previous nursing newborn twins scene.*
*LIZA should be lying down, obviously ill, wrapped in a blanket at the beginning of this scene.)*

*(Weak and ill.)*

I'm lying in bed, and all my joints ache.
I've been here for weeks now, coming up on a month.
I can't fulfill a thing I'm supposed to do.
I can't make deadlines of articles
I'm supposed to be writing.
I can't even take the kids to school.
Philippe has to do the whole morning routine,
Get all four kids fed and out the door.

I can't swallow without gagging.
I'm losing weight.
I feel exhausted,
but I can't sleep.
Nights pass,

with me going from bed to bed, to couch,
trying to find somewhere,
anywhere,
to fall asleep.

*(Time is passing—days, another week—and her condition is worsening; hands now appear severely arthritic, almost like rigor mortis.)*

It's getting worse.

I can't move my hands!
My  body's  not  working!

I don't want anyone to see me like this.

All I can do is wait by the phone.
I'm waiting for the doctor to call.
I've had so many blood-tests,
for all these diseases I do not want:
Leukemia. Rheumatoid arthritis. Lupus.

*(Tone of paralyzing rather than hysterical fear.)*

I'm terrified.
Oh God. Help.

*(Liza hears something offstage--her kids are home from school—she visibly attempts to pull self together.)*

Okay, okay.
The kids are home now.
I hear them
running up the stairs.

*(Speaking to kids, trying in vain to hide despair from them.)*

Hi.  Hi, you guys.
How was your day?
Okay, so.
Why don't you go downstairs and play with Kristina okay?
She'll give you snacks,
and then Daddy will be home.
And I'll be here the whole time, okay?
Okay? So,

37

*(Gestures towards door.)*

see you later.
Close the door please.
The door.
Thanks.

*(Crawls to telephone and shakily dials number. Voice is shaky and scared.)*

Hello, Dr. Levine?
I'm sorry to call you at home–it's Liza–
Dr. Levine, I'm falling apart.
Remember you said maybe it's stress?
Do you really think this could all just be stress?
I want you to be right so badly.
Then I can take medication.
I want to try it. I want to.

*(Voice indicates release, relaxation, as if medicine is already starting to work.)*

Take those pills.

Paxil...

Paxil.

*(Sleepy, relaxed, loving tone—she is speaking to her kids again, home after school.)*

Oh, hi. Hi you guys. I'm so glad you're home...
I'm right in the middle of a really great snoozer.
Did you thank Kristina for driving you home?...
Stay here...stay in my bed....do your homework here...
or even...want to watch t.v?...right here, stay right here...want to bring
your snacks up...eat your snacks in my bed...
I'm just going to keep snoozing...

*(Liza snuggles in a little more to dreamy delirium, slurring a little, sort of going in and out.)*

Dear Dr. Levine,
I love you.
I don't want you to think I'm a stalker...or anything...
it's just that you saved my life...
I'm sleeping...and sleeping...sleeping the sleep of the gods...
Our whole family is living out of my bed...
I don't want this phase to end yet...

I know it can't last forever...

        but I want it to keep going a little longer...

              just a little...


## ALISON:

*(Sincere, enthusiastic, unself-conscious about potentially coming across as New Age-y. Alison approaches the issue of physical and spiritual wellness with frank intellectual fervor.)*

I read about this really cool Aryuvedic treatment.
You're supposed to rub Sesame Oil
on your whole body, everyday,
If you do it regularly,
it will make your cells healthier and your skin softer.

One morning I wake up and think,

*(Tone of voice is determined. She's ready to undertake the experiment.)*

All right, I'm going to do that oil thing today.
So I go down to the kitchen and get some Sesame Oil.
I take it up to the bathroom and

*(Alison rubs arms and legs as if coating them with oil.)*

start to rub it on my arms and legs.

*(Pause.)*

It smells really strong.
Wait a sec - they probably didn't mean Szechuan toasted sesame oil.
So I start to wash it off.
Leo comes in and says,

*(Leo's voice.)*

"Why does it smell like Chinese food in here?"

*(Alison—to audience)*

I better go back to my research.

39

# EXHIBIT 4

**Agreement between Artists Jennifer Krier, Billie Jo Joy, and Hilary Illick**
**For production of *Venus De MiniVan***
**November/December 2002**
**Art and Soul, Cambridge, MA**

- We three women, Billie Jo Joy, Jennifer Krier, and Hilary Illick all want to create the space where we're all three empowered.

- On published versions of the script *Venus de Mini Van, Mothers in the Breakdown Lane* the credits will read: Written by Hilary Illick and Jennifer Krier, Original Production developed with and directed by Billie Jo Joy.

- Through December 2002 Jennifer Krier and Hilary Illick are hiring Billie Jo Joy at the rate of $60/hour to direct the play *Venus de Minivan*, guide Krier and Illick in authentic movement, stage the scenes, lead voice work, and teach acting. During her paid hours, Billie Jo Joy offered script input. Hilary Illick and Jennifer Krier agree to pay for 32 hours between November 13th and December 14th. If the need arises for additional hours, they will need to be negotiated between Jennifer Krier, Hilary Illick and Billie Jo Joy.

- Proceeds from the five scheduled performances will go to Hilary Illick and Jennifer Krier (Venus De Mini Van Collaborative for Creative Expression) to offset production expenses.

- Jennifer and Hilary intend to send the script to an agent in New York to have it published. Jennifer Krier, Hilary Illick and Billie Jo Joy agree to meet in the month of January to create a contract to determine the percentage profits from the published script. It is the intention of Hilary Illick, Jennifer Krier, and Billie Jo Joy to recognize, in terms of percentages, the valuable creative contributions that have brought this work into being. As of November 14, 2002 we are discussing a percentage range of 12.5% - 25% of profits for Billie Jo Joy for her work as director and assistance with Hilary and Jennifer in developing the script--the former figure proposed by Hilary Illick and Jennifer Krier, and the latter proposed by Billie Jo Joy. We need to seek advice on such a contract and understand the terms and definitions of net and gross profit for this endeavor. We will continue this conversation and reach agreement in the month of January 2003.

- If the play goes into further production Hilary, Jennifer, and Billie Jo will need to come up with another letter of agreement for such a project.

Billie Jo Joy                    Hilary Illick                    Jennifer Krier